UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_______________________________

JAMES F. MILES and
THERESA B. MILES,
Plaintiffs,

Civil Action
No. 07-11722-NMG

V.

September 29, 2009,

GREAT NORTHERN INSURANCE COMPANY,

Defendant.
_______________________________

TRANSCRIPT OF TESTIMONY OF JAMES J. TAGLIENTE

JURY TRIAL DAY 2

BEFORE THE HONORABLE NATHANIEL M. GORTON

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
617-737-4410

APPEARANCES:

FOR THE PLAINTIFFS:

ROGER J. BRUNELLE, ESQ.
Fletcher, Tilton & Whipple
370 Main Street
12th Floor
Worcester, MA 01608
508-459-8016

FOR THE DEFENDANT:

MARK W. CORNER, ESQ.
Riemer & Braunstein LLP
Three Center Plaza
Boston, MA 02108
617-880-3418

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Nathaniel M. Gorton, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on September 29, 2009.)

* * * * * * * * *

THE COURT: Good morning, counsel.

09:53 MR. CORNER: Good morning, your Honor.

MR. BRUNELLE: Your Honor, I apologize for being late.

THE COURT: I understand the reason. I was involved in the same traffic tie-up, although not as seriously apparently.

Are we ready to proceed?

MR. BRUNELLE: I am, your Honor. Mr. Tagliente will be my next witness.

THE COURT: Call your next witness.

MR. BRUNELLE: James Tagliente.

09:53 JAMES J. TAGLIENTE, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK: You may be seated.

Please state your name for the record, spelling your last.

THE WITNESS: James J. Tagliente, T-a-g-l-i-e-n-t-e.

DIRECT EXAMINATION

BY MR. BRUNELLE:

Q. Good morning, Mr. Tagliente.

A. Good morning.

Q. My name is Roger Brunelle, I represent Theresa and James Miles.

By whom are you employed, sir?

A. Chubb & Sons, a division of Federal Insurance Company.

Q. Okay. And what is your current position with Chubb & Sons?

09:54

A. Property general adjuster.

Q. And what is the relationship between Chubb & Sons and Great Northern Insurance Company?

A. Chubb & Sons is a parent organization of insurance companies, and Great Northern is one of the underwriting companies of that group.

Q. Okay. And what is -- I'm sorry, I may have asked you this already, what is your current position with Chubb & Sons?

A. Property general adjuster.

09:55

Q. As part of your duties as property general adjuster do you sometimes adjust claims of insureds of Great Northern Insurance Company?

A. Yes, sir.

Q. And in October of 2004 did you hold the same position, sir?

A. Yes, I did.
Q. And in October of 2004 were you assigned to be the adjuster for a fire loss that had occurred at 1 Running Stream Road in Rehoboth?
A. Yes, I was.
Q. And as part of your duties as an adjuster -- strike that.
At the beginning of your involvement in the claim were you aware that the fire marshal had indicated that the fire had been intentionally set?
09:55 A. I learned that upon arriving at the site.
Q. Okay. And did you at some point assign a man named Charles McIntyre to investigate the claim?
A. Yes, sir.
Q. And Mr. McIntyre's role at that time was what?
A. He was a special investigator with the Chubb Insurance group.
THE COURT: Mr. Tagliente, if you will pull that microphone in a little closer.
THE WITNESS: Sorry about that.
09:56 BY MR. BRUNELLE:
Q. I take it Charles McIntyre is not assigned to investigate every fire loss that occurs, correct?
A. Correct.
Q. The fire loss that he's assigned to investigate, are those where there might be some indication that the insured might

have been involved to cause the fire or there might have been some fraud on part of the insured; is that a fair statement?
A. That's a start.
Q. And you know, Mr. Tagliente, that Great Northern's policy would cover an intentionally set fire as long as the insureds had not participated in causing the fire, correct?
A. The exclusion specifies an insured's involvement, yes.
Q. But the fact that it was intentionally set is not an exclusion in and of itself, correct?
09:56 A. No, it requires the insured's involvement.
Q. Go ahead, I interrupted you.
A. It's a specific exclusion that requires the insured's involvement.
Q. Okay. Now, as part of your responsibility or as part of what you did as the adjuster in this claim, you issued a number of advance payments to Theresa and James Miles; is that correct?
A. Yes, we did.
Q. All right. And if you have the exhibit book in front of
09:57 you there, sir, and I think you were here yesterday when I was questioning Mr. McIntyre, but let me just explain to you that the exhibits are all numbered. There are tabs to help you find the number of the exhibits, and at the top right-hand corner each page is numbered. So I will use that to help call your attention to the document I want you to look at.

So would you turn now, please, to Exhibit Number 11, sir. And this is a document entitled Advanced Payment Agreement.

And if we turn to the second page of the document, which is page number 148, it indicates that this document was signed by Theresa Miles on November 12th of 2004; is that correct?

A. Yes, sir.

Q. All right. And this is an agreement that you had asked Mrs. Miles to sign at the outset of the adjustment of the claim; is that correct?

09:58

A. No.

Q. That's not correct?

A. No.

Q. Okay. Who asked Mrs. Miles to sign this?

A. I asked both Mr. and Mrs. Miles to sign it.

Q. This is a document you prepared, isn't it, sir?

A. Yes, sir.

Q. And Mr. Miles' name doesn't appear on this document, does it?

09:58

A. No, this is -- can I have a moment, please?

Q. Sure. Take your time.

(Pause.)

A. This is the redacted version that Mr. Miles prepared.

Q. You're saying Mr. Miles redacted this version?

A. Yes.
Q. Okay. All right. So at some time you're saying you asked both of them to sign an Advanced Payment Agreement, and did you ever get an Advanced Payment Agreement signed by both of them?
A. I'm not exactly sure.
Q. Okay. All right. In any event, if you turn next, please, to Exhibit 12, and this is a photocopy of a check with the date of -- the issue date of 11/22/04, that's up at the top right-hand corner. Do you see that?
09:59 A. Yes, sir.
Q. All right. And then if I look across the left side at the top where it says -- on the line that's labeled "claimant," it says "Miles, dwelling," correct?
A. That's what it says, yeah.
Q. And this check was issued for the amount of $25,000, and it was made payable to James F. Miles and Theresa B. Miles, correct?
A. Yes, sir.
Q. All right. And if you turn next, please, to Exhibit 13,
09:59 this is another check. This one was issued on 2/2/05. And again, it was for the amount of $25,000 to James F. Miles and Theresa B. Miles. And at the top on the left it says, "Claimant Miles, (ALE)." What does "ALE" mean to you, sir?
A. Additional living expenses.
Q. Okay. And that was something that was covered under the

Mileses' -- the policy that Great Northern had issued to the Mileses; is that correct?

A. Yes, sir.

Q. And just to help his Honor to understand what that might mean, let's turn to the policy which is Exhibit 9 and turn to page 90 in that policy. And in about a third of the way down the page there's a section there that's entitled, Additional Living Expenses, and it says, in part, "As described below under certain conditions when your house cannot be lived in, we

10:01 provide coverage for additional living expenses which consist of extra living expenses, loss of fair rental value, and forced evacuation expenses. There is no deductible for this coverage." And then it goes on to explain further as well, correct?

A. Yes, sir.

Q. And am I correct, sir, that there's no dollar limit on that coverage in the policy; is that correct?

A. There is no dollar limit.

Q. That's correct, what I said?

10:01 I'm having a little trouble hearing you, Mr. Tagliente.

A. There is no dollar limit on it.

Q. Thank you, sir.

If you go back, please, to Exhibit 14, this is another check issued on February 2, 2005, the same as the other check

was issued, and again, it's for $25,000. And this is to James Miles and Theresa Miles, and this is issued for dwelling coverage; is that correct?
A. It's an advance payment.
Q. It's an advance payment for dwelling, correct?
A. It's an advance payment.
Q. Sir, it says "dwelling" on there, correct?
A. It says in parenthesis dwelling, yes.
Q. And that means it's an advance payment for the dwelling
10:02 coverage, doesn't it?
A. In settlement of advance payment under terms of the loan.
Q. That's correct, sir, but I'm not asking you that. I'm asking you, it says "dwelling" on there, doesn't it?
A. Yes.
Q. And "dwelling" means the building loss, correct?
A. It's an advance, yes.
Q. Sir, can you just answer the question I'm asking you?
The fact that this says "dwelling" means that it was an advance payment on the building loss, correct?
10:02 MR. CORNER: Objection, asked and answered, I believe, twice.
THE COURT: Overruled.
A. It's an advanced payment, sir.
Q. Is it an advance payment on the building loss, yes or no?
A. It's an advance payment towards the fire loss.

Q. On the building?
A. That line says, claimant Miles parenthesis dwelling.
Q. Sir, you understand that this policy had various coverages, correct?
A. Yes, sir.
Q. And some of them had different limits of liability, correct?
A. Yes, sir.
Q. And one of the coverages it has was for building loss,
10:03 correct?
A. Yes.
Q. For the dwelling, correct?
A. Yes.
Q. And this payment was issued under that coverage, wasn't it?
A. It's an advance payment.
Q. It's an advance payment under the dwelling coverage, isn't it, sir?
A. It's an advance payment against this policy.
10:03 Q. Against this policy under the dwelling coverage?
A. I don't understand your question. We keep going in circles.
Q. Sir, you issued this check, didn't you?
A. Yes, sir.
Q. And the word "dwelling" appeared on it because you issued

it, isn't it? Isn't that true?
A. That company issued it, but, yes.
Q. Sir, who is responsible for putting the word "dwelling" on this check?
A. That comes off the accounting system.
Q. So somebody in your company, whether it was you or not, issued this check and issued toward the dwelling as an advance payment as a dwelling loss?
A. At the time this was issued it was issued off the dwelling line.
10:04
Q. Thank you, sir.
Now, let's turn to Exhibit Number 15, please. This is another check in the amount of $25,000. This is dated 4/28/05, and am I correct there's nothing on the face of this check that will tell us under which portion of the policy it was issued?
A. In settlement of partial advance payment.
Q. Right. But it doesn't say under which part of the policy was issued, does it?
A. No, sir.
10:04
Q. Okay. If you turn to Exhibit 16 next, sir, this is another check, and again -- sorry, I may not have said this, but Exhibit 15 was payable to both James and Theresa Miles; is that correct?
A. Yes, sir.
Q. Exhibit 15.

Okay. Now I'm turning forward to Exhibit 16, please. And this is another check -- now, this one is dated 5/31/05, and this one is for the amount of $50,000, five-zero thousand dollars, correct?
A. Correct.
Q. And it's payable to James Miles and Theresa Miles. And at the top it says, "claimant Miles (ALE)," correct?
A. That's what it says, yup.
Q. So this check was issued as an advance payment on the 10:05 additional living expenses coverage, correct?
A. It was an advance payment towards their fire loss.
Q. Towards their additional living expenses, sir, right?
A. It was issued off the coverage line of ALE in our system, yes.
Q. Okay. Thank you, sir.
If you turn next to Exhibit 17, this is another check, this one is dated 6/23/05 for the amount of $50,000, and it is again payable to James and Theresa Miles. And am I correct there's nothing on the face of this check that would tell us 10:06 under which coverage it was issued?
A. This is only half of the document.
Q. Okay. But on the document we're looking at doesn't tell us under which coverage it was issued; is that correct?
A. Document 000154?
Q. That's right. That's correct, sir?

A. That's half the check, yes.
Q. Okay. So this half of the check doesn't tell us under which coverage it was issued, does it?
A. Advance payment via loan agreement or loan receipt.
Q. Sir, do you understand what my question is when I'm asking you about which part of the policy a check was issued under?
A. I certainly understand what you're asking me.
Q. Okay. Can you answer that question? Does this check tell us under which part of the policy it was issued?
10:07 A. No.
Q. Thank you, sir.
If you turn next, please, to Exhibit 18, this is another check, this one is dated August 22, 2005 for the amount of $50,000, again payable to James Miles and Theresa Miles. And down underneath the amount in words, in the middle of the check it says, "In settlement of advanced payment under loan agreement-contents." Do you see that?
A. Yes, sir.
Q. So this check here, this $50,000 check was issued under
10:07 the contents portion of the policy, correct?
A. It was an advance payment against the loss.
Q. Against -- advance payment against the contents portion of the policy?
A. That's the description.
Q. That's what it says. Okay.

And, sir, I think we can agree that was the last payment that your company issued. Do you know that? Let me ask you that.
A. I do not know that.
Q. You're not sure. Okay.
I think it's a matter of record. I think it's agreed that there was a total of approximately -- of exactly $250,000 advanced to Theresa and James Miles by your company. Do you agree with that?
10:08 A. I do.
Q. Thank you. All right. Now, sir, in addition to issuing the advance payments directly to James and Theresa Miles, your company also made some payments to the first mortgagee and other mortgagees on the property, correct?
A. Yes, sir.
Q. Would you turn, please, sir, to Exhibit 19, and within the tab of 19 you'll see an exhibit that's labeled 19 A at page 156-A. Do you see that?
A. Yes, sir.
10:08 Q. Okay. And in the middle of the page there's -- it looks like an e-mail to Jim that says, "Speak with John Tener and proceed to adjust the mortgagee claims." Do you see that?
A. That's not an e-mail, but, yes, I do see that.
Q. It's not an e-mail? What is it?
A. It's what we call a work station note.

Q. Okay. And it's a way of communicating -- the author of this was Tony Schiavone?
A. Tony Schiavone.
Q. That sounds better. Tony Schiavone is the author of that note, correct?
A. Yes.
Q. And the Jim that's addressed to is you, correct?
A. Yes.
Q. And the date of this notice is 02/03/05?
10:09 A. Yes, sir.
Q. You said that it's a work station note, is that what you said it is?
A. Yes.
Q. And a work station note is a way of Mr. Schiavone communicating to you, correct?
A. It's an electronic file note, yes.
Q. Is it kind of similar to an internal e-mail, something like that?
A. Each claim has its own electronic file and --
10:10 Q. In any event, this was a message conveyed to you from Mr. Schiavone, correct?
A. Yes.
Q. And then above that I see a -- this is -- it's called a file note or work station note, the subject of it is first mortgagee People's Savings Bank, and the author is you, Jim

Tagliente. And the note says, "After speaking with John Tener" -- by the way, John Tener was the attorney who was representing Great Northern with regard to this claim?
A. Yes, sir.
Q. "After speaking with John Tener I placed a call to People's Savings Bank and left a message for loan manager Richard Hess. I await his call back."
And that note is written on March 3, 2005, the day after Mr. Schiavone wrote the note that we just looked at a moment ago, correct?
10:10
A. Yes, sir.
Q. Okay. Now, if you turn to the next page, please, this is Exhibit 19 B, and 19 B is a letter addressed to a Dick Hess, H-e-s-s, at People's Savings Bank, and it goes over onto the next page and it appears to be a letter from you to Mr. Hess; is that correct?
A. Yes, sir.
Q. And if we turn to the next page, which is page 156-B-1, down at the bottom you wrote this letter to Mr. Hess, Our records show a mortgage from Theresa B. Miles to Bank of Taunted now held by People's Saving Bank located in Brockton, Massachusetts dated November 22, 1993 in the original principal amount of $216,000 recorded with Bristol North District Registry of Deeds at book 5775, page 164, and that said mortgage was current as of June 1, 2002 with a principal amount
10:11

of $193,462.86. Please confirm that status of this loan and the principal balance, and then please respond in writing to you.

First of all, sir, do you know how it was that you knew what the principal amount had been on June 1, 2002? Where did you get that information?

A. I don't recall at this point. A lien search or a title search.

Q. Now, sir, if you turn to the next page, this is Exhibit 19 C, page 156-C, down at the very bottom of the page, the last thing on the page is -- it says, "File note to Scott, authority to settle mortgage holders." Do you see that? Right at the bottom of the page, sir.

A. Yes, sir.

Q. Okay. And that -- this is a file note dated 5/17/05; is that correct?

A. Yes, sir.

Q. Okay. And if we turn the next page, to page 156-C-1, this is the actual file note that begins on the bottom of the page before, right?

A. Yes.

Q. And this is a file note, the author is Jim Tagliente. That's you, correct?

A. Yes, sir.

Q. Okay. And it begins, "Scott, per the attached, the

insured's first mortgage holder, Webster Bank, has replied to John Tener's claim with a claim for the insurable interest in the property totaling $184,284.68."

Now, was it your understanding that Webster Bank was the successor in interest to the People's Savings Bank to whom you had written the letter, which was Exhibit 19 B?

A. That's what I recall today.

Q. That's what you recall, okay.

So it was your understanding that Webster Bank was

10:14 basically asking to get paid off on their mortgage, correct?

A. They had a mortgage interest in the property.

Q. Right. And it was roughly $185,000 that they were claiming they wanted to get paid by Great Northern, correct?

A. Yes, sir.

Q. Okay. And Theresa Miles didn't ask you to pay that mortgage off, did she?

A. I don't believe so.

Q. Okay. And if I'm going -- I'm back on page 156-C-1, sir, in the second paragraph you wrote, "We have not actually

10:14 received the insured's claim for the house reconstruction via their public adjuster. We have made a formal demand for a Proof of Loss over 90 days ago and granted one extension. It would appear we have the data need to support the settlement of the mortgage holder's claims up to the amount of our consultants', Brown and DuPont, evaluation dated 12/07/04

totalling 583,822.92 with" -- it looks like "444,364 in debris removal." Do you think that's a typo?
A. I believe it is.
Q. It looks like an extra four in there. So it's probably closer to $45,000 for debris removal?
A. You are correct, sir.
Q. All right. Now, if we turn, sir, to the next exhibit, Exhibit 19 D, at page 156-D, this is a file note dated 5/20/05 from Scott Pringle -- by the way, what was Scott Pringle's role at Chubb at this time?
10:16
A. He was a technical supervisor.
Q. He was your supervisor?
A. Yes, sir.
Q. Okay. And this file note says, "Jim" -- and that would be you, right?
A. Yes, sir.
Q. "Since we have confirmed a loss in excess of the first mortgagee's interest, I agree we should pay the" -- it says "sirst," but the "first mortgagee. However, please confirm with counsel that he concurs." Correct?
10:16
A. Yes, sir.
Q. And then if we turn to the next page, this is Exhibit 19 E at page 156-E, this is a letter from an attorney named Thomas McGuire addressed to John Tener dated August 8, 2005. And it reads at the beginning, "Dear John, I am forwarding a new

payoff statement for my client, Webster Bank NA, successor by merger to First Federal Savings Bank of America," et cetera. Correct?
A. Yes.
Q. Okay. And if we turn then to Exhibit 20, this is a document entitled "Payoff Statement," it's dated August 1, 2005, it's from Webster Bank, and it indicates that the total due to pay the loan in full is roughly $186,554, correct?
A. Yes, sir.
10:17 Q. And then if we turn to Exhibit 21, this is a check issued to Webster Bank on September 14, 2005 for the amount of -- it looks like 189,103.15, and it says, "In settlement of building coverage," correct?
A. Yes, sir.
Q. So this check here that we're looking at -- this was the check that was issued by your company to pay off the first mortgage holder on the Mileses' property, correct?
A. Their mortgage --
Q. And it was paid off at the request of the mortgage holder -- 10:18 of the mortgagee bank, correct?
A. We stimulated that communication, but, yes.
Q. Excuse me?
A. We stimulated the communication at the demand of the second mortgage.
Q. Whether you initiated the conversation or not, Webster

Bank told you we want our mortgage paid off and it's going to cost you $189,000, whatever it is, correct?
A. I don't remember that statement, but, sure.
Q. Well, sir, the documents we just looked at contain statements saying that Webster Bank had made a claim for its mortgage interest, correct?
A. They're the first mortgagee on the property.
Q. The first mortgagee had made a claim to be paid what it was owed, correct?
10:19 A. The second mortgagee made a claim to be paid off.
Q. Well, sir, didn't we just look at a document where you or Mr. Pringle said that, that the first mortgagee had made a claim? Do you want to go back and look at that?
A. Which tab are we going back to, sir?
Q. I'm going back to page 156-C-1. This is your file note or work station note to Scott Pringle dated 5/17/05, and on page 156-C-1 you wrote, "Scott, per the attached, the insureds' first mortgage holder, Webster Bank, has replied to John Tener's request with their claim for insurable interest in the property totaling at that time 184,000 some-odd dollars?
A. Correct.
Q. So what I said was correct, the mortgage holder, the first mortgage holder, made a claim to Great Northern to have their mortgage paid off, right?
A. Pay their mortgage interest in the property.

Q. Pay their mortgage interest in the property. That's different than paying off their mortgage?
A. I don't know.
Q. Now, sir, if you turn to Exhibit Number 22, this is a letter from Roger Lehrberg, L-e-h-r-b-e-r-g, Esq. dated January 11, 2005. It's addressed to Chubb Insurance Solutions Agency and also to Great Northern Insurance Company. And you're familiar with this -- in fact, at the bottom it says there was a carbon copy sent to you, James Tagliente. And you're familiar with this letter, are you not, sir?
A. Yes, sir.
Q. And if we look at Exhibit 23 -- I'm sorry, let's stick with 22.
Exhibit 22 informs you that Mr. Lehrberg represents a man named Simon Belli, B-e-l-l-i, who is the present holder of a mortgage on the premises at 1 Running Stream Road. The mortgage is dated June 12, 1992 in the original amount of $100,000 and recorded at such and such a place.
And then in the second paragraph he says there is presently due and owing more than $200,000 on that mortgage.
And then in the third paragraph, he basically says demand is made on Great Northern pursuant to the terms of your policy to pay that mortgage. Correct?
A. Yes, sir.
Q. Okay. And if we turn to Exhibit 23, this is another

letter from Mr. Lehrberg of the same date, January 11, 2005, addressed, again, to Great Northern Insurance Company with a copy to you, indicating that Mr. Lehrberg is saying that he represents Simon Belli, Joseph Mindic, M-i-n-d-i-c, and Jason Long as the holders of a mortgage on the 1 Running Stream Road property in the original principal amount of $200,000.

And then he goes on to say in the second paragraph, there is presently due and owing to the mortgagees a sum in excess of $500,000.

10:22 And in the third paragraph he basically demands payment of that amount from your company, correct?

A. Yes, sir.

Q. Okay. And that -- you understood that this was a separate mortgage he was referring to, separate from the mortgage that was referred to in Exhibit 22?

A. I believe so.

Q. Okay. And if we turn to Exhibit 24, this is another letter from Mr. Lehrberg dated January 11, 2005, again addressed to Great Northern Insurance Company, again with a 10:23 copy to you, telling you that he represents Simon Belli as the holder of a mortgage on 1 Running Stream Road in Rehoboth dated October 5, 1997 in the original principal amount of $160,000.

In the second paragraph he says that there is due and owing to Simon Belli the sum in excess of $352,000.

And in the third paragraph he basically makes demand

for payment of the amount due or up to the insurance amount, correct?
A. Yes, sir.
Q. Okay. And -- so these three letters all arrived together, obviously?
A. They're all dated January 11th.
Q. Is it your memory that you received all of them around the same time?
A. Yes.
10:24 Q. Okay. And a little while ago you said that you had -- there was a demand or something you received from the second mortgagee that triggered communication with the first mortgagee. Is this what you were referring to, these letters?
A. Yes, sir.
Q. Okay. So when you got these demands from the second mortgagee, that's when your company contacted the first mortgagee and said, Gee, there's been a fire, what do you want do about it? And then the first mortgagee bank sent you a claim saying we want you to pay our mortgage off. Is that a
10:24 fair summarization of what happened?
A. We reached out to the first mortgagee for their interests.
Q. And when you reached out to them, they said, Yeah, we want you to send us the amount that we are due to satisfy the loan that's secured by the mortgage, correct?
A. I believe so. I'm not following your question. I'm not

sure.
Q. You're not following my question?
A. No, sir.
Q. Well, sir, do you want to go back to your file letter and look at it again?
A. No, we've done that.
Q. Okay. So you understood that the first mortgagee bank was saying to your company, to your insurance company, we're owed roughly $185,000 by Mrs. Miles and we want you to pay us what
10:25 we're owed as a result of the fire loss, correct?
A. They have a mortgage interest in the property, yes.
Q. The mortgage interest in the property, correct. The mortgage interest secured the loan that Mrs. Miles owed to that bank, correct?
A. They had a mortgage interest in the property.
Q. Okay.
By the way, you were aware by January 11, 2005 that Simon Belli was Mrs. Miles' father?
A. I believe I was, yeah.
10:26 Q. Okay. And if you turn next, Mr. Tagliente, to Exhibit 25, this is a check dated September 14, 2005, same date as the check you gave to the Webster Bank that was Exhibit 21, and this is made payable to Roger Lehrberg as attorney for Simon Belli, Joseph Mindic, and Jason Long, and the amount of the check is a little hard to read, but I believe it's $611,198.87,

correct?

THE COURT: Would you give me the date of that, please, again?

MR. BRUNELLE: It is 9/14/05, your Honor. And the amount again is 611,198.87.

BY MR. BRUNELLE:

Q. And it says, sir, on the face of the check, "In settlement of building coverage," correct?

A. Yes, sir.

10:27 Q. All right. And this check was issued by your company as a result of the demands made by Mr. Lehrberg on behalf of Simon Belli and on behalf of Joseph Mindic and on behalf of Jason Long to satisfy their mortgage interests in the Mileses' property, correct?

A. Yes, sir.

Q. Okay. And if you would turn next, please, Mr. Tagliente, to Exhibit 26, this is a letter dated April 24, 2006 from Attorney Tener. If you could turn to page 168, we'll see Attorney Tener's signature. And I see on page 168 that a cc

10:27 was sent to you. And the letter is addressed to Robert Lehrberg, and would you agree with me that was intended to be sent to Roger Lehrberg?

A. I believe it was.

Q. Okay. That's his address, right, 38 B-a-l-c-a-r-r-e-s Road, West Newton, that's Roger Lehrberg's address?

A. I don't know --
Q. Well, let's go look it.
A. No, I think Roger -- I agree.
Q. Thank you, sir.
And if we turn to page 167, sir, at the bottom of the page under the section of this letter which is labeled "Mortgage Payments," Mr. Tener was explaining to Mr. Lehrberg how Great Northern came to the -- calculate how much it was going to pay to his clients; that is, Simon Belli and the others. And it reads as follows: "The enclosed letter dated August 8, 2005 reflects a payoff demand from the first mortgagee, Webster Bank, of 186,954.71 with a per diem interest amount of 36.43. Great Northern, therefore, paid the first mortgagee 189,103.15."
And, sir, would you agree with me that the letter of August 8th that he's referring to there is the document that we looked at earlier, which was Exhibit 19 E, the letter of August 8th from Attorney Thomas McGuire?
A. Yes, sir.
Q. Okay. Then it goes on to say, "The enclosed letter dated January 11, 2005 reflects a demand by the second mortgagees in excess of $503,389." And would you agree with me, sir, that that letter he's referring to there is the letter that Mr. Lehrberg sent which has been marked as Exhibit 23?
A. What tab is that under?

Q. 23, sir.
A. Thanks.
I believe so, yes.
Q. Okay. And then Mr. Tener went on to say, "The partial loss to the insureds' structure was calculated by Great Northern as noted to be $800,301.22, which includes as a general reconstruction cost the demolition amount of $50,054.40. Therefore, Great Northern determined that the amount payable to the second mortgagees to be 611,198.07 or the difference between the reconstruction cost of 800,301.22 and the deduction of the first mortgage payment of 189,103.15."
First of all, did I read all of that correctly?
A. I believe you did.
Q. And that letter says, sir, that when your company paid the first mortgagees and then the second mortgagees, it did so on the basis of its estimate of the reconstruction cost plus the demolition costs that it had estimated, correct?
A. Yes, sir.
Q. Okay. Thank you.
10:31 Now, sir, if you turn to Exhibit 54, this is a letter dated April 21, 2005, begins on page 262, and it ends on page 264. And it is -- it's not signed by you, but it has your name at the end of it. Do you see that, sir?
A. Yes, sir.
Q. So this is a letter that you sent on April 21, 2005 to

Paul Winnick, W-i-n-n-i-c-k, correct?
A. Yes, sir.
Q. And Mr. Winnick was the public adjuster who was assisting Theresa Miles in the adjustment of her claim, correct?
A. Yes, sir.
Q. All right. And in your letter you wrote that, "I ask that you provide on their behalf the following documents: 1, Proof of Loss for Theresa Miles' property claim." And by property claim there you meant for the building loss, correct?
10:32 A. Yes, sir.
Q. And then, "2, Proof of Loss for Theresa and Jim Miles' content loss, including daughter Heather Miles," correct?
A. Yes, sir.
Q. And if we turn to the next page, page 263, at he bottom of the page you wrote this paragraph: "Great Northern has already extended the deadline for submitting proofs of loss and wishes to conclude its adjustment and investigation of the claim as soon as possible. Therefore, Great Northern extends the deadline for the submission of proofs of loss to and including May 20, 2005." Correct?
10:33
A. Yes.
Q. Did I read that correctly?
A. Yes, sir.
Q. So you had -- whatever deadline you had set before, you had agreed to extend it to May 20, 2005, correct?

A. Yes, sir.
Q. All right. If you turn next, please, sir, to Exhibit 55, this is a letter dated May 19, 2005 from Alan, A-l-a-n, Miller, addressed to yourself. Just take a moment and read that silently to yourself, sir.
(Pause.)
A. I have.
Q. Okay. This letter at the top beneath the date of May 19, 2005 says it was delivered via messenger. Do you see that?
10:34 A. I do.
Q. And you understood that Alan Miller was an attorney who was representing Mr. and Mrs. Miles at that time?
A. I'm not sure when Mr. Miller got involved in the process.
Q. You know at some time he was representing them?
A. I do know that.
Q. Okay. And in fact, the letter begins, "Dear Mr. Tagliente, please be advised that I represent the above insureds with regard to their loss of October 17, 2004."
So this may have been his first introduction to you,
10:35 would that be fair to say?
A. That's my assumption.
Q. Sir, Mr. Miller's office was on Beacon Street in Boston, and he addressed this to you at One Financial Center in Boston. Where is One Financial Center in Boston?
A. It's the tall blue building.

Q. The tall blue building. How close is that to -- what is that 6 Beacon Street, a few blocks?

A. I don't know, but it -- I would assume they're both in the downtown area.

Q. All right. Would it be fair to say, sir, you received this letter by Mr. Miller on May 19?

A. If that's a business day, yes.

Q. Okay. And his letter goes on in the first paragraph I was reading, "I enclose herewith a sworn statement and 'Proof of 10:36 Loss'" -- that phrase is in parenthesis -- I'm sorry, in quotation marks -- "executed by my clients on May 18, 2005, which is submitted to you as a result of your request of April 21, 2005."

And it also says in the third paragraph, "Mr. and Mrs. Miles are diligently attempting to gather the necessary information to submit the details of their contents claim as well as consulting with contractors regarding the rebuilding of their premises. When this lengthy process of gathering this information is completed, I anticipate that Paul Winnick of 10:36 Swerling Milton Winnick will submit the details of the claim to you."

If we turn next, sir, to Exhibit 56, this is a document that's entitled "Sworn Statement and Proof of Loss." Do you see that?

A. Yes, sir.

Q. And do you recognize this, sir, as the sworn statement and Proof of Loss which Mr. Miller transmitted and delivered to you on May 19, 2005 with his letter, which was Exhibit 55?
A. Yes, sir.
Q. Okay. And you see that it says at the bottom, "This statement is made under the pains and penalties of perjury." Do you see that?
A. Yes, sir.
Q. Okay. And then you see there's a signature under the name of James F. Miles? Do you see that?
A. Yes, sir.
Q. And there's a signature under the name of Theresa B. Miles? Do you see that?
A. Yes, sir.
Q. And then beneath that it says, Subscribed and sworn to me -- Subscribed and sworn to before me this blank day of May, 2005, and above the word "notary public" there's somebody's signature that I can't read. Do you see that?
A. Yes, sir.
Q. Okay. In fact, it may be the same person that signed as the witness to both, Tim Brett.
A. It looks to be.
Q. It took to be the same to me, too.
All right. Sir, if you turn to Exhibit 57, this is a letter dated June 10, 2005 to Alan Miller from you, James

Tagliente. Why don't you take a minute to read that silently to yourself, sir.

(Pause.)

A. I've read it.

Q. Okay. Now, this is your response to Mr. Miller about the Proof of Loss that the -- the purported Proof of Loss statement, as you call it, dated May 18, 2005 submitted by the insured James F. Miles and Theresa Miles. And it goes on, "Great Northern rejects the purported Proof of Loss for the following reasons: 1, it is untimely submitted."

10:39 Sir, you just told the Court that you received it on May 19, 2005 and the deadline was May 20, 2005. Can you explain to the Court why that was untimely submitted?

A. No, sir.

Q. Okay. So is that wrong then when you put that down?

A. I don't know.

Q. You don't. Okay.

You went on to say, "It is not subscribed and sworn to in the presence of a person duly authorized to take oaths."

10:39 Now, we just looked at the -- if we go back to Exhibit 56, I pointed out to you at the bottom it says, Subscribed to and sworn to before me this blank day of May 2005, so and so, who claims to be a notary public. That wasn't satisfactory to you to show that it was sworn to in the presence of a person duly authorized to take oaths?

A. I don't know.
Q. You don't -- well, sir, you wrote this letter. What were you thinking when you said that it was not properly subscribed and sworn to?
A. That letter was drafted jointly by counsel.
Q. You signed it?
A. I did.
Q. Okay. So you don't know what you were thinking?
A. Not at this moment.
10:40 Q. Okay.
Sir, would you agree with me that the policy that -- I'm sorry, just give me a second, your Honor.
Let's turn to the policy, Exhibit 9, and turn to page 144-C of Exhibit 9.
Are you there, sir?
A. Yes, sir.
Q. Okay. And before we look at this in detail, I want to call your attention to the fact that at the bottom of that page it says, "New Jersey policy terms." Do you see that?
10:41 A. Yes, sir.
Q. Okay. And in fact, if we turn and start at page 144 at the bottom of the page it says, "New Jersey policy terms," and then this is the page number on the original policy, page Y 1. Do you see that? I'm looking at Exhibit page 144 but at the bottom of that page it says, "New Jersey policy terms." Do you

see that, sir?
A. I do.
Q. And on the next page, which is exhibit page 144-A, at the bottom of that page it says, "New Jersey policy terms," right?
A. Yes, sir.
Q. And on the next page, 144-B, it says, "New Jersey policy terms," right?
A. Yes, sir.
Q. And on the next page, 144-C, it says the same thing, "New Jersey policy terms."
A. Correct.
Q. On page 144-D, 144-E, it says the same thing, right?
A. Yes, sir.
Q. And then on page 144-F, it says, "New Jersey signatures." Do you see that?
A. Yes, sir.
Q. I understand, of course, sir, that you're not responsible for issuing this policy, but can you explain to the Court -- strike that.
You understand that the only connection that this policy had to New Jersey was that it was mailed to Mr. and Mrs. Miles -- if we turn back to page 71 of Exhibit 9 -- it was mailed to Mr. and Mrs. Miles, care of Simon Belli, her father, at 14 Sunset Road in Lawrenceville, New Jersey. Were you aware of that fact? Page 71.

A. I don't know if there's a mailing address in the file.
Q. It's right on the policy face, sir, page 71.
A. Yes, sir.
Q. Okay. So the only connection -- and this policy was insuring a property in Massachusetts, correct?
A. Yes, sir.
Q. And, sir, you know from looking through the policy, we just kind of thumb through and look at the bottom of the pages, they all refer to Massachusetts, Massachusetts deluxe coverage, 10:43 Massachusetts valuable articles coverage, Massachusetts personal liability coverage.
Can you explain to the Court how it is that these New Jersey policy terms got appended to a Massachusetts insurance policy?
A. No, sir.
Q. You understand that there's a law in Massachusetts that sets a standard form of fire insurance policy. Are you aware of that?
A. No, sir.
10:44 Q. You're not aware of that.
Are you aware that it's against the law to issue a policy in Massachusetts that is not a standard policy unless it has been approved by the commissioner of insurance? Did you know that?
A. No, I did not.

Q. Okay. All right. Let's go back to page 144-C, which is the page I was originally asking you about, and there's a section here about Proof of Loss. And it reads, "You must submit to us within 60 days after we request your signed sworn Proof of Loss which documents to the best of your knowledge and belief" -- and then it's got a list of things that it's supposed to include.

Would you agree with me, sir, that that doesn't say that it has to be sworn to in front of a person duly authorized to take oaths?

10:45

A. No, it does not.

MR. CORNER: Objection.

THE COURT: Overruled.

BY MR. BRUNELLE:

Q. Do you agree with me, sir?

A. I do.

Q. Okay.

Now, sir, going back to Exhibit 57, this is your letter explaining to Mr. Miller why the Proof of Loss was rejected.

10:45

Number 3 was: The cause and origin of the fire --

THE COURT: Do you mean Exhibit 56?

MR. BRUNELLE: No, I think it's Exhibit 57, your Honor. This is the letter -- this is Mr. Tagliente's letter.

THE COURT: Okay. 57.

MR. BRUNELLE: 57, your Honor.
THE COURT: All right.
MR. BRUNELLE: Thank you.
BY MR. BRUNELLE:
Q. So Exhibit 57, Mr. Tagliente, and point 3 as to why you rejected the Proof of Loss was: The cause and origin of the fire are not shown.
And indeed, if we turn back to the Proof of Loss in Exhibit 56, at the top it's item number 1, it says, "Time and
10:46 origin a fire loss occurred on or about October 17, 2004. The cause and origin of the said loss were unknown to the insured." So that's what it says, correct?
A. Yes, sir.
Q. All right. And if I turn back to page 144-C of your policy, it says, "Proof of loss, you must submit to us within 60 days after we request your signed sworn Proof of Loss which documents to the best of your knowledge and belief." And one of the things is supposed to be the time and cause of loss. In fact, that's the first item it's supposed to say. Do you see
10:47 that?
A. Yes, sir.
Q. Okay. So, sir, is it your argument that if an insured just doesn't know what the cause and origin of the fires were, that somehow makes the Proof of Loss improper?
A. I don't know.

Q. That's what you wrote there, sir. The cause and origin of the fire are not shown. They said they didn't know, and you're rejecting the Proof of Loss because they didn't know it, right?
A. That's the document, yes.
Q. It's your letter, sir. You signed it, didn't you?
A. Yes, sir.
Q. Okay. And you signed it on behalf of your company?
A. Yes, sir.
Q. Okay. Now, you understand an insured doesn't have an
10:47 obligation to investigate the cause and origin of the fire if they don't know it, correct?
A. They should give the circumstances of it, yes.
Q. If they know it, they should give it, right?
A. Yes.
Q. And if they don't know it, they're not obligated to hire someone to go in, like you hired someone to go in, and figure it out, are they?
A. I don't believe so.
Q. Okay. Now, the next reason you rejected the Proof of Loss
10:48 is number 4, I'm looking at Exhibit 57 again. "It does not include the actual cash value."

And if I turn back to the Proof of Loss, item 6 says the actual cash value of said property at the time of the loss was to be determined.

So again, sir, your policy just requires the insured

to answer -- to provide the information in the Proof of Loss to the best of their knowledge and belief, correct?

Do you want to go back to that? It's page 144-C.

I'll read it to you again, sir. "Proof of Loss. You must submit to us within 60 days after we request your signed sworn Proof of Loss which documents to the best of your knowledge and belief" -- and then it has a list of things -- by the way, one of the things -- I don't see this on the list, it doesn't actually say on your list what they're actually supposed to list, what the actual cash value was, does it? That's not even in your policy, sir, is it? Assuming this is your policy.

A. Line number 4?

Q. Line number 4.

A. Does not include the actual cash value.

Q. Right. That's what you wrote there.

My next question to you, sir, was on page 144-C --

A. Yes, sir.

Q. -- this is the New Jersey policy terms, where it says you must submit a Proof of Loss which documents to the best of your knowledge and belief, and then it's got a list of, I don't know, seven or eight items. I don't see actual cash value as one of the items they're required to include in the Proof of Loss. That's not in there, is it?

A. No, sir.

Q. Okay. Item 5. You rejected the Proof of Loss because it does not include the whole loss and damage insurance under the policy. And again, if we turn back to sworn statement and Proof of Loss, item 7, which is the whole loss and damage insurable under such policy was, and again, that's to be determined, according to the Proof of Loss as was submitted there, right?
A. What was the question?
Q. The question was that on the Proof of Loss that was 10:50 submitted to you in the section that's labeled Whole Loss and Damage Insurable Under Such Policy, the Mileses put in "to be determined."
A. Yes, sir.
Q. So they hadn't determined what the amount was yet, right?
A. That's what they stated.
Q. That's what they stated.
Again, if I turn back to your policy, page 144-C, I don't actually see in your Proof of Loss requirements that they're supposed to -- they are supposed to provide you with 10:51 the whole loss and damage insurable under such policy. That's not there, is it, sir? Page 144-C.
A. What tab is that under, sir?
Q. I'm sorry, I didn't hear what you said.
A. What tab is it under?
Q. It's under tab 9 at page 144-C.

(Pause.)
A. And your question was?
Q. My question was that your policy does not require the insured to tell you the whole loss and damage insurable under the policy?
A. Specifications of any damaged building or detailed estimates of repairs or damages and inventory of damaged personal property.
Q. Okay. So you think that's the same thing?
10:52 A. Yes.
Q. Okay. All right. Fair enough.
But, in any case, they told you, and Mr. Miller told you in his letter, that they were still working on developing that information at that time, correct?
A. Yes, sir.
Q. Okay. And in fact, your company was still working on developing its information at that time, wasn't it?
A. We hadn't received a claim from them yet.
Q. But your company hired somebody, a builder, to go in and
10:53 make an estimate as to what it would cost to repair the property?
A. Yes, sir.
Q. And at one point, you hired someone to go in and try to do an estimate of the contents damage as well, right?
A. To assist and review the public adjuster's claim to us.

Q. But that hadn't been completed by this time, right?
A. Due to the failure of them to provide their claim to us.
Q. All right. But, in any event --
Now, let's turn to page 269 of Exhibit 57. This is another reason why you said this Proof of Loss was rejected, because it did not include the amount of the deductible. And again, sir, if I turn back to your policy, page 144-C, I don't see anywhere in there that says they're supposed to include the amount of the deductible in the Proof of Loss.
10:54 A. No, it doesn't.
Q. This form that we're looking at, the Sworn Statement and Proof of Loss, Exhibit 56, is this a form that your company generates? Not the information in it, but the form itself?
A. It's a fairly industry standard form.
Q. Okay. It's an industry standard form. Fair enough. All right.
And, sir, by the way, when it's -- when we're talking here item 6 on your letter, which is Exhibit 57, and you said the Proof of Loss was rejected because it does not include the amount of the deductible, what the deductible was in this claim 10:55 was a matter of record. You knew what it was because it's right in your policy, right?
A. That's right.
Q. All right. So you didn't really need them to tell you that, right?

A. I don't think so.
Q. Okay. And similarly, item 7, you rejected the Proof of Loss because it did not include the amount of partial payments. You knew what the amount of partial payments had been up to that point, didn't you?
A. We would have had a record of it.
Q. Sure. You could just open up your computer screen and find out within five seconds what it was, right?
A. It's an old computer screen.
10:55 Q. Okay. So maybe it would have taken a little bit longer than five seconds?
A. Definitely.
Q. But you certainly didn't need the Mileses to tell you what your partial payments had been to that point?
A. Yes, sir.
Q. And the last reason was it did not include the amount claimed, and, as we've already discussed, the Mileses told you that they didn't know yet what the amount was that they were going to be claiming, correct?
10:56 A. Yes, sir.
Q. Okay.
Now, sir, if you turn next, please, to Exhibit Number 10, this is a letter dated October 12, 2005 from you to Alan Miller. And why don't you take a moment and read that silently to yourself, sir.

(Pause.)

A. I've read it.

Q. Now, sir, am I correct that this is a letter that you sent on behalf of Great Northern Insurance Company to Mr. Miller to inform him -- to inform the Mileses through him, that, you know, I'm quoting here from the end of the second paragraph of your letter, quote, It is Great Northern's position that the Mileses are in breach of the policy and that it has no liability for the claim which is denied in its entirety, unquote. That was the reason for sending the letter, correct?

10:58

A. Yes, sir.

Q. And if we turn to the second page of your letter, which is page 146 in the exhibit book, you give a list of the reasons for this denial, and one of the reasons is item number 3, the Mileses have failed to provide timely and proper proofs of loss. And my question to you, sir, is: Is there any other reason that you can tell the Court now to justify that statement other than the ones that were contained in your letter which we looked at a moment ago, Exhibit 57?

10:58

A. That letter stands as it is.

Q. Okay. So there's no -- I want to be sure, give you a chance, sir -- there's no other reason that you can say to the Court today why the proofs of loss were not timely and not proper other than what your letter said?

A. We stated they did not provide values for their loss after

six months -- what was it, eight months. No, I think that's inclusive in that letter.
Q. Okay. That's fine.
Now, we're going to go over this letter in some detail, sir, but before we do, I just want to make it clear to the Court, nowhere in this letter does Great Northern take the position, that is, denying the claim on the ground that the loss was intentionally caused by either James Miles or by Theresa Miles, correct?
10:59 A. It does not state that.
Q. Does not say that. Okay.
It says that the reason that the claim is being denied is that the Mileses had failed to cooperate with the investigation.
A. Is there a question there?
Q. Yeah, I'm asking you, is that what the letter says, in essence, that the reason for denial was alleged lack of cooperation?
A. Yes, sir.
11:00 Q. Okay.
Now, sir, in the second paragraph of the letter, this is on page 145, in the -- it looks about the sixth line down, you wrote this, "Great Northern has been prejudiced in its attempts to investigate liability for this claim because of the Mileses' failure to cooperate and in particular to provide

information regarding and access to alarm records for the security system in place at the time of the fire."

So one of the things that you were particularly concerned about was getting access to these alarm records, correct?

A. Yes, sir.

Q. And you know that the Mileses had, in fact, provided you with some -- at least with one alarm record for the month of the fire, correct?

11:01 A. That was through the special investigator, so I might not have had knowledge of that, but --

Q. Well, sir, the special investigator would write an SIU report, you would receive those?

A. I did review those.

Q. They were addressed to you, in fact, weren't they?

A. Correct.

Q. And you read them all?

A. Yes, sir.

Q. And you remember, sir, at least one of the SIU reports he

11:01 mentions that Mrs. Miles at her examination under oath produced a record of the setting and unsetting of the alarm at the premises for the month of October '04. You remember that, don't you?

A. I don't, but --

Q. Okay. All right.

A. We had testimony yesterday about it.
Q. All right.
Now, sir, you know that since you wrote this letter, since October of '05, Great Northern, in fact, obtained all of the records of the Protection One Alarm Company having to do with the Mileses' alarm system. You know that, right?
A. I learned that yesterday.
Q. You learned that yesterday? You didn't know that before yesterday?
11:02 A. I may have known it.
Q. And, sir, one of the things you claim in your letter is that your company was prejudiced by its inability to see those records, to have those records, correct? That's what your letter says?
A. Yes, sir.
Q. Okay. And you're telling the Court -- well, let me ask you this: Have you ever looked at the records yourself?
A. No.
Q. So you can't -- as you sit here today you can't tell the
11:03 Court whether there is anything in the records that would support your claim that the fact that you didn't have them in October of '05 somehow prejudiced your company?
A. I don't have the expertise to review alarm records.
Q. Okay. Whether you have the expertise or not, you can't tell the Court today why it was that if your company had had

those records earlier it could have done something different in the investigation of the claim, right?

A. I guess we'll never know.

Q. Well, sir, we will know because the records are here, right in court. They've been produced. So I'm asking you as the adjuster who denied the claim whether you can say to the Court why it was that if you had had those records earlier your company would be in a different position than it is now?

A. That's the investigation of the arson, so it's driven by SIU and their guidelines as to what is germane to an investigation is their prerogative.

(Pause.)

Q. So you've never gone back, sir, and redetermined whether there's any prejudice to your company from the failure to deliver those records. Is that a true statement?

A. No.

Q. It's not a true statement.

When did you go back and redetermine that?

A. No, the no was we did not revisit.

Q. Okay, so you agree with my statement. Okay.

And were you here yesterday when Mr. McIntyre told the Court that if he had had the records from Protection One earlier, he would have reached a conclusion earlier that Mr. Miles was responsible for starting the fire, something to that effect? Did you hear him say that yesterday?

A. I certainly did.
Q. Okay. And did you hear him say that what he found in the records from Protection One that he got in November of '06 was that there was nothing in them to indicate that there had ever been any reports of a problem with this zone 4 at the house? Did you hear him say that?
A. I did.
Q. Okay. And, sir, that was the only thing, the only piece of evidence, if you will, that your company had in 2006 that it didn't already have in October of '05 at the time the fire -- at the time you denied the liability for the fire?
11:06
MR. CORNER: Objection.
THE COURT: Sustained.
BY MR. BRUNELLE:
Q. Sir, what -- in October of '05 your company knew a lot about the fire, correct?
I'm sorry, let me withdraw that question. It's a terrible question.
MR. BRUNELLE: Sorry, your Honor.
11:06
If I could just have one second, please.
THE COURT: Yes.
(Pause.)
MR. BRUNELLE: I'm sorry, your Honor, I beg your pardon.
BY MR. BRUNELLE:

Q. Sir, let's go back to your letter, which is Exhibit 10, please. And I'm going to turn to page 146, which is the second page of your letter, and this is the reasons for denial include but are not limited to the following. Do you see that?
A. Yes, sir.
Q. And reason number one is, "The Mileses refused to answer or provided evasive answers to numerous questions posed to them at their respective examinations under oath and in interviews."
Now, I'm going to -- we're going to focus first, sir, 11:08 on Theresa Miles. First of all, have you read Theresa Miles' interview with Mr. McIntyre?
A. Not in the past four years.
Q. Okay. Let's take a look at it right now. Turn to page -- sorry, to tab 65, please.
Why don't you take a moment to just read that two or three pages silently to yourself, sir.
(Pause.)
Q. Okay. Have you done, that sir?
A. I have.
11:10 Q. Would you agree with me that after reading that that Mrs. Miles answered the few questions that were asked of her until the question about the Social Security Number came up?
A. Yes, sir.
Q. Okay. And when the Social Security question came up, it wasn't she who refused to answer it, it was Mr. Miles who said

to her, no, don't answer that, and then there was a discussion between Mr. Miles and Mr. McIntyre, correct?
A. Yeah, it appears to be a belligerent conversation.
Q. I didn't ask you that, sir. There was a discussion?
A. I think it was beyond a discussion.
Q. You think it was beyond -- you weren't there, sir, were you?
A. No, but I'm reading through the lines.
Q. We can all read the lines ourselves, sir.
11:11 A. You asked me my opinion.
Q. Excuse me?
A. You asked me my opinion.
Q. I didn't ask for your opinion. I asked you to answer the question.
The next question is, it was Mr. McIntyre who terminated the interview, wasn't it?
A. After a belligerent discussion.
Q. It was Mr. McIntyre who concluded the interview, wasn't it, sir?
11:12 A. Yes, sir.
Q. Mrs. Miles didn't ask to terminate the interview, did she?
A. Mr. Miles did.
Q. Sir, page 445, line 128, CM, that's Charles McIntyre, right?
A. Correct.

Q. "I'm concluding this interview. We will proceed with the examination under oath at this time."

JM. That's James Miles, right?

A. At your choice.

Q. "It's your choice," right? Mr. Miles didn't choose to conclude the interview, sir; Mr. McIntyre chose to conclude it, didn't he?

MR. CORNER: Objection.

THE COURT: Sustained.

11:12 BY MR. BRUNELLE:

Q. Sir, by the way, on the issue of Social Security Numbers, turn back to Exhibit 1, which is the SIU report number one and turn to page 2. This is a report that was dated November 1, 2004, so before the date of this recorded statement. Right at the top of the page, on page 2, that's the Social Security of Theresa Miles, right?

A. Which tab are we going to, sir?

Q. Number one, sir, number one, page 2. Right at the top of the page, very first line, Theresa B. Miles, date of birth and

11:13 Social Security Number. Do you see it?

A. Yes, sir.

Q. Okay. So your company had that information as early as November 1, 2004, before Mr. McIntyre even took Mrs. Miles recorded statement, correct?

A. Yes.

Q. And you certainly -- your company certainly wasn't prejudiced because Mr. Miles made an objection to that question, was it?
A. Yes.
Q. Your company was prejudiced? How was your company prejudiced, sir?
A. We were unable to have a cohesive and open discussion with the claimant.
Q. Well, sir, nobody asked to -- Mr. McIntyre terminated the examination, didn't he?
MR. CORNER: Objection.
THE COURT: Sustained.
MR. BRUNELLE: Let's move on.
BY MR. BRUNELLE:
Q. Let's turn to the examination under oath. That's Exhibit 61, sir. This is Theresa Miles' examination under oath.
A. What tab, sir?
Q. It's at tab 61, sir.
And, sir, I don't believe you were present at this examination which occurred on January 19, 2005, but have you read it through?
A. Not in the past two years.
Q. Did you read it through before you wrote Exhibit 10, which was the letter denying the claim?
A. I believe I did.

Q. Okay. And when you wrote, "The Mileses refused" -- this is on page 146 of tab 10 -- when you wrote, "The Mileses refused to answer or provided evasive answers to numerous questions posed to them at their respective examinations under oath and in interviews," were you including Theresa Miles in that statement as well as James Miles?
A. Yeah, both policyholders.
Q. I'm sorry?
A. They're both policyholders.
Q. I understand they're both policyholders. I didn't ask you that. I asked you, did you include, when you said, "The Mileses refused to answer questions or provided evasive answers," did you mean to refer to Theresa and James both?
A. I believe so.
Q. Okay. And are you able, sir -- and I realize this may be difficult for you, maybe your counsel can help you later -- are you able to point out to me in the examination under oath any instances where Theresa Miles refused to answer a question? Do you know of any?
A. Not at this date.
Q. Do you know of any instances in her examination under oath that you say now were evasive answers?
A. Not at this date.
Q. Okay. Is it your position that if someone is asked a question at an examination under oath and they don't know the

answer, that that would be a refusal to answer or an evasive answer?
A. Is that asking my opinion?
Q. I'm asking if that would be how you would view that? Let me give you a specific example.
Turn to page 304 of Exhibit 61, and within page 304 you'll see that each of this four pages of a transcript there, sir, and each page has a separate number. Do you see that?
A. Yes, sir.
11:17 Q. I'm going to call your attention to page 28 of the transcript, starting at line 4. And Mrs. Miles was asked this question:
"Q. Who is Joseph Mindic?
"A. Well, I don't know, I just recognize his name."
And then below that at line 15, it says:
"Q. So sitting here today, do you know whether he's a mortgagee on your property?"
Line 17, "A. I'm not sure."
Do you view that, sir, as an example of either
11:17 refusing to answer or an evasive answer?
A. I think it's unusual that she didn't know.
Q. I didn't ask you that, sir. I'm just asking you was that an instance that you were thinking of when you wrote that Mrs. Miles refused to answer or gave evasive answers? If you know?

A. I don't know.
Q. Okay.
How about if we turn to page 305 in the Exhibit 61, and on page 31 within the transcript at line 17. This is Mr. Tener asking a question.
"In the last year prior to the fire at your home, did you make -- personally make any mortgage payments to anybody?"
"A. I don't recall right now. I just don't remember."
11:18 Is that an example, sir, that you are relying on when you wrote that Mrs. Miles gave evasive answers or refused to answer a question?
A. She had three mortgages on the house and didn't recall making a payment to a mortgagee? I know when I issue payments to my mortgagee. So, yes.
Q. So you think that was an example -- I'm just trying to understand. That would have been an example of an evasive answer or refusal to answer?
A. I think any reasonable person would know whether or not
11:19 they've been paying their mortgage.
Q. Okay, I'm just trying to understand. So that's an example for you. Okay.
Now, let's turn back to your letter, Exhibit 10, paragraph -- I'm sorry, I'm looking at page 146, Mr. Tagliente. Paragraph 2 -- the second reason in your list of reasons for

denial is, "The Mileses have refused to provide copies of numerous documents and records requested of them, including, among other things, federal and state income tax returns."

So one of the things you were interested in -- I'm sorry, I'll wait for you. We're at page 146, sir.

(Pause.)

All set?

A. Yes, sir.

Q. I was at page 146 and reading item 2 in your list for reasons of denying the coverage.

11:20

"The Mileses have refused to provide copies of numerous documents and records requested of them, including, among other things, federal and state income tax returns."

Now, sir, you already knew because Mr. McIntyre had included it in his reports, and you had database information, that Mr. Miles was in bankruptcy and had a million dollar non-dischargeable judgment against him, right?

A. I was aware of that.

Q. You were aware of that.

11:21

And you were also aware, because Mrs. Miles testified about it in her examination under oath, that she had no regular source of income, right ? You were aware of that.

A. I understood she was a realtor for one moment in time.

Q. Okay. But you understood that she testified in her examination under oath that at that time, the time of the fire,

that she had no regular source of income?
A. Sure.
Q. Okay. And you understood that she testified at her examination under oath that she was liquidating some of her assets just to support herself. You knew that as of October 2005, didn't you?
A. I believe we did.
Q. Okay. So you were certainly aware that the insureds had some financial stress in their life at the time of the fire, 11:21 correct?
A. I think stress is an understatement.
Q. Stress is an understatement. They were in bad financial shape at that time?
A. Yes.
Q. And that was important to your investigation because insureds who are in bad financial shape might have a motive to commit arson, right?
A. Yes, sir.
Q. Okay. And the request for income tax returns would be for 11:22 the purpose of finding out what the financial condition of the insureds was, correct?
A. Verifying that financial --
Q. Verifying. Well, did you think that they were lying to you that they were in financial distress?
A. A good man in insurance once said we trust and then

verify.
Q. I think Ronald Reagan said that, too. In any event, sir, when you finally got the income tax returns after your company agreed to sign a confidentiality agreement, did you ever look at them?
A. No, sir.
Q. Okay. So as you sit here today, you don't know what they show?
A. I don't think it was very positive for them.
11:23 Q. Okay. You heard the testimony here yesterday when I went over with Mr. McIntyre?
A. Yes, sir.
Q. And you heard that essentially all of the income tax returns for 2002, three, and four showed a negative income at that time, correct?
A. That was the testimony.
Q. Okay. So that was essentially what you already knew, correct? Yes?
A. Yes, sir.
11:23 Q. Okay. Going back to paragraph 2 on page 146, you wrote that the Mileses have refused to provide highway toll receipts.
Now, was that a reference to the toll receipt that Mr. Miles had talked about at his recorded statement and at his examination under oath where he told Mr. McIntyre and Mr. Tener that he had gotten on the New Jersey Turnpike through an Easy

Pass lane by mistake and when he got off at the end he paid the toll and got a receipt for it? Is that what you're referring to.

A. That was one of the tolls.

Q. Well, is there another one?

A. There could be.

Q. Well, I'm asking you, you wrote the letter, what did you have in mind?

A. He traveled from Massachusetts to New Jersey. There are several tolls along that route.

Q. Did you get a toll receipt every time you go through the Mass. Turnpike?

A. Yes, I do.

Q. You do. Even if you're not on business?

A. I have Easy Pass, which keeps an electronic record.

Q. Well, you know Mr. Miles testified he didn't have Easy Pass?

A. Yes.

Q. Okay. In any event, sir, at least one of the toll receipts that you were asking for was this one that we talked about on the Easy Pass or Fast Lane, whatever it was that he was -- strike that. Let me start it over again.

One of the toll receipts you were asking him for was the one that he had said that he had obtained when he got off the New Jersey Turnpike, right?

A. Yes, sir.
Q. Okay. And you knew, sir, that Mr. Miles had told Mr. McIntyre that he couldn't find that receipt, and that at his examination under oath he testified under oath that he couldn't find that receipt anymore, right?
A. I believe that was his comments.
Q. And understand, sir, that it would have been to Mr. Miles' advantage to produce that receipt because it would have placed him in New Jersey about an hour before the fire started back at 11:25 his house in Massachusetts, right?
A. I'm not the investigator. I'm not sure how that would be germane.
Q. Sir, just as a matter of common sense, wouldn't you think that would be advantageous to Mr. Miles, to be able to corroborate his testimony as to where he was if he could produce a toll receipt with that time stamped on it from the New Jersey Turnpike?
A. I'm not a trained investigator, so my opinion wouldn't matter.
11:25 Q. Okay, fair enough.
But whether your opinion mattered or not, when you wrote this letter, you thought it was an important document for your company to have and his failure to produce it was one of the reasons why you denied the claim, right?
A. That was a document of request.

Q. Okay. And is it your company's position, sir, that if somebody loses a document and they can't produce it that that is a justification for your company to deny their claim?
A. Not in and of itself.
Q. Not in and of itself. Okay. But it was one of the reasons?
A. Certainly.
Q. Okay. All right. And then the last item here that we've already talked about is their failure to produce protective
11:26 alarm (sic.) records or alternative releases, et cetera, we've already gone through that.
A. Yes, sir.
Q. Okay.
Now, sir, by the way, before this letter of October 10th was sent out -- excuse me, October 12th was sent out, this is Exhibit 10, had you or anyone from Great Northern sent a written warning to the Mileses or their attorney that this was the firm deadline by which these things had to be produced or else the claim was going to be denied?
11:27 A. No, sir.
Q. And in fact, sir, if we turn to Exhibit 31, this is an e-mail from Alan Miller to John Tener dated August 16, 2005 --
A. Which tab are we at again?
Q. 31, sir.
And item number 2 in that letter says -- first of all,

item number 1 says, "With regard to the income tax returns, the Mileses are not willing to turn over such returns." But item number 2 says, "As for the alarm system, please forward to me any authorization you need to obtain the desired information." Correct?

A. Yes, sir.

Q. And that would be indicative that the Mileses were willing to sign such a release, correct?

MR. CORNER: Objection.

11:28 THE COURT: Sustained.

MR. BRUNELLE: Okay.

BY MR. BRUNELLE:

Q. Turn to Exhibit Number 32, please, sir. And this is a letter from Mr. Tener to Alan Miller dated August 30, 2005. And it begins, "Dear Mr. Miller, now that you are back from vacation, please find attached a copy of an authorization for the release of Protection One Alarm records. I request that you promptly have the Mileses sign the release and that you return it to me."

11:29 And that doesn't contain a deadline for when that release had to be returned, does it?

A. No, it does not.

Q. In fact, sir, you know that at her -- I'm sorry. There's never been an instance where Mrs. Miles had refused to provide a release for the records, has there? There's no written

instance of that, is there?

MR. CORNER: Objection.

THE COURT: Sustained.

BY MR. BRUNELLE:

Q. Do you know of any writing from Mrs. Miles or any oral statement from Mrs. Miles where she refused to provide a release?

MR. CORNER: Objection.

THE COURT: He can answer if he knows.

11:29 A. Mrs. Miles was represented with counsel and with a public adjuster and her direct communication with me was limited.

Q. Okay. Fair enough.

MR. BRUNELLE: Thank you, Mr. Tagliente. Those are all the questions that I have.

THE COURT: We're going to take the morning recess at this stage. We'll be in recess for 15 minutes.

THE CLERK: All rise.

(Recess taken.)

THE COURT: Good morning, again, counsel.

11:50 Mr. Tagliente, you're reminded that you remain under oath.

And you may conduct the cross-examination, Mr. Corner.

MR. CORNER: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CORNER:

Q. Good morning, Mr. Tagliente.
Could you please, sir, turn your attention -- I'd like to start where Mr. Brunelle finished. If I could turn your attention, please, to Exhibit 10. Now, Exhibit 10, sir, that's the letter by which the Great Northern denied the Mileses' claim, and it's dated October 12, 2005. Do you see that?
A. Yes, sir.
Q. Sir, you signed the letter that went out?
A. Yes, sir.
11:50 Q. And you signed it on behalf of Chubb & Son, a division of Federal Insurance Company, correct?
A. Yes, sir.
Q. Mr. Tagliente, did you provide all of the information that's contained in this letter?
A. It was provided by our company.
Q. Now, you had a role in the investigation of this claim, did you not, sir?
A. In the investigation?
Q. I'm sorry, in the adjustment of the claim, correct?
11:51 A. Yes.
Q. You were the adjuster, correct?
A. Yes.
Q. Can you describe your role as the adjuster?
A. To evaluate the damages with the assistance of consultants, to find the scope of the damage and the costs

associated with it, and apply the policy terms to that damage.

THE COURT: Once again, Mr. Tagliente, will you turn that microphone closer. Thank you.

THE WITNESS: Sorry.

BY MR. CORNER:

Q. Now, Mr. McIntyre also had a role in this process, correct?

A. Yes, sir.

Q. He was involved in the investigation of whether the claim

11:51 ought to be paid under -- whether the claim ought to be paid or not based on the presence of exclusion, correct?

A. We had a fire that was known to have caused by arson, and he was investigating that to determine if our policyholder was involved in that event.

Q. Did Mr. McIntyre provide any information in connection with the preparation of this letter?

A. I believe he did.

Q. Okay. Fair to say that he provided the information concerning the information that was missing from his

11:52 investigation?

A. Yes, sir.

Q. Okay. And you didn't have any involvement in preparing that portion of the letter, correct?

A. No, sir.

Q. In fact, your knowledge is confined to the adjustment of

the loss, correct?
A. Correct.
Q. That's your job?
A. Yes, sir.
Q. Okay. Now, turning to -- turning to the date of this letter, October 12, 2005, you state that one of the reasons for denying the claim is that their failure -- the Mileses' failure to submit a Proof of Loss, correct?
A. Correct.
11:52 Q. And we've seen in evidence the Proof of Loss that was submitted by the Mileses back in May of 2005, correct?
A. Yes, sir.
Q. And that was the letter that was -- the proof of loss that was rejected in your letter, correct?
A. Yes.
Q. After the date of that letter, had the Mileses submitted any other Proof of Loss?
A. No, sir.
Q. Okay. As of the date -- as of October 12, 2005, had the
11:53 Mileses provided you with any information about the amount of their claim?
A. Could you repeat the date, please?
Q. Sure, October 12, 2005, the date of the letter.
A. No.
Q. As of that date they had never provided any information --

A. No.
Q. -- about the amount of the claim?
A. Yes.
Q. If I could turn your attention, please, to the second page of Exhibit 10, page 146, line 4, you stated that the Mileses have not cooperated with Great Northern in the investigation and the adjustment of their claim.
Do you have any knowledge as to how it is that the Mileses hadn't cooperated in the adjustment of their claim?
11:53 A. Yes, I do.
Q. And what -- what had been -- what had the Mileses failed to do in connection with the adjustment of their claim?
A. We can start with the beginning. Their whereabouts at the time -- immediately after the fire were unknown to us, as we could not interview them or talk to them about their loss. They retained a public adjuster but failed to execute a contract with him in a timely manner so that the public adjuster could do the job that he was hired to do. When the public adjuster did prepare a preliminary claim for them, they 11:54 rejected their claim and failed to allow them to submit that to us. When we hired an inventory service to work with the public adjuster, they created a maze with regards to who owned certain contents and who was representing them on certain contents; their daughter's claim was to be presented outside the parameters of the PA's claim. The PA was unallowed to provide

inventory data to our consultants. They didn't timely submit an advance payment receipt so that we could issue advances in a timely manner. We did anyways. We spoke about the interview process, which is usually a cordial event between just us and the policyholder. That was a belligerent melee. At one time I sat through one of those; the second time I did not sit through one.

I think that's enough for now.

Q. But in terms of the adjustment of the loss, your comments

11:55 are confined to the dollar value of their claim, correct?

A. Yes.

Q. And as of October 12, 2005, they hadn't provided you with any such information.

A. Yes.

Q. And the fire occurred on October 17 of 2004, correct?

A. Yes, sir.

Q. So we're almost a year out, right?

A. Yes, sir.

Q. And by this point, Great Northern had paid the Mileses

11:55 $250,000 in advances, correct?

A. Yes, sir.

Q. Okay. Now, let me -- stepping back a second, you talked about your role as an adjuster. How long have you served as an adjuster for the Chubb Group of Insurance Companies?

A. I worked with them since 1996.

Q. Okay. And prior to that, did you have any experience as a property adjuster?
A. I worked for nine years with a company called Crawford & Company.
Q. So you spent a substantial part of your professional career as a property loss adjuster, correct?
A. Yes, sir.
Q. Now, on the following -- following your receipt of Notice of Fire, did you visit the site?
11:56 A. Yes.
Q. Could you turn your attention, please, to Exhibit 75? And Exhibit 75 is a photograph of the house?
A. Rear elevation, yes.
Q. And that's a photograph that was taken that -- you recognize that to depict the condition of the property after the fire?
A. If the camera was set correct, it was taken on the 4th of November.
Q. And does this accurately -- does this accurately depict
11:57 the condition of the house at the time?
A. That's how I recognize it, yes.
Q. And similarly, if we could look at Exhibit 76?
A. Yes, sir.
Q. Another photograph of the house after the fire?
A. Yes.

Q. So substantial damage to the center part -- the structure in the center part of the picture, correct?
A. Yes, sir.
Q. Were you able to obtain access to the area to the left part of the photograph? Do you see the left part of the photograph there?
A. Yes.
Q. Okay. And what area of the house is that?
A. That's over the garage and I believe the kitchen is where 11:57 that indent is.
Q. And what was the condition of that part of the house after the fire?
A. Smoke-related damage.
Q. Was there any structural damage that you could see?
A. No.
Q. How about to the right of high roof area, do you know what area that is?
A. I would call it a multiseasonal room.
Q. And can you describe -- what was the condition of that 11:58 room?
A. Smoke-related damage.
Q. Structurally -- were there any structural damages that you could observe?
A. No, sir.
Q. Now, when did you first speak with either of the -- either

Mr. or Mrs. Miles?
A. Approximately two weeks after the event.
Q. Was that at the recorded interview of Mr. Miles?
A. Yes.
Q. Had you had any opportunity to speak with Mr. Miles prior to that?
A. No, I don't believe so.
Q. Had you made any efforts to contact either Mr. or Mrs. Miles Miles prior to the interview on November 4th?
11:58 A. Our lead contact was a Roger Lehrberg, who was an attorney, and he was assisting in that process.
Q. Okay. And were you -- aside from your contacts -- you referenced a contact to the Mileses through Mr. Lehrberg. Had you had the ability to contact either Mr. and Mrs. Miles directly?
A. No, their whereabouts was unknown.
Q. Is it your practice as a property general adjuster at Chubb to contact the insured after a fire loss?
A. To meet with them within hours of receiving a claim.
11:59 Q. Did you consider it unusual to have to wait two-and-a-half weeks to speak with the insured?
A. Very unusual.
Q. Why was it very unusual?
A. Stretching my memory to recall another time where an insured had not been readily available and anxious to meet with

us.
Q. Okay. You were asked some questions about the insurance policy, Mr. Tagliente. I want to refer you to that exhibit, Exhibit 9.
And if I could turn to you the third page, which is page 71. The word "Masterpiece" appears across the top. Do you know what a -- do you know what a Masterpiece policy is --
A. Please repeat the tab.
Q. I'm sorry, it's Exhibit 9, and it's page 71.
12:00 A. Yes, sir.
Q. And it is identified as a Masterpiece policy, correct?
A. It is.
Q. Can you tell the Court what a Masterpiece policy is?
A. That's a trade name of Masterpiece, but it is our standard homeowner's policy.
Q. Okay. And this is a policy that's issued by Great Northern?
A. Yes, it is.
Q. And it's issued by other members of the Chubb Group of
12:01 Insurance Companies?
A. I believe it's issued in 49 out of 50 states.
Q. Okay. Now, I want to turn your attention, please, to Exhibit 11, which is the Advance Payment Agreement.
A. Yes, sir.
Q. And this is -- this is an agreement that you prepared or

was prepared by Chubb?
A. It was prepared by counsel for us, yes.
Q. And under some questioning from Mr. Brunelle it was noted that only Mrs. Miles signed the agreement. Do you recall that testimony?
A. Yes, sir.
Q. And at some point had you requested that Mr. Miles sign it as well?
A. Yeah, the original document we forwarded to them had both 12:01 of them listed as named insureds. This one was returned with just Theresa.
Q. And do you have an understanding as to why Mr. Miles was removed as being on this Advance Payment Agreement?
A. He alleged that he requested via his agent that the policy reflects solely Theresa as a policyholder, but our records differed, and there were no requests for a name change.
Q. But Chubb had requested that Mr. Miles sign it, and his name was removed at Mr. Miles' request?
A. The document was recreated by him without his name on it.
12:02 Q. And that was -- that was done by Mr. Miles as opposed to somebody from Chubb doing that?
A. Mr. Miles or someone on his behalf redrafted the document.
Q. Now, is -- there's been discussions about advances. Can you describe to the Court what an advance is under an insurance policy in general?

A. Insurance companies understand there might be financial hardships immediately following a loss, and during the adjustment process, while numbers are being created or investigations being undertaken, advances can be issued to assure that those hardships are limited.
Q. Okay. And does the policy provide for the payment of advances to its insureds?
A. It's a policy of reimbursements.
Q. So Chubb had requested that the Mileses execute this
12:03 Advance Payment Agreement, correct?
A. Yes, we did.
Q. And is an Advance Payment Agreement something that is done in each instance where Chubb issues advanced payments to an insured?
A. No, only when there is question of coverage based on the policy or the cause of loss.
Q. So at the time that -- at the time that advances were made, there was in this case a question about the -- about the coverage for this loss, correct?
12:03 A. Yes.
Q. And it was on that basis that the Advance Payment Agreement was requested by Chubb?
A. Yes, sir.
Q. And it was signed by Mrs. Miles?
A. Yes, sir.

Q. And Mrs. Miles signed that document on November 12, 2004, looking at the second page of the exhibit?
A. Yes.
Q. Okay. Now, I want to turn your attention to Exhibit 12. Exhibit 12 is a check that was paid to the Mileses as an advance?
A. Yes, sir.
Q. And the date of the -- the check was issued on November 22, 2004?
12:05 A. Yes, sir.
Q. So shortly after the Mileses signed the Advance Payment Agreement?
A. Yes.
Q. When payments -- on a fire loss, when payments are -- let me step back a second.
The Masterpiece policy contains a number of coverages, correct?
A. Yes, it does.
Q. In fact -- and in this case, the Mileses had deluxe home
12:05 coverage, correct?
A. I believe they were under our deluxe form.
Q. And they had -- they also had -- they also had deluxe personal -- I'm sorry, deluxe personal liability coverage under the policy, correct?
A. Yes, sir.

Q. And they also had deluxe contents coverage, correct?
A. For sake of argument, deluxe is -- defined some perils that are insured for, but either deluxe or standard are covered by fire. I think they were covered by deluxe, but I prefer to read it than just guess.
Q. Oh, sure.
(Pause.)
Q. If I could turn you to page 75 of Exhibit 9. That's the premium summary renewal. And isn't it true that spells out the coverages that the Mileses purchased from Chubb?
12:06
A. That's a premium summary, but --
Q. Okay.
A. Somewheres in the policy it will have their policy limits and it will define what peril.
Q. And within the policy, and that's at pages 79 through 85?
A. Yeah, here we are. If we go to page 79, you're going to see they have 1,080,000 in deluxe house coverage, 540,000 in deluxe contents coverage.
Q. Fair to say those are the two coverages that provide -- that provide coverage in the event of a fire loss, correct?
12:07
A. Those are the two primary coverages.
Q. Okay. And in this -- in this instance, the deluxe house coverage would cover losses to the physical structure, correct, among other things?
A. Yeah, we need to define what that is, but, yes.

Q. And then the deluxe contents coverage would cover the personal items within the house, among other things?
A. Yes.
Q. But that's basically how the coverage is delineated?
A. Correct.
Q. You were asked questions -- and again, I'm going to turn you back to Exhibit 12, you were asked questions about the notation as to -- under where it says "claimant," it says "Mileses' dwelling"?
12:08 A. Yes, sir.
Q. Do you see that? Mr. Brunelle had some questions about that.
Can you describe why it is that it would say "dwelling" in this instance?
A. When a homeowner's claim is filed, we give data up to our actuaries on the scope of the loss. We define it very crisply down to what line of coverage or what available coverage payments eventually are issued off of. So they want to know how much we paid out for debris, they want to know how much 12:08 we're paying out for ALE, they want to know how much is paid out in contents, so they can do their actuarial work and understand when we give unlimited ALE coverage, is that a good business decision? When we give unlimited debris removal, is that a good business decision?
So we create those before reserves are even posted.

So advance payments are usually issued off the first coverage line that's entered.
Q. Okay. And so Mr. Brunelle was asking you questions about under what coverage the advance payments were made. Do you want to describe that?
A. The advanced payment is issued off the file. How we internally account for it doesn't reflect necessarily any limitation or addition of coverage to their policy. Their policy limit for house is one million, the policy limit for contents is 540, and we issue advances off of that policy.
Q. So by issuing an advance, you're not making a determination as to whether the -- as to the amount of the claim, correct?
A. No.
Q. Okay. And so, ultimately, if you -- there is -- and the ALE payments, the additional living expense payments, those are payments that are made off of the deluxe house coverage part of the policy, correct?
A. On the deluxe house coverage we also have extra coverages --
Q. Right.
A. -- which are defined, and one of those are the additional living expenses.
Q. Right. So that comes under the house coverage as opposed to contents coverage?

A. Yes, sir.
Q. As opposed to the liability coverage?
A. Yes.
Q. Okay. Now I want to ask you some questions about the payments associated -- the payments that were made to the mortgagees, and I want to first turn your attention to Exhibit 23. I'm sorry, let's start with 22.
Exhibit 22 is a letter that you received from Mr. Lehrberg?
12:11 A. Yes, sir.
Q. Mr. Lehrberg is representing the second mortgage on Mrs. Miles' home, correct?
A. At this time of the file it was, yes.
Q. And Exhibit -- in Exhibit 23 are similar letters from Mr. Lehrberg on the same day where he's also representing junior mortgagees on the property?
A. Yes, sir.
Q. And you were aware when you received these letters that Mr. Belli -- first of all, Mr. Belli was one of the mortgagees, correct?
12:11
A. Yes, he is.
Q. And you at some point learned that Mr. Belli was Mrs. Miles' father?
A. I was aware of that.
Q. And that these mortgages were in, shall we say, junior

position, correct? There was a first mortgage ahead of them?
A. There was an institutional mortgage number one, and these followed as secondary mortgages.
Q. And at this time, this letter, Mr. Lehrberg is asking for payment to the -- to his clients as mortgagees, correct?
A. Yes, sir.
Q. Now, you made some -- during your testimony you had made some statements about that you were -- that the payments that were ultimately made to Mr. Belli and to Webster Bank were 12:12 payments of the mortgagee's interest under the policy. Can you explain what you meant by that?
A. Under our Masterpiece policy, and for sake of argument, Exhibit Number 1440 spells out the mortgagee's clause in the policy. And in its simplest term, the mortgagee stands independent of the policyholder.
Q. Okay. When you say "stands independently," what do you mean?
A. Any violation of the policy that they may have attributed to cannot be attributed to the mortgagee, and that they be paid 12:13 for their interest in the property.
Q. Okay. So if Chubb had gone ahead and denied the Mileses' claim, which they did, there was still an obligation to pay the mortgagees, correct?
A. There was, correct.
Q. Unless, of course, the mortgagees had some involvement in

the basis on which the claim was denied?
A. Yes.
Q. Okay. Now, at some point payment was made to Mr. Lehrberg's clients, correct?
A. Along with the first mortgagee, yes.
Q. I just want to turn your -- I just want to set a timeline here.
You first received word from Mr. Lehrberg on January 11th of 2005, correct?
12:14 A. Yes, sir.
Q. So about three months after the fire?
A. Correct.
Q. To that point had you heard -- had Chubb ever heard anything from the first mortgagee?
A. No, sir.
Q. Okay. Now, ultimately, payment was made to Mr. Lehrberg's clients on September 14th of 2005. And I'll refer you to Exhibit 21 for that.
A. Yes, sir.
12:14 Q. So it took nine months to make that payment to the mortgagees, correct?
A. Yes, sir.
Q. Okay. Now, Mr. Lehrberg is stating in January -- he sets out the amounts of the claim and identifies the mortgagees. Why wasn't payment made directly right then to Mr. Lehrberg's

clients?
A. We needed to understand the status of the first mortgagee's interest in the property.
Q. And at some point you determined there was, in fact, a first mortgagee on to the property?
A. Yes.
Q. And if I could now turn your attention to the -- starting at Exhibit 19, and in particular, Exhibit 19 A, which is page 156-A of the exhibit book --
12:15 A. Yes, sir.
Q. -- and the first two entries on that page indicate that you were to start -- you were to proceed with making the mortgagee claims, correct?
A. Yes, sir.
Q. Okay. And in connection with that, you placed a call to People's Savings Bank?
A. I did.
Q. People's Savings Bank, you learned at that time, was the first mortgagee on the property?
12:16 A. Yes, sir.
Q. Okay. And how did you learn that?
A. Mortgagees are listed on the declaration pages.
Q. Okay. So you made an inquiry to determine who the first mortgagee was, correct?
A. Yes.

Q. And you did that by checking the policy initially?
A. Yes.
Q. Okay. As of March of 2005, had you received any communication -- had Chubb received any communication from People's Bank looking for payment on their mortgagee claim?
A. No.
Q. That was unlike Mr. Lehrberg's clients, they made their demand in January, correct?
A. Very aggressively, yes.
12:16 Q. And so you sought out People's Bank, the first mortgagee, after having been prodded to do so by the second mortgagee, correct?
A. Yes, sir.
Q. Okay. Now, turning your attention to Exhibit 19 B and 156-B, you then reached out and you wrote a letter to Mr. Hess at People's Savings Bank, correct?
A. I did, sir.
Q. Okay. And how did you -- do you recall how you determined that Mr. Hess was the person to contact?
12:17 A. Like any time you deal with a bank, I spoke with ten different people to find the person who was in charge.
Q. But this was based on you checking with People's Bank. Is how you ultimately got to Mr. Hess, correct?
A. Yes.
Q. People's Bank hadn't made any demands of Chubb, right?

A. No, sir.
Q. By the way, at this point were you aware of -- did you ever -- well, let me turn to the next page.
Fair to say that Chubb conducted a search at the registry of deeds and was able to identify the first mortgagee?
A. Yeah, that's a typical action plan.
Q. Did you have any understanding whether the first mortgage was current at this point?
A. I would have no knowledge of that.
12:18 Q. You didn't. Okay. But you hadn't received any -- you hadn't received any information from People's saying, Hey, Mrs. Miles is behind on the mortgage?
A. We were not made aware of any foreclosure proceedings.
Q. Were you at any time advised that Mrs. Miles was behind on the mortgage to People's Bank?
A. No.
Q. Now, if I could turn your attention, please, to page -- Exhibit 19 C, page 156-C-1. And this is an e-mail, if I could turn to the page before, it was received on May 15, 2005?
12:19 A. Yes, sir.
Q. Okay. And stated here that Webster Bank has replied to John Tener's request for their insurable interest, correct?
A. Yes, sir.
Q. So, again, the bank responded to Chubb's inquiries concerning the amount of the first mortgage?

A. Yes, sir.
Q. No claims for -- no demands had been made, correct?
A. Correct.
Q. No foreclosure as far as you knew?
A. No.
Q. You go on to state that at this point you have not actually -- you have not received the insured's claim for the house reconstruction via their public adjuster. That's Swerling Milton Winnick?
A. Yes.
Q. Swerling Milton Winnick was the public adjuster you referred to previously.
Just for the record, so the Court understands, can you describe what a public adjuster is?
A. A public adjuster is licensed by the state to assist policyholders in the presentation of their property-related claims, whether that be a commercial policy or a homeowner's policy. They assist them in preparing the damage analysis with regards to cost of construction; most of them are skilled in writing estimates or have consultants that will do so on behalf of the policyholder.
Q. Okay.
A. They have the wherewithal to prepare an inventory and general insurance knowledge to advise the policyholder accordingly.

Q. Okay. Now, Swerling Milton Winnick had been hired by the Mileses, correct?
A. Yes, they were.
Q. At some point they were hired by the Mileses, correct?
A. They were my secondary contact at the time of the loss notice, and I met with Jim Harley of their office on our first inspection.
Q. Yes, Jim Harley was a construction guy, right?
A. He's a consultant of Swerling Milton Winnick with a background in construction.
Q. Right. Now, Swerling Milton Winnick was also assisting Mr. Lehrberg in his claim that was being made on behalf of Mr. Belli, correct?
A. Yes, sir.
Q. And it states at this point that you made a formal demand for the Proof of Loss over 90 days ago and granted one extension at that point, correct?
A. Yes, sir.
Q. So you were attempting to get the information from the Mileses concerning the amount of their claim, correct?
A. Routinely with a public adjuster you receive a house claim within 60 days, a contents claim soon thereafter.
Q. Now, at this point -- Chubb had engaged Brown and Dupont at this point, correct?
A. Yes.

Q. And for what purpose?
A. Brown and Dupont and specifically Tom Brown is a specialist in construction. He has a long history of construction background and was assisting us in reviewing the scope of the fire damage and to assist us in evaluating the cost of that damage.
Q. It appears at this point that he had, that Mr. Brown had prepared a construction estimate, correct?
A. He prepared a preliminary draft, needed to walk through the house again with Mr. Harley at Swerling Milton Winnick.
Q. And if -- what was the purpose for hiring -- for Chubb hiring a consultant, given that the Mileses had also hired a building consultant? Why did Chubb need to hire its own consultant?
A. It goes back to the verification process.
Q. Okay. Fair to say that you were trying -- that you were trying to reach an agreement on the amount of the loss?
A. Yes, sir.
Q. Okay. And the amount of the loss from the insureds' perspective would be presented through their building consultant?
A. They present their claim to us and we will review it.
Q. Sir, now, if I could turn your attention, please, to Exhibit 19 E, and it's page 156-E. That's a payoff statement that was sent to Mr. Tener?

A. Yes, sir.
Q. And at some point you saw this, correct?
A. I did.
Q. And this is sent by Thomas McGuire, and you understood him to be counsel to Webster Bank?
A. That's my understanding.
Q. And you understood by this point Webster Bank had become the assignee of the first mortgage on Mrs. Miles' property, correct?
12:24 A. Yes, sir.
Q. Webster was a successor to People's Bank?
A. That's my understanding.
Q. And do you recall receiving any other written communication from Webster Bank aside from this letter from Mr. McGuire?
A. Not that I'm aware of.
Q. You're not aware of any demands having been made as of August of 2005?
A. No, sir.
12:25 Q. No foreclosure proceedings had been commenced?
A. No, sir.
Q. Ultimately, payment was made to -- if I could turn you to Exhibit 21 -- ultimately payment was made to the first mortgagee, Webster Bank, on September 14 of 2005, correct?
A. I believe that's the date.

Q. And that was made at the same time as the payment to Mr. Lehrberg's clients, right?
A. Yes, sir.
Q. That included Mr. Belli?
A. Yes, sir.
Q. Now, as of September 14 of 2005, were you aware of the Mileses having commenced any construction activities at their home?
A. No, I was not.
12:26 Q. Were you aware that the Mileses had had any intention of beginning construction activities at their home?
A. I was not aware of any intention.
Q. Now, if you had been aware of the Mileses being interested -- obviously, if the Mileses were going to repair or reconstruct their home, it's fair to say that it would come from the insurance proceeds, correct?
A. That would be my assumption.
Q. Sure, that's why you get homeowner's coverage, right? Among other reasons.
12:26 If you had been aware of the Mileses' desire to make construction -- to prepare construction payments, would there be any difference in the way these payments were made?
MR. BRUNELLE: I'm not sure, which payments are you referring to?
MR. CORNER: I'm sorry, I'm referring to the mortgagee

payments that were made to Webster Bank and to Mr. Lehrberg's client.

MR. BRUNELLE: Objection.

THE COURT: I'm not sure I understand the question.

MR. CORNER: Okay. Let me try it again.

BY MR. CORNER:

Q. If you were -- if payments were going to be made for the reconstruction of the house, you would pay the Mileses, right?

A. We pay the Mileses and their mortgagee if there was no violation of the policy terms.

12:27

Q. So, again, if the intention -- so the check would have been made jointly to the Mileses and to the mortgagee, correct?

A. Mortgagee's interest would always be protected.

Q. Okay. And you were never -- you were never asked to arrange for payment in that manner, correct?

A. No, sir.

Q. You're not aware of the mortgagee saying, Okay, we're going to -- the Mileses are going to rebuild, make payment to us. Nothing along those lines?

12:28

A. No, sir.

Q. In fact, the second mortgagee was pretty aggressive, I believe you stated, in pursuing the payments, correct?

A. Yes.

Q. Never received any word from Mr. Lehrberg saying, Hey, make the payments payable to Mr. Belli as mortgagee and his

daughter, the owner?
A. No, sir.
Q. Which you would have done if the daughter was going to rebuild the house.
MR. BRUNELLE: I object, your Honor.
THE COURT: Grounds?
MR. BRUNELLE: Calls for speculation of what he would have done.
THE COURT: Sustained.
12:28 BY MR. CORNER:
Q. Well, consistent with the company's practices and the terms of the company issuing checks in payment of mortgagee claims, isn't it -- excuse me, payment of homeowner's claims, isn't it true that you would have issued a joint payment to the -- to the owner and the mortgagee if repairs were to be undertaken?
A. If there were no policy violations or exclusionary language that was applicable to the adjustment, we would have issued a payment to the named insureds and the mortgagee.
12:29 Q. And again, that's something that the mortgagee would have to instruct you to do?
A. Repeat your question.
Q. Sure. You'd need the mortgagee's permission to make payment to the owner on a mortgagee's claim?
A. I don't know.

Q. Well, I think I confused you with the question, so let me try another question.
If you were making payment to -- if you were aware that payments were to be made to the insured to repair the structure, they would have -- you would need permission from the mortgagee to make the payment jointly to the owner and the mortgagee.
A. The terms of the policy would name both the mortgagee and the insured on all payments. So permission is not a factor.
12:30 Q. After Great Northern made the payments to Webster Bank and to Mr. Lehrberg's clients, who owned the policy at 1 Running Stream Road in Rehoboth?
A. Who owned the property?
Q. Yes.
A. There was no transfer of ownership.
Q. Mrs. Miles remained in ownership of the property?
A. I believe so.
Q. And in September of 2005 there was no foreclosure?
A. No, sir.
12:30 Q. Just the mortgagees were paid?
A. Yes, sir.
Q. She continued to own the property?
A. Yes, sir.
Q. And the mortgages to Webster Bank and -- was discharged, right?

A. That's my assumption.
Q. And similarly, the second mortgagee, Mr. Belli and the other two mortgagees, their mortgage was discharged as well?
A. Again, that's my assumption.
Q. Mr. Tagliente, if I could turn your attention, please, to Exhibit 54.
THE WITNESS: I'm going to need one of Mr. McIntyre's biological breaks.
THE COURT: Sorry?
12:31 THE WITNESS: I got to go to the bathroom.
THE COURT: All right. We'll take a short break. You may do so.
(Witness took a short break.)
THE WITNESS: Thank you.
THE COURT: Yes, you may continue, Mr. Corner.
MR. CORNER: Thank you, your Honor.
BY MR. CORNER:
Q. Mr. Tagliente, I want to turn your attention, please, to Exhibit 54.
12:35 A. Yes, sir.
Q. And in that letter, again, you're -- looking at the first page, you had requested proofs of loss for both Mr. Miles and Mrs. Miles, correct?
A. Yes, sir.
Q. And can you tell us again what's the purpose for a Proof

of Loss in the claims adjustment process? How does that assist you in adjusting the amount of the claim?
A. It outlines the insureds' claims against their policy, and it provides us with the general details that we need, names of the policyholders, any interest in the property, listing mortgagees or any liens, and it spells out the amount of their claim being presented under that policy.
Q. And is that something you would use and run up against your own consultant's estimates to determine an appropriate amount of claim?
12:35
A. Right. A Proof of Loss has got a cover page, but it usually is substantiated with documents.
Q. So the Proof of Loss, is it fair to say you were expecting more than you got?
A. Yes, sir.
Q. And again, on April 21 of 2005, you never received any documented amount of the Mileses' claim?
A. No, sir.
Q. And if I could turn you to the second page of the letter,
12:36 items 3, 4, and 5 identify some documentary evidence -- some documentary information that you were seeking from the Mileses?
A. Yes.
Q. And you sent this letter on behalf of Chubb, correct?
A. Yes, I did.
Q. And you were making these requests, for the request for

items in 3, 4, and 5, on behalf of Mr. McIntyre, correct?
A. Yeah, Charlie had some issues he needed to resolve.
Q. So, again, you weren't -- the information that you're requesting in items 3, 4, and 5 isn't something that you were looking at in connection with your adjustment of the loss?
A. No, it's not.
Q. If I could turn you to, I think, the last page, 264. Keep us on track here. As of this date, Chubb had already paid out or was paying -- had paid a total of $75,000, between the 50 and the 25 that's identified in the letter?
12:37
A. For additional living expenses.
Q. Right. But, again, these are advances that were made under the Advance Payment Agreement?
A. Yes, sir.
Q. If I could turn you on to Exhibit 56, 56 was the sworn statement of loss that you had received from Mr. and Mrs. Miles?
A. Yes, sir.
Q. And this was -- this was sent under cover of a letter from Mr. Miller, correct?
12:38
A. It was.
Q. Did anyone from Chubb have any role in preparing this Sworn Statement and Proof of Loss?
A. I don't believe so.
Q. And you understand that the form was an industry standard?

A. That's my understanding.
Q. Was this a form that Chubb had provided to Mr. Miller?
A. Either his public adjuster or we did. We have blank forms like this. Did I say Mr. Miller? I meant Swerling's office.
Q. Okay. It was provided either by Chubb or Mr. Swerling's office?
A. That would be my understanding.
Q. Now, if I could turn you to Exhibit 57.
A. Yes, sir.
12:39 Q. Exhibit 57 is the letter that you sent to the Mileses by which you rejected their Proof of Loss, correct?
A. Yes.
Q. And you rejected the Proof of Loss because it was deficient?
A. Yes.
Q. And it was deficient for the reasons that are stated in that letter?
A. Yes.
Q. And Mr. Brunelle went into some detail as to the -- as to why your reported deficiencies were themselves deficient? 12:39
I guess my question to is: Did you deny the Mileses' claim at that point?
A. No.
Q. Did you provide the Mileses any opportunities to submit any information concerning the amount of their claim between

the date of Exhibit 57 and the actual denial of the claim on October 12 of 2005?
A. Without seeing my running notes, I'm sure I communicated with Swerling Milton Winnick and discussed the claim.
Q. Yet, they never -- yet, there was never any -- there was never a sworn Proof of Loss submitted by the Mileses other than Exhibit 56?
A. No, sir.
Q. By the way, Exhibit 56 is the sworn Proof of Loss, it's
12:40 not entirely clear to me on this copy, was there a seal from a notary on the document that you received?
A. I wouldn't know. It doesn't appear to be from the copy.
Q. When I say a seal, you know what I mean, sort of a raised seal -- you've seen notary seals before, right?
A. Paper seal, stamp.
Q. And it doesn't -- what appears states that it's subscribed and sworn to me this blank day of May 2005, doesn't have a date, right?
A. Repeat the question?
12:41 Q. Sure. You see where it says -- the notary public's -- what appears to be the notary public's signature, and it says subscribed and sworn to before me this blank day of May 2005?
A. It's just a signature.
Q. Right. And typically -- do you ever recall seeing when a notary public signs a document it states the date that his or

her commission expires?
A. That's very common.
Q. You would agree that's not on there?
A. No, sir.
Q. So if you wanted to check on the -- on whether this person, Mr. -- it looks like Mr. Brett, if he was actually a notary public, you wouldn't -- you wouldn't be able to access the date of his -- by which his commission expired, correct?
A. Correct, sir.
12:42 Q. If I could turn you, please, to Exhibit 32.
Exhibit 32 is -- I'm sorry, you got that?
A. I do.
Q. Exhibit 32 is a letter, it's hand dated August 30, 2005, and it appears to be to Alan Miller from Mr. Tener. First of all, the first paragraph states, "Dear Mr. Miller, now that you are back from vacation, please find attached a copy of an authorization for the release of Protection One Alarm records. I request that you promptly have the Mileses sign the release and that you return it to me."
12:43 So August -- it would appear here that August 30 a release was sent to the Mileses, correct, through their counsel?
A. That's my understanding.
Q. Okay. And as of October 12, 2005, the date upon which Chubb denied the claim, do you recall whether Chubb had

received an executed release for the Protection One records from the Mileses?
A. I'm not aware of that.
Q. Now, fourth paragraph states that "Attorney Dana Rodin, as you know, has contacted Great Northern regarding the outstanding bill of approximately $58,000 that the Mileses owed his client, the Residence in by Marriott at Tudor Wharf in Charlestown."
Do you have any understanding what that reference is?
12:44 A. Yes, I do.
Q. And can you tell the Court what that refers to?
A. Following the fire, the Mileses and I believe either their personal assistant or daughter moved into the Marriott at Long Wharf, which is approximately -- based on counsel's drive this morning, about two hours away from their house, but probably a hundred miles, 50 miles from the house, and chose to live on the waterfront in Boston. Without payment, they ran up hotel fees in excess of $58,000.
Q. So Chubb learned that the -- that there were $58,000 that
12:45 the Mileses hadn't paid to a hotel in which they were staying?
A. Yes.
Q. And you believed -- you mentioned Long Wharf, this was actually Tudor Wharf in Charleston?
A. Sorry, other side of the water.
Q. Now, at this point, as of the date of this letter, August

30, 2005, Great Northern had made advances to the Mileses, correct?
A. Yes, we had.
Q. In fact, they had made all of the advances to the Mileses that are recorded in this case?
A. I believe all $250,000 was advanced prior to that.
Q. Did Chubb make any payments to any hotels and/or to anybody aside from the Mileses for their additional living expenses?
12:45 A. No, sir.
Q. All of those -- all ALE payments were made directly to the Mileses?
A. At the individual request of their public adjuster, advances were issued.
Q. Those checks were paid, by the way, to Mr. and Mrs. Miles, correct?
A. I believe they all were.
Q. If I could turn you -- just to point that out to you, if I could just turn you to -- as an example, Exhibit 12?
12:46 A. James F. Miles and Theresa B. Miles.
Q. And payments were made in that fashion at Mr. Winnick's request?
A. Yes, sir.
Q. Mr. Winnick, again, being the principal at Swerling Milton Winnick, their public adjuster?

A. Yes, sir.
Q. Now, if I could turn you, please, to the second page of Exhibit 32, it's page 184.
THE COURT: 183, do you mean, Mr. Corner?
MR. CORNER: You may be right.
I apologize, your Honor, it's 183, you're correct. Shortcoming of note-taking on my part.
BY MR. CORNER:
Q. The top -- the very top of the page on page 133 states that "Great Northern rejects the Mileses' request that their choice to live at the Colonnade Apartments at a monthly cost of $12,000 be reimbursed by the company."
Do you have any understanding of that request?
MR. BRUNELLE: Your Honor, I'm going to object here only because the -- I think this evidence is going to -- correct me if I'm wrong -- to the issue of what the amount of the advance -- or the additional living expenses claim should be, and that was decided by the reference proceeding. So I'm not sure that what they asked for or what was paid for that is really relevant. That's a fact that's been already established, I think.
THE COURT: I'm going to let him continue. If there's a time when you believe it's necessary to move to strike, I'll hear your motion.
MR. BRUNELLE: Okay.

BY MR. CORNER:
Q. So the Mileses made a request to stay at the Colonnade Hotel?
A. After being I believe it was evicted from the Marriott, they transferred their residency to the Colonnade. We were advised by that from their public adjuster of their intent to do so. We reaffirmed the language of the policy, which says meeting your normal standard of living, and suggested that a property in the Rehoboth area would be more in kind with what their standard of living was. They chose not to take our advice and did move into the Colonnade.
MR. BRUNELLE: I'm going to ask that all of that be stricken.
THE COURT: That part of the answer will be stricken.
BY MR. CORNER:
Q. Following this letter -- following August 30, 2005, did the Mileses make any further requests for advances?
A. I don't know what the date of the last advance was. What was your date you asked?
Q. If I told you that the date the last advance was made was August 22 of 2005, and that's Exhibit 18, do you know if any subsequent requests for an advance was made by the Mileses?
A. We issued $250,000 in advances.
Q. Right.
A. And that was the last total --

Q. No, my question is, after the last advance payment was made, Great Northern is rejecting this request for -- that the Mileses continue to live at the Colonnade, correct?
A. Yes.
Q. Was that in connection with the request for further advances?
A. I don't recall.
Q. Now, Mr. Brunelle noted a moment ago that the amount of the ALE claim was determined at the reference proceeding.
12:50 Did you attend the reference proceeding?
A. I did.
Q. Can you explain what a reference proceeding is, just in general?
(Pause.)
A. In general terms, if us and the policyholder cannot agree on the value of their loss, that a resolution similar to arbitration is set up by the policy where both sides present their damage analysis to a panel and that panel jointly determines the -- what is a fair and equitable value.
12:51 Q. Okay. And so there was -- fair to say there was an evidentiary hearing convened at which the parties -- the parties made their presentations to the panel of referees?
A. That reference did take place.
Q. And you attended that?
A. I did.

Q. And did the Mileses at that time present a property loss claim?
A. Yes, they did.
Q. And who presented that claim on their behalf?
A. Swerling Milton Winnick.
Q. That was Mr. Harlor?
A. Harlor and one of the Swerling sisters.
Q. Okay. Do you recall the amount of the Mileses' claim at that time during the reference proceeding?
12:52 A. It was a bit over a million dollars.
Q. If I could turn you to Exhibit 81.
Exhibit 81 is the -- Exhibit 81 is a letter from Mr. Lehrberg submitting a building repair estimate prepared by Swerling Milton Winnick Insurance Company for my clients' interest only in the amount of $1,097,370.03. Do you see that?
A. I do.
Q. And does that refresh your recollection as to the -- as to the amount of the property loss claim submitted by the Mileses at the reference proceeding?
12:53 A. It appears to be the same.
Q. It's the same.
Same -- and it was presented through the same -- through the same public adjuster?
A. That's my understanding, yes.
MR. CORNER: One moment, your Honor.

(Pause.)

MR. CORNER: Mr. Tagliente, thank you. I have no further questions.

THE COURT: Any redirect?

MR. BRUNELLE: Yes, thank you, your Honor.

I'll try to be brief, your Honor.

REDIRECT EXAMINATION

BY MR. BRUNELLE:

Q. Mr. Tagliente, we just were looking at Exhibit 81, which 12:54 was a letter from Mr. Lehrberg to you in which he submitted the estimate prepared by Jim Harlor of Swerling Milton Winnick for their -- that company's estimate of what the building loss was in their opinion, correct?

A. That was a claim submitted on behalf of the mortgagees.

Q. Right. But, in any event, it was submitted by the -- the estimate, rather, being submitted on behalf of the mortgagee was prepared by the public adjustment company that you knew had -- was also representing the Mileses, correct?

A. The caveat was that it was solely for the purpose of the 12:55 mortgagees' claim.

Q. I understand. But you also understood that this was coming from the same company that was representing the Mileses at this point, correct?

A. Both coming from Swerling Milton Winnick.

Q. Right. And that gave you some idea of what Swerling

Milton Winnick's opinion was going to be about the property value as of June of '05, correct?
A. I don't know what "some idea" means.
Q. Okay. It gave you an exact idea of what Swerling Milton Winnick's opinion of the property loss value was going to be as of June of 2005, correct?
A. No.
Q. That's not true?
A. No.
Q. Okay. All right. So this document here that we're looking at that's part of 81 starting on page 514 and 515, that did not tell you what Swerling Milton Winnick's opinion was of the loss -- the building loss value?
A. The caveat submission of that saying it was solely for the purpose of the mortgagees' clause and that a revision would probably be submitted for the house claim as presented by the Mileses.
Q. It says, "I am submitting a building repair estimate prepared by Swerling Milton Winnick public adjuster for my clients' interest only in the amount of 1,097,730. This estimate is provided to support the claim of the mortgagees only and without prejudice to the claim of Theresa or James Miles whom I do not represent." Right?
A. Yes, sir.
Q. I don't read in there where it says there was going to be

a revision. Does it say that? Am I missing that somewhere?
A. "Without prejudice" suggests that there are revisions or it's not binding towards them.
Q. Whether there was going to be revisions or not, at least you had some idea of what this company said the value was for purposes of the mortgagees' claim, right?
A. Yes, sir.
Q. Okay. All right. And your own adjust -- I'm sorry, your own expert, this Tom Brown you talked about, had come up with a different number as I recall?
12:57
A. He certainly did.
Q. And his number was closer to, give or take a few dollars, was around $800,000, which included demolition costs, true?
A. True.
Q. And that was the number that your company used when you were paying off the mortgagees, you paid up to the amount that Mr. Brown had estimated was the reconstruction costs plus the demolition costs, right?
A. Yes, sir.
12:57
Q. And even though, sir, that up to August of '05 you had not received any Proof of Loss from the Mileses which included a dollar figure for their claim, your company nevertheless continued to make advance payments until they had totalled $250,000, correct?
A. Yes.

Q. Okay. And even though -- I'm sorry, let me go back for a minute, please.

Will you turn, please, to Exhibit 31. Exhibit 31 is Mr. Miller's e-mail to Mr. Tener that we looked at earlier, and the third item in that e-mail says, "I am attaching hereto the contents loss of the Mileses which approximates $750,000."

So that would have been the first time in August 10th -- August 16th, excuse me, August 16, 2005 that the Mileses had submitted a contents claim and the amount was roughly $750,000; is that correct?

12:58

A. That's what the e-mail states.

Q. Well, do you remember getting that claim around that time, August, for $750,000?

A. I don't at this moment, but I see it as an attachment to the e-mail.

Q. And, sir, you know, because you were there, at the reference proceeding, that your attorney, Mr. Tener, stipulated that the amount of the contents loss -- stipulated with my clients that the amount of the contents loss was -- and I'm looking at Exhibit 64 now, this is the decision of the referees, it says, "The stipulated contents loss, not including business property and scheduled FERS, is 713,158.89." You know that, correct?

12:59

A. I'm trusting you read that document.

Q. Thank you. So you agree with me that your company was not

prejudiced in any way because the Mileses didn't submit their contents claim until August of '05. No prejudice in any way with regard to adjusting the contents claim, true?
A. No.
Q. That's not true?
A. No.
Q. How was your company prejudiced by the fact that the contents claim wasn't submitted until August of '05?
A. I would not know, it was not submitted until then.
12:59 Q. I'm sorry, I didn't hear the last thing you said.
A. I said how would I know if I was prejudiced, they failed to provide it until then.
Q. Well, once they -- you tell us, sir. Your company is in here claiming it was prejudiced because of the delays that my client made, so you tell the Court. How was your company prejudiced by the fact that the claim wasn't submitted until August of '05 if your company later, two years later, stipulated that the amount of contents loss was $719,000 -- $713,000? How were you prejudiced? Tell the Court.
01:00 A. It's a verification process in every adjustment, and we would inspect the contents to determine their value, and the more timely that is done, the more accurate it is. At some point in time, that was -- facts become a bit cloudy, and at that point maybe we did stipulate for the purpose of the appraisal that the number was there. But we did hire a firm

that specializes in going into burnt houses, looking at the items, with a public adjuster, identifying what they are, and putting a value upon those.

Q. Okay.

A. That process could not take place because they failed to submit an inventory in a timely manner.

Q. Well, sir, your company could do -- take the inventory itself. You sent somebody into the house, they could count how many vases there were, how many dishes there were, how many pictures were on the walls. You didn't need the Mileses to tell you that, did you?

01:01

MR. CORNER: Objection.

THE COURT: Sustained.

BY MR. BRUNELLE:

Q. Okay, sir. In any event, I just want to be sure that the Judge wasn't misled by this, sir.

When you were talking about the additional living expense payments -- and I think Mr. Corner asked you something about that they were -- that it came under the house coverage, you were not suggesting that payments for additional living expense were deducted from the limit of liability for the building loss, were you?

01:01

A. There's no reference to deducting made.

Q. Excuse me?

A. There was no reference that we were deducting ever made.

Q. So the building loss, limit of liability, which was 1,080,000. That's separate from the additional living expense limit, correct? In fact, there is no limit for additional living expenses under the policy, correct? No dollar limit?
A. When are you going to end your question?
Q. I'm ending it right now. There's no dollar limit for additional living expenses, are there?
A. Additional living expense is additional coverage provided under our house coverage. Extra coverages have specific limits
01:02 or terms separate than the house coverage. For additional living expense it's based on the period of restoration and their normal standard of living. So, no, there is not a dollar value, and it is additional to the $1 million coverage which was afforded to the house.
Q. Thank you very much, sir.
Now, sir, with regard to why your company paid this mortgage of the first mortgagee, and I think you said to Mr. Corner that no demands -- or Mr. Corner had asked you were any demands made for payment, and you said no demands for
01:03 payment were made.
Would you turn back, sir, to Exhibit 19, and this will be Exhibit 19 C, which is that e-mail that starts at the very bottom of the page -- I'm sorry, it's not an e-mail, it's a file note to Scott Pringle. And if I turn the page to page 156-C-1, are you with me there, sir?

A. I am.
Q. Okay. And then in the body of that file note, down at the bottom, towards the bottom it says, Number 1, Webster Bank principle 180 some-odd thousand dollars, current demand for balance 184 some-odd thousand dollars. So there was a demand being made for the payment of that mortgage by Webster Bank, correct?
MR. CORNER: Objection.
THE COURT: Grounds?
01:04 MR. CORNER: This is a -- -- I'll withdraw the objection.
A. The word "demand" came from me, not from the Webster Bank.
Q. Well, sir, you understand that Webster Bank was asking your company to pay 184 some-odd thousand dollars, right? That was your understanding, wasn't it?
A. My understanding is the Webster Bank was the first mortgagee. I understand also that the second mortgagee, including Mrs. Belli's (sic.) father, were demanding claim. Under the terms of the mortgagee clause, our obligation is to 01:04 the first mortgagee first and sequence it down. So without protecting the first mortgagee's interest, we would violate our policy by paying the policyholder mortgagee number two. So, yes.
Q. Well, sir, you're an experienced property adjuster, right?
A. I am.

Q. You know, sir, when there's a fire loss that mortgagees typically have clauses in them that say that the mortgagee bank at its option can accelerate the debt, even though the debt is not then due, and get paid off in full if that's what it wants to do, right?
A. No.
Q. You're not familiar with that?
A. No.
Q. All right. Turn to Exhibit 79, sir. This is a copy of 01:05 the mortgage which was eventually assigned to Webster Bank. The mortgage is originally to the Bank of Taunton, and if you would turn, please, sir, to page 507 in this exhibit, I'm going to read a portion of this to you.
A. I can't read this.
Q. I can. Two paragraphs down it begins, "Unless lender and borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the property damaged if the restoration or repair is economically feasible and lender's security is not lessened. If the restoration or repair is not 01:06 economically feasible or lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by the security instrument whether or not then due with any excess paid to the borrower."
So, sir, when you -- when your company paid Webster Bank as the first mortgagee, it was paying it because it had a

right to be paid under its mortgage. It had a right to accelerate the debt even though it may not have then been in default. That was your understanding, wasn't it?
A. No.
MR. CORNER: Objection.
THE COURT: He can state what his understanding was. Objection is overruled.
BY MR. BRUNELLE:
Q. Okay. That was not your understanding.
01:06 Okay. Well, certainly, sir --
THE COURT: Did you answer the question?
THE WITNESS: I said no.
MR. BRUNELLE: I'm sorry, your Honor, I thought he had. I beg your part, sir.
BY MR. BRUNELLE:
Q. Certainly, sir, you never consulted with Mrs. Miles as to whether or not she wanted you to pay off her first mortgage or the second mortgage, correct?
A. No, sir.
01:07 Q. Okay. You just -- you did that because demands had been presented to you, and it was your understanding that under the terms of your policy, your company was obligated to honor the request made by the mortgage holders to pay off whatever amount was due to them up to the amount that was due for the building loss under the mortgage, true?

A. Yes, sir.
Q. Okay.
And Mr. Corner asked you some questions about if you had known that Mrs. Miles planned on rebuilding. You had never discussed with Mrs. Miles one way or the other whether she planned on rebuilding, had you, up to that point?
A. James and Theresa Miles were represented by a public adjuster. I was in contact with them regularly as to whether or not they had commenced with any demolition, temporary protection, or had secured a contractor to do some work.
01:07
Q. Right. But nobody had ever said to you -- Mr. Winnick or anybody else had ever said to you on behalf of the Mileses, No, they're not going to rebuild, true?
A. I don't know what your question is.
Q. My question is: Did anybody ever say to you on behalf of the Mileses that they were not going to rebuild?
A. I'm not aware of that.
Q. Okay. And in fact, sir, your company paid every single dollar that it estimated it would cost to demolish and rebuild that structure, that money was all paid to the mortgagees in accordance with their request, true?
01:08
A. It was a very heavily mortgaged house.
Q. It was a heavily mortgaged house, but you didn't answer my question, sir.
All of the money that your company estimated, all

$800,000, which included reconstruction costs and demolition costs, all of the money that would have been needed, according to your company, to rebuild that house was paid to the mortgagees?
A. Yes.
Q. Okay.
MR. BRUNELLE: Those are all the questions that I have your Honor.
THE COURT: Okay. Any recross?

RECROSS-EXAMINATION

BY MR. CORNER:
Q. Mr. Tagliente, if I could have you turn to Exhibit 22. Exhibit 22 is one of the letters from Mr. Lehrberg.
And if I could turn your attention to the third paragraph, it states, "Now, therefore, in that the said Simon Belli is named as a mortgagee on a policy of insurance issued by the Great Northern Insurance Company, demand is hereby made on the Great Northern Insurance Company pursuant to the terms and conditions of your policy for payment of the said mortgage of $202,000," and it goes on. Do you see that?
A. Yes, sir.
Q. And the next paragraph says, "The aforesaid statement of fact and demand for payment is made for the purpose of inducing the aforesaid insurance company to pay under its policy and loss and the said mortgagee shall hold them harmless from any

claims from the mortgagor because of such payment." Do you see that?
A. Yes, sir.
Q. So Mr. Lehrberg used the term "demand" in his letter, correct?
A. Yes.
Q. Okay. Did you ever receive any letter from Webster Bank or its counsel with the word "demand" in it?
A. No, sir.
01:10 Q. Nothing threatening suit?
A. No, sir.
Q. Nothing threatening foreclosure?
A. No, sir.
Q. At the reference proceeding -- excuse me.
If I could turn your attention to Exhibit 64. At the reference proceeding the stipulated contents claim not including the business property and scheduled FERS is 713,158.89, correct?
A. Yes, sir.
01:11 Q. What is the coverage limit for contents under this policy?
A. 540, I believe. Am I correct in that?
Q. In fact, the company stipulated to the amount of the contents loss because it was in excess of the coverage limit, correct?
A. Significantly.

MR. CORNER: I'm sorry, I have one -- I'm sorry, your Honor, give me one moment, please.

(Pause.)

MR. CORNER: I apologize, your Honor. I had it and I lost it.

(Pause.)

BY MR. CORNER:

Q. If I could turn you to Exhibit 31. Exhibit 31 is the e-mail from Mr. Miller to Mr. Tener that Mr. Brunelle was asking you about.

01:13 If I could turn you to paragraph 4, the last sentence states that "Chubb's failure to make advance payments has compromised the Mileses' ability to commit to a rebuilding and replacement program for both contents and the building loss." Do you see that?

A. Yes, sir.

Q. And that letter is dated August 16, 2005, correct?

A. Yes, sir.

Q. Okay. If I could please turn your attention to Exhibit 18.

01:13 Exhibit 18 is a check dated August 22, 2005, correct?

A. Yes, sir.

Q. And that's another advance payment check?

A. Yes, sir.

MR. CORNER: Thank you, Mr. Tagliente.

Your Honor, I have nothing further.

MR. BRUNELLE: I have nothing further, your Honor.

THE COURT: Thank you, Mr. Tagliente. You may step down. We'll be in recess until 5 minutes past 2.

(End of testimony of James J. Tagliente.)

* * * * * * * * * * *

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Debra M. Joyce
Debra M. Joyce, RMR, CRR
Official Court Reporter

November 13, 2009
Date

INDEX

| WITNESS | PAGE |
|---|---|
| JAMES J. TAGLIENTE | |
| Cross-Examination by Mr. Corner | 66 |
| Redirect Examination by Mr. Brunelle | 108 |
| Recross-Examination by Mr. Corner: | 119 |