UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JAMES F. MILES and
THERESA B. MILES,
Plaintiffs,

V.

GREAT NORTHERN INSURANCE COMPANY,

Defendant.

Civil Action
No. 07-11722-NMG

September 28, 2009,

10:11 p.m.

TRANSCRIPT OF BENCH TRIAL DAY 1

BEFORE THE HONORABLE NATHANIEL M. GORTON

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
617-737-4410

APPEARANCES:

FOR THE PLAINTIFFS:

ROGER J. BRUNELLE, ESQ.
Fletcher, Tilton & Whipple
370 Main Street
12th Floor
Worcester , MA 01608
508-459-8016

FOR THE DEFENDANT:

MARK W. CORNER, ESQ.
Riemer & Braunstein LLP
Three Center Plaza
Boston , MA 02108
617-880-3418

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Nathaniel M. Gorton, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on September 9, 2009.)

THE CLERK: This is civil action 07-11722, James Miles v. Great Northern Insurance Company.

Counsel please identify yourselves for the Court.

MR. BRUNELLE: Good morning, your Honor. My name is Roger Brunelle, I represent James Miles and Theresa Miles.

THE COURT: Good morning, Mr. Brunelle.

MR. CORNER: Good morning, your Honor. I'm Mark Corner representing Great Northern Insurance Company.

THE COURT: Good morning, Mr. Corner.

We are here in a jury-waived trial in this matter. I have become familiar with the papers that are filed, but I will allow counsel, if you like, to make a brief opening.

What is your plan for today, Mr. Brunelle?

MR. BRUNELLE: Yes, your Honor. I would like to make a very brief opening, and my plan for today in terms of witnesses you're asking me?

THE COURT: Yes.

MR. BRUNELLE: I have two witnesses I hope to be able to finish today, both witnesses from the Great Northern

Insurance Company, Mr. McIntyre and Mr. Tagliente.

THE COURT: All right. Do you wish to make an opening as well, Mr. Corner?

MR. CORNER: I do, your Honor.

THE COURT: How long do you expect to make your opening, Mr. Brunelle?

MR. BRUNELLE: I will probably be less than three minutes, your Honor.

THE COURT: That's fine. Just one logistics matter. I did notice the exhibits you had listed for me -- I notice now that you have an exhibit book. Have you numbered those exhibits sequentially?

MR. BRUNELLE: Yes, we have, your Honor.

THE COURT: So that the defendants 1 through 19 follow along numerically from the plaintiffs?

MR. BRUNELLE: They may. I can't promise you they're exactly in the order that those two lists have --

THE COURT: They don't have to be in the same order, I just don't want plaintiffs exhibits and defendants exhibits, I'd rather just have one list of exhibits.

MR. BRUNELLE: At this point, your Honor, there are 84 numbered exhibits. However, in the middle of the book you'll find I think there's four or five of them which we took out, so there will be papers saying there is no 45, for example.

THE COURT: That's fine.

MR. CORNER: Your Honor, just so you understand, these are all the exhibits I proposed; there was some overlap between what Mr. Brunelle proposed. What's before your Honor is a set of what I would describe a set of joint exhibits. They are exhibits that are in evidence.

THE COURT: That's fine. Then, just so the record is clear, at whatever time is appropriate, after you put your first witness on and offer the exhibits, you can offer them en masse and we can have them admitted as long as it's stipulated to.

MR. BRUNELLE: That's fine.

I would point out, your Honor, that in the exhibit book there are three lettered exhibits, A, B, and C, which are exhibits Mr. Corner had proposed to which I did object. I guess we'll leave it to him as to whether he wants to offer them at some time.

THE COURT: That's fine. We'll mark them for identification until such time he offers them, and then we'll determine whether they'll be admitted.

MR. BRUNELLE: As a final logistics matter, just so you'll know, we have prepared a book for the witness to use, one for yourself, of course, and one for your law clerk so everyone can follow along.

THE COURT: That's fine.

I notice you have a podium here. As long as you keep

your voices up, if you want to examine from counsel table, you're free to do that. If it's easier for you to use the podium there, you may do that as well.

MR. BRUNELLE: Thank you, your Honor.

THE COURT: All right. Then, Mr. Brunelle, I'll allow you to make your opening.

MR. BRUNELLE: Thank you, your Honor.

Your Honor is already familiar with the facts in this case, many of which are not in dispute, and you know those facts from the summary judgment practice that we had earlier this year, so I will not go over those.

But I would like to simply emphasize a couple of things, your Honor.

While there will be much evidence in this case regarding an investigation into the cause and origin of the fire which led to this fire loss, and there will be much testimony regarding that, in fact, apparently it was an arson fire, and there will be much evidence regarding the investigation as to whether or not Mr. or Mrs. Miles had anything to do with that fire, that is not an issue in this case which will need to be decided.

The insurer is not defending this case on a claim that the insureds intentionally committed the fire. The defense in this case, the sole ground that the insurer has denied this claim on, is that the insureds breached their duty of

cooperation and that as a result of that breach the insurance company was prejudiced in its ability to protect its interests.

I would simply ask, your Honor, as I know you will, to remain focused on that as the issue and there's no -- and not on the question of who actually committed the fire, which will not be decided in this case.

I would also say to your Honor that when it comes to the issue of deciding whether or not there has been a prejudice -- actually, let me take a step back and say that we expect to prove that the Mileses did cooperate fully with the investigation to the extent they were required to do so under Massachusetts law. But if your Honor should find that they did not, then, of course, it becomes the burden of the insurance company to prove by an affirmative showing that it suffered actual prejudice, not hypothetical prejudice, but actual prejudice. And in this case, your Honor, we submit that the insurance company will not be able to prove that.

And I would point out to your Honor that it will not be necessary for anybody to make hypothetical surmises about what may or may not have been -- what the insurance company may or may not have done had it had the information that it claims the Mileses withheld from them. Because all of that information was subsequently obtained by the insurance company so that you will be able to see this is what they had asked for, this is what the information said, and you'll be able to

tell, I submit, that the insurance company did not suffer any prejudice by the fact there was a delay in its obtaining of that information.

And lastly, your Honor, the plaintiff will argue that if you should find that there was a lack of cooperation on the part of James Miles, that that lack of -- and that lack of cooperation, in fact, prejudiced the insurance company, then I will argue that that lack of cooperation of Mr. Miles cannot be attributed to Mrs. Miles.

Now, I'm aware that your Honor ruled as part of the summary judgment rulings that a lack of cooperation on the part of one of the insureds could, in fact, be attributed to the other. But I will be presenting to your Honor a different argument based on a different point of law than the one upon which your Honor ruled. And that argument is going to be based upon the standard Massachusetts fire insurance policy and some case law having to do with that.

And I would simply ask your Honor to, as the evidence is being presented, to please distinguish between evidence regarding the alleged lack of cooperation of James and the alleged lack of cooperation of Theresa. Because, as I said, I'm going to argue that one cannot be attributed to the other and that each -- the claim of each has to be decided separately.

And finally, your Honor, just so this point is clear

to you as well, James' claim in this case is very limited. The only claim that he has is for roughly $8,000 in business equipment lost during the fire. Theresa Miles was the owner of the house and the owner of the contents and she makes her claim for the amounts due for those losses and she also makes her claim for the additional living expenses that were incurred as a result of the fire.

So James' claim is limited to the $8,000, the balance of the unpaid -- what we say is the unpaid loss, which is roughly $490,000, is being presented by Theresa Miles.

Thank you.

THE COURT: Thank you, Mr. Brunelle.

Mr. Corner.

MR. CORNER: Thank you, your Honor.

A point before I begin, just to make sure there is no confusion on this point, I think it's clear, the defendant in this case is the Great Northern Insurance Company. You may hear references to Chubb throughout the case. I just want to let you know, Great Northern Insurance Company is one of the Chubb -- members of the Chubb Group of Insurance Companies, which is a number of underwriting companies that underwrites under the Chubb umbrella.

You'll hear testimony from Mr. Tagliente and Mr. McIntyre today, both of whom are employees of the Chubb -- of Chubb & Son, which is a division of Federal Insurance

Company. That's the entity that manages the writing companies and does the investigation, does the claims adjustment for --

THE COURT: So is Great Northern a wholly-owned subsidiary of the Chubb Group?

MR. CORNER: I'm sorry, say --

THE COURT: Is Great Northern a wholly-owned --

MR. CORNER: It is not, your Honor. It's an independent -- it is an independent entity, I believe -- I believe it's a subsidiary of the Federal Insurance Company.

My only point is, however, you may hear the terms "Chubb" and "Great Northern" independently. They are different, but for purposes of the trial and purposes of this case, it's okay to use them interchangeably. They're functionally -- for purposes of the next few days, there's no particular difference.

Your Honor, I expect that the Mileses are going to portray this as a run-of-the-mill fire case, that the insurance company didn't honor its obligations and the insurance company didn't -- acted irregularly in this case.

Your Honor, the evidence will show that there is nothing about this case that was run-of-the-mill. And the reason there was nothing run-of-the-mill about this case is based on the behavior of James Miles.

Mr. Miles throughout this case failed to cooperate. He threw up every roadblock that he possibly could to prevent

Chubb from completing its investigation of the claim.

Now, Mr. Brunelle indicated that we need to establish that there was -- that an affirmative demonstration of prejudice here. The prejudice here, your Honor, is that Chubb -- that by the time the claim was denied, Great Northern never had the ability to complete its investigation. The purpose of this investigation, the entire purpose was to eliminate the Mileses as the cause of this fire and to eliminate them from the claim being -- being denied on the basis of an intentional act. And because of that, ultimately, the -- we will be -- we will be able to prove that the failure to provide this information, that it's clear that they didn't provide, created actual prejudice to Chubb.

Turning to the facts in this case, your Honor, as you know, this case arises out of a fire that occurs in the early morning hours of September 17, 2004 --

THE COURT: September or October?

MR. CORNER: I'm sorry, October, your Honor. I'm confusing it with my wedding anniversary.

On October 17th, in the early morning hours, shortly after, within a business day, Chubb -- the report is made to Chubb. Chubb sends out its investigator -- excuse me, its adjuster, Mr. Tagliente. His job here is to determine the amount of the claim and to establish whether there's coverage for this loss.

He arrives and determines -- there are -- the local authorities are there, and a preliminary determination is made this is an arson fire. Because it's an arson fire, Chubb does two things: They hire a cause and origin expert, T.J. Klem, and they also assign the case to the Special Investigations Unit. Any sort of a fire claim, any sort of a suspicious fire claim, is routinely assigned to the Special Investigations to determine how the fire occurred. And the purpose, here again, is to eliminate the insured as having been the cause of the fire so as to eliminate the denial of the claim on the basis of an intentional act or a material representation or a fraud.

Now, typically, your Honor, and the evidence will show, that an insured who suffers a fire loss is going to be anxious to have it -- have it resolved. They're going to be anxious to cooperate with the insurance company. They want to expedite payment; they want to move this case along.

That's not what happened here, your Honor. The Mileses could not have acted more suspiciously in this case.

From the get-go they're nowhere to be found. The only way of contacting them is through an attorney by the name of Roger Lehrberg, who is, apparently, a family friend, but also goes on later to be representing the mortgagees on this claim. The mortgagee, of course, is Mrs. Miles' father.

There's no ability to contact -- to speak with the Mileses directly -- it's very important during the course of

the investigation to speak with the insureds -- until November 4th, two-and-a-half weeks or so after the fire.

Before Mr. Miles would even sit down with Great Northern there was a request for a confidentiality agreement, something that's entirely irregular, which is never done based on the existing confidentiality provision in the policy.

Once Mr. McIntyre conducts the interview through his investigatory role, and once he does get Mr. Miles into the room to talk, Mr. Miles described as circumspect would be an understatement, because he won't give any information about his movements on the day of the fire, he won't provide any financial information, he won't -- and specifically, he indicates he has knowledge, that he believes he has knowledge of somebody who may have caused the fire, and he won't tell -- he won't give that information out. He's claiming that that's somehow protected by the attorney/client privilege.

So the next thing that happens is that Great Northern attempts to do the interview of Mrs. Miles, and Mr. Miles interferes with that examination. There's actually a transcript of that before the Court.

So then the next step in the process is the statutory requirement, a mechanism that's in both the policy and Massachusetts law, an Examination Under Oath. And again, Mr. Miles fails to provide information about who might have caused the fire, doesn't provide any information about his

finances, and there's -- and again, a request is made to permit Great Northern access to the intrusion alarm records, because significantly the -- there was an intentionally set fire but the -- the burglar alarm mechanism was never triggered and that raised some suspicions with Great Northern. They wanted to look into that and find out what the records from the alarm company showed. That's information that wasn't provided at the outset.

For the entire first year after the fire, your Honor, none of this information is provided to Great Northern. No financial information, no access to the records, no indication from Mr. Miles as to whom he thought might have caused the fire. And meanwhile, Mr. McIntyre's conducting an independent investigation, and he learns that Mr. Miles is in bankruptcy, has an outstanding judgment approaching a million dollars, which has been determined by the United States Bankruptcy Court to be non-dischargeable. He learns that both Mr. and Mrs. Miles are not working, and he learns that Mrs. Miles has borrowed $460,000 from her father over the years, and Mr. Lehrberg, on behalf of her father, is now seeking repayment from the insurance company on that loss.

So after -- as of a year after the fire, James Miles is the only suspect for having caused the fire. You'll hear -- you will hear from Trooper O'Neil, who was conducting the investigation for the state fire marshal's office, he was of

the same view; he viewed Mr. Miles as suspicious, simply wasn't enough evidence to indict him.

So in the first year after the fire, Mr. Miles and Mrs. Miles, because she has an obligation to provide information, too, do everything they can to prevent Great Northern from obtaining the very information that would exonerate them and permit Chubb to make the claim.

So that's on the investigative side of things, which is handled by Mr. McIntyre.

Mr. Tagliente, on a parallel path, is attempting to determine the amount of the claim. And in the first year after the fire, the Mileses never give any information to Great Northern about the amount of their building loss. They have hired a public adjuster, Swerling Milton Winnick. You will see from the evidence that Swerling Milton Winnick had prepared a building loss estimate which they refused -- which they would not -- which the Mileses would not allow to be turned over to Chubb in support of their building loss claim.

So there is a request both under the policy and under state law for a sworn Proof of Loss. The Mileses submit one in May, some seven months after the fire, and they say the loss is to be determined. So one year after the fire, Great Northern is unable to complete its investigation as to who might have caused the fire, and the Mileses have not presented any information as to the amount of the loss. So at that point,

Great Northern denies the claim for lack of cooperation on October 12, 2005. The denial letter is in evidence. And that's where things stood as one year after the fire.

Just short of two years after the fire the Mileses engage new counsel. A Request For Reference is made. Under the statute there's a procedure if the insurer and the insured cannot agree on the amount of the loss, the case is submitted to a three-person panel that decides the amount of loss at an evidentiary hearing.

Additionally, the Mileses now decide that they're going to cooperate. They then release the information to allow Great Northern to talk to the alarm company. They then release their tax returns to Great Northern, which had been requested at the outset. And in the meantime, Great Northern is able to obtain from the state police the identity of people who Mr. Miles believed had caused the fire.

Ultimately, your Honor, the evidence will show that if -- at the end of the day if this information had been available to Great Northern as of a year after the fire, they would have been in a position to complete their investigation. And upon completion of their investigation, Mr. McIntyre would have been in a position to say that the Mileses -- that based on the evidence that was there, that was ultimately made available, that the claim should have been denied for an intentional act. There was sufficient evidence to deny the

claim for the intention -- for an intentional act.

Now, Mr. Brunelle indicated that we can't make any sort of suppositions about what would have happened. Well, that's the entire of -- the ability to prove prejudice here, your Honor. We didn't get the information in real time so we need to go back and determine what the outcome would have been had it been provided in real time. There is no dispute that the evidence -- that the information that Great Northern was looking for and was entitled to was not provided in real time.

Based on the behavior of the Mileses, Great Northern, during the two years between the fire and the referee's decision, really had -- they could only view it one of two ways: Either Mr. Miles was operating under consciousness of guilt, he was trying to prevent the information from getting to Great Northern. If he thought it was going to exonerate him, he would have presented it. He didn't. That's one way of looking at it. The other way of looking at it, if he really didn't do it, is that he was going to test limits. He was going to control the amount of information that flowed to the insurance company. I'd suggest, your Honor, that's a breach of his duty of cooperation, and it did -- and that as a result Great Northern was prejudiced.

Insureds don't get to control the investigation, your Honor. That's not the law, that's not cooperation.

At the end of the evidence, your Honor, I'm going to

ask you to find that Great Northern did not breach its contract, that it acted properly, that its denial of the claim for lack of cooperation on October 12, 2005 and its subsequent failure to make payment in accordance with the referee's award in May of 2007 was consistent with its obligation under the policy, consistent with its obligations under the law.

You'll also note, your Honor, there is a counterclaim in this case. Because while the Mileses were not providing information, Great Northern paid them a total of $250,000 for additional living expenses. They did so under the expressed agreement that if the claim was denied and the coverage -- and if the -- if coverage was not available, that they would repay those amounts. So we're seeking recovery of the $250,000 that was paid to the Mileses.

Additionally, under the policy, your Honor, we're seeking recovery of $800,000 that was paid to the -- to the first and second mortgagees on the property, some $800,000, which under the policy Great Northern is entitled under a subrogation basis.

So with that, I'll thank you.

THE COURT: Thank you, Mr. Corner.

The plaintiffs will present their case.

Mr. Brunelle.

MR. BRUNELLE: Yes. Thank you, your Honor.

Before I call the first witness, your Honor,

Mr. Corner and I did enter into a stipulation with a few facts having to do with dates certain documents were sent or received, and I'd like to offer this at this time, your Honor.

THE COURT: Yes, you may.

The stipulation of facts will be received. Perhaps it should be marked as an exhibit in the next numbered sequential --

MR. BRUNELLE: It will be 85, your Honor.

THE COURT: All right. It will be received as Exhibit 85.

(Exhibit 85 received into evidence.)

MR. BRUNELLE: Your Honor, for the record, then, before I call my first witness, I would like to say that by agreement there's been a book created of joint exhibits that are currently numbered 1 through 85, although I should also point out there are certain documents -- further exhibit numbers that have no document because they were removed by agreement, and I would ask that at this time the exhibit book be admitted into evidence.

THE COURT: And there's no objection?

MR. CORNER: I have no objection to that, your Honor. Those are exhibits that have been put together jointly.

THE COURT: All right. Then as a group, the Exhibits 1 through 84, so that we don't confuse it with the previously just marked Exhibit 85, will be admitted.

1 through 84. Right, Mr. Corner?

MR. CORNER: Yes, your Honor.

MR. BRUNELLE: Yes, thank you, your Honor. That's fine.

(Exhibits 1 through 84 received into evidence.)

MR. BRUNELLE: May I proceed, your Honor?

THE COURT: Yes, you may.

MR. BRUNELLE: I would call Charles McIntyre, please.

CHARLES H. McINTYRE, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK: You may be seated. Will you please state your name for the record, spelling your last.

THE WITNESS: Charles H. McIntyre, M-c-I-n-t-y-r-e.

DIRECT EXAMINATION

BY MR. BRUNELLE:

Q. Good morning, Mr. McIntyre.

A. Good morning, Mr. Brunelle.

Q. Mr. McIntyre, before I begin, let me point out to you before you on the witness stand is a large white binder which contains all of the exhibits that have just been admitted into evidence. You will see there are tabs that will help you find the exhibit that we are speaking of. At the top right-hand corner there are numbers that will help us identify a particular page within an exhibit when and if you want to call your attention to that page, all right?

A. Yes.
Q. Mr. McIntyre, by whom are you employed?
A. Chubb & Son, a division of Federal Insurance Company.
Q. All right. And what is your position with Chubb & Sons?
A. Special investigator.
Q. How long have you had that position, sir?
A. A little over 11 years now.
Q. Have you ever had any specialized training in determining the cause and origin of fires?
A. No, I have not.
Q. During the time that you were investigating the fire which is the subject of this case, did Federal Insurance or Chubb have any written policies or procedures with regard to how to investigate a suspicious fire loss?
A. No, sir.
Q. Is it a fair statement that your role as a special investigator is to become involved when there's a question of possible fraud on the part of the insured?
A. Yes, sir.
Q. Calling your attention to the date of October 19, 2004, on that date did you have a conversation with a man named James Tagliente, T-a-g-l-i-e-n-t-e, about a fire which had occurred on October 17, 2004 at 1 Running Stream Road in Rehoboth?
A. Yes, sir.
Q. And was Mr. Tagliente at that time an employee of one of

the Chubb companies?
A. Yes.
Q. What was his position, as you knew it?
A. General adjuster.
Q. Did Mr. Tagliente ask you to begin to investigate this fire loss?
A. Yes, sir.
Q. Did Mr. Tagliente tell you that the fire marshal had indicated that accelerants were found and that there were multiple points of origin?
A. Yes, sir.
Q. And this was evidence, obviously, that the fire had been intentionally set, true?
A. Yes, sir.
Q. And you understand, sir, that Great Northern's policy would cover an intentionally set fire as long as the insureds did not intentionally cause or participate in causing the fire?
A. Yes, sir.
Q. Did you begin your investigation by doing a database research?
A. Yes, sir.
Q. And did you obtain something called a Nexus Lexus report?
A. Lexus Nexus.
Q. Lexus Nexus, the other way around?
A. Yes.

Q. Sorry, in alphabetical order. Lexus Nexus report?
A. Yes.
MR. BRUNELLE: And that report is not an exhibit, your Honor.
Q. Is it true, Mr. McIntyre, that the information you obtained in that report included the fact one of the named insureds, James Miles, had filed a Chapter 7 bankruptcy in February of 2003?
A. Without looking at the document, I don't know if it's the Lexus Nexus or the Auto Track.
Q. Okay. And Auto Track would be another database report?
A. Yes, sir.
Q. Well, would it be fair to say that within the first day that you began investigating the case, you were aware that there was evidence that Mr. Miles had filed a Chapter 7 bankruptcy in the year before the fire?
A. Yes, sir.
Q. Okay. And that information was significant to your investigation because it showed that Mr. Miles had a potential financial motive for committing arson, true?
A. Yes, sir.
Q. Now, after you had done your database research, was your next step to go out to the house itself?
A. Yes, sir.
Q. And would you turn now, sir, to Exhibit Number 1, which is

entitled "A Special Investigative Unit Report Number 1"?
A. Yes, sir.
Q. And on the first page of that report, the date of the report is November 1, 2004; is that correct?
A. Yes, sir.
Q. And it indicates that it was -- the report was sent to James Tagliente from Charles H. McIntyre, and then there were copies sent to James Mandolfo, M-a-n-d-o-l-f-o. Who at that time was James Mandolfo?
A. My supervisor.
Q. And also to a woman -- a person named Bev, B-e-v, Ascolese, A-s-c-o-l-e-s-e. Who was Bev Ascolese?
A. Bev Ascolese was the technical adviser for SIU, Special Investigations Unit.
Q. Was she your superior?
A. Yeah, I guess.
Q. Okay. And also, a person named Scott Pringle received a copy of the report. Who at that time was Scott Pringle?
A. Scott would have been James' supervisor and technical adviser on claims.
Q. That would make him your supervisor as well, correct, of the food chain?
A. Anybody above there is my supervisor I would say.
Q. Okay. All right. Now, again, sticking with page 1, down towards the bottom, there's a place that says, "Synopsis of

loss." Do you see that?
A. Yes, sir.
Q. And you wrote there, "Claim of fire loss submitted by the agent, the state fire marshal reported initial finding of intentionally set fire." And that's what we said earlier, correct?
A. Yes, sir.
Q. All right. Now, if you turn to the second page, Mr. McIntyre, it indicates that your investigation of this began on 10/20/04, so three days after the fire, and that at 9:30 a.m. you arrived at the fire scene, correct?
A. Yes, sir.
Q. All right. Would you take a moment to just read silently to yourself the first paragraph there?
And that indicates that when you arrived there, there was a person in the driveway named Diaz, D-i-a-z, and you spoke to him he gave you some information that he thought the building had been for sale, correct?
A. Yes, sir.
Q. If you turn to page 3 of this report, right at the bottom underneath the map that's --
A. Yes sir.
Q. -- there it indicates at 11:40 a.m. you spoke with someone named Tarra, T-a-r-r-a, Vikery, V-i-k-e-r-y, at 7 Apple Valley Drive.

A. Yes, sir.
Q. And that's in the same vicinity where Running Stream Road is; is that correct?
A. Yes.
Q. If you turn to page 4 at the last sentence of the paragraph that begins at the top of page 4, you wrote, "She had heard that the house was for sale, but she has not seen a 'for sale' sign," correct?
A. Yes, sir.
Q. And, sir, it would be a significant fact for your investigation if the house had been for sale at the time of the fire, because it would show that the owner may have been trying to get out of the house, true?
A. Yes, sir.
Q. In other words, it would be more arson -- more evidence of the possibility that the homeowner may have been involved with arson, true?
A. Yes, sir.
Q. And, sir, your report does not indicate anywhere in it that on the day you were there, on October 20th, you saw a "for sale" sign in front of the house, true?
A. Yes, sir.
Q. In fact, you did not see a "for sale" sign in front of the house that day, did you?
A. No, sir.

Q. Okay. Would you turn to Exhibit 78 for a moment, please.
Are you there?
A. Yes, sir.
Q. Thank you. And Exhibit 78, do you recognize this as a photograph of the front of the Mileses' home?
A. Yes, sir.
Q. And you see in this photograph there is a sign that says "for sale by owner" in front of a tree?
A. Yes, sir.
Q. And that sign wasn't there on the day that you visited the house, was it, sir?
A. I don't recall it.
Q. Well, sir, it would have been a significant fact to you that you would have recorded in your report if it had been there, correct?
A. I do not recall it.
Q. Sir, do you agree with me that the house that we're looking at here is set back from the street quite a distance? Do you remember that?
A. Yes, I do.
Q. Okay. And would you agree with me that from the street no one would be able to see that "for sale" sign if it was in that location without coming onto the property?
A. I would say yes, sir.
Q. Okay. Now, if we can go all the way back to Exhibit 1,

please, and turn to page 5 in Exhibit 1, please, Mr. McIntyre. You there?
A. Yes, sir.
Q. And at the bottom of the page under the date of 10/22/2004, there is a report of a conversation you had with a man named Jim Coyle, C-o-y-l-e, at Protection One, and Protection One you understood to be the security alarm system company that was at the Mileses' home, correct?
A. Yes, sir.
Q. All right. And without -- I'm sorry, why don't you take a moment to read your report there, which goes over onto page 6. Read that silently to yourself, please.
(Pause.)
A. Yes, sir.
Q. All right. And incidentally, before we get any further in this, Mr. McIntyre, in paragraph 6 of your report about the conversation with Mr. Coyle, you indicated that the fire activation was at 12:28 at 10/16/04. Do you agree that's an error on your part?
A. Typo, yes, sir.
Q. The actual date of the fire, we've all agreed, is 12:28 -- the fire alarm was on the 17th of October, 2004, correct?
A. Yes, sir.
Q. So you've read over what Mr. Coyle told you, and that information was significant to you because it indicated that

there was no intrusion into the house between 6:30 -- roughly 6:30 p.m., when the alarm was finally armed, and 12:30 a.m. the following early morning, correct?

A. 12:28, yes, sir.

Q. And that was significant to you obviously?

A. Yes, sir.

Q. And you also asked Mr. Coyle to preserve all information having to do with the Mileses' security records, true?

A. No, sir.

Q. You did not?

A. These records here?

Q. Excuse me?

A. The entry records I asked him to preserve.

Q. Just the entry records. You didn't ask him to preserve anything else?

A. No, sir.

Q. At that time you didn't think anything else would be significant?

A. I didn't know at that time, sir.

Q. Okay.

Now, if you turn to page 6 of Exhibit 1, and I'm going to ask you to read silently to yourself the portion of this page that begins with "11:55 a.m.," and if you would read all the way down to -- and including the paragraph at the bottom that says, "I agree to have a copy." Just read that silently

to yourself for a moment, sir.
(Pause.)
A. Yes, sir.
Q. Okay. So first of all, sir, the first time you had any contact with either one of the insureds was the phone call that's recorded here, correct?
A. Yes, sir.
Q. And that was on the date of 10/22/04 that you had this telephone conversation with Mr. Miles, true?
A. 10/22?
Q. Yes.
A. Okay. No, you said 10/24.
Q. I thought I said 10/22/04.
A. I'm sorry.
Q. Let's be clear. The conversation with Mr. Miles was on 10/22/04, correct?
A. Yes, sir.
Q. And one of the things he told you was that he had a brain injury of some sort?
A. Yes, sir.
Q. He also told you that he was concerned that some of the information that was being asked for not be released into the public arena, and that he would like to have a confidentiality agreement, correct?
A. Yes, sir.

Q. And you told him that you couldn't agree to that but if he would send you something, you would pass it along to someone else who could decide upon it. Is that a fair summation?
A. Yes, sir.
Q. And if we turn to the top of page 7, am I correct that this is -- I'm sorry, it actually begins at the bottom of page 6, where you wrote, "The following e-mail was sent to Lehrberg" -- Lehrberg is spelled L-e-h-r-b-e-r-g. By the way, I don't think we've said this on the record. Roger Lehrberg was an attorney, correct?
A. Yes, sir.
Q. In fact, you said at the very top of page 6 that you received a phone call from Roger Lehrberg, who said he would not be representing James because of a conflict of interest, but he would be representing two mortgage holders, correct?
A. Yes, sir.
Q. All right. And in any event, after the conversation you had with James, you sent Roger Lehrberg this e-mail that begins on the bottom of page 6, and that was for the purpose of him having your e-mail address so that he could then send the confidentiality agreement to you, true?
A. Yes, sir.
Q. Okay. Now, if you would turn to Exhibit 36, next, please. And down at the bottom half of Exhibit 36 you see the name B. Ascolese, 10/25/2004, 1:29 p.m. Do you see that?

A. Yes, sir.
Q. After you had your discussion with James Miles about him requesting a confidentiality agreement, did you inform Bev Ascolese about that request?
A. Yes, sir.
Q. And I'm going to read into the record here -- by the way, is this called a file note, what we're looking at here?
A. Work station note I refer to it as.
Q. A work station note. That's fine.
Okay. And the work station note that was written by Bev Ascolese on 10/25/04 at 1:29 p.m. says, "Insured has asked for agreement to protect any information he provides before consenting to an interview. Charlie" -- that would be you correct?
A. Yes, sir.
Q. -- "Charlie asked him to submit a proposal and we will respond. Told Charlie to retain outside counsel to provide advice at this time on this issue. Told him we will try to accommodate the insured's request but we would not be able to agree not to release files pursuant to subpoena, for example, or in connection with any regulatory or statutory requirements. Now waiting for insured's proposal. Mr. Miles is an attorney, I'm told."
That was her work station note. Is that what you said?

A. Yes, sir.
Q. Okay, all right.
Now, by the way, at the top of that note, before the part I just read, these words appear in brackets, "viewable by non-Chubb." Do you see that?
A. Yes, sir.
Q. Right above her note. And that means that the information on this screen was accessible to agents or certain people who are outside of Chubb, correct?
A. I believe it was.
Q. Yeah. And so Chubb had a computer system which allowed people outside of its insurance company to access information about its insureds that might be made on one of these work station notes, correct?
A. To limited sources, yes.
Q. To limited sources, but somebody outside of Chubb, somebody outside of the insurance company, right?
A. I believe that's what that referred to.
Q. Okay.
Now, if you turn next to Exhibit 37, this is page 220 of the exhibits, down at the bottom there's an e-mail which is addressed to C. McIntyre at Chubb.com, it's from Roger Lehrberg. Do you see that, 10/26/04. About halfway down is where his address is.
A. Yes, sir.

Q. And then the body of it says, "Attached please find the nondisclosure and confidentiality Jim Miles would like Chubb to sign. He would like to meet with you and Morse on November 5th," et cetera, et cetera.

If we then turn to Exhibit 38, and I realize this is densely worded, so you don't have to read the whole thing, but read as much of it as you need to answer this question: Is this a copy of the non-disclosure and confidentiality agreement which Mr. Lehrberg sent you with his e-mail on 10/26/04?

A. I can say it appears to be without comparing it.

Q. I understand it's a lengthy document.

In Exhibit 38, sir, will you please turn to page 224.

A. Yes, sir.

Q. And I'm going to read the very last paragraph to you.

"Furthermore, it is an expressed purpose of this agreement to protect the doctor/patient privilege of the parties hereto that are also insureds as attorney/client privileges of the parties hereto and the attorney/client privileges and work product doctrine relating to any of JM's legal clients. In addition, Chubb agrees, represents, covenants, guarantees, and warrants that any and all information and/or material of whatever kind, nature, and origin furnished pursuant to this agreement can be used only pursuant to the terms of this agreement and for no other purposes regardless of their merit."

Did I read that correctly, sir?
A. Yes, sir, you read it correctly.
Q. Now, if you turn next, please, to Exhibit 39.
And turn to page 227 -- I'm sorry, I was right the first time. Exhibit 29, page 226 down at the very bottom, I see your name, Charles McIntyre, and then the date.
A. Excuse me, sir, I didn't know if you said 29 or 39.
Q. 39, page 226, bottom of the page. It says your name, Charles McIntyre, and then beneath that the date 10/27/2004, 3:09 p.m. Do you see that?
A. Yes, sir.
Q. And then, beneath that it says, "To Roger Lehrberg," correct?
A. Yes, sir.
Q. If we turn the page to 227 at the very top, am I correct that this at the top is the body of an e-mail that you sent to Roger Lehrberg on 10/27?
A. Yes, sir.
Q. Okay. And this reads, "Roger, the non-disclosure and confidentiality agreement that you have forwarded for James Miles and Theresa Miles is not an acceptable agreement. An agreement cannot change the terms of the policy, and Federal Insurance refuses to enter into this agreement that substantially alters our obligation under the policy, statutory law, and common law."

So you basically told him that your company was flatly refusing to enter into this agreement, correct?
A. Yes, sir, as written.
Q. Excuse me?
A. As written.
Q. As written. Well, did you indicate in this e-mail that you would consider some other form of agreement?
A. No, sir.
Q. Okay. And you didn't tell him what Bev Ascolese had said earlier, that the company would consider some form of a confidentiality agreement, correct?
A. No, sir.
Q. Now, if you turn to Exhibit 40, please, and down -- about midway down the page you see the name Bev Ascolese, 10/27/04, 3:55 p.m. Do you see that?
A. Yes, sir.
Q. Okay. And this is an e-mail to you, to Charles McIntyre, from Beverly. And she writes, "Charlie, I read the attached document and note your response."
And by the way, when she said "your response," she was referring to the e-mail we just read a moment ago, Exhibit 39, correct?
A. I believe that would have been the following page that's not in here.
Q. Okay. Well, if we -- what would have been the following

page?
A. Well, looking at this e-mail, you've got another section at 10/27/2004 at 309.
Q. Right. That was the e-mail we looked at in Exhibit 39, sir.
A. Right, just following the sequence of e-mails, that should have been the one attached to this one, in which case you'd be right.
Q. Okay. Just so we're clear, Beverly was commenting on the response you sent to Roger Lehrberg which we looked at as Exhibit 39?
A. Correct.
Q. She wrote, "Charlie, I read the attached document and note your response. Please let me know the insureds' response to your request for an interview as soon as you receive it. While we appreciate the insureds' concern for privacy with respect to records and/or information they provide, I agree that the attached document is not acceptable. Does Mr. Lehrberg represent the insureds? Do we have a letter of representation? We will work with the insureds and Mr. Lehrberg to work out a mutually acceptable form of a confidentiality agreement and that should be done through John Tener." By the way, John Tener is an attorney; is that correct?
A. Yes, sir.
Q. All right. "I do not expect the insureds to agree to an

interview until this has been resolved. Therefore, you should go ahead and retain John Tener and have him work on the issue directly with Mr. Lehrberg, assuming I am correct that they will not agree to an interview at this time and in the absence of some sort of agreement. Obviously we need to try to resolve this ASAP in order to conduct a prompt investigation. WTO will need to review any proposed agreement before it is consummated, keep me posted. Thanks, Bev."

What does "WTO" mean there, sir?
A. That's the acronym for Warren, which is the home office of Chubb.
Q. If you turn next, please, to Exhibit 44, in the middle of the page there is -- is this another one of those work station notes, the one that's dated 11/01/2004?
A. 11/01?
Q. Yeah, middle of the page, middle of page 229?
A. No, I got lost. I have 11/5.
Q. I'm looking at Exhibit 41 on page 229.
A. 44 starts at 232 on my book.
Q. 41. Did I say 44?
A. I have 44. I heard you say 44.
Q. 41, I'm sorry. It was a typographical error.
Okay. Exhibit 41, I beg your pardon. The file note or work station note dated 11/01/04 in the middle. Do you see that?

A. Yes, sir.
Q. And the author of that note was Bev Ascolese?
A. Yes, sir.
Q. And the note was to Scott Pringle and there was a cc to Charlie McIntyre, and that's you?
A. Yes, sir.
Q. And then also a man named Tony -- say that for me?
A. Schiavone.
Q. Tony Shiavone, S-h-i-a-v-o-n-e. And was what Tony Schiavone's role at Chubb at that time?
A. I couldn't give you his title. I know he worked out of home office and was an expert in policy language.
Q. Okay. And halfway through this file note Bev Ascolese wrote the following: "The following needs to be done. 1. Get address/phone contact information for both Mr. and Mrs. Miles. 2. Inform the insureds that we will consider their request for some sort of confidentiality agreement with respect to documents/records they may provide to us. We will need input from outside counsel on this issue. Our files are confidential in that they are not public record and not available to anyone outside the insurance company unless subpoenaed or required by regulators."
Now, if you turn next, please, to Exhibit 42 --
A. Yes, sir.
Q. -- this is an e-mail that you wrote to somebody named Tom;

is that correct?
A. Yes, sir.
Q. And Tom is Tom Klem, K-l-e-m, correct?
A. Yes, sir.
Q. And Tom Klem was the principal of a company that you had hired to do a cause and origin investigation about the fire, correct?
A. He was hired by Chubb, yes.
Q. He was hired by Chubb, okay. And his job was to find out what started the fire, how the fire started, et cetera, correct?
A. Yes, sir.
Q. Okay. And this e-mail is written by you on 11/3/04. So this is roughly two days after the file note that we just looked at a moment ago, Exhibit 41, that file note by Bev Ascolese, correct?
A. Yes, sir.
Q. Okay. And in this e-mail you wrote to Tom: "Tom, I received a call from Miles last night and have set up an appointment with him for Thursday at 11:30 at Lehrberg's home. I was not asked about any confidentiality agreement or did I tell him of my intentions of having you at the interview."
Now, you had just been -- two days before that, Bev Ascolese had said that what needed to be done was to inform the insureds that we will consider their request for some sort of

confidentiality agreement. So my question to you, sir, is: When you spoke to Mr. Miles on this phone call last night, which would have been November 2nd, did you tell him that the company would consider his request for some sort of confidentiality agreement?
A. No, but he did agree to the interview.
Q. But you didn't tell him that, what your boss said he should be told?
A. A recommendation, no.
Q. You say that was a recommendation?
A. Yes, sir.
Q. Where Bev Ascolese wrote, "The following needs to be done, inform the insureds that we will consider their request for some sort of confidentiality agreement." You viewed that as just a recommendation?
A. If it was addressed, yes.
Q. If it -- does it say that, sir?
A. No, sir.
Q. So you put that gloss on it yourself, that you -- even though your superior said you should inform the insureds that your company would consider that request, you did not inform the insureds that your company would consider their request, correct?
A. I retained Attorney Tener.
Q. I didn't ask you that, sir.

A. No, sir, but I'm answering your question.
Q. You did not inform the insureds, correct?
A. I did not personally.
Q. Now, sir, if you would turn to Exhibit 43, down at the bottom there's a file note dated 11/3/04, and this is a file note written by Charles McIntyre, that's you, right?
A. Yes, sir. This is an e-mail.
Q. It's an e-mail, all right. The e-mail -- okay. The e-mail is dated 11/3/04 at 6:49 a.m., correct?
A. Yes, sir.
Q. You start work early.
And this e-mail is to J. Tener, and that's Attorney John Tener, correct?
A. Yes, sir.
Q. All right. And then you wrote to Mr. Tener as follows: "John, as you can see below, I have an appointment scheduled with Miles. There has been no mention of a confidentiality agreement and I will be meeting with him. I am going to ask that you still start a draft in case it is asked by Miles. The package was mailed yesterday. Charlie."
Now, again, sir, Bev Ascolese' instructions about what needed to be done didn't say we'll consider that if it's asked for, correct?
MR. CORNER: Objection.
THE COURT: Overruled.

BY MR. BRUNELLE:
Q. Correct?
A. No, sir.
Q. Now, if you will turn, please, to Exhibit 63, and Exhibit 63, for the record, is a transcript of the recorded statement that you took from James Miles on November 4, 2004; is that correct?
A. Yes, sir.
Q. All right. And I'm going to point something out to you in order to help you locate parts of this examination as I go through it. I'm going to refer not only to page numbers in the exhibit book, but I will refer you also to page numbers within the transcript and line numbers as well. Okay? That will help all of us find the same spot.
A. Yes, sir.
Q. All right. So I'm looking at Exhibit 63, the exhibit page 393, and transcript page 1. And down on line 12. And I see that the time of the -- the starting time for this tape-recorded statement was 11:42 a.m.; is that correct?
A. Yes, sir.
Q. And if we go all the way to the end, which is page 441 in Exhibit 63, down at the bottom of page 97 in the transcript at line 4344, this indicates that the conversation ended at roughly 3:12 p.m., correct?
A. Yes, sir.

Q. And there were no lunch breaks taken, correct?
A. No, sir.
Q. There were a few times when the tape-recording was turned off for various reasons, correct?
A. For breaks, yes.
Q. For breaks, okay. But essentially you spoke to -- you questioned Mr. Miles for roughly four hours on that day. Would that be fair to say, three and a half -- let's say --
A. Three and a half.
Q. Excuse me, my math is never good. Roughly three-and-a-half hours, correct?
A. Yes.
Q. And going back to page 1 of Exhibit 63 -- well, I'm sorry, to page 393 of Exhibit 63, and on the first page of the transcript it indicates that one of the people present was named Joseph Folger, F-o-l-g-e-r, and he was a fire investigator with the T.J. Klem company that we talked about a little bit earlier, correct?
A. Yes, sir.
Q. You had indicated in your e-mail, which we looked at a moment ago, Exhibit 42, that you hadn't let Mr. Miles know that somebody from T.J. Klem's would be at the interview, correct?
A. Correct.
Q. Okay. And by the way, you had also asked Jim Tagliente to attend this interview as well, correct?

A. Yes, sir.
Q. And you had also not let Mr. Miles know ahead of time that Jim Tagliente would be present, right?
A. Yes, sir.
Q. And when the interview started, Mr. Miles did not object to the presence of those two individuals, did he?
A. No, sir.
Q. And also present at the interview was Roger Lehrberg?
A. Yes, sir.
Q. And he said right at the beginning, and this I'll call your attention to Exhibit 63, page 393, page 1 of the transcript, lines 32 and 33, he said, "My name is Roger Lehrberg. I'm an attorney and I'm here representing the interests of the second mortgagee on the property." Correct?
A. Yes, sir.
Q. So you knew he wasn't there representing James Miles, correct?
A. Yes, sir.
Q. Now, this was not an examination under oath, was it?
A. No, sir.
Q. And in fact, you had very deliberately stated, very carefully and very properly stated on page 2 of the transcript, starting on line 62 that this is a preliminary interview, not to be considered a replacement of an examination under oath, correct?

A. Yes, sir.
Q. And you understand that nowhere in your policy does it state that there is a requirement for an insured to submit to a preliminary interview before an examination under oath, correct?
A. Yes.
Q. So Mr. Miles was there voluntarily, even though he didn't have to be there, correct?
A. Yes, sir.
Q. Now, during the course of this interview, you asked Mr. Miles about whether he had received any threats; is that correct?
A. Yes, sir.
Q. All right. And if you would turn, please, to page 420 of Exhibit 63, and then if you would look on page 56 of the transcript down at the very bottom, starting at line 2508. Do you see that?
A. Yes, sir.
Q. Okay. I'm going to read to you what the transcript says there. CM, and that would be you, correct, Charles McIntyre?
A. Yes, sir.
Q. CM: "Have you had any problems that would have caused someone to start a fire?"
And then at the top of the next page, page 57 in the transcript, starting at line 2510, JM, and that would be James

Miles, correct?
A. Yes, sir.
Q. He said: "I can't answer that question until you give me -- until I -- you cooperate with the guidelines that I have from the Board of Bar Overseers, I can't."
Do you see that?
A. Yes, sir.
Q. And in fact, sir, if we go back for a moment to the proposed confidentiality agreement, which your company had received from Mr. Miles earlier, that's Exhibit Number 38 --
A. Yes, sir.
Q. -- I'll call your attention to page 224 of Exhibit 38.
A. Yes, sir.
Q. The -- I'm going to call your attention to the large paragraph in the middle of the page, and I'm counting up -- counting up six lines, and I'm going to quote a portion of that. "Will limit all inquiries regarding the legal clients or former legal clients of JM or any firm with whom JM is now or ever has been affiliated to an ethics opinion rendered to recently to Roger J.F. Lehrberg, Esq. by the Board of Bar Overseers' office on behalf of JM in order to protect his anonymity in order to preserve any attorney/client privilege that he is obligated to preserve."
Understanding that maybe the legal language there may be confusing, would you agree with me that Mr. Miles in his

initial request for the confidentiality agreement had made some reference to this concept that he had an opinion from the Board of Bar Overseers with regard to what he could and could not disclose to your company?
A. Yes, sir.
Q. Okay. Now, when Mr. Miles made that statement to you that we just looked at in Exhibit 63, when he said that he couldn't disclose this information without some sort of agreement, did you tell him at that point that -- what Bev Ascolese had said, that the company would consider some form of confidentiality agreement?
A. There's some section in here we go through that I need some information to go forward in asking. I just don't remember where it is.
Q. Sir, did you say to him, Yeah, we'll consider some form of confidentiality agreement?
A. Not in those words, no.
Q. In fact, didn't you tell him that it was strictly your opinion that the company may consider some form of an agreement? I call your attention back to Exhibit 63, page 422 in Exhibit 63. Page 56 of the transcript, sir, starting at line 2605. This is CM speaking here. And you said, "Okay, or the company may even consider -- and this is strictly my opinion -- I mean this -- the agreement you sent down was presented to our counsel and I was directed on the reply that

you can't honor what your -- without any basis for it, and the company's not -- you've got a contract and with your insurance policy."

Now, I understand that's a little garbled, but it's certainly at that point, sir, you didn't tell him what Bev Ascolese had said, that the company would, in fact, consider some form of confidentiality agreement?

A. Not in those words, no.

Q. Not in those words. You just told him in your opinion they may consider it, right?

A. Yes, sir.

Q. It wasn't a matter of opinion, it was a matter that someone higher up in the company had already decided that it would consider?

A. Technical adviser, yes.

Q. Excuse me?

A. Technical adviser, yes.

Q. Technical adviser.

And, sir, you didn't tell Mr. Miles during this recorded interview that, in fact, you had already retained John Tener, Attorney John Tener to begin to draft a confidentiality agreement, did you?

A. No, I did not.

Q. Okay. Now, sir, if you would turn next, please, to page 424 in Exhibit 63, and I'm going to call your attention to

transcript page 64, starting at line 2829. Do you see that?

A. Yes, sir.

Q. Okay. And I'm going to read into the record here.

CM: "What you outlined here, and with no detail or what have you, wasn't reported to the state fire marshals?"

And this is JM's response: "I know the process of going through that there, you know, uh, in detail. Yeah, under the provisions that he said it won't go anyplace and that's there, there -- there must be -- they must have been behind it. He won't share it with the" insureds -- I'm sorry. "He won't share it with the in -- the insurance company won't share it with anybody."

So, sir, you were aware that Mr. Miles was basically telling you there that he had already told the state fire marshal's office this information that you were asking him about having to do with who might have been involved and started the fire, right?

A. Yes, sir.

Q. Okay. And that was information that obviously you felt was important to your investigation?

A. Yes, sir.

Q. If you would turn now, please, for a moment to Exhibit 58 and turn to page -- that's 270. Down at the bottom of the page, Mr. McIntyre, that's an e-mail which is from you to somebody named Rob, and the date of the e-mail is 11/22/06. Do

you see that?
A. Yes.
Q. And the Rob that you're referring to there is Robert O'Neil; is that correct?
A. Yes, sir.
Q. And Robert O'Neil was a state trooper who in 2004 had been assigned to investigate the fire at the Mileses' home, correct?
A. Yes, sir.
Q. And you were aware of Trooper O'Neil's involvement in that investigation right from the very beginning of your investigation, correct?
A. Yes, sir.
Q. In fact, you and Mr. O'Neil had actually met together at the property during part of the investigation, true?
A. Yes, sir.
Q. Okay. And you were exchanging information with each other, right?
A. Yes, sir.
Q. As is permitted by law, correct?
A. Yes, sir.
Q. All right. And in 2006 you sent this e-mail to Mr. O'Neil, Trooper O'Neil. "Rob, how are things going? I am still involved with James and Theresa Miles. They are about to sue and one of the things he did not provide us during our investigation was the names of suspects he believed might be

involved in the fire at this home. He testified in his EUO" -- that means examination under oath, right?
A. Yes, sir.
Q. -- "He testified in his EUO that he spoke with you and under a confidentiality agreement provided you with the names of those suspects. He claimed attorney/client privilege, however, once he provided you with those names, he broke that privilege and was bound to give us the names. Would you please provide me with those names he gave you during your investigation?"
So am I correct, sir, that that's the first time that you had actually asked Trooper O'Neil to provide you with the names that Mr. Miles had disclosed to him two years earlier?
A. I think there's a letter that asked for the reports somewhere in this file.
Q. Okay. But that -- would you agree with me that's the first time you specifically brought up this idea of the waiver of the privilege because he had disclosed information?
A. I don't know if there was discussions about that prior in our meeting.
Q. Well, was there ever any discussion where Trooper O'Neil said to you, Gee, I can't give you this information because I promised I wouldn't?
A. I recall some conversations about a confidentiality agreement.

Q. But that's not what I asked you, sir. Was there ever a time when you asked Trooper O'Neil for the information you asked him for in this e-mail where he declines to give it to you?
A. That's what I'm saying. I remember him talking about a confidentiality agreement and he wasn't going to give it to me at the time I asked.
Q. You remember -- all right, I'll find out.
In any event, sir, in -- following your e-mail to Trooper O'Neil, he sent you recorded statements, correct?
A. Eventually, yes, sir.
Q. Eventually. Okay. It took a little while, you had to send a couple of e-mails back and forth, as I recall?
A. Yes, sir.
Q. We'll skip over that. Is it fair to say by January of 2007 you had received those recordings?
A. If that's the date, yes.
Q. I'll help you out in a second.
If you turn to Exhibit Number 60, sir, this is an e-mail dated 1/30/07 -- I'm sorry, it's not an e-mail, it's, I guess, one of your file notes, a work station note. And it says the following: "Today I mailed the recorded statements of James and Theresa Miles that were taken by Trooper Rob O'Neil on 11/16/04 in the course of his investigation to John Tener. John will have the tapes transcribed. My review of the

recording did not reveal anything new that was not part of our investigation. He alluded to Loon Mountain people and the dealership Miles had placed liens and life insurance attachments to."

Did I read that correctly?

A. Yes, sir.

Q. So during -- so after you had reviewed the tape-recorded statements that -- what Mr. Miles had revealed to Trooper O'Neil two years earlier, you concluded there was nothing that you didn't already know, right?

A. Yes, sir.

Q. Okay. And if we go back to Exhibit 4, this is one of your Special Investigative Unit reports, would you look, please, Mr. McIntyre, at page 26 of Exhibit 4 --

A. Yes, sir.

Q. -- and down at the bottom of page 26, you're talking about a conversation you had with an attorney named Peter Tamposi, T-a-m-p-o-s-i; is that correct?

A. Yes, sir.

Q. And you were asking him about any threats that he may have been aware of, and he basically -- that had to do with legal proceedings with Loon Mountain, correct?

A. Yes, sir.

Q. And that's the same Loon Mountain that you were referring to in that e-mail we just looked at in November of 2006,

correct?
A. Yes, sir.
Q. The reference is to the same thing, in other words?
A. Yes, sir.
Q. I realize there's only one Loon Mountain. But the reference is to the fact that you had some information based on public records that Mr. Miles had some litigation with people having to do with Loon Mountain, correct?
A. Yes, sir.
Q. And in fact, that was a litigation that led to the million dollar judgment that had been assessed against him previously, correct?
A. Yes, sir.
Q. And that's the million dollar judgment that you knew about right from the get go?
A. Yes, sir.
Q. Okay. And then Mr. Tamposi also told you at the bottom of page 26 there might be a long list of persons who want to burn Miles out of his home, but not his guys, correct?
A. Yes, sir.
Q. And his guys were the Loon Mountain people, correct? He was their lawyer?
A. Somewhere in that group of attorneys.
Q. We're not going to go too far into that, but that was your understanding, that he had some connection with the Loon

Mountain litigation?
A. Yes, sir.
Q. All right, fair enough.
Now, on page 27 of Exhibit Number 4, in the third paragraph down, you have a comment here about a motion for relief from stay that was filed in the bankruptcy court. Do you see that paragraph?
It says, "Early on in the bankruptcy."
A. What paragraph are you looking at?
Q. Well, I guess the second full paragraph. Right in the middle of page 27, "Early on in the bankruptcy there was a motion"?
A. Oh, okay, yes, sir.
Q. All right. And this is something Mr. Tamposi is telling you here, correct?
A. Yes, sir.
Q. All right. And then about the middle of the paragraph you wrote the following: "It was an auto dealer on the Cape that Miles had done legal work for and had them sign over life insurance policies to secure the legal work he was doing. Tamposi recommended reading this case and said these people would have motivation to burn Miles' house down." That's what Mr. Tamposi told you, right?
A. Yes, sir.
Q. And you did some research and found out that the people

involved there were named Cullen, C-u-l-l-e-n, correct?
A. Yes.
Q. And you did some investigation there as to whether or not this was any evidence that the Cullens may have been involved with the cause of the fire, correct?
A. Yes, sir.
Q. And you eventually concluded that was a dead end, correct?
A. Yes, sir.
Q. And in fact, sir, you've never reached any conclusions as to who is responsible for starting this fire, have you?
A. As who started it?
Q. As to who is responsible for causing the fire. You've never reached any conclusions, have you, sir?
A. Yes, I have.
Q. You have?
A. Yes.
Q. Was that between last year when I took your deposition and today?
A. It was at -- the question that was posed, was have I reached a conclusion? And the answer is yes.
Q. All right. And you know that your company has not declined to pay this claim on the ground that either Mr. Miles or Mrs. Miles intentionally caused the fire, right?
A. At the time it was denied, yes.
Q. At this time, sir, you know your company is not here in

court defending on the ground that Mr. and Mrs. Miles caused the fire. You know that, don't you?
A. Yes, sir.
Q. Now, let's go back to Exhibit 44, please. This is back on the subject of this confidentiality agreement that we were talking about. And Exhibit 44 in the middle of the page, this is a file note or a work station note, as you call it, written by you on the 5th of November. This is the day after you took that recorded statement we just looked at, right?
A. Yes, sir.
Q. Okay. And you wrote as follows: "I have contacted Attorney John Tener to contact Attorney Roger Lehrberg and discuss the confidentiality issues Mr. Miles expressed concern of during his recorded statement on 11/4/04." Did I read that correctly?
A. Yes, sir.
Q. Okay. And, sir, you knew at that time that Roger Lehrberg was not representing Mr. Miles, didn't you?
A. Yes, sir.
Q. He had told you that right at the beginning of the recorded statement, he was there representing the mortgagees, and he couldn't represent Mr. Miles because it would have been a conflict of interest, correct?
A. He was the conduit to get to Mr. Miles.
Q. Well, sir -- did Mr. Miles -- first of all, did you tell

Mr. Miles during the recorded statement that you were going to have Mr. Tener contact him to try and work out a confidentiality agreement?
A. I don't recall.
Q. Sir, do you want to take a moment and read through the transcript? It's not in there, I guarantee.
A. Okay, sir.
Q. You take my word for that?
A. Yes, sir.
Q. And you didn't tell him while the tape-recording was off, did you?
A. That I don't recall.
Q. Well -- now, going back to Exhibit 44, you also wrote the following: "I have removed NHO property." What does NHO property mean?
A. The New Haven office property stuff.
Q. Okay. "I have removed NHO property ECSC" -- what does that stand for?
A. Eastern Claims Service Center.
Q. Okay. "I have removed NHO property, ECSC call center from the performers." What does that term mean in your business, "the performers"?
A. On the work station note, there's a definition of people that will be working on a claim or have access to a claim, they're termed "performers" in the computer.

Q. Okay. So -- okay. So your note says, "I have removed NHO property, ECSC call centers from the performers and asked the performers list be reviewed for a definite need to know on this file."

So would it be fair to say that what you were doing there was to try to accommodate Mr. Miles' request to protect the confidentiality of agreement -- of information that he might be providing to you?

A. Yes, sir.

Q. Okay. But you never told Mr. Miles that you had taken those steps, did you?

A. No, sir.

Q. Okay. And it goes on to say, "When Tener has his discussion with Lehrberg on information that can be offered and protection of the information, other security measures can be used in this file."

So there was other security measures that you could think of to protect the confidentiality of the information even more so, correct?

A. I believe there was.

Q. Okay. And then you went on to write, "All future SIU" -- and that means Special Investigative Unit, correct?

A. Yes, sir.

Q. "All future SIU reports will be transmitted via e-mails to Bev Ascolese, Scott Pringle, Tony Schiavone, James Tagliente,

and if there are others, please advise."
So by saying that you were going to send SIU reports by e-mails, would that limit the accessibility of those SIU reports to only the people who receive those e-mails?
A. Yes, sir.
Q. Okay. So before that had happened, these SIU reports that were in the system would have been available to people who didn't have a need to know; isn't that right?
A. At some point, yes.
Q. Okay. Including, perhaps, outside Chubb people, as we saw earlier from that file note from Bev Ascolese?
A. Yes, sir.
Q. Okay.
A. You're asking that question, I'd like to explain something --
Q. No, you've answered the question, thank you, sir.
A. Okay.
Q. If you turn next, sir, to Exhibit 44 A, this is at page 231 A of the exhibit book, this is another file note that you wrote on 12/2/04. So roughly a month after the last one you looked at. And this reads as follows: "After discussion with Bev Ascolese, there will be a change in the reporting of SIU notes in this file. All SIU reports will be placed in the file and no longer communicated via e-mail to the parties who need to know."

So this was yet another step that your company was taking because there was concern that if you sent these reports by e-mail, they may not be as secure, true?
A. I didn't read that into that.
Q. You didn't read that?
Well, there was some reason why the SIU reports were going to be sent or would be placed in the file and no longer communicated via e-mail. These are people who needed to know this stuff, right?
A. The next paragraph explains it.
Q. "The list of performers should only be those with the need to have access to the file." Okay. "If anyone views the performer list and finds someone listed that is not necessary, they should be removed." So this is Bev Ascolese basically telling you these things, right?
A. Yes.
Q. Okay. "Any information that is deemed sensitive in nature, including location of the insureds, telephone numbers, will be blocked from the SIU report, pasted into the notes, and remain in the hard copy sent to the claim file and to counsel."
So, again, these were extraordinary measures that your company was taking to preserve the confidentiality and privacy of information that the Mileses were providing to you, correct?
A. Not -- well, it is -- the "C" indicates right there it's Chubb only on the work station note.

Q. Okay. So that's different than what we had seen before, where non-Chubb people could get access?
A. That's what I was trying to explain to you in the other question that you shut me off of. If there's a "C" on there, it's a Chubb only.
Q. All right. So at this time, by this time, the company had taken steps to limit it to Chubb only?
A. It's Chubb only in the notes prior, too.
Q. Okay. So by November '04 they had taken steps to limit to Chubb only?
A. We were trying to go even beyond it. The "C" with the list of the performers prevented even Chubb personnel that were not working on it access to it.
Q. Exactly. Exactly.
So your company, sir, was taking all these extraordinary steps to accommodate Mr. Miles, and you never told him that you were doing those things, did you?
A. No, sir.
Q. Now, sir, if you would turn next, please, to Exhibit Number 62. This is the transcript of the examination under oath of Mr. Miles.
MR. BRUNELLE: May I have a moment, please, your Honor?
THE COURT: Yes.
(Pause.)

BY MR. BRUNELLE:
Q. And you were present during the examination under oath of Mr. Miles, correct?
A. Yes, sir.
Q. And according to page 1, this is page 342 in the exhibit book, the examination occurred on December 22, 2004, correct?
A. Yes, sir.
Q. All right. And if you would turn, please, to page 373 of Exhibit 62, and within the transcript itself I'm going to call your attention to page 123, starting at line 15. This is Mr. Tener questioning Mr. Miles.
"Q. At the time of the fire did you have anyone that had ever threatened you or your family?
"A. Yes.
"Q. Who had threatened you?
"A. I cannot tell you that because I had to get permission from the Board of Bar Overseers to talk about it, and I -- and Roger, Roger got it. He went through the proper process for it and he's outlined the rules to me and I have to get guarantees that it won't be disseminated to even one person beyond what's absolutely necessary."
Now, when you were there at the EUO and you heard Mr. Miles make that statement, did it surprise you that his concerns about maintaining the confidentiality of any client confidence information had not yet been resolved?

A. I didn't think about it.
Q. Okay. Well, you had told Mr. Tener a month earlier -- we looked at that e-mail you sent him -- I'm sorry, we looked at your file note, Exhibit 44, on 11/5/04 you wrote, "I have contacted John Tener to contact Attorney Roger Lehrberg and discuss the confidentiality issues which Mr. Miles expressed concern of during his recorded statement on 11/4/04."
So a month, more than a month later, six weeks later, that apparently had not been resolved here, true?
A. I'll have to let Attorney Tener address that.
Q. Okay.
THE COURT: We're going to take about a 15-minute recess at this stage. You may step down for the time being, Mr. McIntyre. We'll be in recess until five minutes before 12.
THE CLERK: All rise.
(Recess taken.)
THE COURT: Mr. McIntyre, you're reminded that you remain under oath.
And, Mr. Brunelle, you may continue with direct examination.
MR. BRUNELLE: Thank you, your Honor.
BY MR. BRUNELLE:
Q. Mr. McIntyre, before I return where we were before we broke for the morning recess, I'd like to go back for a moment to an issue I asked you about earlier having to do with the

conversation you had with James Coyle of Protection One.
Remember I had asked you earlier this morning, as indicated in your file note, that you had asked him to preserve records and that he had told you all information will be secured? Remember we talked about that?
A. Yes, sir.
Q. And then I had asked you at that time which information it was that was to be secured, and I believe, and correct me if I'm wrong, you testified that you were asking him to secure only the information having to do with the arming and disarming of the alarm and with the alarm data for the date of the fire. Is that your testimony?
A. In my mindset at that time, yes.
Q. I'm going to read to you, sir, from your deposition transcript.
MR. BRUNELLE: Counsel, this is starting at page 72, page 72, starting at line 1.
MR. CORNER: Thank you.
BY MR. BRUNELLE:
Q. And at that time, Mr. McIntyre, I was reading to you from your summary of Mr. Coyle's conversation, which is that document we looked at earlier -- let me help you here. It was Exhibit Number 1 at page 5, sir. I'm sorry, Exhibit Number 1 starting at the top of page 6 where you had written, "All information will be secured."

Okay?
A. Yes, sir.
Q. Now, during your deposition I called your attention to that line, and then I ask you this question: "That was something that you asked Mr. Coyle to do, I assume?
"A. Yes.
"Q. Were you specific as to what it was you wanted him to secure?
"A. Any records available on the system.
"Q. On the system itself?
"A. Yes.
"Q. And he told you they would be" -- that -- I'm sorry. I misspoke.
"And he told you they would secure them?
"A. Yes."
So having heard that, your deposition testimony, now, sir, does that refresh your recollection that, in fact, you asked Mr. Coyle to secure all records available on the system?
A. Pertaining to what he was telling me, yes.
Q. So your testimony is that when you said in your deposition "all records available on the system," that didn't mean all records available on the system, it meant all records available on the system pertaining to what he was telling you?
A. My mindset when I was asking him, yes.
Q. Okay. So you didn't think any of the other records were

important at that time anyway?
A. At that time I didn't.
Q. Okay.
Now, sir, if you would return, please, to Exhibit 62, this is the examination under oath of Mr. Miles. And in Exhibit 62, if you would turn, please, to page 373, and within page 373 to transcript page 124 starting at line 1 -- and this is Mr. Miles -- just to refresh your recollection, this is Mr. Miles answering Mr. Tener's question about people that may have threatened him. And he wrote -- I'm sorry, he said, Mr. Miles said, "I have to get guarantees that it won't be disseminated to even one person beyond what's absolutely necessary."
And earlier we had looked at Exhibit 44 A, which is a file note that you had authored three weeks before this examination under oath took place, and you wrote there, "The list of performers should only be those with the need to have access to the file." Correct?
A. Yes, sir.
Q. And that was, sir, exactly what Mr. Miles was asking your company to agree to, that only those who had a need to know would receive the information that he was being asked to divulge, right?
A. That isn't what explains further on.
Q. So you disagree with what I just said about that note.

Your company -- your company was not taking steps to limit the information to those with the need-to-know basis?
A. Yes, we did.
Q. You did, okay. And that's what Mr. Miles had asked you to do, right? That statement that I just read from his examination under oath, that's what he said he needed, he needed guarantees that the information would not be disseminated to even one person beyond who needed to know, or words to that effect, right?
A. As the way you're asking it, yes.
Q. Okay. And, sir, nobody at the examination under oath said to Mr. Miles, Well, gee, guess what, we've already taken steps to be sure that happens, right? No one said that to him?
A. No, sir.
Q. In fact, sir, despite the fact that your company had early on said that they would try to accommodate Mr. Miles' request for a confidentiality agreement, despite the fact that Mr. Tener had been asked to try to negotiate a confidentiality agreement with Mr. Miles, three months later -- if you turn to Exhibit 45, please -- this is a letter Mr. Tener wrote to Mr. Miles on March 24, 2005, and I'll call your attention to page 234 in the exhibit book, second page of the letter, beginning at the top of the page.
Mr. Tener wrote to Mr. Miles on March 24, 2005, "You have previously submitted a request that Great Northern enter

into a confidentiality agreement. You indicated you were willing to provide Great Northern with some of the requested documents conditioned upon Great Northern entering into your proposed confidential agreement. Great Northern has advised you that the insurance policy you have with it does not provide for such confidentiality agreements, and that, moreover, the insurance policy amply provides for privacy policies and practices. See copy attached."

So three months, or more than three months after -- in fact, five months after Bev Ascolese had said that they would try to accommodate Mr. Miles' request for confidentiality and months after the company had actually done something to accommodate that request, Mr. Tener was sending Mr. Miles this letter saying we're not going to agree to anything that's not in the policy, right?

A. Yes, sir.

Q. Okay. Now, by the way, have you -- I realize this is not your field here, but have ever read the policies -- privacy policies and practices? Do you know what they say?

A. I couldn't give them to you verbatim.

Q. I'm sure you couldn't.

Turn to Exhibit 9, this is a copy of the policy, and to page 77 of Exhibit 9.

At the top of the page, do you see, sir, this says, "Privacy Policy and Practices"?

A. Yes, sir.
Q. Okay. And then down towards the bottom there's a paragraph that is labeled "The Personal Information We Share." Do you see that?
Do you see the paragraph I'm talking about, sir?
A. "Sharing personal information with others"?
Q. Above that. "The Personal Information We Share."
A. Yes.
Q. And it says, "Chubb may disclose the personal information we collect only to service, process, or administer business operations, such as underwriting and claims, and for other purposes, such as marketing of products and services, regulatory compliance, the detection of prevention of fraud, or as otherwise required by law. These disclosures may be made without prior authorization from you as permitted by law." And it goes on to say, "Chubb may disclose the personal information we collect to affiliated and non-affiliated parties for processing and servicing transactions, such a reinsurers, insurance agents, or brokers," et cetera, et cetera.
Okay. Now, let's move on, sir.
One of the items that you have asked the Mileses to provide to you were copies of their income tax returns, correct?
A. Not me, sir.
Q. Didn't you ask for that at the beginning of the

investigation?
A. I did not, sir.
Q. Okay. Well, somebody was asking for it, right?
A. Yes, sir.
Q. Okay. And those -- that information was something you wanted because it would help you to determine what the financial condition of Mr. and Mrs. Miles had been, correct?
A. Corroborate it, yes.
Q. To corroborate it. And by corroborating -- you've exactly made my point. You already knew that their financial condition was very poor at the time of the fire, right?
A. I knew there was a bankruptcy, yes.
Q. And you also knew that Mrs. Miles had no regular source of income, because Jim Miles told you that the first time he gave you the recorded statement in early November of 2004, right?
A. Yes, sir.
Q. And you knew that he had -- not only was he in bankruptcy, but he had that one million dollar non-dischargeable judgment against him, right?
A. Yes, sir.
Q. And you put that in your second report, Exhibit Number 2, at page 15. Would you turn there for me, sir?
On the third bullet point down you wrote: "Miles stated his bankruptcy filing was due to his million dollars in legal expenses and no assets to pay." Correct?

A. Yes, sir.
Q. And then if we turn to page -- backwards, I should say, to page 12 of Exhibit Number 2 -- by the way, just so you're clear on this, this, I believe, is your summarization of the recorded statement of Mr. Miles that I'm reading from.
A. Yes, sir.
Q. In the third or fourth line down in the second paragraph of the page, this is the paragraph that begins, "He claimed he has no ownership interest." Do you see that paragraph?
A. Yes, sir.
Q. The third line down he stated that Theresa has no gainful employment, correct?
A. Yes, sir.
Q. All right. And during her examination under oath in January of 2005, Theresa told you, or told Mr. Tener when he asked her the questions about it, that she had no regular income and that she was liquidating some assets, including some stocks and some real estate, to support herself, correct?
A. Yes, sir.
Q. All right. So you already knew then, sir, as of that time, as of January of '05, that your insureds had a financial motivation to commit arson, correct?
A. Yes, sir.
Q. Okay. And, sir, you understand that income tax returns contain highly sensitive and personal information, correct?

A. Yes, sir.
Q. Okay. And certainly, sir, if somebody wanted a copy of your income tax returns, you'd want to be sure there was a good reason for them asking for it?
A. Yes, sir.
Q. And you'd want to be sure if you gave those persons your income tax returns that only the people that needed to see them, for whatever reason they needed it, would have access to them, right?
A. Yes, sir.
Q. Okay. And, sir, you know that eventually Great Northern did sign a confidentiality agreement with the Mileses to get copies of the tax returns that it had requested, right?
A. Yes, sir.
Q. If you turn to Exhibit Number 52, this is a confidentiality agreement. If we turn to page 251, which is the second page, you'll see that it's been signed by Mr. Tener on behalf of Great Northern and by James and Theresa Miles in May of 2007.
If you turn back to the paragraph numbered 1 on the bottom of page 250, the agreement says as follows: "Great Northern agrees that the Mileses' tax returns will be used only for the purposes of this claim, that all reasonable steps will be taken to minimize the extent to which persons other than counsel or other representatives of Great Northern involved in

the investigation and processing of the Mileses' claim will have access to the returns, and that Great Northern will return all copies of the tax returns to the Mileses upon the conclusion of the claim."

Did I read that correctly?

A. Yes, sir.

Q. Okay. And that's not an unreasonable thing to ask for, was it?

A. I didn't have no involvement in this.

Q. All right. Fair enough.

Now, sir, if we turn to the Mileses' tax returns, and for the record, let me say, your Honor, these are redacted returns, but the copies that were sent to Great Northern were unredacted.

This is page 252 of Exhibit 53. At the very bottom, sir, you'll see that the adjusted gross income reported by the Mileses for the year 2002 was a negative $62. Do you see that?

A. Yes.

Q. And if you turn to page 254 of Exhibit 53, this is the 1040 individual income tax return for the year 2003. You'll see that in that year the Mileses reported negative $84,000 in adjusted gross income, correct?

A. Yes, sir.

Q. Okay. And this was consistent with what the Mileses had told you, that they essentially had no income in 2002 and 2003,

correct?
A. Yes, sir.
Q. And if we turn to page 260 of Exhibit Number 35, this is the --
THE COURT: 53, right?
MR. BRUNELLE: Thank you, your Honor. It's upside down on this side.
BY MR. BRUNELLE:
Q. Exhibit 53, page 260, you'll see that at the bottom, line 36 of the return, there's a negative $3,000 in adjusted gross income that year, correct?
A. Yes, sir.
Q. All right. And these are all things that were consistent with what you knew right at the beginning of your investigation, which was that the Mileses had no income and they, therefore, had a financial motivation to commit arson, correct?
A. Yes, sir.
Q. Okay. Now, different topic. During the recorded statement, Mr. Miles answered your questions about what he had done during the day before the fire started, correct?
A. Yes, sir.
Q. And when counsel was making his opening statement, he may have inadvertently made a comment that Mr. Miles refused to answer questions about his activities of that day. Would you

agree with me sir, he didn't -- he told you everything he had done that day, correct?
A. Not everything when we go to that portion, no.
Q. Not everything. Did he refuse to answer some questions about that day?
A. Yes, sir.
Q. What did he refuse to answer, sir?
A. Where he was going.
Q. Okay. The ultimate destination?
A. Yes, sir.
Q. And the reason he said he refused to answer that was because he said he was concerned for the safety of his family?
A. Yes, sir.
Q. Because he was concerned that someone had attempted to start the fire with the idea that he would be in the house?
A. Yes, sir.
Q. Okay. Other than that, other than telling you that -- and incidentally, he told you generally where he was going, correct?
A. To a birthday party, yes.
Q. Well, beyond that, he told you where the birthday party was, it was in the state of New Jersey, didn't he?
A. I believe he did.
Q. Okay. He gave you his route all the way down to when he got off the New Jersey Turnpike, and he gave you the exit

number, didn't he?
A. Yes.
Q. Okay. And it was from that point on that he said he was declining to give you the information for concern of his family's safety?
A. Yes.
Q. All right. Fair enough.
A. There's other things he declined to give.
Q. Excuse me?
A. There's other things he declined to give.
Q. I'm talking about his activities on the day of the fire.
A. Okay.
Q. So other than that, is there any other information about his activities on the day of the fire that you now say he declined to give?
A. Activity-wise, no that I can recall.
Q. Okay. All right.
One of the things he told you about was that he left the house roughly 6:30 in the evening, between 5:30 and 6:30 to go to this birthday party, correct?
A. Yes.
Q. And he told you that he traveled down the East Coast Corridor, down Route 95 and heading down towards New Jersey, correct?
A. Yes.

Q. And he told you that when he got down to the New York-New Jersey area, he mistakenly entered the New Jersey Turnpike through an Easy Pass lane, which is the equivalent of our Fast Lane here in Massachusetts, and he didn't have a transponder on the car he was driving, correct?
A. Correct.
Q. And he told you that when he got to the exit that he was supposed to take, he stopped, explained to the toll booth operator that he had mistakenly entered the turnpike through an Easy Pass lane and he paid a certain toll and received a receipt for that toll, correct?
A. Yes.
Q. And he told you that the time that he received the toll was indicated on that receipt, correct?
A. I believe so.
Q. And he told you he had that receipt with him there during the recorded statement?
A. Yes.
Q. And you asked him if he would provide you with a copy of it, right?
A. Yes.
Q. And he said he would, right?
A. Yes.
Q. And after the three-and-a-half hours of the recorded statement when Mr. Miles went to look for the receipt, he told

you that he couldn't find it, correct?
A. Yes.
Q. All right. And he searched through his wallet?
A. I don't know where he searched. I remember him looking in the car.
Q. Okay. You saw him searching the car?
A. He went to the car, yes.
Q. You remember, sir, that he told you he would continue searching for it and he would provide it to you if and when he found it, correct?
A. Yes.
Q. And you were present, sir, at his -- at Mr. Miles' examination under oath when he told Mr. Tener, just as he had told you, that he was still unable to find this receipt, correct?
A. Yes.
Q. All right. And, sir, you would agree with me that this receipt would be beneficial to Mr. Miles to produce, because it would be another piece of evidence that he was, in fact, in New Jersey about 11:00 p.m., as he told you, on the night that the fire started back in Massachusetts, right?
A. I just need some clarification. I don't know if it was New Jersey or New York in which that occurred.
Q. All right. Let me ask you this question, then. Whichever state it was, he told you that the time receipt on the stamp

was roughly 10:55, 11:00 p.m., something like that? Does that record with your memory?
A. Something like that.
Q. It's in the transcript. If you agree with me, we'll move along.
A. I'll agree with you.
Q. That's fine.
So, in any event, it would be beneficial, it would be corroborative of Mr. Miles' statement that he was in New York or New Jersey at 11:00 p.m. on the night of the fire if he could produce that receipt, correct?
A. Yes, sir.
Q. And in fact, Mr. Miles did produce some -- a credit card statement that corroborated his testimony about being in New Jersey on the night of October 16th, didn't he?
A. Yes, sir.
Q. Okay. And the credit card statement showed that he had a meal at Denny's and that he had bought some gas sometime on October 16, 2006, correct?
A. I was -- as you're saying the 16th, I don't know if it says 16th or 17th on the credit card receipt.
Q. Let's take a look at it. We'll take a look at it, because I don't want you to have to guess at anything. Just give me a second.
Exhibit Number 28, sir. Look at Exhibit Number 28.

This is a credit card statement for James Miles, and if we look at the -- counting down from the top, one, two, three, four -- the fifth line down, there's a transaction -- it's a little hard to read this, but I believe it says 10/16, Denny's, Inc., Lawrenceville, New Jersey. You see that?

A. Yes.

Q. Does that refresh your recollection that Mr. Miles told you he got off at Lawrenceville, he got off the New Jersey Turnpike at Lawrenceville?

A. Yes, sir.

Q. Just above the Denny's entry there's an entry for Amoco Oil in Lawrenceville, New Jersey. And if we go to the left of that, you see the date of that transaction was also 10/16, correct?

A. Yes, sir.

Q. While we're on the subject of this credit card statement, let me highlight a couple of other things.

During his recorded statement with you, Mr. Miles told you that during the day of October 16th when he was preparing to -- strike that -- before he left for his trip to New Jersey, that he had made a purchase at a store called Benny's, correct?

A. Yes, sir.

Q. And this credit card statement actually has a transaction on 10/16 for a Benny's store in Seekonk, correct?

A. Yes, sir.

Q. So that corroborates what Mr. Miles told you, correct?
A. Yes, sir.
Q. And then if we just go down four lines from there to the Shell Oil purchase, do you see that? It's right below the Denny's?
A. Yes, sir.
Q. And that was also another transaction that was on 10/16, correct?
A. Yes, sir.
Q. Okay. And Mr. Miles had told you that before he left he bought gas when he was in Rehoboth or Seekonk that day, correct?
A. Yes.
Q. And you know Seekonk is right next to Rehoboth? You don't know? Okay. All right. Maybe the Court will take judicial notice of that, I don't know.
A. Thank you.
Q. We'll ask Mr. Miles, I think he knows.
In any event, so this credit card statement was corroborative of what Mr. Miles told you in terms of his activities that day, correct?
A. Yes.
Q. Fair enough.
Now, new subject. During the recorded statement, Mr. Miles had told you that he had left the house between 5:30

and 6:30 to drive to New Jersey to join his wife, who had flown there the day before, right?
A. I don't think I knew at that time she had flown.
Q. Okay.
MR. BRUNELLE: Just a moment, please, your Honor.
(Pause.)
Q. All right. In any event, he told you that nobody else was home during the day besides him; is that correct?
A. Yes, sir.
Q. Fair enough.
If you turn to -- I'm at the recorded statement now, which is Exhibit 63, if you would go in Exhibit 63 to page 416, Mr. McIntyre, and on page 416, if you look at transcript page 47 and go down to line 2098 on that page --
MR. CORNER: What page?
MR. BRUNELLE: Page 47 of the transcript. In the exhibit book it's page 416.
MR. CORNER: Thank you.
MR. BRUNELLE: You're welcome.
MR. BRUNELLE:
Q. Are you there with me, sir?
A. Yes, sir.
Q. I'm going to read this into the record.
This is JM. He said: "And I set the alarm from there. I had a lot of trouble with -- I think it was zone 4, I

tried zone -- I tried four or five times on it."

Then you asked him: "What is zone 4?"

And he answered: "I don't know, to tell you the truth, but it's one we have trouble with all the time. My wife said it had something to do with the humidity or something. And so, ah, it took me a while and I kept on trying to set, reset it and so forth, and then -- then I left, and that's it, I mean --"

Okay.

MR. BRUNELLE: If I could just have one second please, your Honor.

Q. I'm sorry, I do have it here. This is on page -- the same page, 416, but on transcripts page 48. Starting at line 2116. This is Mr. Miles speaking again. And he said:

"So that, you know, if you set it with that blinking, the alarm is going to go off, okay? So sometimes it's just do it a few times or something that will do, but it seems to me that there's like a window or something on it that expands or contracts with humidity just enough that it causes a miss with the contact or something like that, okay?"

And then another line down he says, "I may have -- I may have bypassed the zone or something."

Did I read that correctly, sir? And I realize --

A. I think so.

Q. -- it's kind of jumbled, I apologize, but I'm just trying

to read the way it was written.

Down at the bottom of that same paragraph, starting at line 2136, he wrote, "It sometimes, just, you know, as I say, there's something -- my wife says that she's had problems a couple of times on it, and it's humidity, it's expansion of water, something like that."

So Mr. Miles told you that on this day he had trouble setting zone 4 and that he may have bypassed zone 4, correct?

A. Yes, sir.

Q. And he also told you that he had set and reset the alarm several times on that day, correct?

A. Yes, sir.

Q. Before leaving. And that was consistent with what Mr. Coyle had told you when you first spoke to him on October 22nd when he indicated that the alarm had been set -- had been armed and disarmed several times before it was finally armed roughly around 6:30 on the night of the fire?

A. I'll accept your time, I don't know.

Q. But you do --

A. Yes.

Q. You agree that Mr. Coyle told you there was a series of armings and disarmings within just a few minutes, correct?

A. Yes, sir.

Q. Okay. And -- all right.

Now, one of the things that you wanted to obtain as

part of your investigation was the records of Protection One for the Mileses' house; is that correct?
A. Yes, sir.
Q. And Mrs. Miles did produce at her examination under oath on January 19th a record which Protection One had sent to her. And if you would turn, please, to Exhibit 29, we'll take a look at that.
A. Yes, sir.
Q. Okay. And this document is consistent with what Mr. Coyle had told you. If we look down to the date, which is partially punched out by the hole there, but you can see the date which would be 10/16, Saturday. Do you see that?
A. Yes.
Q. By the way, can you remember that the fire started early on a Sunday morning?
A. Yes, sir.
Q. Okay. So this activity here shows that starting at 18:19 the system was armed. Do you see that? This is down at the bottom of the 10/16 entry.
A. Yes, sir.
Q. You understand that's military time, correct? And that would be for us civilians 6:19 p.m.?
A. Yes, sir.
Q. Okay. And it shows that it was armed then and then it was disarmed about nine minutes later and then it was armed a

couple of more times, disarmed, and then finally armed at 18:33, which is roughly 6:33 p.m., correct?
A. Yes, sir.
Q. And that's consistent with what Mr. Coyle told you, right?
A. Yes.
Q. And it's consistent with what James Miles told you in terms of his setting and resetting the alarm several times, correct?
A. Yes.
Q. And then it also shows that the next activity is recorded at 00:28 on Sunday, October 17th, correct?
A. Yes, sir.
Q. All right. And the activity there shows that they dialed from premises. You understand that to mean that the fire alarm company received indication there was a fire and they had called the premises, correct?
A. The alarm company, yes.
Q. Okay. So that would have been -- you agree that would have been the time that the alarm company received an alarm from the house that there was something wrong, a fire?
A. Yes, sir.
Q. And there's no indication of any entry between 6:30 p.m. the night before and 12:30 the next -- early the next morning, correct?
A. Correct, sir.

Q. Okay. And despite having this record, sir, am I correct that your company felt that they wanted to have more records from Protection One in addition to this record?
A. Yes, sir.
Q. Okay. And your company eventually obtained those records in November of 2006, correct?
A. I believe that's the time.
Q. Okay. Well, you recall, sir, that around October of '06 when my law firm became involved, we provided your company with the release that it had asked for from Mrs. Miles to get access to the records, correct?
A. I've got to assume the dates. It's been so long.
Q. Okay. Aside from the dates, you know that at some point you did get the release -- strike that.
You did get a release from Theresa Miles to get access to the Protection One records, correct?
A. Yes, sir.
Q. And you were the point -- you were still the investigator on this claim, correct, at that time?
A. Yes, sir.
Q. And you used the release to get -- to contact Protection One and basically said to them send us everything you got, correct?
A. Yes, sir.
Q. And if we turn to page -- I'm sorry, Exhibit Number 35,

and starting at page 188, Mr. McIntyre, and going all the way through page 212, can you tell me, are these the records that your company received from Protection One in response to the release that it was provided?

(Pause.)

A. Appears to be.

Q. And when you received these records, Mr. McIntyre, obviously you looked them over very carefully?

A. Yes, sir.

Q. And in addition to looking at these records, you also had a telephone interview with a man named William Hooper, H-o-o-p-e-r, who at that time was an employee of Protection One, correct?

A. Yes, sir.

Q. Now, Mr. McIntyre, do you recall a few months ago in April of this year that you were asked to sign an affidavit having to do with this case?

A. Yes, sir.

Q. And you recall that the subject of the affidavit was essentially these Protection One Alarm Company records?

A. Yes, sir.

Q. And when you wrote that affidavit, sir, you understood that you were signing it under the pains and penalties of perjury?

A. Yes, sir.

Q. And that that oath that you took to sign them under the pains and penalties of perjury was just as binding on you as the oath that you took in the courtroom today?
A. Yes, sir.
Q. And you intended that the Judge would rely upon your statement in that affidavit when you filed it, correct?
A. Yes, sir.
MR. BRUNELLE: May I approach the witness, please, your Honor?
THE COURT: Yes.
BY MR. BRUNELLE:
Q. Mr. McIntyre, I just handed you a copy of the affidavit that was presented to the Court, and it's not physically signed by you, but the way the electronic system works here indicates that it was signed by you, and would you take a moment to read this over and let us know if, in fact, this was an affidavit that was signed by you?
(Pause.)
A. Yes, sir. I read it.
Q. Excuse me?
A. I read it.
Q. Thank you. And is this the affidavit that you signed and approved of, sir?
A. I assume it is.
Q. Would you like to consult with your counsel to be sure?

A. I'd like to.

MR. BRUNELLE: Counsel, can we stipulate this is the affidavit?

MR. CORNER: This is the affidavit that was filed in connection with the motion for summary judgment.

MR. BRUNELLE: Can we stipulate that Mr. McIntyre actually signed the affidavit?

MR. CORNER: We have a signed version in my file.

MR. BRUNELLE: All right. So there's no question, counsel, that this is the affidavit Mr. McIntyre signed.

MR. CORNER: Yes.

MR. BRUNELLE: Thank you very much.

BY MR. BRUNELLE:

Q. Mr. McIntyre, if I call your attention, please, to Exhibit -- I'm sorry, it's not an exhibit -- to your affidavit to paragraph 9, and this paragraph reads as follows: "These records" -- and by these records, you were referring to all of the records that we just looked at a moment ago, which are Exhibit 35, correct? They're records that you got from Protection One?

A. Yes, sir.

Q. Okay. You wrote, "These records, as reviewed by me and as interpreted by Mr. Hooper, were inconsistent with James Miles' previous statements to me when he stated that Protection One had been out to his home to address problems with the alarm

system and was advised that window contacts were malfunctioning. Mr. Miles had also previously testified that zone 4 had been bypassed and had been reported to the alarm company."

Did I read that correctly, sir?

A. Yes, sir.

Q. So when you wrote that, sir, the previous statements that you were referring to that James Miles had made to you, those were his recorded statement and his examination under oath, correct?

A. I don't recall what's on the examination under oath.

Q. All right.

A. Can you point me to that area in his examination under oath?

Q. Oh, I'm going to.

A. Okay.

Q. So at least, sir, you were relying on -- you were saying that in his recorded statement to you, James Miles had said to you that Protection One had been out to his home to address problems with the alarm system and was advised that window contacts were malfunctioning; is that correct? Is that what you were saying?

A. Yes.

Q. And you were saying that in his recorded statement James Miles had also previously testified that zone 4 had been

bypassed and had been reported to the alarm company?
A. He reported that to me through Theresa Miles.
Q. He didn't say -- you didn't write that, that he reported it to you through Theresa Miles?
A. No, I did not, sir.
Q. Are you -- I want to be sure I understand your testimony.
Are you saying that Mr. Miles said that Theresa reported it?
A. Theresa tells him that there's problems with the alarm system with the swelling, the humidity, and what have you.
Q. That's not what you wrote here, is it, sir?
A. No, sir.
Q. You said Mr. Miles had testified that there was -- let's take a step back.
Let's turn to Exhibit 63. This is -- you were asking me to point out to you where that subject was brought up. This is the recorded statement.
Did you, Mr. McIntyre, read through the recorded statement of Mr. Miles to compare what he told you in that statement about the alarm system malfunctioning to compare that statement with the records? Did you do that before you signed this affidavit?
A. No, sir.
Q. Were you going just from memory?
A. Yes, sir.

Q. Okay. So it was your memory that somewhere in the recorded statement or the examination under oath or both of James Miles he had said to you that, what you wrote here, Protection One had been to his home to address problems with the alarm company and was advised that the window contacts were malfunctioning. And it was your memory that Mr. Miles somewhere had said, either in his recorded statement or his EUO, that zone 4 had been bypassed and had been reported to the alarm company. That was your memory, correct?
A. Yes, sir.
Q. So let's turn to Exhibit 63, page 416. This is the section we looked at before. Actually, transcript page 47 down at the bottom of the page, starting at 2098. This is James Miles. He said, "I set the alarm from there. I had a lot of trouble with -- I think it was zone 4. I tried four or five times."
Then you asked him, "What is zone 4?"
And he said, "I don't know, to tell you the truth, but it's one we have trouble with all the time. My wife said it had something to do with humidity or something. And it took me a while," et cetera, et cetera.
So, sir, certainly there there's no indication that Mr. Miles told you that Protection One had been to his home to address the problem, right?
A. Correct.

Q. Not in that section.
On page 48 of the transcript, down starting at line 2136, we already looked at this, where he said, "My wife says she's had problem a couple of times and it's humidity, it's expansion of water, something like that." So there's nothing there about Protection One being involved in knowing about this problem, right?
A. There's the inaudible words.
Q. I'm sorry?
A. There's the inaudible words.
Q. Oh, it's in the inaudible words?
A. I don't know, but that's that section in there, there's something missing in the recorded statement.
Q. So your memory is in the inaudible words, that's where we'd find that?
A. That's not what I'm saying.
Q. Okay.
If you turn for a moment to Exhibit 2, which is your SIU report, number 2, and turn to page 13, the third bullet point -- I'm sorry, I'll wait for you, sir. Take your time.
A. What page?
Q. Page 13.
A. Okay.
Q. The third bullet point from the bottom, which begins, "He packed a bag with slacks." Do you see that?

A. Yes.
Q. I'm going to read this. "He packed a bag with slacks, four pairs of underwear, ties, and shirts. Between 5:30 and 6:30 p.m. he left on his trip."
By the way, before I read further, would you agree with me that this is your summarization of the recorded statement that Mr. Miles had given you on November 4 -- November 8, 2004?
A. 4th?
Q. Is it the 4th? I'm sorry, it is the 4th, sir, I stand corrected.
A. That's all right.
Q. So this is your summarization of what he said to you in your recorded statement, true?
A. Yes.
Q. And going on, you wrote, "He had problems setting the alarm which kept recording a problem in zone 4. He stated this had been a recurring problem that the alarm company stated was due to the swelling of the windows. He thought that possibly the system bypassed this zone and the alarm was activated."
Sir, the sections I just called your attention to in the recorded statement, that doesn't say that the alarm company told him that the problem was because the windows are swelling.
A. Correct.
Q. Are you able, sir, to point out to me anywhere, and you

can take as long as you want, in this recorded statement where Mr. Miles said to you that the alarm company told him that the problem was caused by humidity, swelling the windows?
A. I don't recall. You've gone through it, was there any area that you found?
Q. I haven't found any, but I'm willing to let you look.
A. No, it's going to take a considerable amount of time.
Q. So would you agree with me, at least when you wrote that in your report, that was an error on your part?
A. There may have been conversation that wasn't reported, but I wouldn't call it an error on my part.
Q. Sir, are you testifying that you now remember that Mr. Miles said the alarm company told him, or are you just guessing that maybe he said that?
A. My report is a -- is compiled after the recorded statement. You're asking me five years later to recall, and I can't recall.
Q. Okay. So you don't have any memory that he said that to you, do you?
A. No, sir.
Q. And the recorded statement certainly doesn't contain a statement that Mr. Miles said the window -- the alarm company told him it was a problem with the window swelling from humidity?
A. Correct.

Q. Okay. Now, turn to page 426 of the recorded statement, sir, and I'm calling your attention to transcript page 68 and starting at line 3033. And there you ask this question: "And as you're going out, coming back and forth, is there some of the things -- you said zone 4, you have no idea what zone 4 is, you said you thought that it might have been bypassed."

And then Jim said, "I -- uh, I was trying to remember. I remember I kept on trying to get it to catch and, um, I think it's some windows, I don't know if there's any door on it. I think it's windows."

So certainly that statement that I just read to you doesn't support your claim that Mr. Miles said that it was the alarm company that told him there was a problem with the windows, right?

A. Correct.

Q. And it doesn't say anything about him having reported any problem with zone 4 to the alarm company, right?

A. Correct.

Q. Okay. If you turn to page 427 of the Exhibit 63, and this is transcript page 69 starting at line 3051. This is Mr. Miles speaking. "All I know is 4 is the one we always have problems with if there's a problem."

And then you asked: "Okay. Is there a zone assigned to the entry doors?"

And he said, "I just don't know what they are. The

only -- as I say, the only thing I know, if there's ever a problem, it's zone 4, okay? You see, I'm not the one who sets most of the time because, you know, when I leave, my wife's usually there," et cetera.

So, sir, that statement I just read to you does not support your claim that Mr. Miles had told you that Protection One had been to his home to address problems with the alarm, that he had told you that Protection One was advised that the window contacts were malfunctioning, or your claim that he had told you that the problems with zone 4 had been reported to the alarm company. What I just said, that doesn't support your claim, does it?

A. Correct.

Q. Okay.

And if we turn now to Exhibit 62, this is the examination under oath of Mr. Miles, turn to page 371, please, and in the transcript I'm going to call your attention, sir, to page 116 of the transcript starting at line 17. And rather than read this into the record -- actually, I will read it into the record.

He was asked by -- this is Mr. Miles being asked by Mr. Tener.

"Q. When you left the house to start your trip to New Jersey, did you set the alarm?

"A. Yes, I did.

"Q. Tell me how you did that.
"A. I had trouble. I remember I was telling to him" -- and by him he had meant you, correct, because you were there?
A. Probably.
Q. Probably.
"I was telling him I had trouble because there's one zone that sometimes -- we were like having cold and hot weather, you know, it was like that October funny weather and there's some place that we have it, some wood expands or something and we have trouble setting one of them. And I forget which zone it is, I think it's 4. And I think I finally bypassed that zone, but we have so many backups on it, it's like" -- et cetera.
Now, sir, you would agree with me nothing that I just read there supports your claim that Mr. Miles had said to you that Protection One had been out to his home to address the problems with the alarm system and was advised that the window contacts were malfunctioning or your claim that Mr. Miles had said that the problems with zone 4 had been reported to the alarm company?
A. Correct.
Q. Okay. And calling your attention to page 118 of the transcript, starting at line 2, Mr. Tener asked him: "But you did bypass at least zone -- well, you think it's 4."

"A. I think so, yeah, but I've done that on a number of occasions. I mean, it's not at all unusual in -- like when the weather is changing, when we're having humidity some days and cold weather the next or colder nights or something, there is some expansion problems with some wood or something on the window or something, I don't know. And it -- and the contact just doesn't get quite made right or something and, you know, there's no way to cut it out of the zone, you know, short of somebody coming and doing it, so --"

Sir, would you agree with me there that nothing Mr. Miles said there supports your claim that he had made statements to you that Protection One had been to his house to address problems with the alarm system and that problems with zone 4 had been reported to the alarm company?

A. Correct.

Q. Okay.

A. Can I draw your attention to a page?

Q. Sir, down at the bottom of page 119 -- is this what you want to ask me about, where he was asked: "Did you talk to the alarm company after the fire?"

A. Yes.

Q. Let's go there. This is page 119, starting at line 13. "Did you talk to the alarm company any time after the fire?"

"A. No, I talked to them when they were -- had come in and made a lot of these changes at the time."

"Q. But that was before the fire?

"Oh, God, yeah. It was a long time before the fire, years before the fire."

So, sir, that does not support your claim that Mr. Miles stated that Protection One had been to his home to address problems with the alarm system and was advised that the window contacts were malfunctioning, does it?

A. Specifically, no.

Q. Doesn't support it generally, does it?

A. That he called the alarm company?

Q. To address problems with the alarm system. He said they made changes. That's not the same as problems, is it? You equate problems with changes?

A. I took changes to be correction of problems.

Q. You did, okay.

And he also previously testified -- this is your affidavit, quote, Mr. Miles has also previously testified that zone 4 had been bypassed. And he did testify to that, correct?

A. Yes.

Q. We just read that, okay. And had been reported to the alarm company.

Sir, nothing that we just said says that problems with zone 4 had been reported to the alarm company, does it?

A. Correct.

Q. Okay. So, sir, in fact, there were no discrepancies

between what Mr. Miles had told you about in his examination under oath in his recorded statement and what the alarm company records that you obtained showed, at least with regard to these items that you've listed here, true?
A. I'm just reading another section of this transcript. Excuse me. Can you rephrase that question?
Q. Yeah. My question to you is this: In fact, sir, your statement that there were inconsistencies between James Miles' previous statements to you between the records as reviewed by you and as interpreted by Mr. Hooper, that -- your statement is not true, and I'll read your statement: "These records, as reviewed by me and as interpreted by Mr. Hooper, were inconsistent with James Miles' previous statements to me when he stated that Protection One had been out to his home to address problems with the alarm system and was advised that window contacts were malfunctioning. Mr. Miles had also previously testified that zone 4 had been bypassed and had been reported to the company."
That statement in your affidavit was not true, correct, sir?
A. I took it as being true.
Q. You took it as being true at the time you signed it.
Having just gone through all of the recorded statement and the examination under oath with me and seeing that, in fact, neither of those statements supports any of those claims

you made, do you now want to retract this paragraph from your affidavit, sir?
A. No, sir.
MR. BRUNELLE: Thank you. Those are all of the questions that I have.
THE COURT: All right. We're going to take a break. I'll let you start, if you wish, Mr. Corner, or we're going to take a break in about ten minutes.
MR. CORNER: I don't mind starting, your Honor.
THE COURT: Okay. Go ahead. Cross-examination, Mr. Corner.
MR. CORNER: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. CORNER:
Q. Good afternoon, Mr. McIntyre.
A. Good afternoon, sir.
MR. BRUNELLE: Pardon me, your Honor. I just want to clear the decks for Mr. Corner.
MR. CORNER: Thank you.
BY MR. CORNER:
Q. Mr. McIntyre, you were -- you previously introduced yourself. You're a special investigator for the Chubb Group Insurance Companies, correct?
A. Yes, sir.
Q. And can you describe generally what your role is as a

special investigator?
A. As a special investigator I'm responsible for the investigation of questionable claims, arsons, claims that are of suspicion of being submitted for fraudulent or misrepresentation.
Q. And what's the purpose for conducting an investigation in your role as a special investigator?
A. The purpose of my investigations is to see if there's any involvement of the insured's -- any of the insured's involvement in the claim to facilitate the payment of claim.
Q. In other words, you're trying to determine whether the insured had any involvement in causing the loss for which recovery is sought, correct?
A. Yes, sir.
Q. You have been employed as a special investigator, I believe you testified, with Chubb for 11 years, correct?
A. Yes, sir.
Q. Can you tell the Court a little bit about your previous job experience? Prior to being employed by the Chubb, where were you employed?
A. Connecticut State Police.
Q. How long were you employed with the Connecticut State Police?
A. Twenty-eight years.
Q. When you left the Connecticut State Police, can you tell

the Court what position you held?
A. I was the commanding officer in the statewide organized task force.
Q. Can you describe the nature of your duties as the -- being in charge of the organized crime task force?
A. The organized crime task force was my last two years. I was responsible for the investigation of political corruption and organized crime.
Q. Okay. What rank did you hold with the Connecticut State Police when you retired?
A. Lieutenant.
Q. Okay. Can you describe generally over your 28 years of experience in the state police the types of crimes that you investigated?
A. Predominantly my career with the state police was in the major crime sections.
Q. Okay. Can you tell me how many -- can you tell me how many -- let me step back.
Can you describe your training as a -- with the Connecticut State Police?
A. My training with the Connecticut State Police was extensive, primarily in the areas of criminal investigation: Laws of search and seizure, collection of evidence, crime scene processing, interpretation of blood patterns, splatters, reconstruction, fire investigations.

Q. Let's say specifically to crime scenes, did you have any training in crime scene investigation?
A. Extensive training. I have a bachelor's degree in criminal justice and forensic science, and my college adviser at that time was Dr. Henry Lee. Subsequently worked on the major crime squad at the Connecticut State Police, which was the beginning of what today is now known as CSI. We utilized and brought Dr. Lee in to help us in the processing of crime scenes.
Q. You mentioned Dr. Henry Lee. Can you state for the record who Dr. Henry Lee is?
A. Dr. Henry Lee is a world known scientist, worked on many of the major cases, O.J. Simpson, Kennedy Smith, and other notable crimes.
Q. Did you -- can you tell the Court in your 28 years with the Connecticut State Police how many crime scenes you investigated?
A. Crime scenes that I have assisted in processing was 250 to 300 estimated, over 200 bodies that I've been involved with in investigations.
Q. When you say "bodies," what do you mean?
A. Either homicides, suicide, or untimely deaths.
Q. Do you have any teaching experience with regard to crime scene investigation?
A. Yes, taught crime scene and criminal investigation to New

England state police, Rhode Island State Police, directed the Maryland State Police on their investigation of their major crimes and the collection of evidence. I've taught some other ones, I think the state police academy I've taught criminal investigation, too.

Q. Have you ever received any awards in connection with your law enforcement background?

A. I received an award for outstanding investigator of the year by the credit card investigators.

Q. Now, under examination from Mr. Brunelle you indicated that you didn't have any experience -- you didn't have any expertise in the cause and origin of fire; is that correct?

A. Correct.

Q. And have you ever investigated any arson scenes?

A. Yes, sir.

Q. And how is it that you're able to investigate arson scenes without having experience in cause and origin of fire itself?

A. Cause and origin is a specialized area in which they can look and interpret the scenes. Investigate is an art in which you go out and investigate a crime, and the way we taught it was basically a spoke, a wheel, instead of running around the inside of the wheel, you chart the hub and take the direction of the spokes and try to build the investigation off of. Any investigation conducted, whether it's a murder or an arson, is still an investigation.

Q. Okay. So an arson -- when you're investigating an arson crime scene, that's the same as investigating any other type of crime scene, correct?
A. Yes.
Q. And in this case, you brought in -- you brought in a -- Chubb brought in T.J. Klem to perform a cause and origin analysis, correct?
A. Yes, sir.
Q. And similarly, you wouldn't have particular medical experience to determine cause of death, correct?
A. Yes.
Q. That's something you leave to physicians on the forensic side, correct?
A. Yes.
Q. Now, just stepping back, at some point you became aware of a fire scene at the Mileses' home in Rehoboth, correct?
A. Yes, sir.
Q. And that was assigned to you?
A. Yes, sir.
Q. Why was this -- why was this investigation assigned to special investigations?
A. Because it was deemed suspicious and an arson.
Q. Okay. And why was that significant to Chubb's investigation?
A. Chubb assigns all arsons to special investigators.

Q. Okay. Now, there is also an adjuster assigned to this case, correct?
A. Yes, sir.
Q. That's Mr. Tagliente?
A. Yes, sir.
Q. And what was Mr. Tagliente's role in adjusting this claim?
A. His responsibility is the claim, financial part of it, the adjustment principles, and providing monies for insureds.
Q. And how did that role -- how is that role distinguished from yours?
A. Mine is to investigate the claim that's submitted to see if there's any involvement by the insureds of intentional act or misrepresentation or anything that would void payment of the claim.
Q. So simply stated, you go to whether the claim should be paid based on an exclusion, and Mr. Tagliente would make a determination as to the amount of the claim?
A. Basically, yes.
Q. You indicated that you went to the scene of the fire within a day or two after the -- after the fire was reported to Chubb, correct?
A. Yes, sir.
Q. And who was there with you?
A. There was Joseph Holter (phon.), I think a person by the name of Murphy that works for T.J. Klem, and I believe just me.

Q. Okay. Now, when you went to the -- were there any observations that you made about the scene of the fire when you were there?
A. There's observations that I made as to the path of the accelerants, that there was different points that were burnt that were shown to me by T.J. Klem's people just so that I can view that. I also made observations about no forced entry in the doorway, that the doorway bore a contact point for the alarm set, that there was contacts on the windows, none of the windows in the solarium or the sauna room were broken, that there appeared to have been some type of stack of eight-and-a-half by 11 paper sitting on the stoop of the doorway leading from the sauna room into what I found out to be the kitchen.
Q. And you indicated that there were multiple points of origin. Those were all points of origin in one room?
A. They were at the stairway going up to the house, path leading down, and as you continued further on, there was a doorway that lead into what appeared to be an office, and then it went into a basement section.
Q. And you indicated that there was no sign of forced entry. What room were you referring to?
A. There was no signs of forced entry throughout that house.
Q. Okay.
A. The room that I'm talking about, the door is where the

fire was all confined.
Q. So there was no -- there was no sign of forced entry from the exterior door into the area where the fire had been set?
A. Correct.
Q. Okay.
THE COURT: We're going to take the lunch recess at this stage.
You may step down for the time being, Mr. McIntyre.
We'll be in recess until 2:00. May I get an estimate of approximately how long the cross-examination will be as far as you know, Mr. Corner?
MR. CORNER: Maybe an hour.
THE COURT: All right. If we get beyond Mr. McIntyre, it's Mr. Tagliente is next; is that right?
MR. BRUNELLE: Yes, your Honor.
THE COURT: And his -- length of his direct exam will be approximately how long?
MR. BRUNELLE: I would say an hour to an hour and a half.
THE COURT: So it's not likely we're going to get beyond his direct, even if we get to it today.
MR. BRUNELLE: I think it would be very unlikely.
THE COURT: And then tomorrow?
You may step down.
MR. BRUNELLE: I finish with Mr. Tagliente, Mr. and

Mrs. Miles will testify tomorrow. On direct I anticipate half hour to 45 minutes with each of them.

THE COURT: Okay. And then you will have other witnesses?

MR. BRUNELLE: I have a witness, State Trooper O'Neil, who, as we mentioned, cannot be here until Wednesday morning. So if we end short tomorrow, I would ask for your indulgence in allowing us to come back.

THE COURT: All right. We'll be in recess then until 2:00.

(Recess taken.)

THE COURT: Good afternoon, counsel.

Mr. McIntyre will please retake the witness stand.

Good afternoon, Mr. McIntyre. Again, you're reminded that you remain under oath. Please be seated.

THE WITNESS: Yes, sir.

THE COURT: And you may continue with direct examination. Actually, cross-examination. I beg your pardon.

MR. CORNER: Thank you, your Honor.

BY MR. CORNER:

Q. Good afternoon, again, Mr. McIntyre.

At some point, Mr. McIntyre, did you attempt to contact Mr. or Mrs. Miles?

A. Yes, sir.

Q. And why did you do that?

A. Try to set up an interview.
Q. And is it important in performing a special investigation of a fire loss that you conduct an interview of the insureds?
A. Yes, sir.
Q. Why is that?
A. To find out the last movements, who was in the house, to find out the background investigation of the insureds, and to gather the information.
Q. Now, how was it that you went about attempting to contact the Mileses?
A. There was no phone number available. I checked the loss report and it had the number of Roger Lehrberg.
Q. Okay. And again -- and who -- who did you, again, understood Roger Lehrberg to be?
A. Subsequently I found out an attorney, a friend, and a one-time law partner.
Q. And at some point you learned he was not representing the Mileses, correct?
A. Correct.
Q. And at that -- and did you have any understanding of what his role was at that point?
A. At the point I tried to contact him, he was the one who put the claim into Chubb.
Q. After you learned that he was no longer -- that he was not representing the Mileses, what did you understand his role to

be?
A. He was to represent the mortgage holders.
Q. Okay. Aside from through Mr. Lehrberg, did you have any other means of contacting the Mileses at any time?
A. No, sir.
Q. So the only way that you could arrange the interview of the Mileses was through Mr. Lehrberg?
A. Yes, sir.
Q. Now, when did you first -- when did you first interview Mr. Miles?
A. I believe it was November 4, 2004.
Q. So that's about two-and-a-half weeks after the fire?
A. Yes, sir.
Q. Was that an unusual period of time to wait for -- to interview an insured in your experience as an investigator?
MR. BRUNELLE: Objection, your Honor.
THE COURT: Overruled.
A. Yes, sir.
Q. And why is that?
A. We try to contact the insureds right away to facilitate payment of the claim. Usually the people I contact are trying to provide the information as soon as possible.
MR. BRUNELLE: Objection, move to strike.
THE COURT: Overruled.
BY MR. CORNER:

Q. So it was unusual to take that period of time to reach -- to be able to contact the Mileses, correct?
A. Yes, sir.
Q. And you had made previous attempts to contact them, correct?
A. Yes, sir.
Q. And in fact, you talked with them over the phone briefly from Mr. Miles' office on October 22nd, right?
A. I believe it was Mr. Lehrberg's office.
Q. Right, Mr. Lehrberg's office. And at that point he raised issues about confidentiality, correct?
A. Yes, sir.
Q. Now, at some point Mr. -- you received a proposed confidentiality agreement from -- proposed by Mr. Miles, correct?
A. Yes, sir.
Q. Okay. Could I turn you, please, to Exhibit 38?
A. Yes, sir.
Q. And again, Exhibit 38, that is the nondisclosure and confidentiality agreement that Mr. Miles had sent along to you?
A. Yes, sir.
Q. And he sent it along through Mr. Lehrberg, correct?
A. Yes, sir.
Q. Did you have any means of communicating back to Mr. Miles by e-mail or otherwise other than through Mr. Lehrberg?

A. No, sir.
Q. Now, Mr. Brunelle asked you some questions about this document, but fair to say that Mr. Miles was attempting to prevent Chubb from disclosing information other than outside -- other than for its use, correct?
A. Yes, sir.
Q. He was also asking that Chubb -- that in the event that a subpoena was issued, Chubb not comply with the subpoena, correct?
A. Correct.
Q. And is that inconsistent with your understanding of what Chubb's responsibilities would be?
A. Yes, sir.
Q. Okay. Is that one of the reasons Chubb indicated that it was unacceptable?
A. Yes, sir.
Q. If I could turn you to page 222.
A. Yes, sir.
Q. In fact, in this letter, Chubb -- in this agreement, Chubb agrees, represents, covenants, guarantees, and warrants that it will not comply with and will contest any order, including, but not limited to, subpoenas of any court or state, local, county or federal agency or governmental body or entity or foreign government requiring Chubb to turn over any information or materials of whatever kind.

Do you see that part?
A. Yes, sir.
Q. Okay. And you see that -- and Mr. Miles is asking that Chubb not do that until all possible appeals have been exhausted using -- consistent with the highest degree of good faith and the highest degree of diligence and acting as a fiduciary in protecting such information have been exhausted and the issue is final.
Did I read that correctly?
A. Yes, sir.
Q. That's what Mr. Miles was asking for at the outset, correct?
A. Yes, sir.
Q. And that's something that Chubb didn't want to do?
A. Correct.
Q. That's beyond the scope of the policy as far as you understand it, correct?
A. Yes, sir.
Q. Does Chubb have a procedure as to what it does when it receives a subpoena for information?
A. Subpoena goes to the legal departments.
Q. Okay. Does Chubb -- and Chubb takes appropriate steps to respond to subpoenas, does it not?
A. Yes, sir.
Q. And here Mr. Miles is asking, essentially, that Chubb

expend its resources to contest -- to maintain the confidentiality of his information, correct?

A. Yes, sir.

Q. Further on on that page, states that -- he's asking that Chubb agree to hold harmless and indemnify, paying on behalf of wherever and whenever possible, any and all losses, costs, expenses, settlements and/or judgment of whatever kind, nature, and origin which occur or are incurred as a result of turning over his information. Do you see that?

A. Yes, sir.

Q. And that's something else that Chubb decided that it didn't want to do?

A. Yes, sir.

Q. Now, in your experience as an investigator, has any insured ever asked you for a confidentiality agreement?

MR. BRUNELLE: Objection, your Honor.

THE COURT: Sustained.

BY MR. CORNER:

Q. Now, Mr. Brunelle asked you some questions about instructions that you had received internally in terms of responding to the confidentiality -- the request for confidentiality agreement, correct?

A. Yes, sir.

Q. To paraphrase it, it had been suggested that you work -- you work with the insured, correct?

A. Yes, sir.
Q. Did you ever tell Mr. Lehrberg that Chubb would not enter into a confidentiality agreement?
A. Yes, I did.
Q. And when did you do that?
A. E-mail when I replied back on his request to do that.
Q. Okay. You told him this particular confidentiality agreement was unacceptable, correct?
A. Yes, sir.
Q. Did you tell him unequivocally that Chubb would not enter into a confidentiality agreement?
MR. BRUNELLE: Objection, your Honor, the document will speak for itself.
THE COURT: The objection is sustained because of the adjective "unequivocally," but the objection is sustained.
MR. CORNER:
Q. Did you ever tell -- did you ever tell Mr. Lehrberg that Great Northern would not enter into any confidentiality agreement?
A. No, sir.
Q. Did you ever tell Mr. Miles that Great Northern would not enter into a confidentiality agreement?
A. No, sir.
Q. After receiving this initial confidentiality agreement from Mr. Lehrberg did you receive any other request from

Mr. Miles to enter into a confidentiality agreement?
A. Not prior to his interview, no.
Q. Okay. And did you ever -- did you ever receive another draft of a proposed confidentiality agreement from Mr. Miles?
A. No, sir.
Q. Okay. Did you have any reaction -- did you have any reaction to the request for a confidentiality agreement that aroused any suspicions?
MR. BRUNELLE: Objection, your Honor.
THE COURT: I didn't get the question.
BY MR. CORNER:
Q. Sure. Did Mr. Miles' request for a confidentiality agreement arouse any suspicions in connection with your investigation?
MR. BRUNELLE: Objection.
THE COURT: Sustained.
BY MR. CORNER:
Q. Now, at some point you -- and you did conduct Mr. Miles' interview on November 4th of 2004, correct?
A. Yes, sir.
Q. And as a result of that interview, you learned that Mr. Miles was the last person in the house before the fire occurred, correct?
A. Yes, sir.
Q. And he had claimed during the -- in his interview that he

had some problems arming the intrusion alarm system, correct?
A. Yes.
Q. And he indicated some of his movements during the -- prior to the -- following leaving the house, correct?
A. Yes.
Q. Okay. Is there information during -- and it's true that he didn't provide you the information for people he believed had caused the fire, correct?
A. Correct.
Q. And you had also requested the toll receipt that he claimed would have placed him in New Jersey, and he didn't provide that, correct?
A. Correct.
Q. And he wouldn't disclose any information about his income or resources, financial resources, correct?
A. Correct.
Q. Now, following Mr. Miles, you conducted an interview of Theresa Miles, correct?
A. Correct.
Q. And who was present at that interview?
A. Mrs. Miles, Mr. Miles, and Roger Lehrberg.
Q. And can you describe what happened during that interview?
A. Initially, before the tape-recording went on, Mr. Miles was stating he was going to represent his wife. I objected, saying I thought there was a conflict, that they're both

insureds. He said that he wasn't an insured. I said I have evidence contrary to that. Subsequently, we started the interview of Mrs. Miles. I asked her name, address, date of birth. When I asked for Social Security Number, he objected and started interfering, at which point I terminated the interview.

MR. BRUNELLE: Well, I'm going to move to strike "started interfering," your Honor. That's a conclusion on the part of the --

THE COURT: Overruled.

MR. BRUNELLE: Thank you.

MR. CORNER:

Q. Mr. McIntyre, that interview was recorded?

A. Yes, sir.

Q. And it was transcribed?

A. Yes.

Q. And if I could turn you to Exhibit 65.

A. Yes, sir.

Q. That's an accurate transcript of the interview?

A. Yes, sir.

Q. Now, following the recorded interviews, you went on to arrange -- you engaged counsel to conduct examinations under oath of Mr. and Mrs. Miles, correct?

A. Yes, sir.

Q. Can you explain what an examination under oath is?

A. Examination under oath is the means in the policy to have insureds' household members be brought before, in Chubb's case, an attorney, under oath, and with a court reporter to answer questions.
Q. And were documents requested in connection with that examination under oath?
A. Yes, sir.
Q. And were any of those -- and were any documents provided?
A. There was some.
Q. Okay. And can you explain how an examination under oath differs from the recorded interview that you previously conducted?
A. An examination under oath is under formal -- since it's recorded and it's under oath.
Q. Now, you indicated that Mr. Miles wouldn't give information about his specific location as of the date of the fire, correct?
A. Correct.
Q. Okay. And he had indicated that he had traveled through parts of -- through parts of New Jersey but he wouldn't say precisely where, correct?
A. Correct.
Q. And that's information that was followed up on at the examination under oath by Mr. Tener, correct?
A. Yes, sir.

Q. Okay. Now, I want to turn your attention to Exhibit 29.

Exhibit 29 is one of -- excuse me, Exhibit 28. We'll get to 29 in a minute.

Exhibit 28 is one of the documents that the Mileses presented at the examination under oath?

A. I believe so.

Q. And Mr. Brunelle asked you some questions about this. And these records show some -- some charges that were made in New Jersey on October 16th. Did you see that?

A. Yes, sir.

Q. And those are the -- those are the charges that Mr. Miles claims indicates his whereabouts at the time of the fire, correct?

A. Yes, sir.

Q. Do those -- do these receipts indicate the time in which the charge was made?

A. No, sir.

Q. Only indicates the day?

A. Yes, sir.

Q. Now, you had also -- Mr. Miles also talked about a toll receipt that would have put him at the Throgs Neck bridge at a particular period of time; is that right, sir?

A. Yes, sir.

Q. And that's information that would have -- that would have placed him at a particular location at a particular time,

correct?
A. Yes, sir.
Q. And that's information that he never turned over to you?
A. No, sir.
Q. Claims that he lost it?
A. Claims he couldn't produce it.
Q. Okay. Now, aside from Mr. Miles' testimony, is there any other evidence that you're aware of that places Mr. Miles at a particular place in time at the time of the fire?
A. I believe there was some cell phone records with an area code.
Q. So -- and those are documents that were produced to you as well?
A. Yes, I don't remember exactly when.
Q. But fair to say that there were -- that aside from -- that Mr. Miles didn't provide you with any documents that placed him at a particular location any particular time at the time of the fire, correct?
A. No, sir.
Q. And that's all -- and there was information that might have helped verify that, correct?
A. Yes, sir.
Q. Okay. So you -- so the only information that you had about his whereabouts at around the time of the fire was his testimony under oath, correct?

A. Yes, sir.
Q. Now, I want to turn your attention now to Exhibit 29, and Exhibit 29 is another set -- another document that was provided to you at the examination under oath?
A. Yes, sir.
Q. Okay. And this is the -- this record -- you understand this record indicates the fire alarm activity at the Mileses' home around the time of the fire?
A. Yes, sir.
Q. Now, this was a record from Protection One?
A. Yes.
Q. That was the alarm company that provided the fire alarm system for the Mileses' home, correct?
A. The alarm system, I don't think it was just limited to fire.
Q. That was my next point. You also indicated when you appeared at the scene of the fire you saw evidence of intrusion -- an intrusion alarm system, a burglar alarm system?
A. Yes.
Q. As far as you know, does this record indicate -- provide any indication of the activity in the burglar alarm system?
A. There's no activity on here for burglars.
Q. That's my point. This document relates only to the activity of the fire alarm system and not the burglar alarm system?

A. There was none.
Q. Right. In fact, there was no -- you learned it through your investigation that the burglar alarm was not triggered at the time of the fire, correct?
A. Correct.
Q. And you also indicated there was no sign of forced entry into the area of the home where the fire was set, correct?
A. Correct.
Q. Now, following the -- Mr. and Mrs. Mileses' examinations under oath, did you take any subsequent steps to investigate the cause of the fire? Excuse me, until October of 2005?
A. Did I take steps to --
Q. Let me ask you this: Did you receive any additional documents from the Mileses between the time of their investigation under oath and October 12 of 2005?
A. Not that I recall.
Q. Okay. Let me turn to -- I'm focusing on October 12 of 2005 because I want to refer you to Exhibit 10. And Exhibit 10 is a letter from Chubb to Mr. Miller, who, the records will show, was the Mileses' attorney, denying the claim?
Now, as of October 12 of 2005, had you completed your investigation into the cause of the fire at the Mileses home?
A. No, sir.
Q. And why is it that you had not completed your investigation?

A. I was lacking information received from the Mileses.
Q. Now, based on your investigation at that time, did you -- did you have any understanding of who might -- who you felt might have been responsible for the cause of the fire?
A. I was looking for more information from the Mileses to try to come up with a conclusion.
Q. So had you reached any preliminary conclusion at that point?
A. I think I wrote in a report basically what my feelings were at that point.
Q. And -- your purpose was to exclude -- in conducting the investigation was to exclude the Mileses as the cause of -- having caused the fire, correct?
A. Yes.
Q. And as of October 12, 2005, were you able to exclude the Mileses as the cause of the fire?
A. No, sir.
Q. Why was that?
A. Because I lacked the alarm records, I lacked the financial records, and I lacked his identification of potential suspects for lighting the fire.
Q. Okay. At that time had you identified any motive as to why the Mileses might have been responsible for having caused the fire?
A. There was a strong financial motive for them to start the

fire. There was comments about other people having reasons to light the fires.

Q. And you had looked into some of those people and they had come up as dead-ends, correct?

A. Yes, sir.

Q. Now, you mentioned a financial motive. In your experience why is -- investigating fire losses why is financial loss something you would consider?

A. It provides the insured the ability to get cash.

Q. And what was the factual basis of that as of October 12, 2005 for believing that the Mileses had a financial motive to cause the fire?

A. No identifiable means of income, bankruptcy, a million dollar judgment that had been ordered in a New Hampshire court, large amounts of second mortgages that were on the house from Mrs. Miles' father. There was some comments about Mrs. Miles wanting to downsize, if I recall correctly. The house had been on the market at some time for sale. I contacted a real estate agent which time it was posted the asking price was higher --

MR. BRUNELLE: Objection, your Honor.

THE COURT: Sustained.

BY MR. CORNER:

Q. Now, did you -- did you form any -- at this stage had you reached any conclusions about the -- about the Mileses' opportunity to have caused the fire?

A. It was still open as to the opportunity.
Q. Okay. And was there any basis that -- did you have -- was there any basis that led you to believe that the Mileses might have caused -- may have caused the fire?
A. The bypassing of zone 4 and that was the area where the fire was initiated.
Q. Okay. That was -- and zone 4 was the area where the -- was, the jacuzzi room?
A. Jacuzzi, sauna, whatever it was called.
Q. That was the point of origin of the fire?
A. Yes.
Q. That was also, I believe you testified, the door where there was no forced access into that area, correct?
A. Correct.
Q. Now, Mr. Miles -- you had indicated that Mr. Miles had identified some people who had -- or he identified some threats against him, correct?
A. He alluded to threats, alluded to hypotheticals, but nothing as the times that I talked to him or when he wrote as to the specifics.
Q. And was it important for you to determine whether there were other people who might have caused the fire?
A. Yes, sir.
Q. And why was that?
A. To see if there was other people and to make benefit to

the Mileses to pay the claim.
Q. Any other reason?
A. Subrogation, so we could recover if we did pay the claim as to other people who did cause the fire.
Q. So if you identified who caused the fire, the company could sue a claim for them for the amounts they paid the Mileses?
A. Right.
Q. And additionally, if you identified people who did cause the fire, that would eliminate the Mileses having been engaged in an intentional act, correct, sir?
A. Yes.
Q. There had been an indication that in Mr. Miles' recorded statement -- I mean his recorded interview and his examination under oath that there was -- he was raising attorney/client issues. Do you recall that?
A. Yes, sir.
Q. Do you recall what he said about that?
A. That he couldn't -- that he couldn't breach the attorney/client confidentiality, asked him for specifics or any type of hypotheticals, at which point we had a discussion that if you've got a client that makes a threat against you, have reported it law enforcement, then there is no attorney/client privilege at that time.
Q. And had you had any previous experiences in dealing with

attorneys who had raised the attorney/client privilege and your clients brought information in the course of an investigation?
A. Yes, in Connecticut.
Q. Can you explain that, please?
A. While running one of the major crime squads, we had an attorney come forward to make a complaint about a client that was making threats. We subsequently spoke to our state's attorney about pursuit of it, and it was directed to us that if a crime had been committed --
MR. BRUNELLE: Objection, your Honor.
THE COURT: I'm going to let him explain it. Overruled.
A. -- that if a crime had been committed, i.e., a threat or anything else, there was no attorney/client privilege that we could not discuss with the attorney anything that involved the pending case that he would have been retained for.
Q. And did you attempt to address that issue during Mr. Miles' -- during Mr. Miles' interview?
A. Yes.
Q. And how did you attempt to address that issue?
A. I tried to explain to him that if your client had made a threat against you, then there is no attorney/client privilege. And we just -- at one point he questioned where I got my law degree, and it just didn't go anyplace.
Q. Now, turning to Exhibit 10, Exhibit 10 provides the basis

upon which the Mileses' claim was denied by Chubb, correct?
A. Yes, sir.
Q. Did -- and as of October 12, 2005, what information had the Mileses not provided to you that you needed to conclude your investigation?
A. The alarm records, the toll receipt, the identity of potential suspects, and at that time I don't think we had the income tax records either.
Q. And these -- these are all pieces of information you felt that you needed to conclude your investigation?
A. Yes.
Q. And the conclusion of your investigation -- and your investigation was attempting to rule out the Mileses having caused the fire?
A. Yes, sir.
Q. Now, did Mr. Miles ever identify to you the persons whom he believed were threatening him?
A. No, sir.
Q. Did you ever make -- did you ever undertake any effort to determine who those people were?
A. Yes, I did.
Q. And how did you do that?
A. I conducted database searches, Pacer searches of the federal records to determine the lawsuits in the bankruptcy; subsequently found out about the Loon Mountain, spoke to the

attorneys and as many of the people involved in that. I also conducted a database search of prior claims submitted by family members and came upon one of a claim for a motor vehicle incident accident that was submitted by Mr. Miles' son submitted to the Progressive Insurance Company. I contacted my counterpart in Progressive, obtained their reports, their information, and found that Mr. Miles had towed the car away before the insurance company could get to it.

Mr. Miles claimed that there was some activity done to the car. They had former FBI agents look at the car but never produced any reports to substantiate that. Subsequently, the investigation by Progressive and the fire department up there said that Mr. Miles' son had run off the road while intoxicated and subsequently caused the car to burn.

Q. And these investigative efforts -- these are efforts you undertook prior to October 12 of 2005, correct?
A. Yes, sir.
Q. And that would be the Loon -- I believe the Loon Mountain people that you testified about on direct examination from Mr. Brunelle?
A. Yes, sir.
Q. And also the Cullen people that Mr. -- that Mr. Brunelle asked you about?
A. Yes, sir.
Q. Now, after October 12, 2005, did you do anything to

attempt to determine the identity of the people whom Mr. Miles believed caused the fire?
A. After that date I don't believe so.
Q. Okay. Well, did you -- you testified previously about obtaining information from the state police?
A. That was in --
Q. I'm talking about after October 12 of 2005.
A. Yes.
Q. And you testified about having obtained the tapes from Mr. Miles' recorded interview in -- that he gave in 2004, correct?
A. Right.
Q. And he identified some people in that tape that he believed that caused the fire?
A. Yes.
Q. He identified an individual by the name of Raymond Pham (phon.) in the tape. Is that someone who you had investigated previously?
A. I believe it was a name that was there, I just -- I can't recall at this time.
Q. Okay. And there was -- he identified a Rick Kelley, who's the general manager at Loon Mountain. That's somebody you had previously identified?
A. I believe so.
Q. And how about Butch Wilbur, is that somebody you had

looked into?
A. Yes, sir.
Q. That was -- I believe you identified him -- I believe Mr. Miles identified him in his deposition as a bookie from Taunton. Does that refresh your memory?
A. Yes, sir.
Q. So these are all people that you had previously investigated through your own efforts, correct?
A. Yes, sir.
Q. And they -- and they, essentially, as I believe Mr. Brunelle put it, ended on a dead end?
A. Yes, sir.
Q. And if I could please turn you to Exhibit -- you had indicated in a file note that your review of the recording did not reveal anything new that was not part of your investigation?
A. Yes, sir.
Q. So you weren't able to identify any other suspects as having caused the fire; is that correct?
A. Right, sir.
Q. Now, you also testified about obtaining records from Protection One, correct?
A. Yes, sir.
Q. And again, that was in -- that was in late 2006 and early 2007?

A. Yes, sir.
Q. What information were you trying to obtain from Protection One?
A. I was trying to ascertain any reported problems with the system, primarily zone 4, also trying to find out what the components of the system were as Mr. Miles had explained it was an elaborate, redundant burglar alarm system.
Q. Can you tell the Court generally what Mr. Miles had told you about the alarm system that you wanted to check up from Protection One?
A. When we were discussing zone 4, he thought it was immaterial if it was bypassed because the system was so redundant, said he had motion detectors, he had heat sensors, so if anybody had tried to get in there, it would have detected them.
Q. And when you say "get in there," what are you referring to?
A. Into the house.
Q. Okay. Anywhere in the house?
A. Correct.
Q. Including area 4?
A. Yes.
Q. I mean zone 4. That was the zone that he had bypassed?
A. Yes.
Q. And what records were you seeking from Protection One to

establish that?
A. To see what the system was comprised of.
Q. Okay. And did you -- and you testified that you ultimately obtained some records?
A. Yes, sir.
Q. And you got that from Protection One. And you got that information in early 2007 -- I'm sorry, November of 2006, correct?
A. Yes, sir.
Q. And then subsequently, in February of 2007, you spoke to Mr. Hooper?
A. Yes, sir.
Q. And what did you understand Mr. Hooper's role to be?
A. Mr. Hooper was asking to explain the information that I had seen on the records, to explain the system, to decipher those documents that they had given to me. Also trying to ascertain from him anything about records that might have been lost.
Q. And what did Mr. Hooper -- so you had a discussion with Mr. Hooper?
A. Yes.
Q. And what did Mr. Hooper say about those records?
MR. BRUNELLE: Objection, your Honor.
THE COURT: Hooper is employed by whom?
MR. CORNER: He's employed by Protection One, your

Honor. This gets to the area that you had stricken the testimony from the affidavit, but I suggest that Mr. -- that in attacking Mr. McIntyre's credibility through the affidavit that he's essentially opened the door to what has happened there.

THE COURT: Mr. Brunelle, the ground for your objection?

MR. BRUNELLE: It's hearsay, your Honor.

THE COURT: Sustained.

MR. CORNER: Okay.

BY MR. CORNER:

Q. So you reviewed the records from Protection One, correct?

A. Yes, sir.

Q. And you had a discussion with Mr. Hooper from Protection One, correct?

A. Yes, sir.

Q. And as a result of your review of those records and the -- and your discussions with Mr. Hooper, did you draw any conclusions from the records that you obtained from Protection One?

A. That the system -- number 4 was a system that incorporated everything just in the sauna, that there was a burglar alarm system; besides all the records, the burglar alarm never went off prior to the fire. That if somebody had entered the building through one of those protected areas, it would have activated before the fire alarm. That the components of the

system were window contacts, window contacts, and there was motion detectors. I don't recall anything about heat, body heat detectors being in the system.

Q. And these are all components of the system that Mr. Miles told you about?

A. Yes.

Q. Now, having reviewed those records, did that have any impact on what -- how did that have an impact on what Mr. Miles had told you about the system?

MR. BRUNELLE: Objection, your Honor.

THE COURT: I'm not sure I understand it, so sustained.

MR. CORNER: Okay.

BY MR. CORNER:

Q. Following your review of the records and your discussion with Mr. Hooper, did you reach any conclusion about the alarm system, Protection One Alarm system?

MR. BRUNELLE: I think he's just answered that question, hasn't he?

THE COURT: Overruled. You can answer that if you understand it.

A. What I learned at which point is the alarm system that activated was the fire alarm just above the doorway, that had somebody forced entered, it would have activated an alarm, that the system would record that. If the fire alarm went off and

there was a burglary, the system would also record that. There was no retention within the system of any information that wasn't recorded to Protection One monitoring center. That there was no repair records for anything logged in the Protection One to show anything about problems with the system.
Q. So did -- Mr. Miles had testified that or had told you and had testified that he had disarmed or -- zone 4, correct?
A. Yes, bypassed.
Q. Bypassed it, I'm sorry. And did anything that you saw in your -- did your review of the records call that statement into question?
A. I'm going to ask you to rephrase it, please.
Q. Sure. After your review of the records, did it call into question anything about what Mr. Miles had told you about the alarm system?
A. That there was no report to Protection One of a problem with zone 4 or it was also that they had some system for removing records and I don't know what records had been lost in the past to say there was a problem with zone 4.
MR. BRUNELLE: I object and move to strike, your Honor. I think it's non-responsive, and I think it contained a level of hearsay if I'm not mistaken.
THE COURT: Overruled.
BY MR. CORNER:
Q. Now, Mr. McIntyre, did the Mileses ever provide Chubb with

their tax returns at any time after October 12th of 2005?
A. Yes, they did.
Q. And what was the purpose for obtaining their tax returns?
A. To show the income and the monies that they had to run their household.
Q. And those -- that -- those returns verified what the Mileses had told you about their financial condition, correct?
A. Yes, sir.
Q. That they had no -- that they had no source of income?
A. Correct.
Q. And prior to receiving those records, had you received any information whatsoever from the Mileses concerning their financial condition?
A. No.
Q. Okay. So in conclusion here, as of October 12 of 2005, you didn't have -- you had not completed your investigation, correct?
A. Correct.
Q. Now, you were following -- after October 12, 2007 you received the Mileses' tax returns, correct?
A. Correct.
Q. And you received tapes of Mr. Miles' interview with the state police, correct?
A. Correct.
Q. And you received the information -- you received the

information from Protection One, correct?
A. Correct.
Q. And you had not yet received -- you had not received the toll receipt that would have placed Mr. Miles at the toll in New York at the time of the fire, correct?
A. Correct.
Q. And that's because Mr. Miles told you he couldn't find it?
A. Correct.
Q. Now, after receiving all of this additional information, was your investigation complete?
A. As to the involvement of the insured, yes.
Q. Okay. And did you reach -- and following your receipt of this information, did you form any conclusion -- did you form any conclusions?
A. Yes, sir.
Q. And what was that conclusion?
A. That --
MR. BRUNELLE: Objection, your Honor.
THE COURT: Overruled. He can state his own conclusion.
A. That Mr. Miles had left zone 4 unsecured, open door so that the persons that lit the fire could gain entry.
Q. Now, if you had had that information available to you in October 12 -- on October 12 of 2005, would that have changed your opinion at that time?

A. Yes, sir.
Q. And how would it have changed your opinion at that time?
A. I would have recommended nonpayment because of intentional act and fraud.
Q. That's based on -- that's based on the additional information that you received after the initial denial of the claim?
A. Yes, sir.
Q. And that's -- that's information that allowed you to complete the -- to complete your investigation?
A. Yes, sir.
Q. So as of October 12, 2005, you hadn't been able to determine that Mr. Miles had caused -- had been responsible for causing the fire, correct?
A. Correct.
Q. Because you -- because there were other potential people who had -- who might have caused it that he was aware of that he hadn't told you about, correct?
A. Correct.
Q. And once you went to the state police you were able to determine that the people you had investigated were not -- had not -- that the people that he had identified were people you had previously investigated?
A. Yes.
Q. So after you received that information from the state

police, there were no other suspects that you could pursue, correct?
A. Correct.
MR. CORNER: Thank you, Mr. McIntyre. I have no further questions.
THE COURT: Redirect?
MR. BRUNELLE: Yes, thank you.
THE COURT: Mr. Brunelle.
MR. BRUNELLE: Yes, sir.

REDIRECT EXAMINATION

BY MR. BRUNELLE:
Q. Mr. McIntyre, when did you reach the conclusion that you just told the Court about?
A. That would have been after the Protection One records.
Q. And you got those records roughly November of '06; is that right? Sometime after November of '06?
A. Yes. Six?
Q. Yes.
A. Okay.
Q. And your interview with Mr. Hooper was in February of '07, right?
A. Yes.
Q. Okay. And, sir, do you remember I took your deposition in this case and that was done in September 15, 2008, so after you had the records and after you had your conversation with

Mr. Hooper, right?
A. Yes, sir.
Q. And at your deposition, sir, I asked you this question -- page 194, counsel, line 9:
"And would it be fair to say that as of today, which is September 15, 2008, you have never reached any conclusions as to who was responsible for starting the fire at 1 Running Stream Road in Rehoboth?"
And your answer at that time was: "Correct." Right?
A. That is correct.
Q. Okay. Now, sir, the conclusions that you say you came to that Mr. Miles had left zone 4 unarmed to let some person go in to start the fire, that information -- that conclusion was based upon information that you actually had before October 15, 2005, wasn't it?
A. It was not verified with the Protection One company.
Q. Well, what was verified with Protection One company was exactly what Mr. Miles had told you; that is, that he had set the alarm a number of times and he had left at 6:30 and then nothing happened between then and when the fire started at 12:30 that night, right?
A. Correct.
Q. There was nothing in the records that you got from Protection One in November of '06 which changed that information, was there?

A. There was the -- Mr. Miles' statement about redundancy of the protection.
Q. And redundancy in protection. Mr. Miles told you that the system had motion detectors, right?
A. Yes, sir.
Q. And you knew, because your expert told you, that the system had motion detectors; isn't that right?
A. Yes, sir.
Q. Okay. So that was something you knew already. So there was a redundancy in the system, right?
A. He explained heat sensors.
Q. Mr. Miles said something about heat sensors?
A. Yes, sir.
Q. And there's nothing one way or the other about heat sensors in the records of Protection One; is that right?
A. Correct.
Q. Okay. So you're focusing on the fact Mr. Miles said there might have been heat sensors and the fact that Protection One records doesn't say something one way or the other that changed your opinion, that's your testimony?
A. Trying to give Mr. Miles the benefit of the doubt.
Q. Okay, I understand.
By the way, your experts, when they went to the scene, actually took the Protection One panel off the wall in the basement where it was so they could have the chip analyzed,

right?
A. Correct.
Q. And it turned out for technical reasons it wasn't possible to do that?
A. Correct.
Q. And you later found out that nothing would have been recorded with that chip with regard to the question you had about bypassing zone 4, anything like that, correct?
A. Correct.
Q. But Mr. Miles candidly stated to you that he had bypassed zone 4?
A. Yes, sir.
Q. Okay. And sir, if you would turn, please, to your SIU report, which is Exhibit Number 7.
A. Yes, sir.
Q. Thank you. And this is -- starting on page 57, there's a report that you wrote about something that happened on January 27, 2005 when at 5:00 p.m. you met that day with Trooper O'Neil and Tom Klem at the Sturbridge police barracks, correct?
A. Yes, sir.
Q. All right. And at that time you provided Trooper O'Neil -- you brought copies of the recorded statements of James and Theresa Miles and Katherine Antonio, A-n-t-o-n-i-o, and Simon Belli, B-e-l-l-i, correct?
A. Yes.

Q. By the way, there's nothing recorded here in this statement about you having asked Trooper Miles (sic.) for copies of the statements he took from James and Theresa and him refusing to give you those statements on the ground that he had made a promise not to. That's not recorded in here, is it?
A. Trooper O'Neil?
Q. Right.
A. Okay, no.
Q. Because you said earlier in your testimony, if I understood you correctly, that you had this memory of having once asked Trooper O'Neil if he could give you copies of the statements James and Theresa gave him, and he said something about I can't do that because I said I wouldn't?
A. Plus it had hadn't been transcribed.
Q. It hadn't been transcribed. Well, sir, when you got it, it wasn't transcribed either, was it?
A. That's how long it was after.
Q. When you got it, it was just a copy of a recording?
A. Correct.
Q. It was on the form of a CD?
A. Correct.
Q. So when you -- this -- certainly this would have been the time for you to say to Mr. O'Neil, Trooper O'Neil, hey, here's my copies of their recordings or their statements, can I have copies of yours? Do you remember doing that at this time?

A. We discussed it, yes.
Q. On this day?
A. Yes.
Q. And is this the day that he said I can't do it because I promised the Mileses that I wouldn't do it, I wouldn't pass it on to anyone else?
A. Discussion like that, he still hadn't transcribed it.
Q. Is that recorded somewhere here in your very careful file notes, sir?
A. No, sir.
Q. But you're remembering that today?
A. Yes, sir.
Q. Okay.
Now, turning to page 58, you discussed a number of things with Mr. Klem and Trooper O'Neil about evidence having to do with how the fire started, correct?
A. Yes, sir.
Q. And many of the things that are in here are the same things that you just told the Court about as to why you had concluded that Mr. Miles had left the zone 4 unarmed, left the door unlocked, and that somebody had then come in and set the fire, right?
A. Yes, sir.
Q. All that information that you just said you didn't have until two years ago -- until November '86, (sic.) you actually

had here as of January of '05; isn't that true?
A. I had theories, yes.
Q. Excuse me?
A. I had theories, yes.
Q. You had theories, but you had the same information, didn't you?
A. Yes, sir.
Q. And one of the things -- I'm turning to the top of page 59, and it says Klem and O'Neil or O'Neil and Klem concur there has to be an unknown delay device. And that -- that statement is based on the fact that between 6:30, when the system was armed, and midnight, obviously the fire hadn't started during that time, correct?
A. Correct.
Q. Okay. And if we turn to the next report, sir -- and by the way, when you would talk about unknown delay device at that time, you were talking about Mr. Miles having used an unknown delay device, right?
A. An unknown delay device, yes.
Q. That was your suspicion, right?
A. It was an avenue to look at, yes.
Q. All right. And you and Mr. Klem returned to the fire scene on February 18 -- I'm looking now at Exhibit Number 8, page 62 --
A. Yes.

Q. Okay. And you remember, sir, that at this time on this date you were doing an experiment to try to verify the information you had received from a neighbor named Karen Antonio?

A. Yes.

Q. Excuse me, Karen Antonio was the -- I'm sorry, Katherine Antonio was the person who gave you the information, right? One of the Antonios?

A. The younger.

Q. The younger of the Antonios. And essentially, if I can paraphrase, and correct me if I'm wrong, she had told you that on the night of the fire she had been awakened in her room around midnight and heard some car doors and then heard some voices coming from what she thought was the backyard of the Mileses' home, correct?

A. Correct.

Q. And on this date, February 18, '05, you actually conducted an experiment, you went up to -- Karen or Katherine let you sit in the bedroom with the window open and you had Mr. Klem and the other person walk into the backyard speaking in normal, conversational tones, and you said you could hear them, right?

A. Yes.

Q. And if you turn to the next page, top of page 63, you said, "At the time that this test was conducted, it was clear that at 12:30 a.m. the surrounding noise would be significantly

less and that the sounds of car doors closing and persons speaking in normal voices could be heard as described by Katherine Antonio." Correct?

A. Yes.

Q. Okay. And then you made some more observations here. There's a total of eight observations that you made. And these are exactly the same observations that you told his Honor about that helped you to come to the conclusion in -- after November of '06 that Mr. Miles had been responsible for having someone start the fire, correct?

A. These are observation, yes.

Q. All right. These are your observations. This is the information you -- based on the information you had, right?

A. Yes.

Q. You were asked before what conclusions did you draw? These were the observations that you were drawing at the time, correct?

A. Correct.

Q. Okay. Sir, you understand that despite everything that you just told the Court, despite the fact that you have concluded that Mr. Miles was responsible for having someone come to his house and set it on fire, that your company has not taken that position in this litigation. You understand that, don't you?

A. Yes, sir.

Q. Okay.

MR. BRUNELLE: May I just have a moment, please, your Honor?

THE COURT: Yes.

(Pause.)

BY MR. BRUNELLE:

Q. One of the things you were just asked about a moment ago was Exhibit 55, if you would turn to that, please, sir. This is the tape-recorded statement of Mrs. Miles.

THE COURT: It's not 55.

MR. BRUNELLE: 65, your Honor, pardon me.

THE COURT: 65?

MR. BRUNELLE: Yes, sir.

THE WITNESS: Can I ask a question, your Honor?

THE COURT: No, you'll just answer his, and then if you don't understand something, you can express that.

THE WITNESS: It's regards to a biological --

THE COURT: If you need to take a short break, we can wait.

THE WITNESS: Sorry about that.

MR. BRUNELLE: That's quite all right.

(Witness took a short recess.)

THE WITNESS: Sorry.

THE COURT: All right. You may continue, Mr. Brunelle.

MR. BRUNELLE: Thank you.
BY MR. BRUNELLE
Q. We're at Exhibit 65 now, Mr. McIntyre, and this is the interview that you conducted with Mrs. Miles, and Mr. Corner asked you some questions about this. And I'm calling your attention to page 444.
A. Yes, sir.
Q. You had asked Mrs. Miles her name, and she told you her name, correct?
A. Yes, sir.
Q. And her date of birth, correct?
A. Yes, sir.
Q. And then you asked for her Social Security Number, correct?
A. Yes, sir.
Q. And Mrs. Miles never actually responded one way or the other to that, correct?
A. Correct.
Q. Mr. Miles said, "Don't give that." And then there was a discussion that ensued between you and he as to whether or not he could be her attorney, correct?
A. Correct.
Q. And you didn't think he had a right to do that?
A. Correct.
Q. Okay. And turning to page 445, down at line 128, you

said, "I am concluding this interview. We will proceed with the examination under oath at this time." Correct?
A. Correct.
Q. Mrs. Miles did not ask you to terminate the interview, did she?
A. No.
Q. Mr. Miles did not ask you to terminate the interview, did he?
A. No, sir.
Q. Sir, you already had Mrs. Miles' Social Security Number as of the date that you asked her that question?
A. I had a number that was questionable, I think it said, in the database reports.
Q. Well, sir, if I return to Exhibit 1, page 2, at the top of that page you have the name Theresa B. Miles, date of birth, and a Social Security Number, correct?
A. Yes, sir.
Q. And it doesn't say next to that Social Security Number, This is questionable, does it?
A. If you look at one of the database reports --
Q. No, sir. Does it say in your report next to her Social Security Number that this was questionable?
A. No, sir.
Q. Okay.
A. I believe it was the date of birth that was mentioned on

the -- one of the database reports if my memory is correct.
Q. She told you her date of birth anyway, didn't she?
A. Yes, sir.
Q. Let's see. Was it the same? 3/9/48. Let's check.
Yeah, Exhibit 65, page 44, line 60, 3/9/48. So you knew you had the right person right then and there, right?
A. Yes, sir.
Q. Okay. So it didn't impede your investigation in any way that Mr. Miles had instructed his client not to give her Social Security Number, did it?
A. Correct.
Q. Okay. Now, another thing that you say was a problem is that Mr. Miles wouldn't tell you exactly where he went on the night of the fire. Is that what you're telling the Court?
A. Correct.
Q. Okay. If we turn, please, to Exhibit 63, this is his recorded statement. And if you turn to page 407, I'm looking at transcript page number 30, Mr. McIntyre, and about halfway down the page at line 1317 -- and this is you saying: "Okay. You had said that you were supposed to be going to a party in New Jersey."
Now, a little bit earlier today I think you said you couldn't remember whether he said New York or New Jersey. Does that refresh your memory that he told you it was New York or New Jersey?

A. New York or New Jersey regarding the toll.
Q. No, toll -- I may be wrong. I thought you said earlier that when he told you where he was going with regard to the birthday party you weren't sure whether it was New York or New Jersey?
A. I don't recall that part.
Q. In any event, do you agree with me he had told you it was New Jersey apparently?
A. Yes.
Q. Okay.
And if you turn, please, to 413, about -- and this is on transcript page 41, Mr. McIntyre, I'll give you a second to get there.
A. Go ahead.
Q. Down -- about halfway down the page at line 1817, and you said to him: "Just to go back with the -- with the 10:55 receipt. What exit did you get off of? Was this to get to --"
"A. I don't know. Don't hold me to this, I think it's 7 A, but don't hold me to it, but I'm sure -- I'm sure it will say on the receipt.
"Q. Is that where you were going in New Jersey?
"A. That's the exit that I -- I would have taken to go to where I was going, okay?"
And then you asked him: "Where were you going in New Jersey?"

And this is where he said, "I'm not saying because you wouldn't do anything to protect my family. You're telling me this may be arson," et cetera.

So that's the point where you say that he had refused to give you an exact location that he was heading to, correct?

A. Yes, sir.

Q. Okay. But he did tell you that he got off on Exhibit 7 A, correct?

A. He believed it was, yes.

Q. He believed it was exit 7 A. Okay.

And then he had stopped at a Denny's, right?

A. Somewhere in there, yes.

Q. And the credit card receipt shows that the Denny's is in Lawrenceville, New Jersey, right?

A. Yes, sir.

Q. Did you ever make any effort to determine how long it would take or how many miles it is from Rehoboth to Lawrenceville, New Jersey?

A. I don't recall doing so.

Q. If I suggested to you, sir, the distance is roughly 225 or 250 miles, would that seem right to you?

A. I wouldn't even want to venture a guess.

Q. You wouldn't venture a guess?

Do you know that Lawrenceville is near Trenton?

A. I have no idea where Lawrenceville is.

Q. Okay, fair enough.

And, sir, if you turn next to page 415 of Exhibit 63, and I'll call your attention to page 46 of the transcript, about halfway down at line 2035, you said to him: "I tried to stay out of there. Wherever you are going, what time did you arrive at your final destination?"

And Mr. Miles replied: "I will tell you that it was after 10 minutes to 12 and I'll tell you it was before 1:00." Correct?

A. Yes.

Q. All right. So you had information there that he had exited the turnpike, the New Jersey Turnpike, at exit 7 A and that his final destination was within, what's that, roughly an hour and ten minutes of that location, correct?

A. Yes.

Q. Okay. And, sir, the fact that he was nonspecific about exactly where his final destination was, that didn't impede your investigation in any way, did it?

A. No.

Q. No.

Now, getting back to this confidentiality agreement issue, Mr. Corner asked you whether one of the reasons why Chubb had declined to agree to the confidentiality agreement that Mr. Miles had submitted was because there was this clause in there about resisting subpoenas and having to fight it

legally, et cetera, and your company just didn't want to assume that burden, true?
A. I think you asked me Chubb agreed to it; it didn't agree to it.
Q. I'm sorry if I said that wrong. I meant to say Chubb wouldn't agree to that.
Let me start the question over again. That was a bad question.
Did you testify a few minutes ago in response to Mr. Corner that one of the reasons why Chubb wouldn't agree to the confidentiality agreement was that it contained this clause about resisting subpoenas?
A. Yes.
Q. Okay. But when Chubb -- when you responded to Mr. Lehrberg, when you sent Mr. Lehrberg an e-mail saying we're not going to agree to this, you didn't tell him that was the thing you objected to, did you?
A. That wasn't the only thing.
Q. That wasn't the only thing. In fact, you just told him we weren't going to sign any agreement because it was contrary to the policy?
A. I didn't say that.
Q. Well, isn't that what your e-mail to him said?
A. I believe it says that one was not acceptable.
Q. That one was unacceptable?

A. You have the e-mail there, but it said it was not acceptable.
Q. Okay. We'll take a look at it.
MR. BRUNELLE: If I can have a moment, your Honor.
THE COURT: Yes.
BY MR. BRUNELLE:
Q. All right. I'm back on Exhibit 39 -- all right. Yes.
Exhibit 39 at the top of page 227. And you wrote to him: "Roger" -- are you with me?
A. Yes.
Q. -- "the non-disclosure and confidentiality agreement that you have forwarded for James Miles and Theresa Miles is not an acceptable agreement. An agreement cannot change the terms of the policy and Federal Insurance refuses to enter into this agreement that would substantially alter their obligation under the policy, statutory or in common law."
And you didn't go on to say, But we'll discuss some agreement with you, did you?
A. Correct.
Q. By the way, turn to Exhibit 43 for a minute. This is your e-mail to Mr. Tener of November 3, 2004. And you instructed him: "I am going to ask that you still start a draft of a confidentiality agreement in case it is asked by Miles." Did you ever see a draft prepared by Mr. Tener of a confidentiality agreement?

A. I don't recall.
Q. Well, I'm sure if you there was one Mr. Corner will show it to us.
MR. BRUNELLE: If I can just have a moment, please, your Honor, I think I may be done.
THE COURT: Yes.
(Pause.)
BY MR. BRUNELLE:
Q. Oh, sir, did you just say to Mr. Corner a few minutes ago that one of the things that you found something significant about the Protection One alarm records that you got in November of '06 was that they didn't show any report of a problem with zone 4?
A. Yes, sir.
Q. Okay. And the reason that you said earlier that you found that significant is that you claimed Mr. Miles had said that they had reported a problem with zone 4 to Protection One. That's what you said in your affidavit, right?
A. Yes, sir.
Q. Okay. But now we know, sir, that, in fact, from looking at the recorded statement and the examination under oath, Mr. Miles never said that he reported a problem with zone 4 to Protection One?
A. Correct.
Q. Okay. So the fact that there was no report of a problem

with zone 4 in the Protection One records was entirely consistent with what Mr. Miles had said to you?

A. Entirely consistent.

Q. It didn't contradict him, it didn't say -- he didn't say there was a report of a problem, and the records showed otherwise, correct? The records showed there was no report of a problem?

A. Shows no report of any problem with zone 4.

Q. Okay, all right. And that's -- all right.

Did you say, sir, that you had reason to believe that there were some records of Protection One that were lost? Is that your statement?

A. Lost or destroyed by their policies.

Q. Lost or destroyed by their policies.

MR. BRUNELLE: Could I just have a moment please, your Honor?

THE COURT: Yes.

(Pause.)

BY MR. BRUNELLE:

Q. Sir, isn't it a fact that you have no knowledge that any records relating to the Mileses' security system were ever destroyed by Protection One? That's a fact, isn't it?

A. I have no personal knowledge, no.

Q. You have no knowledge of any kind, direct or indirect?

A. I believe there's an e-mail there from their attorney or

somebody in regards to the retention.
Q. Sir, there's no reason for you to believe that any records of Protection One that they had at the time of the fire were destroyed between the time of the fire and the time you obtained the records, is there?
A. I can't answer that.
Q. Well, you answered it when I asked you that in your deposition, didn't you? You don't know one way or the other, let's put it that way.
A. No.
Q. Is that a fair statement?
A. The way you're putting it, yes.
Q. Okay. So I want to be sure that his Honor understands that you're not saying you have knowledge or information that there were records that existed at the time of the fire that were destroyed after the time of the fire. You're not making that claim, are you?
A. I have no conclusive testimony from Protection One.
Q. One way or the other?
A. Correct.
Q. All you were told is that they only hang onto their records for seven years?
A. Correct.
Q. Okay. So -- okay.
By the way, these tax returns that you had asked for,

that you had wanted to see that you said that was one of the things that you didn't have at the time of October '05 when your company denied the claim --
A. Yes, sir.
Q. -- you never actually looked at those tax returns once they were received by the company, did you?
A. I don't recall if Attorney Tener sent them to me or asked me to look at them.
Q. So you don't recall looking at them?
A. No, sir.
MR. BRUNELLE: Fair enough. No further questions.
THE COURT: Any recross?
MR. CORNER: Briefly, your Honor.

RECROSS-EXAMINATION

BY MR. CORNER:
Q. Mr. McIntyre, Mr. Miles had told you that the reason he had bypassed zone 4 was because he was having some problems with zone 4, right?
A. Yes, sir.
Q. And you were looking for records that would have verified that indeed that there were problems in zone 4?
A. Yes, sir.
Q. Okay. So if you had -- if you had obtained records that indicated there were problems in zone 4, that would have corroborated what Mr. Miles told you, correct?

A. Yes, sir.
Q. Now, the absence of those records indicated there either was a problem or there wasn't a problem, correct?
A. The absence of those records --
Q. Sure, that was a terrible question. Let me try that one again.
The fact that there was -- I'm going to just withdraw that question entirely.
You were not able to obtain any records from Protection One that verified Mr. Miles' contention that there were problems with zone 4 and those problems with zone 4 are what led him to disarm zone 4 at the time he left for New Jersey?
A. Correct.
Q. Okay. Now, Mr. Brunelle asked you a few moments ago about this experiment that you conducted outside of Katherine Antonio's bedroom. Do you recall that?
A. Yes.
Q. If I could turn you to page 63, it's Exhibit 8.
What was the purpose for conducting that experiment?
A. The purpose of it was to see the possibilities of the younger -- I think it's Kathleen -- Katherine, excuse me, of her possibilities of hearing noises, sounds, car doors, and voices to the Mileses' house.
Q. And why was that significant in connection with your

investigation?
A. It was significant as to the persons going into the house feeling free to talk freely without being surreptitious, that they went into the house, because shortly after that she heard a fire alarm and the fire started, which led me to believe that that zone was conveyed to the perpetrators to let them know they could get in.
Q. Now, let me turn you now to Exhibit 60. That is your file note dated January 30, 2007 that indicates that you received and listened to the taped interview -- Mr. Miles' taped interview with the state police, correct?
A. Yes, sir.
Q. And you obtained those tapes sometime in January of 2007?
A. Yes, sir.
Q. Had you previously requested any reports from the state police about this investigation?
A. Yes, sir.
Q. And did you do that prior to October 12 of 2005, the date of the denial?
A. Yes, sir.
Q. And were you able to obtain those records?
A. Never.
Q. Why not?
A. Never honored. I don't think they were ever written.
Q. So during the course of your investigation you were

attempting to obtain the information about Mr. Miles' interview with Trooper O'Neil?
A. Yes, sir.
Q. And you weren't able to obtain that information until January of 2007?
A. Correct.
Q. Okay. And in your -- in this file note that's Exhibit 60, you state that the -- the review of the recording did not reveal anything new that was not part of your investigation, correct?
A. Correct.
Q. Now, ultimately you obtained the records of -- the Protection One records, correct?
A. Yes.
Q. And you spoke with Mr. Hooper in February of 2007, correct?
A. Yes, sir.
Q. So you obtained -- you interviewed Mr. Hooper after -- after you received the state police recording, correct?
A. Yes, sir.
Q. And if I could just turn -- Mr. Brunelle asked you about a statement that you made during your deposition where you stated that you never reached any conclusions as to who was responsible for starting the fire at 1 Running Stream Road in Rehoboth, correct?

A. That's correct.
Q. Do you know who set the fire?
A. No, I do not.
Q. Do you know -- do you have any opinion as to who actually started the fire?
A. No, I do not.
MR. CORNER: Thank you. I have no further questions.
THE COURT: Any re-redirect?
MR. BRUNELLE: No, your Honor.
THE COURT: Thank you, Mr. McIntyre. You may step down.
MR. CORNER: Your Honor, just for the record, I'd just like to reserve the right to recall Mr. McIntyre if the need arises during my case in chief.
THE COURT: Yes, you may do so.
MR. CORNER: Thank you.
THE COURT: Rather than get started with this witness, we were going to break by 3:30 anyway, we'll break at this stage.
MR. BRUNELLE: Thank you, your Honor. I appreciate that.
THE COURT: Tell me again, maybe you've already told me, Mr. Brunelle, but the approximate length of the direct examination of Mr. Tagliente.
MR. BRUNELLE: I think I estimated an hour to an hour

and a half, your Honor.

THE COURT: And the cross?

MR. CORNER: I imagine that it will be somewhat consistent with my proposed -- what Mr. Brunelle covers will be largely duplicative of what I do, but I would say somewhere probably somewhere on the length of Mr. McIntyre's --

THE COURT: Okay.

So we will get to another witness hopefully tomorrow, and that will be --

MR. BRUNELLE: I will probably call James Miles first and then Theresa Miles, your Honor.

THE COURT: All right.

MR. BRUNELLE: I may change that order.

THE COURT: All right. In any event, after that there will be one other witness --

MR. BRUNELLE: Trooper O'Neil.

THE COURT: -- that will necessarily be on Wednesday morning. If we get through all of the plaintiffs' witnesses other than that trooper, the defendant will go forward and will take the trooper out of order on Wednesday. Is that understood?

MR. CORNER: Yes. Although, your Honor, I do anticipate that my direct -- any sort of case in chief would be dictated by what the Mileses say, what Trooper O'Neil says, although right now I'm not anticipating much of a case in chief

to be honest with you.

THE COURT: I will allow you to do that, but I'm not going to suspend the case, maybe it's unlikely if we get to that point by this point tomorrow.

MR. CORNER: Understood.

THE COURT: We'll go forward with your case and allow you to supplement it the following day.

MR. CORNER: That's fine.

THE COURT: It is the best estimate, counsel, I take it, that we will be able to complete the testimony in this case Wednesday?

MR. BRUNELLE: I believe so.

MR. CORNER: I think so.

THE COURT: Anything else that needs to come to my attention before we adjourn for the day?

MR. BRUNELLE: 10:00 tomorrow morning.

THE COURT: Actually, we're going to go at 9:30 tomorrow. Thank you. We'll be in recess.

(Court adjourned at 3:21 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Debra M. Joyce
Debra M. Joyce, RMR, CRR
Official Court Reporter

February 16, 2010
Date

## INDEX


| WITNESS | PAGE |
| --- | --- |
| CHARLES H. McINTYRE | |
| Direct Examination by Mr. Brunelle | 20 |
| Cross-Examination by Mr. Corner | 105 |
| Redirect Examination by Mr. Brunelle | 147 |
| Recross-Examination by Mr. Corner | 168 |


## E X H I B I T S


| Exhibit No. | Description | Received |
| --- | --- | --- |
| 85 | Stipulation of Facts | 19 |
| 1 through 84 | Agreed-to Exhibits | 20 |