UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

___________________________

JAMES F. MILES and
THERESA B. MILES,
Plaintiffs,

Civil Action
No. 07-11722-NMG

V.

September 30, 2009,

GREAT NORTHERN INSURANCE COMPANY,

9:40 a.m.

Defendant.
___________________________

TRANSCRIPT OF BENCH TRIAL DAY 3

BEFORE THE HONORABLE NATHANIEL M. GORTON

UNITED STATES DISTRICT COURT

JOHN J. MOAKLEY U.S. COURTHOUSE

1 COURTHOUSE WAY

BOSTON, MA 02210

DEBRA M. JOYCE, RMR, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 5204
Boston, MA 02210
617-737-4410

APPEARANCES:

FOR THE PLAINTIFFS:

ROGER J. BRUNELLE, ESQ.
Fletcher, Tilton & Whipple
370 Main Street
12th Floor
Worcester , MA 01608
508-459-8016

FOR THE DEFENDANT:

MARK W. CORNER, ESQ.
Riemer & Braunstein LLP
Three Center Plaza
Boston , MA 02108
617-880-3418

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Nathaniel M. Gorton, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on September 30, 2009.)

THE COURT: Good morning, counsel.

MR. BRUNELLE: Good morning, your Honor.

09:41 MR. CORNER: Good morning.

THE COURT: We're ready to resume.

The plaintiff may call their next witness.

MR. BRUNELLE: Yes. The plaintiff calls Trooper Robert O'Neil, please.

ROBERT A. O'NEIL, having been duly sworn by the Clerk, was examined and testified as follows:

THE CLERK: You may be seated.

Will you please state your name for the record, spelling your last.

09:41 THE WITNESS: Trooper Robert A. O'Neil, O-'N-e-i-l.

DIRECT EXAMINATION

BY MR. BRUNELLE:

Q. Good morning, Trooper. My name is Roger Brunelle. As you know, I represent Theresa and James Miles, which is the case that is before the Court today.

I will point out to you that in front of you is a binder which contains copies of the exhibits which have been admitted in this trial. From time to time either myself or Mr. Corner, who represents Great Northern Insurance Company, may call your attention to one of the exhibits. In addition to the fact that there are tab numbers to help you find the exhibits, at the top right-hand corner of each page the pages are numbered, that will help us direct your attention to which particular page we went to ask you about.

09:42 Are you a Massachusetts state trooper?
A. Yes, I am.
Q. And were you a Massachusetts state trooper in October of 2004?
A. Yes, I was.
Q. At that time, Trooper O'Neil, what was your duty assignment?
A. I was assigned to the State Police Fire and Explosion Investigation Section.
Q. Is there some relationship between that section and the
09:42 state fire marshal's office?
A. Yes, there is.
Q. What's the relationship there?
A. It's almost kind of like a subcontracting situation. It's the investigative unit that's under the state fire marshals. Troopers are assigned to that office to investigate fires and

explosives.
Q. All right. Now, on or about October 17, 2004 were you asked to investigate a fire that had occurred on October 17, 2004 at 1 Running Stream Road in Rehoboth?
A. Yes, I was.
Q. Did you go to the scene of the fire on the day that you were assigned there?
A. Yes.
Q. And that would have been October 17, 2004?
09:43 A. Yes.
Q. Were fire personnel still at the scene when you arrived?
A. Yes, there were.
Q. Were other police officers from the Town of Rehoboth there as well?
A. I don't know if they were right there when I arrived, but through the course of the day they were, and I do believe somebody was there when I arrived.
Q. Okay. And as a normal part of your investigation did you speak to the firefighters that were at the scene?
09:43 A. Yes.
Q. And did you also then conduct your own inspection of the scene?
A. Yes.
Q. And when you did this, Trooper O'Neil, did you make notes for yourself as to what you were observing?

A. Yes.
Q. Did you make sketches of the house and different parts of the house with notes on it to indicate things you had observed or learned?
A. Yes.
Q. If you would turn, Trooper, to tab 82 in the exhibit book.
And, Trooper O'Neil, tab 82 consists of a series of sketches starting at page 516 and through and including page 522. Would you just take a look at each of those pages for a moment, please?
09:45
(Pause.)
A. Okay.
Q. Are these sketches and notes which are Exhibit 82 sketches and notes you made on the first day that you were at the scene, October 17, 2004?
A. Yes.
Q. If you would please turn to page 519 of Exhibit 82. At the bottom right-hand corner, just to the left of where the number 519 is stamped on the page, there's some words that you wrote there. Can you please read for us what that says?
09:46
A. It says, "'for sale by owner' sign in garage" and then the bottom writing is chopped off. There's quotation marks there.
Q. And that's the result of the photocopying process.
Do you have a memory of what those words are that have been chopped off?

A. No, I don't recall.
Q. All right. Fair enough.
Now, Trooper O'Neil, if you turn next, please, to Exhibit 78, which is a photograph. Now, do you recognize this photograph as being the photograph of the front of the Mileses' house?
A. Yes.
Q. And do you see in the photograph in front of the tree there's a sign there that says, "for sale by owner"?
09:47 A. Yes.
Q. Is that the sign that's referred to in the note that you wrote on page 519 of Exhibit 82?
A. Yes.
Q. When you arrived at the scene, Trooper, was the sign in the garage or was it in the location that it's shown in the photograph?
A. It was in that location.
Q. In the photograph?
A. Yes.
09:47 Q. And why is it, sir, that you wrote, "for sale by owner' sign in garage" in your notes?
A. From what I recall, I had some conversation with, I believe it was fire personnel at the scene, and I believe they --
MR. CORNER: Objection.

THE COURT: Sustained.
BY MR. BRUNELLE:
Q. In any event, you wrote that, "'for sale by owner' sign in garage" in your notes, correct?
A. That's correct.
Q. Based on some information you obtained at the scene?
A. Yes.
Q. All right. Now, as part of your investigation, Trooper, did you speak to both James Miles and Theresa Miles?
09:48 A. Yes.
Q. Did you speak to them more than once?
A. I spoke to James more than once. I don't remember speaking to Theresa. I only remember speaking to her once.
Q. When you spoke to James the first time, did you consider him a suspect -- strike that.
As a result of your visit to the property, the observations you made, did you come to some preliminary conclusions as to the cause of the fire?
A. Yes.
09:48 Q. And what were your preliminary conclusions, Trooper?
A. I believed the fire was set.
Q. Okay. And when you spoke to James the first time, was he a person of interest to you in your investigation?
A. Yes.
Q. Did you give him his Miranda rights at the time you spoke

to him the first time?
A. I don't remember.
Q. Did he at any time decline to answer any of your questions on the basis of the right of privilege against self-incrimination?
A. No.
Q. And did you at a later time have another interview with Mr. Miles that was tape-recorded?
A. Yes.
09:49 Q. And at that time at the tape-recorded interview -- and we do have the transcript that's in evidence -- do you remember giving Mr. Miles his Miranda rights, warning him of his Miranda rights?
A. I think we went through the recorded interview form that the state police uses. I don't recall if the Miranda was specifically part of that or not.
Q. All right. And again, we have the tape-recording transcript so we can see for ourselves. But your memory, sir, was there any time when Mr. Miles declined to answer a question
09:49 on the grounds of the privilege of self-incrimination?
MR. CORNER: Objection.
THE COURT: Overruled.
A. He declined things that I asked him, but not to answer questions.
Q. Not to answer questions on the ground of

self-incrimination?
A. That's correct.
Q. Okay. Thank you, sir.
If you would turn to Exhibit 59, Trooper, this is a transcript of the recorded interview that you had with Mr. Miles. Do you have that in front of you, sir?
A. Yes, I do.
Q. If we look at the first page, which is page 271 in the exhibit book, in the center of the page there's a description of what this is. It says, "Transcription of a recorded statement of James Miles taken by Trooper Robert O'Neil and Trooper Sean Sullivan on November 16, 2003."
Am I correct that that date is wrong?
A. Yeah, I believe it was '04.
Q. '04. Because the fire itself had occurred on October 17, '04?
A. That's correct.
Q. Fair enough.
If you turn to the next page, please, Trooper, this is page 272 in the exhibit book, and you'll see that each -- there's four pages on this one page and each of them have their own individual page number. Do you see that?
A. Yes.
Q. I'm going to use those page numbers to call your attention to different parts of this transcript, all right?

A. Okay.
Q. On page 2 of that transcript, starting at line 16, this is what you said, Mr. O'Neil: "And we met back on the 2nd, we talked for about an hour and a half or so, went through some of the basic stuff, and then we ran out time."

Was that a reference to that initial interview you told me you had with Mr. Miles?
A. Yes.
Q. That would have been November 2nd that you're referring to

09:52 there?
A. Yes.
Q. All right. And then continuing on to page 3, this was a question by you: "At that time you started -- you mentioned the possibility of threats in the past."

On Mr. Miles went on: "Well, I was talking about two different sets of them at that time I believe I told you."

And you said, "Yeah."

And he said, "And I had mentioned to you that through other counsel I sought an opinion of the Board of Bar Overseers

09:52 as to what I could release and what I couldn't release, and I said the -- the limits that they put on it were that it couldn't go beyond who I told unless it developed into something. Obviously if you found out that they had actually done something, then it could be made public, and you said you would agree with that."

And your response to that was, "Yeah, I think we're on the same page with that. I mean" --

And then Mr. Miles started talking.

And then calling your attention to page 4, Trooper O'Neil, starting at line 16, the witness, who is Mr. Miles, said, "The instructions are that I am supposed to have their agreement that it won't go beyond -- it won't be made public. In other words, you won't pass it on to anybody else unless you find that there's, you know, that there's a legitimate subject of investigation here."

09:53

And your response to that was: "Right."

Did I read all that correctly?

A. Yes.

Q. And then -- again, I'm not going to read through this whole transcript, obviously, but am I correct that Mr. Miles then went on to talk to you about persons that he thought might have made threats against him or might have had reason to commit arson at his home?

A. Yes.

09:53

Q. All right. And following those disclosures did you pursue the leads that he had given you to determine whether or not any of them might be viable?

A. Yeah, I pursued them to what I felt was a reasonable degree.

Q. And having done that, Trooper, to a reasonable degree, did

you come to conclusions as to whether or not any of the persons Mr. Miles had mentioned may have been involved in causing the fire?
A. Yes.
Q. And what conclusions did you come to, sir?
A. I didn't think that any of them had anything to do with it.
Q. Now, if you turn, next, please, Trooper, to tab 85, this is a letter from you to Charles McIntyre dated October 29,
09:54 2004. And I'll give you a moment to read it silently to yourself.
(Pause.)
A. Okay.
Q. And how is it that you knew Mr. McIntyre was involved in this -- representing Chubb Insurance Company with regard to this fire?
A. He called me. He made contact with me at some point.
Q. Now, if you turn next to Exhibit 86, Trooper, this is a letter dated December 8, 2004 from Mr. McIntyre, and it's
09:55 addressed to Joanne, J-o-a-n-n-e, Nason, N-a-s-o-n, at the department of State Police Fire Explosion and Investigation Section. And that's the section you told us you were working at at that time?
A. Yes.
Q. And it's a request on behalf of Great Northern for a copy

of Fire and Explosion Investigation Section reports concerning the fire of James F. and Theresa B. Miles on October 17th, et cetera.

And, Trooper, did you ever prepare an actual Fire and Explosion Investigation Section report with regard to this fire?

A. No.

Q. Okay. Are you actively investigating this claim any longer?

09:56 A. It's not active, no.

Q. Okay. By the way, are you assigned to that section at this time?

A. No.

Q. When did you last -- when did you last work for that section?

A. I think it was May of '05, it may have been '06.

Q. Do you know when it was that you ended your investigation into the fire of the October 17th?

A. I don't exactly -- it was at least a couple of months, and

09:57 then I was doing things here and there between other investigations.

Q. At least a couple of months from when, sir?

A. From the initial fire.

Q. Okay. Now, if you turn next, please, Trooper, to Exhibit 56 -- I'm sorry, 58, Exhibit 58, and down at the bottom half of

the page, Trooper, you'll see there's a box there, and in the box it starts out "Rob." Do you see that?

A. Yes.

Q. And the e-mail is sent to labrador1@yahoo.com. Is that your -- or at that time was that your e-mail address?

A. Yes.

Q. And this is an e-mail from Charles McIntyre to you dated November 22, 2006, and it says, "Rob, how are things going? I am still involved with James and Theresa Miles, they are about to sue, and one of the things he did not provide us during our investigation was the names of suspects he believed might be involved in the fire at this home. He testified in his EUO that he spoke with you and under a confidentiality agreement provided you with the names of those suspects. He claimed attorney/client privilege; however, once he provided you with those names, he broke that privilege and was bound to give us the names. Would you please provide me with those names he gave you during your investigation?"

And then it says, "Were all of your reports completed and are they available?"

Trooper, my question to you is: Do you have any specific memory of Mr. McIntyre ever asking you for this information, for the names of the suspects that Mr. Miles had revealed to you, did he ever ask you for that information before the date of this e-mail, 11/22/06?

A. We talked about it.
Q. Did he ever ask you for that information, sir?
A. He didn't ask me for the interviews.
Q. And, sir, am I correct that although Mr. McIntyre had to send you a copy of more e-mails to remind you to send these interview tapes, that eventually you did send those to him?
A. That's correct.
Q. Okay. And --
MR. BRUNELLE: Thank you, Trooper. Those are all the questions I have for you.
09:59
THE COURT: Cross-examination, Mr. Corner.
MR. CORNER: Yes, your Honor.

CROSS-EXAMINATION

BY MR. CORNER:
Q. Good morning, Trooper O'Neil.
A. Good morning.
Q. Let me reintroduce myself. I'm Mark Corner, I represent the Great Northern Insurance Company. I just have a few questions for you today.
10:00
Trooper O'Neil, you responded to the scene of the fire essentially the day after the -- the day after the fire occurred, correct?
A. It was in the morning.
Q. In the morning. In fact, the fire was still smoldering at this point?

A. Yes.
Q. Now, Trooper, you're trained in determining the cause and origin of fires, correct?
A. Yes.
Q. And when you appeared at the scene of the fire, the smell of gasoline was still present, correct?
A. Not to my detection.
Q. Okay. When you say "not to your detection," was there any presence of gasoline?
10:00 A. Yes.
Q. And can you describe the presence of gasoline?
A. In the back, like, sunroom or foyer when you walked in, there was actually a gasoline can to the right. I think it was, like, five gallons, something like that.
Q. So there was a gasoline can in the -- you called it a sunroom, foyer?
A. Yes.
Q. Was there a jacuzzi present in that room?
A. Yes.
10:01 Q. And did you observe the points of origin of the fire?
A. Yes, I believe there were several points of origin.
Q. And those points of origin were in the jacuzzi room, right?
A. I think they were more in towards the cellar, when you walked into the cellar, and I think there was something in the

jacuzzi room when you walked near the steps.
Q. But after your -- upon leaving the scene of the fire, you were confident that it had been intentionally set?
A. Yes.
Q. And you were investigating it as an arson?
A. Yes.
Q. And you were attempting to determine who was responsible for causing the arson?
A. Yes.
10:01 Q. Now, Trooper, if I could please turn your attention to Exhibit 78. It's the photograph Mr. Brunelle asked you about a few moments ago.
And, Trooper, that's -- you stated that was a photograph of the house, right?
A. Yes.
Q. And that's -- this photograph was taken by the state police crime scene service, correct?
A. I believe so, yes.
Q. And this photograph depicted the condition of the house
10:02 when you saw it, right?
A. Yes.
Q. And it depicted the -- and the "for sale" sign was present when you saw the house?
A. Yes.
Q. Now, one of the things you were doing in investigating the

scene of the fire, Trooper, you were looking for signs of forced entry, correct?
A. Yes.
Q. And that was significant in determining whether the fire was intentionally set?
A. Yes.
Q. And some doors had some -- showed some signs of forced entry, correct?
A. Yes.
10:03 Q. And is it true that the doors that you saw as having signs of forced entry were consistent with fire department entry?
A. That's correct.
Q. Okay. Now, if I could turn you, Trooper, to your -- the chart -- I'm sorry, the diagram that you prepared, that's Exhibit 82. And I want -- I'm looking at page 516, which is the first page of the exhibit, and I'd like to turn your attention, please, to the entry that you've made at the lower right-hand corner of the document.
A. Okay.
10:03 Q. And it says, "Entry door into the jacuzzi room." Do you see that?
A. Yes.
Q. The jacuzzi room is where you said you found the gas can, correct?
A. That's correct.

Q. And it's also the area where you found some of the points of origin of the fire?
A. I believe so.
Q. Okay. And you note here that Chief Pray -- is that the fire chief?
A. Yes.
Q. Okay. -- observed storm open and thinks door was ajar?
A. Yes.
Q. Do you see that?
10:04 So was it your observation as well that the door into the jacuzzi room was ajar at the time that you appeared?
A. I don't recall if I observed it that way.
Q. Fair to say that there was no sign of forced entry into the door into the jacuzzi room?
A. That I don't recall.
Q. Okay.
Trooper O'Neil, you identified a few moments ago Mr. -- that you thought Mr. Miles was a person of interest at the outside of the investigation. Can you tell the Court what
10:05 you mean by that?
A. Well, at first he was very tough to get in touch with. His daughter originally showed up at the scene, and she wasn't very cooperative. I was talking to another attorney, I believe, the day of the fire. I forget his name offhand.
Q. Was it Attorney Lehrberg? Does that refresh your

recollection?

A. Sounds familiar.

Q. Okay.

A. But it took me about two weeks to finally be able to get in touch -- actually talk to Mr. Miles. And at that point I found the interview to be very difficult. You know, he spoke in rambling fashion, he was hard to follow. You know, I didn't feel that he was being complete -- cooperating completely.

MR. BRUNELLE: Well -- I'm sorry. Nothing, your Honor.

10:06

BY MR. CORNER:

Q. At some point did you suspect that Mr. Miles might have been involved in the fire?

A. Yes.

Q. Now, you testified that you interviewed -- that you interviewed Mr. Miles on two occasions?

A. Yes.

Q. And on the first occasion it was not -- it was not recorded, correct?

10:06

A. That's correct.

Q. And the second occasion was the recorded interview which was transcribed which forms the basis of the transcription you just looked at a few moments ago, correct?

A. Yes.

Q. Now -- and you didn't remember whether you gave him his

Miranda warnings during the course of that investigation; is that your testimony?

A. That's correct.

Q. Okay. Now, I want to turn your attention, if I could, to the transcript of the interview, which is Exhibit 59. It states that among those present at the interview was a Theodore Aleixo, Esquire?

A. That's correct.

Q. He's an attorney, correct?

10:07 A. Yes.

Q. And he's an attorney -- he was present there representing Mr. Miles, correct?

A. Yes.

Q. Okay. And at various points during the -- isn't it true that during your interview at certain points Mr. Miles met with Mr. Aleixo?

A. Could you repeat that?

Q. Sure. At various points during the interview Mr. Miles met and spoke with Mr. Aleixo?

10:08 A. Mr. Aleixo, from what I recall, he was there the whole time.

Q. Right. And they would -- and on a couple of occasions they conferred during the course of the interview?

A. I think so. They never left the room.

Q. Okay. Now, this interview occurred on November -- let's

see, November 16 of 2003, correct? That was the second interview?

MR. BRUNELLE: It's 2004, counsel.

MR. CORNER: I'm sorry, you're right.

MR. BRUNELLE: It does say 2003 on the page. My mistake.

BY MR. CORNER:

Q. And that was the -- the November 16 interview was the second time that you interviewed him, correct?

10:08 A. Yes.

Q. And the first time you interviewed him was November 2nd, correct?

A. Yes.

Q. So about two weeks after the fire?

A. That's correct.

Q. And did you consider significant that you weren't able to get in touch with him for two weeks after the fire?

A. Yes.

Q. And why did that arouse suspicions in you?

10:09 A. Well --

MR. BRUNELLE: Objection. He didn't say it aroused suspicions, he just said it was significant.

MR. CORNER: I'll withdraw that question because I did misstate it.

BY MR. CORNER:

Q. Why did you consider it significant that you weren't able to contact him for two weeks after the fire?
A. It was very unusual. Typically home owners are anxious to find out what's going on with their property, and, you know, they're normally cooperative if they've got nothing to do with it. And just through my training, it naturally aroused suspicion.
Q. Now, if I could turn, please, to Exhibit 59, the transcript of your interview, and if I could turn you, please,
10:09 to Exhibit -- I'm sorry, to page 272 and page 3, the -- and I want to point you to the passage that Mr. Brunelle just asked you about a few moments ago.
During the course of the interview Mr. Miles told you that he had obtained an opinion of counsel, correct?
A. Yes.
Q. And that limited his ability to disclose some of the information that you would be asking him during the course of the interview, correct?
A. Yes.
10:10 Q. And he had asked that you not use it, use the information that you obtained, for any reasons outside of the -- other than as necessary for your investigation?
A. Yes.
Q. Okay. So you weren't going to give the information out to -- you weren't going to make the results of anything he told

you public, right?
A. At that time I wasn't sure because --
Q. And it wasn't your intention that it interfered -- your agreement with him not to disclose the information, it was your understanding that wasn't going to impede your investigation, right?
A. Can you rephrase that?
Q. Sure. You weren't agreeing not to prosecute anybody if the information that he gave you led you down the path that was going to identify a suspect, correct?
A. That's correct.
Q. And so did you verify whether or not this opinion of counsel had any validity?
A. No, I didn't.
Q. Okay. Did you agree with it -- did you agree or disagree with whether his -- the restrictions he was putting on it had any validity?
MR. BRUNELLE: Objection, your Honor.
THE COURT: Well, if he understands the question, he can answer it.
MR. BRUNELLE: Doesn't it call for a legal opinion on his part?
THE COURT: I don't think so. Overruled.
MR. BRUNELLE: All right. Thank you, your Honor.
A. I understand the question, but, actually, what Mr. Miles

was talking about I found to be very confusing. And the way I understood it was that if it had something to do with the investigation, then I would follow through. And at that point I was going to -- I was just simply playing it by ear to see where the investigation led.
Q. Sure. So in order -- the restriction -- the restrictions that you agreed to weren't going to have any impact on your ability to investigate whether a crime had occurred or not?
A. That's correct.
10:12 Q. Okay. Now, during the course of your interview, you learned that Mr. Miles was the last person in the house before the fire, correct?
A. Yes.
Q. And he told you that he set the burglar alarm, right?
A. I don't recall that.
Q. Okay. You recall giving a deposition in this case, correct?
A. Yes.
Q. In Mr. Brunelle's office. And if I could refresh your memory --
10:12 MR. CORNER: Your Honor, may I approach the witness?
THE COURT: Yes.
MR. CORNER: Page 114.
BY MR. CORNER:
Q. Trooper, I'm showing you a transcript of your deposition,

and I want to turn your attention to page 114.
A. Okay.
Q. Wait a minute. Am I on the right page?
MR. BRUNELLE: Line 12.
BY MR. CORNER:
Q. Page 114, line 12, you say -- the next question:
"Q. The next question, did he set the burglar alarm and he told you yes?"
And you answered: "Right."
10:13 A. Yes.
Q. And so -- and you were referring to your notes of your initial interview with Mr. Miles at this time, correct?
A. That's correct.
Q. Okay. So when he first met with you, he told you he had set the burglar alarm?
A. Either the first or the second interview.
Q. Okay. One of his interviews he told you he had set the burglar alarm. Thank you.
And isn't it true, sir, that during your investigation
10:14 you learned that the burglar alarm had not been triggered prior to the fire?
A. That, again, I don't recall.
(Pause.)
MR. CORNER: Your Honor, if I may approach again.
THE COURT: Yes.

MR. CORNER: Thank you.

Page 241.

MR. BRUNELLE: Thank you.

BY MR. CORNER:

Q. Trooper O'Neil, I'm turning you, again, to page 241 of the transcript of your deposition, line 19. You were asked at the deposition: "Now, there was also an intrusion or burglar alarm in the house, wasn't there?"

And you answered: "I believe so, yes."

10:15 Do you see that?

A. Yes.

Q. You were then asked: "And it's fair to say that the burglar alarm wasn't triggered at any time prior to the fire? Do you see that from the records?"

And you answered: "That's what I gather from the records."

A. Yes.

Q. And did the absence of the burglar alarm being triggered have any significance in your investigation?

10:15 A. Yes.

Q. And why is that?

A. To me it indicated that there was no forced entry.

Q. Okay. And you were aware that the -- there was -- the fire alarm did go off, correct?

A. I do remember that, yes.

Q. Okay. So the fire alarm went off, but the burglar alarm did not go off, correct?
A. Yes.
Q. So would you agree with me, sir, that if the burglar alarm had been armed and then an entry was made into the house and a fire was set, the burglar alarm would have been triggered before the fire alarm if it had been activated?
A. That's what I would think, yes.
Q. And that led you to believe that the person who made entry
10:16 into the house had familiarity with the house?
A. That's correct.
Q. Okay. Now, during the course of Mr. Miles' interview you had requested some financial information from him?
A. Yes, I believe so.
Q. And he wouldn't -- and he wouldn't provide you with that information?
A. That's correct.
Q. And that information was significant to you, wasn't it?
A. Yes.
10:16 Q. It was significant in establishing whether or not he had a financial motive in setting the fire?
A. Correct.
Q. Now, after interviewing Mr. Miles you came to the conclusion that you didn't think he was a credible guy?
MR. BRUNELLE: Well, objection, your Honor.

THE COURT: Sustained.

BY MR. CORNER:

Q. After conducting the interview did you think he was credible?

MR. BRUNELLE: Objection, your Honor.

THE COURT: Overruled. He can answer that.

MR. BRUNELLE: Testifying on his opinion of credibility, your Honor?

THE COURT: I think he can testify to that.

10:17 MR. BRUNELLE: Note my objection, please, your Honor.

THE COURT: I note your objection.

MR. BRUNELLE: Thank you, sir.

A. Could you repeat it?

Q. Sure. After concluding your interview with Mr. Miles did you think he was credible?

A. No.

Q. Why was that?

MR. BRUNELLE: Objection, your Honor.

THE COURT: Overruled.

10:17 A. The manner of the interview was very rambling, these things that he was throwing out to me just didn't make very much sense. There were several things that he wasn't going to provide to me, and just an overall sense and the fact that it took two weeks for him to be willing to talk to me. Those are among the reasons that I felt that -- came to that conclusion.

Q. In fact, following your interview with Mr. Miles you considered him the prime suspect as having caused the fire, correct?
A. Yes.
Q. And he had given -- and based on the names that he had given you during the interview you had some leads to follow, correct?
A. Correct.
Q. To find out if there was anybody else who might have been responsible for the fire?
10:18
A. Yes.
Q. And none of those leads were productive?
A. That's correct.
Q. I believe you testified earlier, sir, that the Mileses' arson is unsolved?
A. Correct.
Q. The file is not closed but it's inactive?
A. That would be accurate, yes.
Q. Okay. And at the time the file was closed, Mr. Miles remained the primary suspect?
10:19
A. Yes.
Q. And he remains the primary suspect today?
A. That's correct.
Q. But you simply didn't feel you had sufficient evidence to bring a criminal complaint against him?

A. Yes.
MR. CORNER: Trooper, thank you. I have no further questions.
THE COURT: Any redirect?
MR. BRUNELLE: Just very briefly, please, your Honor.

REDIRECT EXAMINATION

BY MR. BRUNELLE:
Q. Trooper, would you turn to Exhibit 82? Again, this is your sketch. And the first page of your sketches, Trooper, which is page 516 in the exhibit book, at the bottom of the page Mr. Corner had asked you some information about notes you made about the entry door into the jacuzzi room, which you labelled door A on your diagram; is that correct?
A. Yes.
Q. So if we look in the middle of diagram itself, I see the letter A pointing towards a part of the building, and then to the right of that it says, "9 fixed glass." Is that what that says?
A. Yes.
Q. So nine fixed panels of glass there, is that what that means?
A. That's correct.
Q. So A is referring to that door into the jacuzzi room, and then, as Mr. Corner said, you were told by Chief Pray that the storm door was open and he thought the door was ajar. So that

the door into the jacuzzi room was ajar, correct?
A. That's correct.
Q. And that's where the gas can was found?
A. Yes.
Q. Okay. And then above this -- Mr. Corner didn't ask you what your notes say above this, so let's read this into the record, sir. Does this say, "lower hinge on interior in" -- I'm sorry -- "interior of wood in swing door pried from jam." Did I read that correctly? Is that what that says?
10:21 A. Yes.
Q. Okay. And that's -- that's referring to door A, correct?
A. If you can give me a second.
Q. Sure.
(Pause.)
A. Yes, I believe that's referring to door A.
Q. Okay. And then it goes on to say -- and, by the way, the fact that a lower hinge was pried from a doorjamb would be evidence of forced entry through that door at some point, correct?
10:21 A. Yes.
Q. Okay. And the fire department told you when they got there the door was already open, so that would lead you to the conclusion that it wasn't the fire department that pried that hinge off the jam, correct?
A. That was never confirmed. That was an issue of discussion

between myself and Chief Pray. That was something we were trying to nail down and it was never -- never happened.
Q. All right. Let's put it this way. Mr. Corner asked you if there was any signs of forced entry through that door, and would you agree with me that the fact that the lower hinge of a wooden door was pried off the jam is a sign of forced entry by somebody?
A. Yes.
Q. Okay. And we don't know who that somebody was; is that fair to say?
A. That -- yes.
Q. So it could have been the fire department or it could have been somebody else?
A. Yes.
Q. And if it was somebody else, it could have been the night of the fire, it could have been at some other time; fair to say?
A. I'd say so.
Q. You don't know when that damage was done?
A. I don't know would be an accurate statement.
Q. I want to be fair to you, Trooper. You don't know when this was done?
A. Correct.
Q. Then there's also some other damage noticed, noted there, that the closer unit forcibly removed from door. Would that be

the closer unit, like one of the pneumatic arms on the storm door you're talking about?
A. I believe so. I think photos would clarify it.
Q. I have photos here; I don't have a photo of that particular item of damage. You may remember, we went through in the deposition looking for that, and, unfortunately, we didn't have one. And then you also noted "inside of storm latch broken." And that could be a sign of a forcible entry, true?
10:23 A. Yes.
Q. Okay. And then you also noted "bottom of storm glass missing, glass inside door." So does that mean that there was glass inside of the door, broken glass inside of the door? Is that what that comment means?
A. That's how I would interpret it, yes.
Q. And again, that could be a sign of a forcible entry, correct?
A. Yes.
Q. And you don't know when any of that damage was done or by whom; is that correct, sir?
10:23
A. Yes.
Q. Just one more point. You mentioned that Mr. Miles had declined to provide you certain financial information. And that was specifically you asked him about bank accounts. Do you remember that?

A. I think that was part of the interview form, the standard form.
Q. And, sir, I'm going to show you -- this is not an exhibit but I'm going to just show you to help refresh your recollection. This is --
MR. BRUNELLE: May I approach the witness?
THE COURT: Yes.
BY MR. BRUNELLE:
Q. This is a copy you provided to us at your deposition of
10:24 the owner interview on November 2, 2004 with James Miles. And I'm looking at question 55 -- this is a standard form that you went through asking him questions; is that correct?
A. Yes.
Q. All right. And question 55 was: "Any personal loans, liabilities, debts, lawsuits, or other unpaid bills." And you wrote down "judgment" -- is that "has filed bankruptcy, not settled yet," something like that?
A. Something close to that.
Q. Okay. All right. So Mr. Miles did tell you that he was
10:24 in bankruptcy at the time that you were interviewing him?
A. I remember him talking about being in bankruptcy court or -- yeah, having been in court for some type of bankruptcy.
MR. BRUNELLE: Thank you very much, Trooper. Those are all the questions that I have.
THE COURT: Recross?

MR. CORNER: I have no further questions of Trooper O'Neil.

THE COURT: Thank you. You may step down, Trooper O'Neil.

MR. BRUNELLE: Thank you very much, Trooper, for coming in.

MR. CORNER: Thank you.

MR. BRUNELLE: May I proceed, your Honor?

THE COURT: Yes, Mr. Brunelle.

10:25 MR. BRUNELLE: Your Honor, I call James Miles. And Mr. Miles has asked if he could be affirmed rather than sworn in as a witness.

THE COURT: Yes.

JAMES FREDERICK MILES, having been duly affirmed by the Clerk, was examined and testified as follows:

THE CLERK: You may be seated. Please state your name for the record.

THE WITNESS: My name is James Frederick Miles.

DIRECT EXAMINATION

10:26 BY MR. BRUNELLE:

Q. Good morning, Mr. Miles.

A. Good morning.

Q. Keep your voice up, please, so everybody can hear you.

Where do you reside, sir?

A. I reside in New Jersey, Lawrenceville, New Jersey.

Q. Who are you living there with?
A. With my father-in-law and my wife.
Q. Who owns that house?
A. My father-in-law does.
Q. How old are you, Mr. Miles?
A. I'm just shy of 65, a couple of days I'll be 65.
Q. Are you married, sir?
A. Yes, I am.
Q. To whom are you married?
10:26 A. To Theresa Miles.
Q. And this is the first tough question you have. What was the date of your marriage?
A. August 29, 1970.
Q. Do you and Theresa have any children?
A. Yes, we do.
Q. And what are their names and what are their ages, please?
A. Alexis Katherine, she's 36; James Nicholas, he's 35; and our youngest daughter, Heather Elizabeth, will be 32 next month.
10:27 Q. Very good.
Now, Mr. Miles, at some time in your youth did you suffer a serious brain injury?
A. Yes, I did.
Q. Can you --
A. I was never supposed to live -- I was never supposed to

come out of a coma.

Q. If you could tell the Judge just in general terms, please, without going into too many details, what is it that happened to you, and what was the injury you suffered?

A. I suffered direct trauma to three lobes to my brain, most severe to my frontal lobe. I was in a coma, I wasn't supposed to come out of it, and when I did come out of it, the prognosis was statistically no one had ever lived more than 12 years after that, so I was supposed to be dead by 29.

10:28 Q. How old were you then?

A. Seventeen.

Q. And, Mr. Miles, does that injury that you suffered back when you were 17 have an effect on your cognitive abilities at this time as you understand it?

A. Yes, it does.

Q. Can you explain to the Judge what effect that has on your cognitive abilities at this time?

A. Well, over the course of the years I've been on different medication and so forth. Sometimes they have to take me off of
10:28 it because of adverse consequences from the medication. Your body chemistry changes as you age. When that happens, I have trouble articulating both verbally and in writing. Because of my brain injuries, I had to kind of retrain my brain so I have to think out everything in advance kind of before I do something. And what happens is when I'm having trouble like

that, I sometimes leave out what I thought -- some of what I've thought of but I think I've articulated it. It causes me to appear to be rambling, disconnected, and so forth. Sometimes the medication helps, sometimes it doesn't.
Q. Okay. I think that's a good explanation. Thank you, sir.
Now, Mr. Miles, are you an attorney at law?
A. I'm not presently practicing, but I've -- I'm trained as an attorney. I'm a lawyer.
Q. And where are you -- or where have you been licensed to practice law, sir?
10:29
A. In the Commonwealth of Massachusetts.
Q. What's your current status in the Commonwealth as an attorney?
A. I'm on a disability leave of absence.
Q. When did that begin, approximately?
A. It's been several years now, I'm not quite sure.
Q. In October of 2004 what was your status as an attorney?
A. I was -- I was still -- I was still active, but --
Q. Now, prior to October 2004, Mr. Miles, was there a period of time when you were not actively practicing law for several months?
10:30
A. Yeah, several -- unfortunately, as you advance in age --
Q. Just was there a period of time?
A. Yes.
Q. And how long was it, sir?

A. There were several of them.
Q. The most recent one before October of '04, that's what I'm interested in.
A. I was basically not actively practicing at that time. I hadn't been actively practicing since sometime in 2003 for medical reasons.
Q. Okay. In October of 2004 where were you living?
A. In Rehoboth, Massachusetts.
Q. At what address, sir?
10:30 A. 1 Running Stream Road.
Q. Who owned the house you were living in?
A. My wife did.
Q. Was that a single-family home?
A. Yes.
Q. Who owned the furnishings of the house, sir?
A. My wife did.
Q. Other than your personal clothing, were there any items in that house as of October 16, 2004 that you owned personally and individually?
10:31 A. I maintained an office there for myself and I had computers and copying machines and fax machines, things of that nature. You know, things that would relate to my consulting work and my legal work.
Q. And are those the items for which you made claim in this case, sir?

A. Yes.
Q. Is that the only thing you're making claim for in this case?
A. Basically, yes.
Q. Were you present in the house during the day of October 16, 2004?
A. I'm sorry, can you give me the date again?
Q. Yes, the day before the fire. Were you present in the house during the day Saturday, October 16, 2004?
10:31 A. Yes, I was.
Q. And at some time during the day did you leave the house?
A. I left several times, yes.
Q. Several times, okay. And I want to focus your attention towards the middle of the day. Towards the middle of the day did you leave the house?
A. Yes.
Q. Do you recall why it was you left the house?
A. Yeah, I brought our three dogs to the kennel because I was going to be going down to New Jersey and I had to board them.
10:32 Q. Okay. Did you do anything else during the day when you left the house in the middle of the day?
A. Yeah, I think from the kennel, which is on one side of Rehoboth, I went over to -- I went around and out to Route 44 and I went to -- I got some gas and I went to a store called Benny's.

Q. Okay. And when you went to -- I forget -- let's stay with the gas. Did you pay for the gas with a credit card?
A. I believe I did, yes.
Q. And when you went to the Benny's, did you make a purchase?
A. Yes, I did.
Q. And did you pay for that purchase with a credit card?
A. I believe I did.
Q. If you turn, please, to Exhibit 28, Mr. Miles --
A. I'm sorry, I need to change glasses, I can't see this.
10:33 Q. Take your time.
(Pause.)
A. I'm sorry, what's the number again, please?
Q. Exhibit 28, Mr. Miles.
A. Yes.
Q. Okay. And you'll see -- is this a credit card statement for the credit card that you used to make the purchase of the gasoline in Seekonk and of the purchase that you made at Benny's?
A. I'm sorry, even with my glasses on I'm having trouble
10:33 reading this. The print's too small for me.
Q. All right, never mind. There's been testimony about it already. We'll move on.
Where is Seekonk in relationship to Rehoboth, by the way.
A. They're right next -- Seekonk's the next town farther

west.
Q. Okay. Thank you.
After you made the purchases at Benny's and -- for the gas and the other -- brought the dogs and all of that stuff, did you return back to the house?
A. Yes, I did.
Q. Was there anybody else in the house with you at any time during the day of October 16, 2004?
A. No.
10:34 Q. Where was Mrs. Miles on that day?
A. She was in New Jersey.
Q. And how did she get from Massachusetts down to New Jersey?
A. She flew.
Q. Do you know when it was she flew down?
A. She left around 5:00 a.m. on Friday morning, I guess that -- October 15th.
Q. Now, did you leave the house at sometime on October 16th to go somewhere after you had done these errands?
A. Yes.
10:35 Q. Let me ask -- that was a very awkward question. When was the time of day the last time you left the house on October 16th?
A. It was sometime between 6:00 and 6:30 I believe, maybe as early as 5:30, but I think it was around 6:00, 6:30.
Q. And what was your intended destination, sir?

A. I was going down to my father-in-law's house.
Q. And where is that located?
A. In Lawrenceville, New Jersey.
Q. And where is Lawrenceville, New Jersey?
A. It's just a north of Trenton, just south of Princeton. It's right in between the two.
Q. Is this a trip you made frequently?
A. Well, a number of times over the years.
Q. Sure. What's your best estimate as to the number of miles between Rehoboth and Lawrenceville?
10:35
A. About 225, 250, something like that.
Q. And understanding, of course, that traffic conditions can vary, it can take longer or shorter to travel somewhere, what would you say the average time it would take you to travel from Rehoboth to Lawrenceville during the evening hours would be?
A. During the evening hours? It's usually a little faster, probably between five and six hours.
Q. Okay. Was the house that you were living in at that time equipped with a security alarm?
10:36
A. Yes, it was.
Q. Before you left the house that evening to drive to Lawrenceville did you set the alarm?
A. Yes, I did.
Q. Did you have any difficulties that evening when you were trying to set the alarm?

A. Yes, I did.

Q. What difficulty did you have?

A. On the alarm board, it had lights next to all the zones, and you had to make sure that they were all green when you set the alarm. And one of the green lights was blinking, which meant that -- it could mean that there was a window open, a door open, something like that. That's peripheral protection, it's not your internal protection. And one of them was blinking.

10:37 Q. And do you know what -- strike that.

Were the zones in the house identified by a number?

A. Yes.

Q. And do you know what the number was of the zone with the light that was blinking?

A. It was number 4.

Q. And the fact that the light was blinking indicated that there was a problem in that zone?

A. Yeah.

Q. Did you try to set the alarm more than one time when you 10:37 were leaving?

A. Yeah, I can't recall how many, but I tried several times.

Q. And were you able to fix the problem so that the blinking light in zone 4 cleared?

A. This problem occurred --

Q. Yes or no, were you able to fix it?

A. I basically bypassed that zone.
Q. You bypassed?
A. I believe that's what I did.
Q. How can you bypass a zone, sir?
A. I'm -- it's been a while now, but I think you push two keys, I don't remember whether -- a function key and a number key or if it was two numbers key and then you push the zone, I think. And then the light would change from blinking green to solid green.
10:38 Q. Do you know what part of the house was encompassed within what was called zone 4?
A. No, all I knew was it was just -- it was strictly peripheral, and I didn't know exactly what -- but it was the one we always had trouble with. Whether it was the humidity, high humidity or the temperatures were varying --
Q. The question is: Did you know what area of the house zone 4 was in?
A. I wasn't sure. I thought some of it had to do with the solarium area.
10:38 Q. We've heard testimony about a jacuzzi room. Was there a jacuzzi in the solarium?
A. Yes, that's -- it was like an envelope on the outside of the house.
Q. All right. After you set the alarm, bypassed zone 4, what did you do next, sir?

A. You've got about 30 seconds to get out of the house, so I left right away.
Q. Where did you go after you left the house?
A. I drove to Lawrenceville, New Jersey.
Q. What route did you take to get there?
A. Basically I was going 95 south.
Q. At some point did you enter onto the New Jersey Turnpike?
A. Yes, I did.
Q. Is that a toll road?
10:39 A. Yes, it is.
Q. And was the car you were driving equipped with a Fast Lane transponder?
A. No.
Q. Or anything like that?
A. No.
Q. When you entered the New Jersey Turnpike, did you take a toll ticket as you were entering?
A. No. I didn't realize it right away, but I didn't, I apparently inadvertently went through a pass -- an Easy Pass or
10:39 whatever they call them, lanes.
Q. And what exit did you get off on, sir?
A. I'm pretty sure it's 7 A. It's the one I usually get off on.
Q. Is that the exit near Lawrenceville?
A. It's the fast -- timewise it's the best one to get from

there to Lawrenceville, yes.
Q. When you reached that exit, sir, were you aware at that point that you didn't have a toll ticket?
A. I kind of realized it when I was, like, part way down and -- yes, so --
Q. So when you got to -- tell the Judge very simply, keep it simple, you got to the toll booth, what did you do?
A. I stopped at the toll booth and I informed the person in the toll booth that I had inadvertently got on without getting
10:40 a ticket.
Q. And then what happened?
A. Well, it was simple, because I got on pretty much at the beginning.
Q. What happened?
A. He told me how much the toll would be and I paid him the money and he gave me a receipt for it.
Q. Okay. Did the receipt have a time stamp on it, sir?
A. Yes, it did.
Q. And do you recall what the time stamp said?
10:40 A. I recall that at the time I said it was 10:52.
Q. Do you still have that receipt, Mr. Miles?
A. No.
Q. Do you know what happened to it?
A. It was such a confusing time, I honestly don't know. I thought -- I thought it was in my wallet, then when I couldn't

find it there, I thought it was in the glove compartment of the car.
Q. Did you deliberately discard or destroy that toll receipt?
A. Certainly not intentionally.
Q. Now, when -- at sometime after the fire were you interviewed by a man named Charles McIntyre?
A. Yes.
Q. And this is an interview that was something other than an Examination Under Oath?
10:41 A. Right.
Q. And during that interview did you tell Mr. McIntyre what you just told the Court with regard to your getting on the New Jersey Turnpike through an Easy Pass lane by mistake and having obtained a receipt?
A. Yes, I did.
Q. And did during the interview Mr. McIntyre ask you to show him the receipt, to give him a copy of it?
A. I told him I'd let him have a copy of it, yes.
Q. And at the conclusion of the interview did you search your
10:42 wallet to see if you could find it?
A. Yes, I did, and --
Q. Where else did you search while Mr. McIntyre was there?
A. Well, when I couldn't find it in my wallet, he and I -- actually, everybody walked outside and I went over to my car and I looked in the glove compartment and then I looked in a

pocket that's there as well and I searched around for five minutes or so and I couldn't find it, so I just told him I couldn't find it.
Q. After that time did you look in other places that the receipt might have been, sir?
A. Yes.
Q. And were you ever able to find it?
A. No.
Q. Now, back to New Jersey. After you got off the toll, paid the receipt, where did you go next?
10:43
A. I hadn't eaten since breakfast and I went to Denny's because --
Q. And what town is that Denny's located in?
A. I believe it's Lawrenceville.
Q. Did you pay with a credit card?
A. Yes, I did.
Q. Did you pay with the same credit card that you used up in Massachusetts earlier that day at the Benny's and at the gas station?
10:43
A. Yes, I did.
Q. Okay. After you had your meal, where did you go next?
A. I went to -- I stopped and got gas. I had been just driving five, six hours --
Q. Did you pay for your gas with the credit card?
A. Yes, I did.

Q. Same credit card?
A. Yes.
Q. Where did you go after you had eaten and bought some gasoline?
A. My father-in-law's house about five -- ten minutes from there, I went directly there.
Q. Was anybody awake at the house when you arrived?
A. Yes, my wife was.
Q. Okay. And what time did you and she finally go to bed
10:44 that night?
A. Probably around 2:00 or so.
Q. When you went to bed that night, were you aware that your home was on fire at that very moment?
A. No.
Q. When did you find out that there had been a fire at your home?
A. My wife told me Roger Lehrberg was on the phone.
Q. Who's Roger Lehrberg?
A. A fellow I met in law school, we've been friends ever
10:44 since. We practiced law together from time to time.
Q. And did Roger Lehrberg tell you about the fire?
A. Yeah, he did, and -- yeah, he --
Q. Okay. At the time of the fire, Mr. Miles, did you have a cell phone?
A. Yes.

Q. And who was that cell -- in whose name was that cell phone account?
A. I don't know whether it was -- I don't recall if it was in Roger's directly or the law firm that I had left and Roger was still in, but it was basically -- it was Roger's account. I don't remember whether it was a corporate or in his personal name.
Q. During that evening, from the time you left the home as you were driving down to New Jersey, did you make any calls on
10:45 that cell phone?
A. I remember I called my wife, and I -- and I know I talked to one of my daughters, but I don't remember if I called her or if she called me.
Q. All right. And at some point did you provide or did somebody provide a copy of the cell phone records for that cell phone for the date of the fire to Great Northern?
A. Yeah, Roger was at the --
Q. Just yes or no, sir.
A. Yes.
10:45 Q. Now, at some point after the fire did you consult Roger Lehrberg for legal advice regarding whether and under what conditions you could provide information to Great Northern Insurance Company or other persons investigating the fire relating to threats or possible threats you had received prior to the fire which might involve confidential client

information?
A. Yes, I did.
Q. And what advice did Roger give you?
MR. CORNER: Objection.
THE COURT: Sustained.
BY MR. BRUNELLE:
Q. As a result of that -- strike that.
When you were interviewed by Great Northern's investigator, Mr. McIntyre, did he ask you questions with regard to the subject of whether you had ever received any threats?
10:46
A. Yes, he did.
Q. And how did you respond to those questions?
A. I told him generally that I had but that I was under some restriction on what I could reveal without a nondisclosure confidentiality agreement.
Q. Now, before you met Mr. McIntyre, were you aware that Roger Lehrberg had sent him, at your request, a non-disclosure and confidentiality agreement?
10:47
A. Yes, I was.
Q. And if you turn, please, to Exhibit 37.
A. Okay.
Q. This is -- at the bottom half -- I'll read this, Mr. Miles, since I know you have a little trouble reading -- it's an e-mail from Roger Lehrberg dated 10/26/04 addressed to

Charles McIntyre. It says, "Attached please find the nondisclosure and confidentiality Jim Miles would like Chubb to sign."

If you turn next to Exhibit 38, Mr. Miles, this document is entitled, "Nondisclosure and Confidentiality Agreement." And I realize it's very densely worded, but are you able to tell the Court from looking at this and from your familiarity with it, is this the agreement that you had asked Chubb to sign?

10:48 A. Yes, I believe it is.

Q. Okay.

Now, as of the time you met with Mr. McIntyre, what was your understanding as to what Chubb's response had been to your request that they sign this particular agreement?

A. Roger had told me they had declined to sign it.

Q. Okay.

MR. CORNER: Move to strike.

THE COURT: Sustained.

BY MR. BRUNELLE:

10:48 Q. Without saying who told you, sir, what was your understanding as to what Great Northern's response was to your request for the agreement?

MR. CORNER: Objection.

THE COURT: He can state his understanding. Overruled.

BY MR. BRUNELLE:
Q. Your understanding, sir.
A. My understanding was they declined to sign the agreement.
MR. CORNER: Move to strike.
THE COURT: Overruled.
BY MR. BRUNELLE:
Q. Now, if you would turn next, please, Mr. Miles, to Exhibit -- I'm sorry, Exhibit 63, and within Exhibit 63, if you would turn to page 422, and within that page 422, I'm going to 10:49 call your attention to page 59 of the transcript, and I'll read this, the type is very small.
A. Thank you.
Q. Starting at line 2619, this is attributed to CM, who is Charles McIntyre, and he said, "All right. I'm going to ask you the questions. If you want to decline to answer them, then we can go with the proposal to -- to do whatever you want, and I'll go for the attorneys to try to see what could be worked out."
Do you recall Mr. McIntyre stating that to you during 10:50 your recorded interview?
A. Yes, I do.
Q. And, Mr. Miles, did any attorney ever contact you directly on behalf of Great Northern and try to work out a mutually satisfactory confidentiality agreement with you?
A. Not that I recall at this time.

Q. Did Mr. Lehrberg ever present to you a confidentiality agreement which had been drafted by Great Northern Insurance Company for your consideration?
A. No, he didn't.
Q. If you turn next, please, Mr. Miles, to Exhibit 45. This is a letter to you from John Tener dated March 24, 2005. And what was your understanding as to what Mr. Tener's role was in the adjustment of this claim at that time?
A. He was an attorney working on behalf of Great Northern
10:52 Insurance Company.
Q. And at this time, Mr. Miles, as of March of 2005, were you represented by an attorney with regard to this claim?
A. March 2005? I don't believe so.
Q. Okay. And at the very beginning of the claim, when you first met with Mr. McIntyre, which I think was in early November of 2004, was Mr. Lehrberg your attorney at that time?
A. When I met with Mr. McIntyre?
Q. Right.
A. My understanding at the time was he was representing the
10:52 interests of the second mortgages.
Q. And the second mortgagees were who?
A. They were all second lender clients of his, Mindic and Long Associates, or something, and my father-in-law.
Q. Simon Belli?
A. Right.

Q. Okay. So from the time of the fire, sir, up until this point were you represented by counsel?
A. Well, only at the state fire marshal -- my friend, Ted Aleixo, former law partner of mine, had offered to use his offices and he volunteered to sit in, because he's had more experience in that area than I have.
Q. So for that one interview was he acting as your counsel?
A. I actually had two interviews, he was acting as counsel in both of them.
10:53 Q. For both the state police interviews?
A. Right.
Q. With regard to your dispute with Great Northern Insurance Company, were you represented by counsel from the time of the fire up until March of '05?
A. I don't believe so.
Q. Okay. Now, if I turn to page 234 of Exhibit 45, sir, I'm going to read to you what Mr. Tener wrote to you on March 24th.
"You have previously submitted a request that Great Northern enter into a confidentiality agreement, see copy
10:54 attached. You indicated you were willing to provide Great Northern with some of the requested documents conditioned upon Great Northern entering into your proposed confidentiality agreement. Great Northern has advised you that the insurance policy you have with it does not provide for such confidentiality agreements, and that, moreover, the insurance

policy itself amply provides for privacy policies and practices. See copy attached."

Other than what's written in this letter, Mr. Miles, did Mr. Tener ever have any communications with you on the subject of a confidentiality agreement?

A. I may have raised it in my -- in the Examination Under Oath, but he never had any conversations about the furtherance of a nondisclosure and confidentiality agreement.

Q. Okay. Did he ever present to you a confidentiality agreement that he had drafted?

10:55

A. I don't believe so.

Q. Now, during the course of the investigation did Great Northern Insurance Company request that you and Theresa provide them with copies of your income tax returns?

A. Yes.

Q. And up until the time that Great Northern declined the claim, which was in October of 2005, did you or Theresa give Great Northern copies of your income tax returns?

A. No.

10:56

Q. And why not?

A. Privacy reasons mostly. I -- they weren't willing to enter into a confidentiality and nondisclosure agreement. From personal experience representing clients I had identity theft issues. I knew that insurance companies weren't particularly tight with their information and I was afraid of -- there were

a number of Social Security Numbers on these returns involving my wife and I and I think one or two of the children as well and I was -- I was very -- I was very concerned about that.
Q. Okay. I think you've answered the question. Thank you.
Now, at some time after Great Northern had denied your claim did you and Theresa, acting through my law firm, offer to provide copies of the tax returns to Great Northern if they would sign a confidentiality agreement?
A. Yes.
10:57 Q. And if we turn, please, to Exhibit 52, and within Exhibit 52, if I call your attention to page 251, is that your signature at the bottom of that page?
A. Exhibit 52.
Q. Exhibit 52.
A. It looks like my signature.
Q. Okay. And after this confidentiality agreement was fully executed, did you then, through my office, send Great Northern copies of your income tax returns for the years 2002, 2003, and 2004?
10:58 A. Yes, we did.
Q. And had -- the agreement is dated in May of '07, so did you and Mrs. Miles file income tax returns for the years 2005 and 2006?
A. I don't recall. Maybe we didn't because we -- I don't think we had any income during those years.

Q. Now, during the Examination Under Oath and during the recorded interview that you had with Mr. McIntyre, were you asked questions regarding to your financial status at the time of the fire?
A. Yes.
Q. And what did you tell -- let's start with Mr. McIntyre. What did you tell Mr. McIntyre during the recorded interview?
A. I told him that I was in bankruptcy, that I had roughly a million-dollar judgment against me that was -- that had been 10:59 ruled non-dischargeable. I told him basically that I didn't have any income at that time, and I told him in response to his question that my wife didn't have any income at that time.
Q. Okay. Mr. Miles, even though this is not an issue in the case, I want to give you a chance to say this publicly and on the record. Did you set fire to your home?
A. No.
Q. Did you ask somebody to set fire to your home?
A. No.
Q. Do you know who set fire to your home?
10:59 A. No.
MR. BRUNELLE: Thank you, sir. Those are all the questions that I have.
THE COURT: Mr. Corner.
MR. CORNER: Thank you, your Honor.
THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. CORNER:

Q. Good morning, Mr. Miles.

A. Good morning.

Q. Sir, you come to us with some experience in the insurance business, do you not?

A. I worked in it for a number of years.

Q. In fact, you owned an agency?

A. Yes, I did.

11:00 Q. You hold a broker's license?

A. Yes.

Q. You hold an insurance adviser's license?

A. Yes.

Q. Fair to say you're familiar with the handling of insurance claims?

A. Yes.

Q. In fact, you've taught classes on fire policy?

A. I think I probably did. I taught a number of insurance classes over the years.

11:00 Q. Sure. And you're also an attorney?

A. Yes.

Q. And in fact, you're an attorney who had been successful in the past in suing corporations that you decided -- desired to acquire causing the target companies to incur substantial expense and suffer other difficulties, eventually forcing the

companies to capitulate to a sale on your terms?
MR. BRUNELLE: Objection, your Honor.
THE COURT: Grounds?
MR. BRUNELLE: Relevancy.
THE COURT: Overruled.
A. I don't know where you got that from.
Q. If I told you I got that from Judge Lynn's decision out of the bankruptcy court in New Hampshire, would that refresh your recollection?
11:01 A. Somebody testified to that, but there is absolutely no truth in it.
Q. In fact, that was one of Judge Lynn's findings, wasn't it?
A. It may have been one of his findings, but nobody ever submitted any evidence to back it up.
MR. BRUNELLE: Objection.
Q. You've seen Judge Lynn's decision, right?
A. Yes.
Q. And that's contained within Judge Lynn's decision?
A. There would be a record of something like that; nobody's
11:01 been able to produce one.
Q. It's a matter of public record, right?
A. His --
Q. The judge's decision is a matter of public record?
A. His decision is a matter of public record.
Q. And that's in his decision?

A. That's what he -- that's what he said in his decision.
Q. That's a finding he made?
A. I believe -- I'm not -- I'm not a litigator. I'm not sure whether your phraseology is correct; I'm assuming it is. If that's what you're saying it is, I'm not challenging it.
Q. You're not a litigator, but you were litigating the claim that was before Judge Lynn?
A. Not by choice, I wasn't.
Q. But you were litigating it?
11:02 A. He required me to litigate it or forfeit it.
Q. And as a result of your litigation of the claim, that's what led to the sanction of $972,500 that's been levied against you?
A. Yes, that was the legal fees of the opposing parties.
Q. And that's what led to your filing of bankruptcy?
A. That's correct.
Q. Okay. And in fact, that judgment was determined by Judge Feeney in the United States Bankruptcy Court here in Massachusetts to be non-dischargeable?
11:02 A. That's correct.
Q. Okay. And the reason she determined it was non-dischargeable was she determined that it was -- that you had caused a willful and malicious injury?
A. I don't recall what her finding was. I'm not disputing it, I just don't remember.

Q. Just to refresh your recollection, sir, at the time immediately before the fire you were working on a brief, right?
A. That's correct.
Q. And it was a brief that was to be filed in the bankruptcy appellate panel?
A. I was appealing -- was she the underlying judge? Was she the judge at the -- whatever -- the lower level? I don't -- I didn't handle that myself. That was handled by bankruptcy counsel.
11:03 Q. You were writing a brief on the day of the --
A. Yes, I was appealing it.
Q. You were appealing her decision that --
A. If she was the judge.
Q. Excuse me, sir. You were appealing her decision that the judgment against you issued by the United States Bankruptcy Court was non-dischargeable, correct?
A. That's correct.
Q. That's what you were working on the day -- the event leading up to the fire?
11:04 A. Actually, I finished, I completed it, it was on my desk.
Q. Right. And you were attempting to get it filed?
A. I, actually, because I was having some health problems, I called up the attorney on the other side and asked for a two-day extension so I could file it on Monday or Tuesday instead, and he asked me to file for two weeks instead of two

days and agreed with it.
Q. Attorney Tamposi, who was representing the Loon Mountain interests?
A. I'm not sure whose interests he was representing at that time, but --
Q. He was representing --
A. At that time he was representing the directors of Loon Mountain.
Q. That was the party that was adverse to you in the litigation?
11:04
A. There were a number of parties.
Q. He was one of them?
THE COURT: Let him answer the question.
MR. CORNER: Sorry.
A. I believe the initial parties at least he started out representing were the directors of Loon Mountain.
Q. Mr. Tamposi was representing parties that were adverse to you in the appeal that you were filing with the bankruptcy appellate --
11:05
A. Yes, he was.
Q. So when you were working on that brief, you were aware that the basis for Ms. -- for Judge Feeney's ruling was that the -- that you had caused a willful and malicious injury upon Mr. Tamposi's clients?
A. Well, I believe what the basis was no one ever submitted

that in the underlying case and she made a ruling based on that and it had never been put into evidence. That was my understanding of it.

I'm not -- again, I'm not a bankruptcy -- you're asking me something that has happened five or six years ago now, and I just -- that's my recollection of it.

Q. So you're -- five or six years ago, you don't have specific memory of what happened five or six years ago?

A. I have -- I have cognitive problems and I've been -- I've been out on disability because of them, so it's -- remembering details to the extent that you're asking me about is sometimes difficult.

Q. Okay. So just so I understand, because of your cognitive difficulties, you have difficulty remembering things that occurred five years ago?

A. In detail legal issues like that, yeah, I do, yeah. And the underlying case was beyond that. I mean, we're going back to the year 2000, 2001 or something.

Q. I understand.

A. We're talking almost ten years ago, nine, ten years ago.

Q. I understand. And you testified about your cognitive difficulties, and I'm just trying to get a handle on it. And you're telling me it affects your ability to remember things that you're testifying about?

A. It can.

Q. Okay. Fair enough.
Now, Mr. Miles, you testified that you weren't working regularly at the time of the fire?
A. I wasn't -- I wasn't working on behalf of a paying client at the time of the fire.
Q. You weren't making any money?
A. That's correct.
Q. You had last practiced, I believe you testified, 2003?
A. Yes.
11:07 Q. And your wife wasn't working either?
A. No.
Q. She wasn't making any income?
A. That's correct.
Q. And she -- you were present for her testimony -- she hadn't worked since 2003?
A. That's correct.
Q. And the last time she worked, she worked in your law office?
A. She -- she worked as an independent contractor, but she was working for me, yes.
11:07 Q. Fair enough.
And you've always -- and you and your wife always kept your financial affairs separate, correct?
A. Pretty much, that's correct.
Q. You're totally unfamiliar with her finances?

A. I -- our finances have been kept separate since the time we were married, by agreement, basically.
Q. No problem with that. But you do file joint tax returns?
A. Sometimes we do, yes.
Q. And Mr. Brunelle asked you some questions about some tax returns that you turned over to Great Northern, correct? Do you recall that testimony?
A. Yes, pursuant to the agreement, that's correct.
Q. Those are joint returns?
11:08 A. Those are joint returns, right.
Q. Now, turning to the events leading up to the fire, Mr. Miles, you were the last person in the house before the fire occurred, correct?
A. Obviously not, but I -- but I was the last one that I know of.
Q. You were the last one -- sure. You answered my question. I asked the wrong question, you answered the right one, so thank you.
You left on late Saturday afternoon?
11:08 A. As I said, it could have been as early as 5:30, I think it was sometime between 6:00 and 6:30.
Q. But it was Saturday afternoon?
A. Yes.
Q. And you planned on leaving Friday?
A. I planned on leaving Friday after I had done a filing in

Boston.
Q. That's the filing we were just talking about, the bankruptcy appellate --
A. That's correct.
Q. And you ultimately didn't depart on Friday because you weren't feeling well?
A. I had -- I experienced some problems Friday morning, that's correct.
Q. And as a result of those problems, you decided to defer your departure until Saturday?
11:09
A. On advice of my doctor.
Q. Sure. Okay.
Now, so you left the house at around, you said, 5:30, 6:30, whenever it was, it was late Saturday afternoon, correct?
A. That's correct.
Q. And you locked the house?
A. I believe I did.
Q. And you set the alarm?
A. As I told you, as I've testified.
11:09
Q. And you had some problems -- and you testified that you bypassed zone 4?
A. My recollection is I bypassed zone 4.
Q. Is that -- are you -- is there any uncertainty as to whether or not you bypassed zone 4?
A. No, I'm just telling you that's my memory of it.

Q. And that's the -- and again, that's the area that would have -- that governed the area where the -- I think you called it where the solarium was?
A. I said I believe at least part of it affected some of the solarium.
Q. Solarium. And that's -- when we talk about solarium, that's -- I've referred to it as a jacuzzi room?
A. Well, it had a jacuzzi in it.
Q. And you had some problems with setting the alarm in that area in the past, correct?
A. As I said, my recollection is I had problems with zone 4. I can't specifically say what was causing the problems.
Q. That's fine. I'm just trying to understand that the reason -- the reason you bypassed zone 4 is because you had a problem doing so. That's your testimony?
A. I have problems setting it, yes.
Q. And that's not the first time you had this problem?
A. It would occur several times a year, usually in the in-between seasons.
Q. And your wife had also had experience having some problems arming the alarm in that zone, correct?
A. I believe everybody had.
Q. Okay. And you were present for your wife's testimony yesterday, were you not?
A. Yes, I was.

Q. And do you recall her saying that she didn't recall making any reports one way or the other to Protection One?
A. I believe that's what she testified.
Q. And had you ever made any reports to Protection One?
A. No.
Q. Okay.
A. I almost never dealt with them.
Q. Okay, fair enough.
Now, you also -- before you left for New Jersey, you
11:11 took your three dogs to the kennel, right?
A. That's correct.
Q. You were planning on -- you were planning on leaving the previous day, correct?
A. That's correct.
Q. So at the time of the -- at the time of the fire, as far as you're concerned, the house was locked?
A. That's correct.
Q. It was empty?
A. Yes. It wouldn't have set because the infrareds would
11:12 have triggered if there was somebody else in the house.
Q. I'm just talking about your observation, sir. When you left the house, the house was empty?
A. That's correct.
Q. No people, no dogs?
A. That's correct.

Q. But possessions were there.
You had bypassed zone 4 --
A. Right.
Q. -- but the rest of the alarm system for the rest of the house was armed?
A. Yeah, the way the system works is that is -- that's -- where you set the alarm from is an unprotected area, except for peripherals, so you can set it there. If it was -- if you try to set it from anyplace else, because I was present, it 11:13 wouldn't set, another zone would show that it wasn't functioning. So by the fact that I could set it, it indicated that nobody else was present in the house, that's correct.
Q. My question is much simpler, sir. If you stay with my questions, we may be able to move along.
A. I'm sorry, I misunderstood.
Q. That's okay. I know you're trying to be helpful.
As far as you know, the remaining part of the house, aside from zone 4, was armed, correct?
A. That's what the alarm indicated.
11:13 Q. Right. That was your understanding?
A. That's my understanding.
Q. So the entire house was alarmed, except for zone 4, which you bypassed, correct?
A. I bypassed zone 4, yes.
Q. So my question was: As far as you knew, when you left the

house, the entire house was alarmed, except for zone 4?
A. Yes.
Q. Now, you understand a little bit about -- generally about how your alarm system works, right?
A. Yes.
Q. So you've got intrusion alarms, correct?
A. It's all on one system, yes.
Q. Right. Just to understand what type of things your alarm system does, it has -- it has an intrusion alarm, correct?
11:14 A. I think you're talking about what I'm calling the peripherals, windows, doors, things like that.
Q. In other words, it's going to -- after the house is armed, it's going to detect entry?
A. Yes.
Q. Somebody -- if somebody enters the house through an area where it's armed, it's going to set off an alarm?
A. It should, that's what it's designed to do.
Q. That's what it's supposed to do.
And also the system has smoke and fire alarms, 11:14 correct?
A. It had heat detectors and smoke detectors and infrareds, which they have been calling motion detectors, but they're infrared detectors.
Q. Assuming the house was properly alarmed and the system was working, if someone was trying to break into your house to set

an alarm, the first thing they would have to do is enter the house, correct?
A. I don't know how the fire was started. I honestly don't.
Q. I'm just --
A. I just don't know how to answer that question.
Q. I understand you don't know how the fire was set. I'm trying to understand how your alarm system works. And if the house is alarmed and if somebody were trying to get into your house to set the alarm, the first thing they'd have to do is
11:15 get into the house, right?
A. Assuming that's how the fire was set --
Q. That's my assumption. Before somebody could set fire in your house, they had to first enter the house, right?
A. Based upon the facts you're assuming.
Q. So -- and if somebody entered the house when the alarm system was armed, it would set off the intrusion alarm, right?
A. That's what it was designed to do.
Q. And then if the person were to then set the fire, that fire would then trigger the smoke and fire alarms, correct?
11:16 A. Probably trigger the heat first.
Q. Heat, and that sends a signal to the fire department, right?
A. No, it sends it -- it sends it directly to Protection One. They call the fire department.
Q. Protection One then calls the Rehoboth Fire Department.

So if the house had been -- if the alarm system had been properly operating, armed and functioning throughout, if somebody broke into the house and set the fire, the intrusion alarm system would have triggered first, then the fire alarm system, correct?
A. Under the facts you're asking me to assume, I guess that's correct.
Q. And it's your understanding that the house -- that the fire was set in the house, correct?
11:16 A. I understand from testimony of people that there seemed to be several points of origin in -- back where I kept my files in my office and in the solarium.
Q. In the house?
A. Well, that's all in the lowest level of the house.
Q. That's what I'm trying to establish. The points of origin were all in the house?
A. That's what I understand from other people.
Q. Okay.
A. That's correct.
11:17 THE COURT: All right. We're going to take a short morning recess here. We'll be in recess for 15 minutes. You may step down for the time being, Mr. Miles.
THE CLERK: All rise.
(Recess taken.)
THE COURT: Good morning, counsel.

Mr. Miles, you may retake the stand.

And you are reminded that you remain under affirmation.

You may continue with cross-examination.

MR. CORNER: Thank you, your Honor.

BY MR. CORNER:

Q. Good morning, again, Mr. Miles.

Mr. Miles, you found out about the fire the morning after it occurred, correct?

11:40 A. I believe it occurred in the morning.

Q. Okay.

A. So I think it was the same morning.

Q. So it occurred -- well, as far as you know, it occurred sometime after midnight on October 17, 2004, correct?

A. That's what I've heard.

Q. And you found out about it from a phone call during the daylight hours of the morning, shall we say?

A. Yes.

Q. And you heard about it from Roger Lehrberg?

11:40 A. That's correct.

Q. Roger Lehrberg is a friend of yours?

A. Yes.

Q. And he told you that -- he called up and told you that your house had burned down?

A. He said he had received a call.

Q. And that was the first time you heard anything about it?
A. That's correct.
Q. But you had nothing to do with it?
A. I'm sorry?
Q. You had nothing to do with it?
A. Absolutely.
Q. And you understand you brought this lawsuit against Great Northern, correct, you and your wife?
A. Yes.
11:41 Q. And it's a claim for a breach of contract?
A. That's correct, that's my understanding.
Q. And the contract that you're suing on here is the insurance policy, correct?
A. That's my understanding.
Q. And you're a lawyer, so you know that an insurance policy is a contract, correct?
A. That's my understanding.
Q. And it's your contention that Great Northern has violated the terms of the policy?
11:41 A. That's my understanding.
Q. And you understand as a lawyer that in a contract both sides have obligations?
A. It's whatever the contract states.
Q. Okay. So the terms of the contract here are what controls as far as you understand, is that --

A. Well, except in insurance contracts you usually have liberalization clauses and other things that extend those, and sometimes the states in which they're allowed to operate because they have to be licensed impose their own requirements, so --
Q. Sure. But the contract -- again, the terms of the contract are the terms of the policy that are before the Court, correct?
A. I'm sorry, I --
11:42 Q. I'll withdraw that question.
Let me turn to Exhibit 9.
Exhibit 9, if I could turn your attention, please, to page 96.
A. Page 96.
Q. I want to turn your attention to -- you see at the top where it says "exclusions"?
A. Yes.
Q. Okay. And I want to turn your attention to the third paragraph up from the bottom where it says, "intentional acts." 11:43 And I'll read it to you. It says, We do not cover any loss intentionally caused -- caused intentionally by you or a family member or by any person directed by you or a family member to cause a loss. An intentional act is one whose consequences could have been foreseen by a reasonable person.
You see that, don't you?

A. I see it.
Q. That's -- you understand that's one of the terms of the contract that you've brought suit under, correct?
A. Subject to what we just said were the things, it's my understanding.
Q. Sure.
Now, if I could also turn you to Exhibit -- on Exhibit 9 to page 144.
A. Page -- I'm sorry?
11:43 Q. 144 of Exhibit 9.
A. Okay.
Q. And it states here that -- where it says -- the fourth paragraph up, "Concealment of Fraud." "This policy is void if you or any covered person has intentionally concealed or misrepresented any material fact relating to this policy before or after a loss."
Do you see that?
A. Yes, I do. I also see that this is a New Jersey policy term.
11:44 Q. Okay. And -- but this is the contract that's in evidence, right?
A. Yeah, but subject -- we had an agreement that there are things that effect and control these things beyond what's stated in the policy.
Q. So it's your contention that this provision isn't

applicable?

MR. BRUNELLE: Well, that's really an argument of law, your Honor.

THE COURT: Overruled.

MR. BRUNELLE: Okay.

A. I'm just pointing out to you that I don't know whether this is a valid form in Massachusetts or not.

Q. You don't?

A. But I don't -- normally speaking, you're not allowed to
11:44 commit fraud or conceal fraud.

Q. Sure, you understand that. So you understand that fraud or concealment is a circumstance that can prevent a loss from being paid as a general matter -- a matter of general insurance law?

A. Yeah, if it's proven, that's correct.

Q. Okay.

Now, after the fire you were anxious to resolve the claim, right?

A. I'm sorry.

11:45 Q. You were anxious to resolve the claim?

A. My concern after the fire was the condition of my wife. She was devastated.

Q. Sure, sure. As anyone would be after a fire loss. Would you agree with that?

A. I don't think anybody -- unless you experience it, I don't

think you can realize it, but, yes. It's not the loss of building and contents like they've been talking about, it's the loss of your home.

Q. Absolutely, and no one's disputing that. And you would agree, sir, that in your experience in the insurance industry that any loss, any fire loss to a home, is a devastating event?

A. Any loss that impairs -- I'm sorry, I'm having trouble with my words. The viability of the home is very traumatic as a rule, that's correct.

11:46 Q. No dispute there.

Now, but after the fire you basically -- you had -- other than moving in with your father-in-law, you had no place to live?

A. No.

Q. You needed some money?

A. I'm sorry, what?

Q. You needed money?

A. We needed money?

Q. Yeah.

11:46 A. Well, to get back into a new home --

Q. Sure.

A. -- so forth, yes, we needed money.

Q. And you wanted to get that money from the insurance company?

A. Well, she was paying, like, $6,000 a year for the

coverage, I think that was a reasonable expectation.
Q. Actually, your father-in-law was paying the premiums, wasn't he?
A. I don't know what the arrangement was, to tell you the truth. Somebody was paying them.
Q. Sure, sure. But you were present yesterday when Mrs. Miles testified that Mr. Belli was paying the premiums on this policy?
A. I just don't know when he took over doing that. I don't
11:47 know if it was as a result of the fire or if it was a condition of the mortgages or what. I just don't know.
Q. We digress. You wanted to process the claim promptly, didn't you?
A. As I said, my first concern was my wife.
Q. Sure. Okay.
Now, the fire was October 17?
A. That's correct.
Q. And the first time you actually sat down to speak with Mr. McIntyre was on November 4th, right?
11:47 A. I believe that's correct.
Q. So two-and-a-half weeks after the fire was the first time you spoke with anybody from Chubb?
A. I don't know if it was the first time I spoke to anybody. I don't recall that. I don't have a recollection of anything else either. I'm just telling you I don't recall one way or

another. But I do know that we -- we had a little -- I think there was a little trouble getting together on dates or something because he had some availability problems, too, and we did get together on November 4th.
Q. And prior to November 4th you had requested that Chubb enter into a confidentiality agreement, correct?
A. Yes.
Q. And you had -- and you had asked Mr. Lehrberg to communicate that confidentiality agreement along to Chubb, right?
11:48
A. That's correct -- actually, I think he volunteered to do it. He was helping us out because he was up here and we weren't. I didn't have any equipment, I didn't have anything. It was --
Q. He did.
A. He did.
Q. Now, if I could turn you, please, to Exhibit 38. Exhibit 38 --
A. Yes.
11:48
Q. That's the confidentiality agreement that Mr. Lehrberg passed along to Chubb, right?
A. I believe this is the one, I think, we discussed before, yes.
Q. And you prepared this document?
A. I believe I did, yes.

Q. And now -- and, of course, at this point you knew that Mr. Lehrberg was representing your father-in-law, correct?
A. Oh, I'm sorry, I was thinking about your previous question.
Q. Sure.
A. Can you ask the question again, please?
Q. Sure. At the time you asked Mr. Lehrberg to send this confidentiality agreement along to Great Northern, first of all, he wasn't representing you, right?
11:49 A. No, he was just doing it as a favor. I think I had to go to a Kinko's or something, and I think I maybe e-mailed it to him or something and asked him -- I didn't have any facilities for doing the thing. So I think I asked him if he would do it as a favor for me.
Q. But you did also know that he was representing your father-in-law in the claims against the insurance company under his mortgages, correct?
A. I knew he represented my father-in-law on a number of things.
11:50 Q. And certainly at the time of your recorded statement with Mr. Lehrberg's office you knew he was representing your father-in-law, correct?
A. Yes. I believe he -- he stated that right at the beginning.
Q. Sure.

11:50 11:51

Now, you understand that the insurance policy contains some confidentiality provisions, correct?
A. The insurance policy what?
Q. Contains confidentiality provisions in it?
A. That's a matter of opinion.
Q. Well --
A. But --
Q. Let's --
A. I know they have some provisions that they refer to.
Q. Well, let's have a look at it.
If I could turn you to Exhibit 9, which is the policy.
A. Exhibit 9. Excuse me.
Q. And if I could turn to you page 77.
A. Page 77.
Q. I want to turn your attention to the second paragraph up from the bottom where it says, "The personal information we share." Let me read it to you.
"Chubb may disclose the personal information we collect only to service, process, or administer business operations, such as underwriting and claims, and for other purposes, such as the marketing of products or services, regulatory compliance, the detection or prevention of fraud, or as otherwise required or allowed by law. These disclosures may be made without prior authorization from you as permitted by law." Do you see that?

A. I see that.

Q. If I could turn you to the next page, please, which is page 78.

A. Okay.

Q. And the second paragraph down, "Confidentiality and Security of Personal Information." "Access to personal information is allowed for business purposes only. The people who have access to personal information, including employees of Chubb and its affiliates and non-employees performing business functions for Chubb, are under obligations to safeguard such information. Chubb maintains physical, electronic, and procedural safeguards to guard your personal information."

Did I read that correctly?

A. I see that, that's correct.

Q. And the next one down, Personal Health Information?

A. I'm sorry, personal --

Q. Personal Health Information. And the second sentence of that states, "Chubb does not disclose your personal health information to others for the purpose of marketing to you unless we have your expressed consent."

Have I read that correctly?

A. I'm having trouble reading it, but I will take your representation --

Q. Fair enough. I understand that, that's why I read it.

A. Thank you.

Q. So that does refresh your recollection that the policy that you brought suit on does contain some confidentiality provisions, correct?
A. Yeah, I don't think they're worth much. They represent them as confidentiality.
Q. They're the terms of the policy, correct?
A. Um, they are -- they are stated in the policy.
Q. Okay. And that's the policy you brought suit on, correct?
A. I -- is this the policy we brought suit under, is that
11:53 your question?
Q. The policy that your --
A. Yes, I was processing your question, I'm sorry.
Q. I understand. Feel free to take your time, I don't want to --
Now, you've requested that Chubb enter into a confidentiality agreement, correct?
A. That's correct.
Q. So basically you're asking that Chubb do something more than what's in the policy, correct?
11:53 A. It's my experience in the business that insurance companies would enter into agreements like that.
Q. But that's --
MR. CORNER: Well, move to strike as nonresponsive.
THE COURT: Overruled.
BY MR. CORNER:

Q. But, nevertheless, you were asking for something from Chubb that was more than was in the policy, correct?
A. Something that I understood that they gave out when good reasons were presented.
Q. More than under the policy?
A. Yes, I -- it was my personal experience in the business, and I worked in it for quite a few years, in many different varieties, that it was normal that they would consent to confidentiality -- nondisclosure and confidentiality agreements
11:54 when good reasons were presented.
Q. Okay. And if I could turn -- and you hadn't talked to anybody at Chubb when this was presented to them, did you?
A. What was presented?
Q. The confidentiality agreement.
A. I hadn't -- I don't believe I had personally talked to anybody at Chubb, no.
Q. So -- now, let me turn you to the second page of the agreement.
A. Which agreement are we talking about?
11:54 Q. The confidentiality agreement. I'm sorry if I lost you. Exhibit 38.
A. Exhibit 38. Go ahead.
Q. And I want to turn your attention to the first full paragraph on page 222.
A. 222?

Q. Right.
A. You're going to have to read it to me.
Q. I'll do that.
A. Thank you very much, I appreciate it.
Q. And the agreement says that -- the first paragraph says, The terms of this agreement are intended to continue to bind the parties hereto without limit and specifically not limit the expiration date of the policy. Chubb agrees, represents, covenants, guarantees, and warrants that it will not comply 11:55 with and will not contest any order, including, but not limited to, subpoenas of any court or state, local, county, or federal agency or governmental body or entity or foreign government requiring Chubb to turn over any information and/or materials of whatever kind, nature, and origin that was supplied by one or more of the insureds pursuant to this agreement and any information and/or material of whatever kind, nature, and origin that was supplied to Chubb by the insureds or on their behalf or at their direction or request will be conclusively deemed to have been under -- until all possible appeals have 11:56 been exhausted using -- consistent with the highest degree of good faith and the highest degree of diligence and acting as a fiduciary in protecting such information have been exhausted and the issue is final.
Did I read that correctly as far as you can --
A. I'll accept your representation.

MR. BRUNELLE: Actually, counsel, you added a word "not" in the fourth sentence down which you probably didn't intend to do. You said, "will not contest any order" -- actually it says, "will contest."

MR. CORNER: Thank you for correcting me on that.

MR. BRUNELLE: Other than that I agree.

BY MR. CORNER:

Q. So basically you wanted Chubb to agree not to comply with a subpoena to produce this information if it was served one,

11:56 correct?

A. My -- my experience in drafting contracts like this is this is probably the first round of a negotiation.

Q. Well --

A. And I was -- and I was -- and I was obviously trying to transfer the obligation to defend it to them.

Q. Sure.

A. Whether or not they would accept that, whether we negotiate to another position is, you know, normally happens in contract negotiations.

11:57 Q. Again, my question, sir, is: You were asking them not to comply with a subpoena?

A. No. I was not asking them not to comply, I was asking them not to comply until the issue was final.

Q. Until the issue was final you were telling them that they needed to exhaust all possible appeals?

A. Sometimes those appeals move pretty quickly and they are pretty perfunctory.
Q. And they're appeals that you're asking Chubb to prosecute?
A. I was trying to discourage them from being cavalier with my information.
Q. You were asking them to prosecute an appeal for your benefit, correct?
A. I was asking them to protect the information.
Q. By prosecuting appeals?
11:58 A. If that's what it took.
Q. Okay. Fair enough.
So -- and then the second full paragraph -- and I want to go about halfway down, and it states: Chubb agrees to hold harmless and indemnify paying on behalf of wherever or whenever possible any and all losses, costs, expenses, settlements, and/or judgments of whatever kind, nature, and origin which occur or are incurred, including but not limited to the cost of securing safety and health, preventing any losses, costs, expenses, settlements, and/or judgments of whatever kind,
11:58 nature, and origin from occurring or being incurred.
So you're also asking Chubb to be responsible for any damages resulting from the disclosure of the information, correct?
A. I was concerned that if I got sued by a client alleging that I had breached my attorney/client privilege with them as a

result of turning this information over, that they were going to defend their position because they had agreed to treating it in a confidential manner. If they failed to do that, I wanted them to defend.
Q. Okay. And that's something that was outside what was already in the policy?
A. It was -- I was asking for -- I was asking for, you know, an indemnity to the policy, which my experience in the insurance business was afforded sometimes.
11:59 Q. So you were asking to amend the policy then?
A. I was asking them -- I was trying to cooperate with them by giving them information that I thought would be -- might be valuable to them. And -- and there was an issue that I felt -- felt was gray enough that I had to seek an opinion on what limits I'd have to place on giving that to somebody. I was trying to act pursuant to that advice.
Q. Okay. And the policy terms didn't cover that as far as you knew?
A. I didn't feel they covered it sufficiently.
12:00 Q. Fair enough.
Mr. Miles, ultimately you did sign a confidentiality agreement?
A. That's correct.
Q. If I could turn your attention, please, to Exhibit 52. And it's -- looking at page 250. And starting at the numbered

paragraph 1 at the bottom of the page, this is the agreement that you ultimately agreed upon, correct?
A. I'll accept your representation on that.
Q. It says, Great Northern agrees that Mileses tax returns will be used only for the purposes of this claim and that all reasonable steps will be taken to minimize the extent to which persons other than counsel or other representatives of Great Northern involved in the investigation and processing of the Mileses claim will have access to the returns and that Great
12:01 Northern will return all copies of the tax returns to the Mileses upon the conclusion of the claim.
That's what you ultimately agreed upon?
A. Regarding the tax returns, correct.
Q. And you were also concerned about other information that was going to be disclosed, correct?
A. I'm sorry?
Q. At the time you presented the original confidentiality agreement to Chubb, you were concerned about other information?
A. That's correct.
12:01 Q. And this is the only confidentiality agreement you ever signed?
A. That's correct.
Q. And aside from Exhibit 38, the confidentiality agreement that you originally prepared, and Exhibit 52, the confidentiality agreement that you ultimately signed, are you

aware of any other drafts -- are you aware of any drafts being presented by you or anyone else on your behalf to Chubb?
A. I have a vague recollection that at -- when I met with Mr. McIntyre, he told me that he was going to try and encourage the company to reconsider their position and send me a draft of an amended confidentiality agreement. I don't think I ever received one, though.
Q. And that's fine. But my question to you is: You never sent any other one, did you?
12:02 A. I sent -- when I was waiting for them to share -- I showed them my position, I was waiting for them to counter and tell me how they wanted to amend it.
Q. So 38 was the only proposed confidentiality agreement that you had ever presented personally to Chubb?
A. I believe so.
Q. And you were waiting for a counterproposal?
A. Mr. McIntyre had told me he was going to try to encourage them to do that.
Q. Again, you were waiting for a counterproposal?
12:03 A. I was hoping for one, I guess.
Q. And you never got one?
A. Not to my recollection.
Q. Okay. Ultimately, you did appear at your -- you did appear at Mr. Lehrberg's office for your interview with Mr. McIntyre, correct?

A. It wasn't delayed as a result of that.
Q. That's what I'm saying.
A. I don't know.
Q. You went into the interview without having a confidentiality agreement?
A. I wanted to move the claim along, and I wanted to act in good faith. I had the attorney/client issue that was obviously -- I think it would be important to you or any officer of the court, but I -- but other than that, I was
12:04 trying to be cooperative. I wanted to protect my family's identity and things like that.
Q. Sure.
A. But other than that, I wanted to cooperate.
Q. So ultimately, you attended the examination -- the initial interview with Mr. McIntyre without a confidentiality agreement in place?
A. Right.
Q. Okay. That's all I want to know.
Now, you've talked about some cognitive difficulties
12:04 that you've experienced, that you're experiencing now. Did you have similar cognitive difficulties at the time of your initial interview?
A. I was -- I was not working at the time because I was having some ongoing problems, and the stress of the situation didn't do me -- I didn't benefit from it.

Q. Understood. Just so I understand, you have testified under direct examination that you've been experiencing some cognitive difficulties presently and those cognitive difficulties you were also experiencing back in November of 2004 when you gave your interview?
A. Right. I don't mean to indicate that the same ones are constant the whole time, that isn't how it works. I have better times and then not as good times.
Q. Understood.
12:05 Now, at your interview, Mr. McIntyre asked you what your destination was, correct?
A. That's correct.
Q. And you wouldn't tell him?
A. I wouldn't tell him specifically. I got him within a five- or ten-minute drive of it, but I didn't pin down the exact address.
Q. Okay.
A. But I basically told him where I got off the highway, I told him the Denny's I went to, I told him the gas station I went to. You know, that place being within, like, five, ten miles from my father-in-law's house.
12:05
Q. So that puts you -- so it puts you within ten miles of a point in New Jersey?
A. I would say within ten miles.
Q. So you were anywhere within that ten-mile radius in the

State of New Jersey?
A. Right.
Q. So, let's see. So that would put you somewhere within 314 square miles of a point in New Jersey?
A. I'll take your word on the mathematics. I, quite frankly, I haven't done them.
Q. The radius -- the radius is 10 miles and pi R squared using 3.14 is pi?
A. Well, I don't think that's how you would arrive at square 12:06 miles, but if that's how you to it, go ahead.
Q. Okay, fair enough.
Now, you also wouldn't tell Mr. McIntyre the time of your arrival at your destination?
A. I -- I told him -- I told him pretty precisely. I told him -- I think I told him I couldn't remember. I told him when I went through the toll, I told him that I went to Denny's and ate. I told him I went to the gas station, and I told him -- my recollection was I arrived at my father-in-law's house, I think I said, sometime between noon and one -- I mean, midnight 12:07 and one.
Q. Let's go back and see exactly what you told him.
A. Whatever I told him, I told him. I'm trying to tell you my memory right now.
Q. Let's look at Exhibit 63, which is a transcript of your recorded interview.

A. I'm sorry, I'm having -- let me --
Q. Exhibit 63.
A. You'll have to give me a second, please.
Q. Sure, take your time.
A. Exhibit 63. I'm never going to be able to read this.
Q. I'll read it to you. If I'm wrong, Mr. Brunelle will tell me.
I want to turn your attention to page 413, and it's page 41 of 98, and I want to turn to you line --
12:07 A. I'm sorry, 413. It probably doesn't matter, I'm not going to be able to read it.
Q. And it's line number 1827, and Mr. McIntyre asked: "Where were you going in New Jersey?"
And you go on to say, "I'm not saying because you wouldn't do anything to protect my family. (Phone ringing) You're telling me that this may be arson. I have reason to believe it was. My family's in danger and I -- uh -- the state police did not have any problem with agreeing to the provisions. They understand -- they understand why I'm 12:08 restricted by the Bar of Overseers, by direction that I have to comply with that. That supersedes anything, also, for a lawyer and because you would not agree to these areas, I'm not going -- I'm not giving this information out. I'm not putting my family in danger."
So that's what you told Mr. McIntyre as to where you

were?
A. As I recall, we talked for about three-and-a-half hours.
Q. Sure.
A. I believe someplace else in there you'll probably find something close to what I said. I can't point it out off the top of my head. You asked me what my memory of it was, and I believe I told him that it was someplace in the range of about midnight to 1:00.
Q. Let me --
12:09 A. I could be wrong.
Q. I'm trying to help you, sir.
A. I'm telling you what my memory is.
Q. Let's turn to page 415 of that same exhibit.
Mr. McIntyre asked you: "What time did you" -- and I'm sorry, page 46 of 98, and I'm looking at line 2035.
Mr. McIntyre asked: "What time did you arrive at your final destination?"
And you go on to say: "I will tell you that it was after ten minutes to 12. I'll tell you it was before 1:00."
12:09 A. Okay, that's --
Q. And Mr. McIntyre asks: "Can I ask why you don't want to be specific with the time?"
And you stated that, "I am fearful somebody might have been starting that fire, not for property damages purposes, okay, but I will be placing the life of my family in jeopardy

and if somebody knows where they were, okay, and I don't know how I can make that any clearer to you, sir. And I bet that if it was your wife or your children that you would be just as adamant about it as I am."

So that's what you told him?

A. That's consistent with my memory.

Q. Okay. Fair enough.

Now, you did -- you did give some indication of your location, you did tell him that you had -- that you had gone through the -- the wrong toll lane -- was it the Throgs Neck Bridge?

A. No, I don't -- it was on the New Jersey Turnpike. The Throgs Neck, I believe, is in New York.

Q. Okay. I stand corrected. But you went through the wrong toll lane. You went through the Easy Pass lane without a transponder, correct?

A. Yeah, there was construction and I got confused, I think.

Q. And ultimately you got off -- you got off at the exit that you were --

A. That I was intending, to.

Q. And you got a receipt?

A. Yes.

Q. And Mr. McIntyre asked you for that receipt?

A. That's correct.

Q. And he's asked for that a number of times?

A. That's correct.
Q. And you've never been able to turn it over?
A. I've never been able to find it.
Q. Haven't been able to find it. And it was -- and it's -- would you agree with me, sir, that between the time you left your house at about 5:30 on the 17th and your arrival in New Jersey you stop at three place, right? You stopped at the toll booth, correct?
A. I -- I definitely stopped at the toll booth.
12:11 Q. You stopped at the gas station -- you stopped at Denny's?
A. Yes.
Q. And you stopped at the gas station.
So aside from stopping at those three places, nobody else saw you, you were in the car, right?
A. I would assume that's correct. I'm not saying nobody saw me, but I'm not aware of anybody seeing me.
Q. There's -- you don't have any -- you're not presenting any testimony that somebody at the gas station placed you at the gas station at a particular time, correct?
12:12 A. No.
Q. Okay. We to have the credit card receipts that show that sometime on October 16 you stopped for gas at a Shell station in Lawrenceville, right?
A. That's correct.
Q. And we also have --

A. No, no, I think you've got that wrong.
Q. I may. You stopped for gas somewhere on your route?
A. I stopped -- I think it was some other kind of gasoline. I think the Shell station was in Seekonk.
Q. It was a gas station somewhere on your route?
A. Yeah, I'm not sure if I can remember the brand right now. I'm sure it will be in here, though.
Q. And you also stopped at Denny's?
A. Yes.
12:12 Q. Okay. And the credit card receipt shows that you stopped at those -- you paid for something at those two locations at some point on the 16th?
A. Yes.
Q. I guess my point is, there's no time entry on the credit card receipt?
A. I'm sure Mr. McIntyre is quite diligent at being -- they record the time -- as you know, they record -- the credit card companies record the time and they record the signatures and all those things. I'm sure it's in the record someplace, and
12:13 I'm sure Mr. McIntyre was quite diligent in pursuing that.
Q. Let's have a look. Exhibit 28.
A. Exhibit 28.
Q. Exhibit 28.
A. Is that the credit card thing?
Q. Yes.

A. I'm not going to be able to read it.
Q. My only question is: Sir, isn't it true there's no time entry as to the time of the charges you incurred of any of the dates on this credit card?
A. I'm take your word for it. I'm saying the credit card company would have their time even if it's not listed here, because that's their normal thing. They do, they record those, they have records of the signatures and things like that, so --
Q. So Mr. McIntyre, you believe, had access to your bank
12:14 records?
A. No, but he -- he probably could have acquired this information from the credit card company if he wanted to.
Q. Okay.
A. He probably did.
Q. Now, it was very important for you to hold onto that toll receipt, right?
A. Well, the man at the toll booth had told me that there's a possibility that a camera had picked me up going through and I might have to prove that I actually paid the toll. So that was
12:14 the only -- ordinarily I wouldn't even have asked for a receipt.
Q. Otherwise you might have had ended up paying a fine?
A. I believe he said it was up to, like, $500.
Q. Were you ever cited?
A. I'm sorry?

Q. Were you ever cited for having failed to pay the toll?
A. No. He said I may or a not be, and it would occur sometime in the four to six months if I were.
Q. So in the four to six months after the fire, you never received word from the New Jersey authorities indicating --
A. No, I never did.
Q. Now, if I could turn your attention to Exhibit 84.
Exhibit 84, sir, is a letter to you from Mr. Tener dated December 10 of 2004, and in that letter he is requesting that you appear for an Examination Under Oath. Do you recall getting that?
A. I recall getting a letter asking for it, yes.
Q. And you recall giving an Examination Under Oath?
A. Yes, I do.
Q. And you recall testifying?
A. Yes, I do.
Q. Okay. And you provided some documents at that Examination Under Oath?
A. I believe I did.
Q. And you understand, sir, that the Examination Under Oath is something that is set forth in the insurance policy?
A. I believe there's a reference to it, that's correct.
Q. Okay. It wasn't something that you did voluntarily, it's something you were required to do?
A. I wasn't objecting to it.

Q. Again, you weren't -- you understood that it was something you needed to do?
A. I didn't have any objection to it. I don't think the issue ever came up.
Q. Okay.
Now, as of the time that you -- of your Examination Under Oath at Mr. Tener's office, you hadn't entered into a confidentiality agreement, right?
A. That's correct.
12:16 Q. And the Examination Under Oath was conducted after the -- after the -- your -- after you did your recorded interview with Mr. McIntyre, correct?
A. That's correct.
Q. And it was after the recorded interview of Mrs. Miles?
A. I believe so, yes.
Q. Which you attended?
A. That's correct.
Q. And, sir, I want to turn your attention, please, to Exhibit 4.
12:17 A. Exhibit 4.
Q. And specifically page 32.
A. I've got to get there first.
Q. Sure. Let me know when you are there.
A. Page 32, did you say?
Q. Yes, sir.

A. Okay.
Q. And this is a page from Mr. McIntyre's investigative reports, and this is an excerpt, there are some excerpts here from Judge Lynn's opinion, and you're aware that was a matter of public record, correct?
A. What are you referring to? I'm sorry.
Q. This report contains some excerpts of Judge Lynn's decision in which he ended up assessing you with the attorney --
12:18 A. The attorney's fees.
Q. And I want to turn your attention to the first bullet on page 40. It states that, "Miles' testimony was" --
A. I'm sorry -- just read it to me.
Q. First bulleted paragraph on page 32, starts page 40, quote, Miles' testimony was rambling, self-aggrandizing, and completely lacking in credibility. Among other things, his testimony at trial was completely at odds with representations he made at a June 11, 1997 hearing before Judge Abramson."
Now, you understand, sir, that this excerpt, along
12:19 with the entirety of Judge Lynn's order, was a matter of public record during the period of Chubb's investigation of your claim?
A. I believe that would be correct.
Q. And up until the time of your Examination Under Oath, you hadn't provided Mr. McIntyre with any documents to establish

your whereabouts on the date of the fire, correct?
A. Up until what date?
Q. Up until the date of your Examination Under Oath.
A. No, I don't believe I had, other than just generally.
Q. So up until the time of your Examination Under Oath, all he had to rely upon as to your location was what you had told him during your recorded interview, correct?
A. That's correct.
Q. Now, both during your interview and during your Examination Under Oath you indicated that there were people that had threatened you?
A. Yes, that's correct.
Q. And you believe -- and you told Mr. McIntyre that these were people, you know, that you thought might have caused the fire?
A. He had asked me if I had any threats, and I said I had.
Q. Okay.
A. And he asked me about the threats. I didn't necessarily accuse any one of these people of starting the fire. He -- the issue had to do with had I had any threats, and I told him I had.
Q. He was looking for leads as to who might have caused the fire, right?
A. I suspect that was the motivation in his question.
Q. And, of course, if somebody -- if somebody else was

responsible for causing the fire, then you weren't, right?
A. Well, he I knew I wasn't, so it had to be somebody else.
Q. Mr. McIntyre didn't.
A. Well, that may be, but -- yes, I expected he was looking for leads.
Q. Okay. And you wouldn't tell him who you believed had -- who had threatened you?
A. I offered to as long as he entered into a confidentiality agreement, just like I did with the state trooper, and I told
12:21 the state trooper when he agreed to it.
Q. I understand that. And the reason why you wouldn't disclose the information to Mr. McIntyre is you believed that disclosing that information may have infringed upon the attorney/client privilege, correct?
A. Particularly in one of the instances, yes.
Q. Okay. So -- and as the basis for that, you were relying on something that Mr. Lehrberg had told you, correct?
A. At my behest he called the Board of Bar Overseers to see --
12:21 Q. Excuse me. And Mr. -- and Mr. Lehrberg -- you asked Mr. Lehrberg to obtain an Opinion of Counsel from the Board of Bar Overseers, correct?
A. I think it's called an informal opinion.
Q. Informal opinion. And you weren't present for that conversation, correct?

A. No, I wasn't.
Q. So you don't know what Mr. Lehrberg said to the Board of Bar Overseers, right?
A. I know I outlined for Mr. Lehrberg to tell them, knowing Mr. Lehrberg, I think he tried to do it as diligently as possible.
Q. I'm sure he did. Nonetheless, sure, you weren't present --
A. No, I was not present.
12:22 Q. You don't know what Mr. Lehrberg said to the BBO representative?
A. I was about 250 miles away.
Q. And you don't know what the BBO said to Mr. Lehrberg?
A. I know what Mr. Lehrberg told me.
Q. I understand that.
A. Did I take part in the conversation? No, I did not. Can I say I have apodeictic knowledge as to what went on? No, I can't. I obviously rely on Mr. Lehrberg acting as my counsel in that instance. That didn't have to do with the claim, it
12:23 had to do with seeking an opinion from the Board on an issue of attorney/client privilege.
Q. Okay. So, at this point Mr. Lehrberg was your attorney?
A. Just for that thing, not to represent me in the claim, but to -- but the purpose of seeking the opinion from the Board of Bar Overseers, the informal opinion.

Q. And that was before your Examination Under Oath?
A. It was before I met with Mr. McIntyre.
Q. I'm sorry, that was the question I meant to ask. It was before your meeting with Mr. McIntyre.
So it was based only upon what Mr. Lehrberg told you that the BBO told him that you refused to answer Mr. McIntyre's questions?
A. Without an agreement pursuant to the guidelines that I understood that they -- that the Board of Bar Overseers gave to
12:23 Mr. Lehrberg.
Q. Okay. And you -- now, as of the time of your recorded statement, where you actually declined to give Mr. McIntyre that information, he was no longer your lawyer?
A. That's correct.
Q. In fact, he was representing --
A. Only represented me for that one purpose. He identified right at the beginning of things that he was not representing my interest, he was representing --
Q. He was representing your father-in-law?
12:24 A. All the mortgagees that he represented.
Q. Including your father-in-law?
A. Including my father-in-law.
Q. So you didn't directly contact the BBO?
A. No, I did not.
Q. And you never received any sort of written opinion from

the BBO?
A. I don't think they give one.
Q. Okay. And it was -- so it was based solely upon the -- upon what Mr. Lehrberg told you the BBO said that you declined to answer the questions in your recorded interview with Mr. McIntyre?
A. Without getting the nondisclosure and confidentiality agreement.
Q. I understand. And we'll get to that, trust me.
12:24 Now, you were subsequently required to give an Examination Under Oath before Mr. Tener, correct?
A. That's correct.
Q. And between -- and that was on December 22nd of 2004, correct?
A. What's the date again?
Q. I can take you to the --
A. No, just tell me, I didn't hear you.
Q. December 22nd of 2004.
A. I think it was around then, that sounds right.
12:25 Q. So seven or eight weeks after your recorded interview with Mr. McIntyre?
A. About six weeks, I think.
Q. Okay. The dates are what the dates are.
In that period of time you never talked to the BBO?
A. I already had the guidelines from Mr. Lehrberg.

Q. Right. So -- and you didn't engage in any independent checking of your obligations to disclose the information?
A. I was reasonably familiar with attorney/client privilege. It's a complex area, as you know.
Q. Sure.
A. And that's why I wanted to be certain. This was not a totally straightforward matter, and that's why I was -- I took the steps I did.
Q. Okay. But the steps you took didn't involve anything
12:25 after Mr. Lehrberg gave you his -- told you what the BBO had told him?
A. After what he told me I didn't think it required any further pursuit.
Q. Okay. Now, before your interview with Mr. McIntyre and before -- well before your interview with the -- with -- your Examination Under Oath --
A. I'm having a little trouble hearing you. When you look down, I can't hear you. If you could project your voice.
Q. I'll do my best. Thank you. I'll try to keep my -- try
12:26 to remain articulate.
You gave two interviews to Trooper O'Neil prior to the -- your Examination Under Oath, correct?
A. Yes.
Q. Okay. And you -- during those two interviews Ted Aleixo was present, correct?

A. That's correct.
Q. And Ted Aleixo was representing you at this --
A. Yes, he was.
Q. And he's an attorney?
A. Yes, he is.
Q. And during the course of these examinations you actually spoke with Mr. Aleixo, correct?
A. In the same room with the -- one time there was one state trooper and the next time there was two state troopers.
12:27 Q. And he was present during both of those interviews?
A. That's correct.
Q. And he was there as your counsel?
A. Yes, he was.
Q. And the reason he was there as your counsel, because you had some concerns over self-incrimination?
A. He actually volunteered. I never had any dealings with this type of thing or law enforcement on that basis or anything. Ted was experienced in that area of the law and we had been law partners for a number of years and we had been 12:27 friends since high school days. So it -- he volunteered. And he was offering his office as a complete -- convenient place to meet. So he -- yes -- but he identified him as representing --
Q. But he was -- he was representing you, correct?
A. Yes.
Q. And you hadn't requested that he provide you any

information about your obligation to disclose the names that Mr. McIntyre was asking you?

A. I had already done it through Roger.

Q. So all you relied upon was Mr. Lehrberg, correct?

A. I relied on Mr. Lehrberg for a number of things over the years. We practiced law together for a number of years.

Q. Mr. Lehrberg was not your lawyer?

A. He was when he sought that opinion.

Q. But he wasn't by the time you testified, right?

A. Well, that would be an ongoing obligation to that one particular subject matter.

Q. Sure.

A. But he was not representing me in this claim.

Q. Okay. But Mr. Aleixo was representing you?

A. Only with the -- for the purposes of the fire marshal's inquiry.

Q. Okay. Now, at your deposition in this case, back just about a year ago, I asked you to identify the people who had threatened you, correct? Do you remember that?

A. I'll take your word for it. I don't recall off the top of my head.

Q. I won't go through it, but I can tell you, you disclosed the names of those people at your deposition. Do you recall doing that?

A. I don't recall what I said at this particular time, but

I'll accept your representation.
Q. Well, prior to testifying at your deposition, in which time you disclosed the identities of these people, you never told anybody at Chubb who you thought -- who had threatened you, right?
A. They still hadn't entered into a confidentiality agreement with me. I was willing to at any point in time as soon as they did that.
Q. But, again, my question is: You hadn't given that
12:29 information?
A. I assume they didn't want it that badly if they didn't enter into the agreement.
Q. And at the time during your deposition we hadn't entered into a confidentiality agreement, had we?
A. That's correct.
Q. Now, during your deposition you identified as one of the people you believed who had threatened you was a bookie from Taunton?
A. I didn't say he threatened me, I don't believe.
12:30 Q. Okay.
A. I said the threat came through my client. It was made by a bookie in Taunton.
Q. The threat was -- the threat was made -- a threat against you was made by a bookie in Taunton, right?
A. The threat was against them, and he included me in the

threat.
Q. Okay. So a bookie in Taunton had threatened you and your attorney, correct?
A. No, my client.
Q. Okay, your client. Right. Who is that client?
A. There was a number of them, but they were corporate entities of various times.
Q. Who were they?
A. But the individual that I was principally concerned about was a man by the name of John Cullen.
12:30
Q. So Mr. Cullen, your client, told you that Mr. -- again, the bookie from Taunton, that's -- is that Butch Wilbur?
A. I believe that's his name.
Q. Okay.
A. I don't think it was Mr. Cullen that told me first. I think it was his son Peter who told me first.
Q. So one of your clients told you that they were being threatened by Mr. Wilbur and that you were involved in that threat?
12:31
A. That's correct.
Q. Okay. That was the -- and so that was -- and what was the context of your representation of the Cullens at that point?
A. They were having problems with their business.
Q. Okay.
A. I had helped them out several times in the past when they

had experienced difficulties. They brought -- they brought me in -- I kept on turning them down, but they finally convinced me to do it because I've known them forever. And during the course of that I was looking at the things and in about 20 minutes I spotted an embezzlement and it was a sizable one.

So I was pursuing a number of things for them, but this arose out of my effort. We were prosecuting -- we were pursuing a civil case against the party that had embezzled money.

12:32 And during that deposition, this issue had arose about this bookie and so forth, and sometime after that the threat came.

Q. So -- and the threat was communicated to you through your client?

A. That's correct.

Q. Okay. And when was that? Was that while you were representing them?

A. Yes.

Q. Now, is that different -- is that a different threat than 12:32 the threat that your wife testified about yesterday when she was at Mr. Beauregard's office?

A. I think Mr. Beauregard was talking about I had got through the mail or something -- it ended up in my mailbox. I can't remember if it was actually in the mail, but I got some kind of a written threat, okay, and I think I might have shown it to

Mr. Beauregard or one of the attorneys there, but I -- I didn't -- quite frankly, I didn't take it that seriously. I think there was actually two of them, and I think that's what -- that issue came up when she was at Mr. Beauregard's office with me.
Q. Now, you also during your deposition had identified a gentleman by the name of Rick Kelly?
A. He works for Loon Mountain.
Q. Loon Mountain. That was the party that was adverse to you
12:33 in the -- in the lawsuit in which Judge Lynn entered his decision, right?
A. That's correct.
Q. So Mr. Kelly was an employee of the interests represented by Mr. Tamposi?
A. He wasn't at that time.
Q. Okay.
A. But he had been previously.
Q. And that's the person --
A. Actually, it depends at which point in time -- he could
12:33 have been. I'm not certain, okay?
Q. Okay. But, again -- and how did you learn -- how did you learn that Mr. Kelly was a threat to you?
A. Right to my face.
Q. Okay. So he told you?
A. Yes.

Q. Okay.
A. On several occasions.
Q. And that -- and Mr. Kelly's threat against you was subject to the attorney/client privilege?
A. No, I didn't say that.
Q. Okay. But you didn't disclose it to Mr. McIntyre, right?
A. I disclosed -- there was more involved than the one little thing you're bringing up here.
Q. I understand, but --
12:34 A. And you asked me about a specific name and you asked me who he was, and I'm answering that question. You're assuming facts that are not correct.
Q. Well, I'm just going by the facts that you told me, sir.
Mr. Kelly was one of the people whom you believed -- who had threatened you, correct?
A. I said that there were a number of people --
Q. Right.
A. -- there that had threatened me. Mr. Kelly had told me to my face.
12:34 Q. Right.
A. That's -- I think -- I'm not sure that's the exact language, but that's the gist of it.
Q. And again, you wouldn't disclose the fact that Mr. Kelly had made a threat to your face to Mr. McIntyre without a confidentiality agreement in place?

A. I didn't think --
Q. Is that true?
A. I didn't think Mr. Kelly was the person. I wasn't -- my concern had to do with another area there. I just -- somehow or another he came up, and I did say that he -- he had communicated it personally to me.
Q. Well, you were concerned that the -- that people involved with the Loon Mountain interests were going -- had threatened you, correct, and that they might have reason to burn your house down?
12:35
A. We had had a number of instances --
Q. Sure.
A. -- of things occur that I felt was attributable to them so, yes.
Q. Them being the Loon Mountain people who are involved in litigation in which you were adverse to them, correct?
A. I had been in litigation which was adverse.
Q. You never represented the Loon Mountain people?
A. No. Well -- no, I didn't.
12:36
Q. Now -- so you had -- you identified these people to Trooper O'Neil because he agreed that he wasn't going to use it outside the scope of his investigation, correct?
A. Right.
Q. Okay. But you also -- you also understood that if it led him to the investigation of a crime, that he could use it?

A. That was my understanding.
Q. So you --
A. If he was pursuing the prosecution of a criminal complaint of somebody, he could use it.
Q. So you believed this information was subject to the attorney/client privilege, yet, you released that information to a law enforcement agency, correct?
A. I released some of it. I never told him what my concern was directly. I never -- I never exposed the actual 12:37 confidential information that was a potential threat to my client.
Q. Okay. Who was your client?
A. I told you, you asked me before, there were a number of Cullen entities there, and there was a father and son that basically had ownership interest, varying degrees of them in different entities, John Cullen and Peter Cullen.
Q. Again, this is -- you had privileged information that you didn't feel you could disclose, correct? Is that basically the gist of it?
12:37 A. Absolutely.
Q. Now, Mr. Brunelle has submitted some requests for rulings of law here, and one of those specifically states that a lawyer shall not disclose confidential information from his client without a waiver from that client?
A. And that's correct --

Q. Let me ask -- that's before the Court.
My question to you, sir, is: Before you told Trooper O'Neil about the identity of these people, did you get a waiver from your client?
A. I never revealed -- I followed the guidelines, and I never revealed the actual confidential information. I never breached the privilege. The privilege, as I understand it, is only a client's to waive.
Q. Right.
12:38 A. That's one of the reasons I had concern.
What I was concerned is where this could lead if they went back there, what ramifications it could have on my client pursuant to privileged information that I knew. It was a complex issue, and that's why we went to the Board of Bar Overseers. But I never revealed that. I revealed who made the threat and so forth and how I found out, but I never revealed the confidential information, and I still haven't.
Q. And you never revealed the identity of the people who you believed had threatened you to Mr. McIntyre, right?
12:38 A. He never signed the confidentiality agreement.
Q. Understood.
A. He told me he was going to try to work it out with the company but never did.
Q. But you disclosed that information to Trooper O'Neil?
A. Because they agreed -- but I didn't reveal the actual

confidential information. I just revealed the nexus.
Q. There was information that you disclosed to Trooper O'Neil that you didn't disclose to Mr. McIntyre, right?
A. That is correct.
Q. And the reason you didn't disclose to Mr. McIntyre, A, because it was privileged; and B, because he wouldn't enter into a confidentiality agreement, right?
A. Either/or, it was either/or.
Q. And before you disclosed the information to Trooper
12:39 O'Neil, you had not received a waiver from your client, correct?
A. I hadn't asked them for a waiver.
Q. Okay. And before you testified about it at your deposition, you never obtained a waiver from your client, right?
A. I never -- in my deposition I never revealed anything that was privileged information of my client.
Q. I appreciate that, but you did tell me the people who threatened you; is that correct?
12:40 A. Yes, I did.
Q. Which is exactly the information that Mr. McIntyre requested?
A. Right. But certain circumstances has changed in the meantime.
Q. Okay. Now, one of the things that you wouldn't disclose

to -- or you hadn't disclosed to Mr. McIntyre is that you hadn't provided a release of the fire alarm records, correct, and burglar alarm records from Protection One?
A. My issue had to with the chip; it wasn't the records. It was all one agreement. It had an issue and there was proprietary software hard-wired in the chip. My concern was I thought the agreement was licensing them to do anything with that, and I didn't think we had the authority to do that.
Q. You recall being requested to sign a release from
12:40 Mr. McIntyre to get that information from Protection One, right?
A. I think I recall that at maybe at my wife's statement under oath. I think -- I think that's correct.
Q. And in fact, you were -- I believe the record will show, and I can take it through it, if you like, but if I told you that two copies of the proposed release had been provided to you prior to the denial of the claim, would you believe that?
A. I'm not questioning you, I just don't recall it.
Q. All right.
12:41 A. But I'm not -- if you're representing it, I'm not questioning it.
Q. Well, let me just -- let's turn you to Exhibit 34.
A. Exhibit 34?
Q. Yes.
A. Okay. Okay, I'm at Exhibit 34.

Q. Exhibit 34 is the authorization for the release of alarm records. Do you see that?
A. Yes.
Q. That's your signature?
A. That looks like my signature.
Q. And it's dated September 21 of 2006, correct?
A. I think that's -- I believe that's what it says.
Q. Okay. And that's the first time you provided Great Northern with the opportunity to -- let me withdraw that.
12:42 It's the first time you provided Great Northern with a release giving them permission to obtain the records from Protection One, correct?
A. Well, we had given them certain records from them, but this is the first time I think we signed this agreement.
Q. Okay.
Now, during the course of both your Examination Under Oath and your interview with Mr. McIntyre you were asked to provide information about your income, correct? Do you recall that?
12:43 A. Yes.
Q. And you stated that's information you don't give to anybody?
A. Who did I say --
Q. Let me see if I can help you.
A. No, I didn't hear the question.

Q. Sure. You told Mr. McIntyre that you didn't give information about your income out to anybody. Do you recall that?
A. I said I hadn't -- I gave him information about it, though. I told him I wasn't earning any money. I told him the last time I earned money was 2003. I told him I was in bankruptcy. I told him I had a million-dollar judgment against me. But as a rule, I never provided financial statements to people.
12:43 Q. Okay. If I could turn you, sir, to Exhibit 63.
A. Exhibit 63.
Q. Page 397.
A. 397.
Q. And I want to turn your attention to page 10 of 98.
A. You're going to have to read this for me.
Q. Sure, I will. Line 444. Mr. McIntyre asked you: "What is your annual income from the position?" And he's talking about your employment.

And you state: "I don't ever release that information 12:44 to anybody."

Mr. McIntyre then went on to ask you on the next page, page 11 of 98 on Exhibit page 398: "How about your usual expenses from the position?"

And you answered: "The only thing I'll tell you, because it's public record, is my billing rate is $500 an hour

and all expenses are -- under my normal contracts are picked up by my clients."

Does that refresh your recollection about what you told him?

A. Well, on that one page.

Q. Sure.

A. We talked for three-and-a-half hours. I gave him other information. I gave him other information about my income and so forth.

12:44 Q. What information you gave him is a matter of -- it's contained in your transcript, right?

A. But that sounds familiar, what you were saying. I don't dispute what you read.

Q. And ultimately, you provided your tax returns to Chubb in May of 2007?

A. After we got the confidentiality agreement.

Q. After the confidentiality agreement was signed, okay.

Now, if I could turn you to Exhibit 84, in particular, the third page of that exhibit. And I want to turn you to the 12:45 second paragraph above Mr. Tener's signature. And it states that, "We also enclosed, pursuant to the policy, a blank sworn statement of Proof of Loss for the policy number insuring the property."

Do you recall being requested to submit a sworn Proof of Loss in December 10, 2004.

A. I don't have a specific recollection, but I know at some time -- I don't -- I don't have a recollection on the date, but I know at some point in time it was requested.
Q. If I could turn your attention, please, to Exhibit 56.
A. Exhibit 56.
Q. Sir, that's your sworn Statement of Loss. Do you see that?
A. I see that, yes.
Q. Okay. And your signature appears there?
12:46 A. That's correct.
Q. It's dated May 18 of 2005?
A. I can't read that, but I'll take your word for it.
Q. You see that it states, "This statement is made under the pains and penalty of perjury"?
A. That's correct.
Q. So you -- as far as you know, when you signed this, everything in it was absolutely true?
A. I believe this was prepared by Alan Miller with the help of Swerling Milton Winnick, and I had confidence -- 12:47 particularly confidence in Alan Miller.
Q. Okay. So you thought -- as far as you knew, everything in there was absolutely true?
A. I'm sure I reviewed it and I thought it was -- I thought it was a fair representation.
Q. Okay. If I could turn you to line 9, do you see where it

says -- line 9 states, "less amount of partial payments"?
A. Yeah.
Q. There's a blank in the corresponding column, isn't there?
A. Yup.
Q. Okay. And that's not true, is it?
A. Well, what I believe is this is a net out thing. Unless you put in the numbers above, there's no point in filling in that number.
Q. Okay.
12:47 A. So there would be no point to fill it in, and certainly the insurance company knows what they advanced us.
Q. But you did know that the insurance company, as of May 18th of 2005, had advanced $100,000 to you and your wife?
A. I'll take your word for that. I don't dispute it, but I don't feel that that's any type of misrepresentation. I don't feel that I was misrepresenting the facts under this by signing this statement.
Q. Okay. Fair enough.
Now, you also state that there are three lines there
12:48 about the -- one of which is the whole loss and damage insurable under policy, and it states, "to be determined," right?
A. I can't read it perfectly, but I'll assume you're reading is correct, yes.
Q. All right. So, now, you mentioned Swerling Milton

12:49

Winnick. They're the public adjuster that you and your wife had hired, correct?
A. That's correct.
Q. Now, if I could turn your attention, please, to Exhibit 69.
A. 69.
Q. Yes.
A. Okay.
Q. Exhibit 69, sir, is a letter that has your wife's name and address above it. It's dated June 8, 2005 --
A. What was the previous exhibit dated? Do you know?
Q. Signed May 18th of 2005.
A. Okay.
Q. And so I'm turning you to a letter that's dated June 8, 2005 and it's to Paul Winnick and your signature appears on the second page, right?
A. Yes.
Q. Now, in your letter you say, "Dear Paul, we understand that you have prepared an estimate of repair for the above property resulting from the fire of October 17, 2004, and we further understand that the estimate will be" -- "will only be submitted to the insurer in support of the claim of the mortgagees represented by Attorney Roger J.F. Lehrberg."
A. I didn't draft this letter. Alan Miller drafted this letter.

Q. All right. So this letter was prepared by your counsel?
A. That's correct.
Q. On your behalf?
A. I assume he prepared it on our behalf, yes.
Q. He didn't prepare it against your interests, right?
A. I would hope not.
Q. Now, you go on to state in your letter that, "We consent to the use of this estimate in support of the mortgagees' claim only, and therefore, we further agree that we will hold you free and harmless from any claim by us arising out of such use of such estimates. We further understand that the mortgagees' claim will be accompanied by a letter reciting that such estimate is not submitted on behalf or in support of the property owner's claims." And it goes on to say, "You should be further advised that our counsel, Alan G. Miller, as well as our architect has advised us that the amount ultimately recoverable from the insurance company may well be in excess of your repair estimate and may well be in excess of the policy limits, provided that we accomplish such repairs."

12:50 12:51 Do you see that?
A. I've listened to you.
Q. Okay.

So as of June 8, 2005 you were aware that Swerling Milton Winnick had prepared a building repair estimate for your home, correct?

A. I believe there was some issues whether or not and -- and I believe Swerling Milton raised them; I think that was the reason for this letter. There was some issues because all of a sudden they realized they might have a potential conflict of interest in representing the interests of the second mortgagees and my wife's interests here.
Q. Excuse me --
A. And I think this is the reason for this. And I think they were suggesting there was some -- that the estimates might -- 12:51 the estimate for my wife might actually be higher than this one but they hadn't been able to determine the nuances of those differences yet, I guess.
MR. CORNER: Your Honor, I move to strike what Mr. Miles said concerning what Swerling Milton Winnick told him.
THE COURT: It's stricken.
BY MR. CORNER:
Q. Mr. Miles, if I could turn your attention, please, to Exhibit 81.
12:52 Exhibit 81, sir, is a letter from Mr. Lehrberg to Mr. Tagliente. And it states, "As you know, I represent certain mortgagees with regard to the above-captioned matter. On behalf of such mortgagees I am submitting a building repair estimate prepared by Swerling Milton Winnick Public Insurance Adjusters, Inc. for my clients' interest only in the amount of

$1,097,730.03. This estimate is provided to you in support of the claim of the mortgagees only and without prejudice to the claim of Theresa B. and/or James F. Miles, whom I do not represent."

So fair to say, sir, that as of -- that's the building repair estimate that you're referring to in your letter?

A. As I said, I didn't draft the letter, but I believe that's the building repair estimate they're referring to.

Q. Okay. And prior to the -- Chubb's denial of your claim in

12:53 October of 2005, you're not aware of that building repair estimate having been submitted to Chubb, are you?

A. Well, I think -- didn't he say he was submitting it herewith?

Q. He submitted it on behalf of the mortgagee.

A. I'm sorry. I thought you were asking in general whether it was submitted.

Q. He never submitted this building repair estimate on your behalf prior to the denial of the claim, right?

A. I don't recall one way or another to tell you the truth.

12:53 Q. Sure. And ultimately, a building repair estimate was submitted at the reference proceeding, correct?

A. That's correct.

Q. And you attended that reference proceeding?

A. Yes, I did.

Q. In fact, that's the building repair estimate that was

submitted, right?
A. I'll take your word for it; I don't recall.
Q. Now, sir, the referees did enter a decision in this case. If I could turn you, please, to Exhibit 64.
A. Exhibit 64.
Q. Yes.
A. Yes.
Q. Exhibit 64, sir, that's the decision of the referees, correct?
12:54 A. Yes.
Q. Okay. And line 5 states that, "We find that this" -- "the business property loss is $7,685." Did I read that correctly?
A. That sounds -- from my memory that sounds about correct.
Q. And the business property, that's your business property?
A. That's correct.
Q. Now, you filed for bankruptcy back in March of 2003, correct?
A. That's correct.
Q. Okay. And at the time you filed for bankruptcy you
12:55 submitted some schedules, right?
A. Schedules were submitted. I had counsel at that time.
Q. Sure. And between the time -- between the time of the fire and the time of the -- excuse me.
Between the time of your bankruptcy and the time of your fire you testified at your deposition that you didn't

purchase any sort of business equipment?

A. I said I didn't recall purchasing any, I think. I think I said I may have but I didn't recall it.

Q. Okay.

MR. CORNER: Your Honor, may I approach?

THE COURT: Yes.

BY MR. CORNER:

Q. Mr. Miles, I'm showing you a document, it's your -- the schedules that were submitted in connection with your

12:56 bankruptcy. And I want to turn your attention to the second page, and there's --

A. Second page?

Q. Second page. And there's a listing under line 3. It says, "computer miscellaneous furnishings." Do you see where it says, "$100"?

MR. BRUNELLE: Your Honor, I'm going to object to this on the basis that the -- I assume it goes to undermining the established amount of the loss. All of this was brought up at the time of reference proceeding and the referees decided that

12:56 was the amount of the loss. And I don't believe that's an open issue in this case.

MR. CORNER: That's not an open issue, your Honor. What is open is Mr. Miles' credibility, and I intend to indicate that he underestimated the amount of his --

THE COURT: You may continue to examine.

MR. CORNER: Thank you.
MR. BRUNELLE: All right.
BY MR. CORNER:
Q. You see the computer miscellaneous furnishings of $100?
A. That's correct.
Q. And it says, "law and other texts $200"?
A. Yes.
Q. And again, those items are your property?
A. That's correct.
12:57 Q. Okay. And then the next page, "personal property" --
A. Can you point it out to me?
Q. Yes. It says, "copies, fax machines and supplies."
A. Yes.
Q. States "$200"?
A. Yes.
Q. Okay. So that's what you told the bankruptcy Court you had in the way of business property at the time, right?
A. There's a different valuation basis.
Q. Okay.
12:57 A. This is ACV. When I talked with bankruptcy counsel about this, they told me you can't get any money for old copy machines and stuff like that; sometimes you have to pay somebody to cart them away. They determined the values for me. They were very experienced counsel. They were well-known bankruptcy counsel in Boston. And I accepted their

representations on this. I thought they were -- I don't think anybody was trying to hide something. But this -- the other thing was on replacement cost value.

Now, you may not be able to sell a computer for more than 50 bucks, but if you have to go and replace it, it may cost $1,000. There's your difference in value.

MR. CORNER: Your Honor, I move to strike Mr. Miles' testimony concerning what his bankruptcy counsel told him.

THE COURT: Sustained.

12:58 I'll take that break.

We're going to us suspend here for lunch. You may step down --

MR. CORNER: Your Honor, I don't know if it changes your opinion, but I'm almost done.

THE COURT: Well, I take it counsel are going to want to argue.

MR. CORNER: Sure, okay.

THE COURT: How long?

You may step down for the time being.

12:58 How long do you want to enlighten the Court with respect to closings?

MR. CORNER: Fifteen minutes, maybe, 15, 20 minutes.

THE COURT: And the plaintiffs?

MR. BRUNELLE: That would be fine, your Honor.

Are we going to be allowed to submit post-trial

memorandum?

THE COURT: Yes, you certainly are.

We will be in recess then until 2:00. And we will -- I take it the plaintiff is going to rest after --

MR. BRUNELLE: Yes, sir.

THE COURT: -- Mr. Miles. And is the defendant going to call additional witnesses?

MR. CORNER: I anticipate resting as well.

THE COURT: We will plan to have closing arguments and 12:59 the conclusion of Mr. Miles' cross-examination starting at 2:00.

MR. CORNER: Thank you, your Honor.

(Recess taken at 1:00 p.m.)

\- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.

/s/Debra M. Joyce
Debra M. Joyce, RMR, CRR
Official Court Reporter

February 18, 2010
Date

INDEX

WITNESS PAGE

ROBERT A. O'NEIL

Direct Examination by Mr. Brunelle 3
Cross-Examination by Mr. Corner 16
Redirect Examination by Mr. Brunelle 32

JAMES FREDERICK MILES

Direct Examination by Mr. Brunelle 37
Cross-Examination by Mr. Corner 62